IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,       )
                                )
                    Plaintiff,  )
                                )  Crim. No. 1:16cr169
        vs.                     )
                                )
RAUSHI J. CONRAD,               )  June 13, 2017
                                )
                    Defendant.  )
_____)


JURY TRIAL


BEFORE:      THE HONORABLE GERALD BRUCE LEE
             UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                  BY:  MATTHEW BURKE, AUSA
                       JAMAR WALKER, AUSA

FOR DEFENDANT:    JONATHAN SIMMS, ESQ.


---


OFFICIAL COURT REPORTER:

                  RENECIA A. SMITH-WILSON, RMR, CRR
                  U.S. District Court
                  401 Courthouse Square, 5th Floor
                  Alexandria, VA 22314
                  (703)501-1580

1                            <u>INDEX</u>

2

3    <u>WITNESS (Government)</u> <u>DIRECT</u>   <u>CROSS</u>    <u>REDIRECT</u>    <u>RECROSS</u>

4    Henry J. Hodor (Cont)    4        6        ---         ---

5    James C. Bedford        12      (Cross not commenced)

6    Maria Couvillon         75       ---       ---         ---

7    Sean Baer               80       90        ---         ---

8    Danielle Hodge         102      108        ---         ---

9    Kenneth Hodge          110      115        ---         ---

10   Bina Martin-Giles      117      122        ---         ---

11   Wray Jones             125      130        ---         ---

12   Ronald D. Rolfe        131      142       149          ---

13   Gerard Horner          150      161        ---         ---

14   Kim Sins               169      180        ---         ---

15   Jian Mao               204      217        ---         ---

16   Delaney Harris         219      227        ---         ---

17   Quentin Powell         233      242       250          ---

18   Charles A. Boyd        251  (Not completed)

19        (Court recessed)

20

21                              ---

22

23

24

25

| | |
|---|---|
| 1 | PROCEEDINGS |
| 2 | |
| 3 | (Thereupon, the following was heard in open |
| 4 | court at 10:04 a.m.:) |
| 5 | (Jury not present.) |
| 6 | THE COURT:  You can bring the jury out, |
| 7 | Mr. Hendrick. |
| 8 | MR. HENDRICK:  Yes, sir. |
| 9 | MR. BURKE:  Your Honor, should we go ahead |
| 10 | and bring the witness? |
| 11 | THE COURT:  Yes, please. |
| 12 | You can come back, sir, and take the witness |
| 13 | stand.  Thank you. |
| 14 | (Witness resumed stand.) |
| 15 | (Jury present.) |
| 16 | THE COURT:  You may be seated. |
| 17 | Good morning, ladies and gentlemen. |
| 18 | THE JURORS:  Good morning. |
| 19 | THE COURT:  Good morning, Mr. Conrad. |
| 20 | Good morning, Counsel. |
| 21 | MR. SIMMS:  Good morning. |
| 22 | THE COURT:  Ready to proceed? |
| 23 | MR. BURKE:  Good morning. |
| 24 | MR. WALKER:  Good morning. |
| 25 | THE COURT:  All right. |

1          Good morning, Mr. Hodor.

2          THE WITNESS:  Good morning.

3          THEREUPON, HENRY J. HODOR, previously duly

4   sworn, testified further as follows:

5               DIRECT EXAMINATION (Continued)

6   BY MR. WALKER:

7    Q.  Mr. Hodor, when we left off yesterday, we were

8   discussing how you would be able to tell the difference

9   between an invoice that was for data migration work and

10  an invoice that was for something else.  And so I want

11  to start there.

12         MR. WALKER:  Your Honor, may we have

13  permission to publish Government Exhibit 6-4 to the

14  jury?

15         THE COURT:  Yes.

16  BY MR. WALKER:

17   Q.  Mr. Hodor, if we look at Government Exhibit 6-4,

18  in the top right corner, what is the invoice number from

19  Bedford's Images to Tridea Works in the top right

20  corner?

21   A.  1684.

22   Q.  And in the bottom right corner, what is the total

23  amount of that invoice?

24   A.  $424,024.86.

25         MR. WALKER:  Your Honor, may we publish

1   Government Exhibit 33-4 to the jury?

2              THE COURT:  Yes.

3   BY MR. WALKER:

4      Q.   Now, looking at Government Exhibit 33-4, the

5   voucher edit report, the invoice number there -- it

6   should be in the top -- on the top row there.  Do you

7   see it?

8      A.   Yes.

9      Q.   What is the invoice number there?

10     A.   1684.

11     Q.   And on this invoice, the amount, which should be

12  listed in the bottom right corner?

13     A.   It's $424,024.86.

14     Q.   And is that amount the same amount as the invoice

15  that we just looked at?

16     A.   Yes, it is.

17             MR. WALKER:  If we could pull back up

18  Government Exhibit 31-3.

19  BY MR. WALKER:

20     Q.   And so, looking back at Government Exhibit 31-3,

21  in the top where you have the invoice listed under your

22  invoice number, which one of these invoices is for data

23  migration work?

24     A.   It would be the top line.

25     Q.   And what invoice number is that?

1    A.   1684.

2    Q.   So, was $424,024.86 the portion of this check

3  that was for data migration work?

4    A.   Yes.

5    Q.   Were there other checks that you issued that paid

6  multiple invoices as well?

7    A.   Yes.

8    Q.   Could you use this same process that we just

9  walked through to determine which portion of the payment

10 of those checks was for data migration work?

11   A.   Yes.

12   Q.   Mr. Hodor, over the course of the time that data

13 migration was performed, were you ever informed about

14 any complaints regarding the data migration work?

15   A.   None.

16   Q.   Since the data migration project, have you ever

17 worked with Bedford's Images again?

18   A.   I have not.

19            MR. WALKER:  Nothing further, Your Honor.

20            THE COURT:  Mr. Simms.

21            MR. SIMMS:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23 BY MR. SIMMS:

24   Q.   Good morning.

25   A.   Good morning.

1    Q.   Mr. Hodor, the government counsel just showed you

2    today and a little bit yesterday afternoon several

3    invoices that were presented to you by Bedford Images.

4    Do you recall that?

5    A.   Yes.

6    Q.   Okay.  And once you received those invoices, you

7    sent them on to SPAWAR, correct?

8    A.   Yes.

9    Q.   Was there a specific individual that you would

10   send them to at SPAWAR?

11   A.   No.

12   Q.   Okay.  Who was your contact in SPAWAR?

13   A.   Kim Bryant.

14   Q.   All right.  Now, did you and Kim Bryant ever have

15   any discussions about the invoices from Bedford Images?

16   A.   Not any specific discussions about any specific

17   invoice; just to make sure that the process was ongoing.

18   Q.   Okay.  So, the individuals that you spoke to at

19   SPAWAR -- I'll just go down the list -- Kim Bryant?

20   A.   Correct.

21   Q.   Angela Bridges ring a bell?

22   A.   Yes.

23   Q.   Tan Tran?

24   A.   Yes.

25   Q.   Okay.  And within the Commerce Department, BIS,

1    your point of contact was Robert Moffett?

2    A.   There was really no discussions between my

3    company and anyone at the Department of Commerce.  It

4    was strictly between us and SPAWAR.

5    Q.   Okay.  So you never talked to Mr. Conrad?

6    A.   Never.

7    Q.   Okay.  Never sent any invoices to Mr. Conrad?

8    A.   Never.

9    Q.   Did he ever attempt to reach out to you to

10   control aspects of the contract?

11   A.   No.

12   Q.   Now, as a prime contractor, did your company ever

13   do any clearance checks on Bedford Images?

14   A.   When you say "clearance check," do you mean

15   security clearance or --

16   Q.   Correct.

17   A.   No.

18   Q.   Did your company ever do any quality assurance

19   checks on Bedford Images?

20   A.   No.

21   Q.   Did you ever speak to James Bedford about the

22   work being performed?

23   A.   No.

24   Q.   Did you ever have a conversation about the

25   increase in files with Mr. Bryant?

1    A.   No.

2    Q.   Did you ever voice any concerns about the

3    invoices that Bedford Images submitted to you?

4    A.   No.

5    Q.   Mr. Hodor, I'm going to refer your attention to

6    Government Exhibit 6-9.

7         MR. SIMMS:  Actually, it's already been

8    admitted.  If we can publish it.

9    BY MR. SIMMS:

10   Q.   It's on the screen, Mr. Hodor.

11        Do you recognize that invoice?

12   A.   I do.

13   Q.   I'm going to direct your attention to the column

14   entitled "Description" on the left-hand side.  Do you

15   see it?

16   A.   I do.

17   Q.   Okay.  It's up on the screen right there.

18        Now, in respect to this contract there's a

19   description here that says, "Authorize by SPAWAR project

20   manager Kim Bryant," correct?

21   A.   Correct.

22   Q.   What does that mean?

23   A.   That the work itself had been authorized by

24   SPAWAR program manager Kim Bryant.

25   Q.   Okay.  And let's go to the total amount for that

1    invoice.

2            Is that accurate?

3    A.   Yes.

4    Q.   And what's the date on the invoice?

5    A.   May 9th, 2011.

6    Q.   Now, Mr. Hodor, do you recall if that work was

7    authorized before the -- that payment was authorized

8    before the work was done or after?

9    A.   Authorization was an invoice-specific, to the

10   best of my knowledge.

11   Q.   Okay.  So this is an invoice that would have been

12   submitted to Kim Bryant?

13   A.   Through us, correct.

14   Q.   Okay.  So, your -- Tridea, your company, would

15   have submitted it to Kim Bryant?

16   A.   Correct.

17   Q.   And Kim Bryant would have authorized the payment?

18   A.   I can't confirm what -- who within SPAWAR

19   authorized the payment, but it was submitted to SPAWAR,

20   correct.

21   Q.   Okay.  What does the invoice say?

22   A.   I'm sorry?

23   Q.   Does the invoice say it was authorized by Kim

24   Bryant?

25   A.   It does.

1       Q.   Okay.

2            MR. SIMMS:  Thank you.

3            I have no further questions, Your Honor.

4            MR. WALKER:  No further questions, Your

5       Honor.

6            May the witness be excused?

7            THE COURT:  May the witness be excused?

8            MR. SIMMS:  Yes.

9            THE COURT:  You're free to leave, sir --

10      free to stay or go, as you like.

11           Thank you.

12           (Thereupon, the witness withdrew from the

13      stand.)

14           MR. BURKE:  Your Honor, the government calls

15      James Bedford.

16           MR. HENDRICK:  Face the clerk.  Please raise

17      your right hand.

18           (Witness sworn.)

19           THE WITNESS:  Yes, ma'am.

20           THE CLERK:  Thank you.

21           Have a seat, please.

22           You may proceed.

23

24           THEREUPON, JAMES C. BEDFORD, having been

25      duly sworn, testified as follows:

                          DIRECT EXAMINATION

BY MR. BURKE:

    Q.   Sir, could you please state and spell your name?

    A.   James C. Bedford, J-a-m-e-s, C, B-e-d-f-o-r-d.

    Q.   And, Mr. Bedford, if you could, if you could

speak directly into the microphone so that we can all

hear you.

    A.   Yes.

    Q.   Mr. Bedford, I'd like to direct your attention to

December 7th, 2016.  Do you recall that day?

    A.   Yes, sir.

    Q.   Where were you on December 7th, 2016?

    A.   Here in this courtroom.

    Q.   What happened that day?

    A.   I pleaded guilty to charges.

    Q.   What charges did you plead guilty to?

    A.   Charges of conspiracy to bribe and bribery.

         MR. SIMMS:  Your Honor, I'm going to ask

that the witness scoot up to the microphone.  I'm not

sure the jury can hear him.

BY MR. BURKE:

    Q.   I'm sorry.  What charges did you plead guilty to?

    A.   Conspiracy and -- to bribe, and bribery.

    Q.   Conspiracy, conspiring with who?

    A.   Raushi Conrad.

1     Q.   And bribing who?

2     A.   Raushi Conrad.

3     Q.   Do you see Mr. Conrad in the courtroom here

4  today?

5     A.   Yes.

6     Q.   Could you identify him by where he is sitting and

7  what he's wearing?

8     A.   Yes.  To my left, white shirt, black tie.

9          MR. BURKE:  Your Honor, we ask that the

10  record reflect that the witness has identified the

11  defendant.

12         THE COURT:  So noted.

13  BY MR. BURKE:

14    Q.   Mr. Bedford, when you pled guilty, did you plead

15  guilty under the terms of a written plea agreement?

16    A.   Yes, I did.

17    Q.   With the assistance of the court security

18  officer, I would ask you to now please take a look at

19  Government Exhibit 501.

20         Do you have 501 in front of you?

21    A.   Yes.

22    Q.   What is Government Exhibit 501?

23    A.   A plea agreement between the United States of

24  America versus James Bedford.

25    Q.   Does your signature appear on the last page of

1  that document?

2     A.  Yes, it does.

3        MR. BURKE:  Your Honor, the government moves

4  to admit Government Exhibit 501.

5        THE COURT:  Government 501 will be received.

6  BY MR. BURKE:

7     Q.  Mr. Bedford, what do you understand to be your

8  obligation under the terms of your plea agreement with

9  the government?

10    A.  To give truth- -- tell the truth about the

11 account that took place.

12    Q.  And what do you understand would happen to you if

13 you did not tell the truth here today?

14    A.  I would be charged for -- for not telling the

15 truth, and the plea agreement would be revoked.

16    Q.  Mr. Bedford, are you hoping that in exchange for

17 your testimony here today you will receive a reduced

18 sentence?

19    A.  Yes.

20    Q.  Do I get to decide your sentence?

21    A.  I'm sorry?

22    Q.  Do I get to decide your sentence?

23    A.  No.

24    Q.  Does anyone from the government or the

25 prosecution team get to decide your sentence?

1    A.   No.

2    Q.   Who gets to decide your sentence?

3    A.   The Honorable Judge Lee.

4    Q.   Now, Mr. Bedford, I would like to direct your

5    attention now to 2009.  In 2009, did you found a

6    business?

7    A.   Yes.

8    Q.   What was the name of your business?

9    A.   Team America Contractors.

10   Q.   Who else founded that business with you?

11   A.   Glen Bertrand, senior.

12   Q.   Who were the owner of Team America Contractors?

13   A.   Myself and Glen Bertrand, Senior.

14   Q.   What kind of company was Team America?

15   A.   A construction and consultant company.

16   Q.   Where were your offices?

17   A.   Manassas, Virginia.

18   Q.   Now, could you explain for the jury the roles

19   that you and Glen Bertrand, Senior, played in running

20   the business of Team America.

21   A.   Yes.  I -- I took care of the operations of

22   the -- office functions, and -- and Glen Bertrand,

23   Senior, took care of field designation work.

24   Q.   So you say "field work" that Mr. Bertrand was in

25   charge of, describe what you mean by "field work."

1    A.   Assigning jobs that were awarded and providing

2    oversight for field work to be conducted out in the

3    field, whether it was construction or consultant.

4    Q.   What kinds of projects did Team America work on?

5    A.   Gas and utilities, commercial build-outs.

6    Q.   When you say "commercial build-outs," are you

7    referring to construction jobs?

8    A.   Yes.

9    Q.   Now, Mr. Bedford, are you familiar with the

10   defendant, Raushi Conrad?

11   A.   Yes.

12   Q.   How did you first come to meet the defendant?

13   A.   Via my partner.

14   Q.   Your partner, Glen Bertrand?

15   A.   My partner -- via my partner, Glen Bertrand,

16   Senior.

17   Q.   And what was the context in which you first met

18   the defendant?

19   A.   We were building a restaurant for -- doing a

20   build-out for a restaurant for the defendant.

21   Q.   What kind of restaurant was that?

22   A.   Chicken Place Restaurant.

23   Q.   And who was the owner of that restaurant?

24   A.   Raushi Conrad.

25   Q.   What year was this?

1    A.   In late 2009, 2010.

2    Q.   Now, where was the business that you were working

3    on for the defendant, the chicken business?

4    A.   At the mall.   At the mall.

5    Q.   Which mall?

6    A.   Fair Oaks Mall.

7    Q.   In Fairfax County?

8    A.   Yes.

9    Q.   And what kind of work was Team America performing

10   on behalf of the defendant's chicken restaurant in the

11   Fair Oaks Mall?

12   A.   Doing a -- a demolition and a commercial

13   build-out to -- and install the restaurant facility --

14   restaurant appliances and equipment.

15   Q.   Now, Mr. Bedford, when you were doing this

16   construction work on behalf of the defendant's business

17   at the Fair Oaks Mall, did you come to learn that the

18   defendant also had another job?

19   A.   Yes.

20   Q.   Where did you come to learn -- what other job did

21   you learn the defendant had?

22   A.   He worked for the Department of Commerce.

23   Q.   And what kind of work did you understand the

24   defendant to be doing at the Department of Commerce?

25            MR. SIMMS:  Objection, hearsay.

1              THE COURT:  Sustained.

2    BY MR. BURKE:

3        Q.   Did you speak to the defendant about his work at

4    the Department of Commerce?

5        A.   Yes.

6        Q.   And what did the defendant tell you about the

7    general type of work he did at the Department of

8    Commerce?

9        A.   IT work.

10       Q.   Now, sir, in -- in the defendant's role working

11   at the Department of Commerce, did he introduce you to

12   anyone?

13       A.   Yes.

14       Q.   Who did he introduce you to?

15       A.   His coworkers, Mr. Rob Moffett and his other

16   boss, Ed -- I don't know his last name --

17       Q.   A man by the name of Ed?

18       A.   Eddie.

19       Q.   Okay.

20       A.   And Kim Bryant.

21       Q.   And where did you understand Kim Bryant to work?

22       A.   I'm sorry?

23       Q.   Where did you understand Kim Bryant to work?

24       A.   I learned that he worked for SPAWARS (sic).

25       Q.   Now, sir, did the defendant invite Team America

1    to submit bids to perform construction work for the

2    Department of Commerce?

3         A.   Yes.

4         Q.   What kinds of construction work did Team

5    America -- what kinds of construction work was Team

6    America awarded by the Department of Commerce?

7         A.   We were awarded work to support a contractor to

8    help complete SCIFs.

9         Q.   And when you say "SCIFs," can you describe in lay

10   terms, what do you mean by a SCIF?

11        A.   A SCIF is a room compartmentalized to review

12   classified documents, or have classified machines,

13   computers in, equipment.

14        Q.   So it's a room that houses classified

15   information?

16        A.   Yes.

17        Q.   And Team America's role in that was to do the

18   building, the construction work?

19        A.   To assist the current contractor with completion.

20        Q.   What other types of construction work did Team

21   America do for the Department of Commerce?

22        A.   We did some additional work with building out a

23   commercial facility in Manassas, and a couple of other

24   rooms that weren't SCIF-classified, but they, I think,

25   had some type of confidential -- confidential status of

1   them.

2       Q.   And this was construction work involved --

3       A.   This was construction work, cabling and

4   installation of monitors.

5       Q.   Now, sir, I would like to direct your attention

6   now to the spring and early summer of 2010.

7            In the late spring and early summer of 2010, did

8   you come to learn of an opportunity to work on a data

9   migration contract?

10      A.   Yes.

11      Q.   Explain to the jury how you first learned about

12  this opportunity, this data migration opportunity.

13      A.   I learned about the opportunity via Mr. Conrad

14  and his coworker talking about a need for the

15  requirement.

16      Q.   And where were you when the defendant mentioned

17  this opportunity to you, first mentioned it to you?

18      A.   I think when I recall first mentioned, I was -- I

19  think the first mention was either at the Commerce

20  Department or the Manassas location.  I don't recall

21  which one was first; but had several conversations about

22  it.

23      Q.   And at this first conversation, whether it was at

24  the Commerce's offices downtown or at the Manassas --

25      A.   Manassas.

1    Q.   -- facility, what did the defendant tell you

2    about this opportunity?

3    A.   He described the need for the opportunity and

4    wanted to know if I had the credentials or capabilities

5    to perform that type of service.

6    Q.   And what did you tell the defendant?

7    A.   I did.

8    Q.   Now, sir, within a few weeks of that initial

9    conversation with the defendant, did you see the

10   defendant again?

11   A.   Yes.

12   Q.   Where?  Where did you see him?

13   A.   At my location, office in Manassas.

14   Q.   When you say your office location in Manassas,

15   the office location of what?

16   A.   Of my company, Team America Contractors.

17   Q.   When the defendant came to that meeting or came

18   to your offices, Team America's offices in Manassas on

19   that day, did he call ahead?

20   A.   No.

21   Q.   Did you know in advance that he would be coming?

22   A.   No.

23   Q.   Who else was present when the defendant arrived

24   at your offices in Manassas?

25   A.   My partner and I.

1     Q.   And when you say your partner, who are you

2     referring to?

3     A.   Glen Bertrand, Senior.

4     Q.   Did you have a conversation with the defendant?

5     A.   Yes.

6     Q.   Who was present for that conversation?

7     A.   Myself, Glen Bertrand, Senior, and Raushi.

8     Q.   When you say "Raushi" --

9     A.   Raushi Conrad.

10    Q.   Tell us how the conversation first began.

11    A.   The conversation started out with Raushi

12    explaining the -- the good job that we had performed in

13    the construction support for Commerce, and that, you

14    know, we had did a really good job.

15    Q.   What happened next?

16    A.   And then the conversation went from there, with

17    Raushi asking us about a loan.

18    Q.   Describe what he said about this -- what he

19    called a loan.

20    A.   He inquired if we might be able to make a loan

21    for -- for him.

22    Q.   To the defendant?

23    A.   To him, yes.

24    Q.   How much money did he describe -- did he describe

25    would be a part of what he labeled a loan?

1    A.    I recall about $180,000.

2    Q.    And when the defendant asked for you to give him

3    what he described as loan, what was your response?

4    A.    I looked at him and looked at my partner and just

5    told him that we didn't have that type of money to loan.

6    Q.    And when you responded that you didn't have that

7    kind of money to give him in a loan, what -- what did he

8    say next?

9    A.    I don't recall the -- all the intricacies, but it

10   was said that it could be investment loan/investment for

11   Chicken Place.

12   Q.    A loan/investment in his chicken restaurant?

13   A.    Yes.

14   Q.    Sir, during the meeting with the defendant, what,

15   if any, discussion was there about a repayment schedule?

16   A.    In the meeting -- none -- none.

17   Q.    What, if any, discussion was there about an

18   interest rate to be charged on what the defendant called

19   a loan?

20   A.    None.

21   Q.    What, if any, discussion was there about

22   collateral that the defendant would post for what he

23   called a loan?

24   A.    None.

25   Q.    I'm sorry?

1     A.  None.

2     Q.  And what -- what, if any, discussion was there

3  about how -- how the profits would be calculated from

4  what the defendant described as a loan/investment?

5     A.  We didn't discuss any.

6     Q.  And what, if any, discussion was there about how

7  the profits would be shared from what the defendant

8  called a loan or an investment?

9     A.  We didn't discuss any profits.

10     Q.  What discussion was there, if any, about what the

11  ownership structure would be relating to this supposed

12  investment?

13     A.  None at that time.

14     Q.  Sir, was there a written promissory note prepared

15  for this, what the defendant called a loan?

16     A.  No.

17     Q.  Was there a written loan agreement ever prepared?

18     A.  No.

19     Q.  Was there a written lien agreement prepared?

20     A.  No.

21     Q.  Was there any documentation regarding a specific

22  repayment schedule?

23           MR. SIMMS:  Objection, asked and answered.

24           THE COURT:  Sustained.

25           MR. BURKE:  Your Honor, I asked him about

1   discussions, but not about documentation.

2           THE COURT:  I sustained the objection.

3           Next question.

4   BY MR. BURKE:

5   Q.  Was there any documentation regarding any

6   interest rate?

7           MR. SIMMS:  Objection, asked and answered.

8           MR. BURKE:  Your Honor, I asked about

9   discussions, but not documentation.

10          THE COURT:  Well, you asked him if there was

11  a loan document and he said there were none.  That

12  includes all those things, doesn't it, Mr. Burke?

13          Objection sustained.

14  BY MR. BURKE:

15  Q.  Sir, did you file articles of incorporation to

16  form a new company with the defendant?

17  A.  No.

18  Q.  Now, Mr. Bedford, a few weeks after this

19  conversation about what the defendant variously

20  described as a loan or an investment, what happened?

21          (Pause.)

22          What happened with respect to the data migration

23  work, if anything?

24  A.  We received a -- a request for a proposal to bid

25  on the data migration work.

1    Q.  Were you awarded that data migration work?

2    A.  Yes.

3              MR. BURKE:  Now, if we could publish

4    Exhibit 34, Government Exhibit 34, Your Honor.  I

5    believe it's in evidence.

6              THE COURT:  All right.

7    BY MR. BURKE:

8    Q.  Mr. Bedford, do you have Government Exhibit 34 in

9    front of you?

10   A.  Yes.

11   Q.  What is Government Exhibit 34?

12   A.  It's a subcontract agreement between Tridea

13   Works, LLC, and Bedford's Images, Incorporated.

14   Q.  Is that the contract you were awarded to perform

15   the data migration work?

16   A.  Yes.

17   Q.  Who is this contract with?  What entity?

18   A.  Tridea Works.

19   Q.  Now, who is Tridea Works?

20   A.  It's a prime contractor for SPAWARS (sic).

21   Q.  So, your contract was with Tridea Works, but

22   describe for the jury, who was the ultimate customer of

23   the work you were going to perform.

24   A.  The end user customer was Department of Commerce.

25   Q.  Mr. Bedford, after you were awarded this

1  contract, did you begin performing the work?

2   A.  Yes.

3   Q.  Did you bill for the work you did?

4   A.  Yes.

5   Q.  Who did you submit your bills to?

6   A.  Tridea Works.

7   Q.  Were you paid for those bills?

8   A.  Yes.

9   Q.  Now, Mr. Bedford, while you were performing the

10  data migration work, what, if any, documentation did you

11  receive from the defendant?

12   A.  Documentation, I don't recall.

13   Q.  Well, with the assistance of the court security

14  officer, I would ask you to please take a look at

15  Government Exhibits 1-1, 1-2, 1-3 and 1-4.

16       Sir, do you recognize Government Exhibit 1-1?

17   A.  Yes.

18   Q.  Do you recognize 1-2, 1-3 and 1-4?

19   A.  Yes.

20   Q.  What are Government Exhibits 1-1 through 1-4?

21   A.  Invoices received to Team America from CPE.

22   Q.  And who provided these invoices to your company?

23   A.  Raushi Conrad.

24       MR. BURKE:  Your Honor, the government moves

25  to admit 1-1, 1-2, 1-3 and 1-4.

1           THE COURT:  Received.

2           MR. BURKE:  Could we publish 1-1, please?

3           THE COURT:  Yes.

4   BY MR. BURKE:

5       Q.  Mr. Bedford, how did this document, Government

6   Exhibit 1-1, first come to your office -- or to your

7   attention?

8       A.  It was received at my business, to the

9   bookkeeper, and processed to me for review of payment.

10      Q.  When you say your business, are you referring

11  to --

12      A.  Team America Contractors.

13      Q.  And physically where was that?

14      A.  Manassas, Virginia.

15      Q.  And you mentioned a bookkeeper.  Who were you

16  referring to?

17      A.  An employee, Alice Bertrand.

18      Q.  What was Alice Bertrand's role at Team America?

19      A.  Her responsibility was to receive incoming

20  invoices or bills from vendors and bring them to me for

21  review, and my partner, to determine whether or not the

22  invoices were accurate and to be paid.

23      Q.  Sir, did you know ahead of time that you would be

24  receiving this invoice?

25      A.  No.

1    Q.   When this invoice arrived at your offices in

2    Manassas, did you review it?

3    A.   Yes.

4    Q.   Now, if we could focus on the top center of the

5    invoice, there's some letters there that say "CPE."

6         MR. BURKE:  Ms. Sandvig, could you blow that

7    up, please.

8    BY MR. BURKE:

9    Q.   Do you see those letters in the top center of the

10   invoice that say "CPE"?

11   A.   Yes.

12   Q.   What does that mean?

13   A.   It's Chicken Place Enterprise.

14   Q.   And what was that?

15        What did you understand Chicken Place Enterprise

16   or Chicken Place Express to be?

17   A.   Raushi's business.

18   Q.   Now, sir, let's look in the middle of the invoice

19   where it has a description.

20        BY MR. BURKE:  Ms. Sandvig, could you blow

21   that portion up, please.

22   BY MR. BURKE:

23   Q.   What work is described in this invoice?

24   A.   Support services.

25   Q.   And what is the amount listed on the face of this

1    invoice?

2       A.   55,000.

3       Q.   Mr. Bedford, did The Chicken Place Express

4    perform the $55,000 worth of support services listed in

5    this invoice?

6       A.   No.

7       Q.   Did Raushi Conrad perform $55,000 worth of

8    support services listed in this invoice?

9       A.   No.

10      Q.   Does this invoice reflect any real work that your

11   company received?

12      A.   No.

13      Q.   What's the date on the face of this invoice?

14      A.   12-10-2010.

15      Q.   Is that approximately when you received the

16   invoice?

17      A.   Approximately.

18      Q.   Is that --

19      A.   Yes.

20      Q.   When you received this invoice in December of

21   2010, did you recognize at the time that it was a fake

22   invoice?

23      A.   Yes.

24      Q.   Now, on its face, the document says that it's an

25   invoice for $55,000 of support services.  What did you

1    understand that this invoice was?

2              MR. SIMMS:  Objection, relevance.

3              MR. BURKE:  Your Honor, it goes to the

4    existence of the agreement.

5              THE COURT:  Overruled.

6    BY MR. BURKE:

7    Q.  What did you understand that this fake invoice

8    was?

9    A.  Payment for services for the -- get the work for

10   data migration.

11   Q.  Describe what you mean when you say "payment for

12   services" and to "get the work for data migration."

13   A.  Payment for service -- payment to receive data

14   migration support work.

15   Q.  You would pay who?

16   A.  The Chicken Place Enterprise, Raushi Conrad.

17   Q.  And you would get what in exchange?

18   A.  The data support work.

19   Q.  Sir, after you received this invoice, did you

20   show it to anyone?

21   A.  Yes.

22   Q.  Who?

23   A.  My partner, Glen Bertrand, Senior.

24   Q.  Was Mr. Bertrand, Senior, aware that Chicken

25   Place Express had done no work for Team America?

1    A.   Yes.

2    Q.   And did -- what was his reaction when you showed

3    him this invoice?

4    A.   He -- he just smirked and said --

5              MR. SIMMS:  Objection, hearsay.

6              MR. BURKE:  Your Honor, it's a coconspirator

7    statement.

8              MR. SIMMS:  They have to establish that

9    foundation.

10             MR. BURKE:  Your Honor, we would ask that it

11   be conditionally admitted.

12             THE COURT:  All right.  If you would lay

13   some foundation about Mr. Bertrand's role or knowledge,

14   that would be helpful.  So I'll sustain the objection

15   for now.

16   BY MR. BURKE:

17   Q.   Sir, what was Glen Bertrand's job duties at Team

18   America?

19   A.   He was my partner in -- in running the business.

20   I -- I hold 51 percent shareowner and he had 49 percent.

21   And we ran -- ran the business together, making

22   decisions about purchases and different types of work

23   that we was soliciting for, and the management of our

24   income and our growing resources for the company.

25   Q.   Was Mr. Bertrand involved in the day-to-day

1  operations of the company?

2      A.   Yes.

3      Q.   Was he familiar with the --

4           MR. SIMMS:  Objection, leading.

5  BY MR. BURKE:

6      Q.   What was his --

7           MR. BURKE:  I'll rephrase, Your Honor.

8  BY MR. BURKE:

9      Q.   What was his involvement in dealing with vendors

10  and subcontractors?

11     A.   He had more hands-on dealings with the day-to-day

12  involvement of the vendors and work for services that

13  were performed, and also was my backup to approving

14  invoices for payment for services that may have been

15  rendered.

16     Q.   And when you received invoices at Team America,

17  what was your routine practice?

18     A.   To receive the invoices in, and I would set aside

19  invoices for he and I to go over to ensure proper

20  payment of services.

21     Q.   So, after you received the invoice, the fake

22  invoice, marked as Government Exhibit 1-1, and you

23  showed it to your business partner, Mr. Bertrand, what

24  was his response?

25           MR. SIMMS:  Objection.

1          MR. BURKE:  Your Honor, it's --

2          THE COURT:  Overruled.

3   BY MR. BURKE:

4      Q.  What was his response?

5      A.  He -- he said, "Pay it" -- "Pay it."

6      Q.  Pay the invoice?

7      A.  The invoice.

8      Q.  Did you agree to pay the invoice?

9      A.  Yes.

10     Q.  Why did you agree to pay an invoice that you knew

11  was fake?

12     A.  Because we wanted the support services to

13  continue that we were receiving.

14     Q.  You wanted to continue to get the business?

15     A.  Yes.

16         MR. BURKE:  Ms. Sandvig, if we could blow up

17  the top left corner.

18  BY MR. BURKE:

19     Q.  Mr. Bedford, looking to the top left corner of

20  this invoice, there's some handwritten notes.  Do you

21  see that?

22     A.  Yes, sir.

23     Q.  And, particularly, there's an address listed in

24  handwriting.  Do you see that?

25     A.  Yes, sir.

1    Q.   When you first received the fake invoice that's

2    marked Government Exhibit 1-1, was this address

3    information written on it?

4    A.   No.

5    Q.   Was there -- was there a mailing address listed

6    on the invoice when you first received it?

7    A.   No, there wasn't.

8    Q.   So, when you received it without an address,

9    what, if anything, did you do?

10   A.   I initially kicked it back to Alice Bertrand with

11   a note to her, asking where was the information required

12   that we normally require from vendors, the address and

13   as well as the tax ID numbers.

14   Q.   And who, if anyone, did you instruct Ms. Bertrand

15   to contact?

16   A.   Mr. Conrad.

17   Q.   After you instructed Ms. Bertrand to reach out to

18   the defendant, what, if any, information did you receive

19   back?

20   A.   That it was not a valid address.

21   Q.   Well, let's pause here for a minute.

22        Did you receive address information back?

23   A.   Yes.  I did -- did receive address information

24   back, and there was an instrument written and mailed to

25   that address.

1    Q.   What -- what address information did you receive
2    back?
3    A.   CPE, PO Box 2898, Centreville, Virginia 20120.
4    Q.   And, sir, in December of 2010, what was the
5    routine practice at Team America for sending payment to
6    vendors?
7         What was the routine practice for actually
8    delivering payment to vendors?
9    A.   Routine practice was that a vendor would submit
10   their invoice, be reviewed through company policy, and a
11   check would be cut and mailed to the -- to the
12   prospective company.
13   Q.   Was a check mailed out to pay this fake invoice?
14   A.   Yes.
15   Q.   To what address was it mailed?
16   A.   CPE, PO Box 2898, Centreville.
17   Q.   And what happened next, after it was mailed to
18   that address?
19   A.   The -- the check came back to us returned.
20   Q.   What do you mean -- when you say the check came
21   back to you returned, what do you mean?
22        Returned how?
23   A.   It came back returned as, through the mail, no
24   address.
25                   MR. SIMMS:  Objection, hearsay.  And best

J. Bedford - Direct

1    evidence rule.

2              THE COURT:  All right.

3              MR. BURKE:  Your Honor, he's testifying

4    about his personal knowledge of observing documents he

5    received.  And there's no truth asserted in an address.

6    It's just, did he get it back or not?  That's not an

7    assertion that's covered by the hearsay rule.

8              THE COURT:  He can describe what the

9    envelope, if he received an envelope, said.

10             MR. BURKE:  That's all I'm asking, Your

11   Honor.

12             THE COURT:  Ask that question.

13   BY MR. BURKE:

14     Q.  Sir, when you received the envelope back, what

15   did the envelope say on the face of it?

16     A.  "Return to sender."

17     Q.  When the check was returned to you, who, if

18   anyone, did you contact?

19     A.  I had Alice Bertrand contact Mr. Conrad.

20     Q.  Did you also speak directly with Mr. Conrad?

21     A.  Yes.

22     Q.  And what did you say to the defendant after you

23   received the envelope back as undelivered?

24     A.  That the mailing address wasn't any good.

25     Q.  What was the defendant's response when you told

1    him that the address was invalid?

2      A.  He understood.

3      Q.  After that conversation, how, if at all, was the

4    check provided to the defendant?

5      A.  The defendant came by the -- Manassas and picked

6    it up.

7      Q.  Picked up the check?

8      A.  Picked up the check.

9      Q.  Now, sir, if you could please turn now to

10   Government Exhibit 1-2.

11           MR. BURKE:  And if we could publish 1-2,

12   Your Honor.  It's been admitted.

13           THE COURT:  You may publish it.

14   BY MR. BURKE:

15     Q.  Sir, what is Government Exhibit 1-2?

16     A.  Invoice for -- from CPE to Team America.

17     Q.  How did you first receive Government Exhibit 1-2?

18     A.  The same route, sir, via the bookkeeper, Alice

19   Bertrand.

20           MR. BURKE:  Let's blow up the top center of

21   this document, if we could, Ms. Sandvig.

22   BY MR. BURKE:

23     Q.  And, sir, looking to the top center of the

24   document marked 1-2, what letters do you see there?

25     A.  CPE.

1    Q.   What do you understand that to be?

2    A.   The Chicken Place.

3    Q.   What work is described --

4              MR. BURKE:  If we could blow up the

5    description, please, Ms. Sandvig.

6    BY MR. BURKE:

7    Q.   What work is described on the face of this

8    invoice?

9    A.   "Support services."

10   Q.   And what is the amount listed on the face of this

11   invoice?

12   A.   $35,000.

13   Q.   Did The Chicken Place Express perform the $35,000

14   listed on the face of this invoice?

15   A.   No.

16   Q.   Did Mr. Conrad perform the $35,000 worth of

17   support services listed on this invoice?

18   A.   No.

19   Q.   Is any real work reflected in this invoice?

20   A.   No.

21   Q.   What's the date of the invoice?

22   A.   2-02-2011.

23   Q.   Is that when you received it?

24   A.   Approximate.

25   Q.   Where did you receive it?

1    A.    My office in Manassas, Virginia.

2    Q.    Sir, when you received this -- this fake invoice

3    in February of 2011, did you recognize at the time that

4    it was fake?

5    A.    Yes.

6    Q.    Sir, although it says "support services" for

7    $35,000, what did you understand this invoice to

8    actually be?

9    A.    Payment for services, continue our support work

10   with the data migration work for Commerce.

11   Q.    And when you say "payment," payment to who?

12   A.    To Raushi Conrad.

13   Q.    And what did you expect to get in exchange for

14   that payment?

15   A.    Continued support services for --

16   Q.    Under the data migration work?

17   A.    Yes.

18   Q.    Sir, after you received this invoice, did you

19   show it to anyone?

20   A.    Yes.

21   Q.    Who?

22   A.    My partner, Glen Bertrand, Senior.

23   Q.    And did he -- did he understand that this invoice

24   was fake?

25   A.    Yes.

1          MR. SIMMS:  Objection.

2          THE COURT:  Sustained, about what he

3    understood.

4    BY MR. BURKE:

5      Q.  Mr. Bedford, I'll rephrase.

6          In February of 2010, what was Mr. Bertrand's role

7    at the Team America?

8      A.  To provide oversight for contractors providing

9    support work for Team America Contractors.

10     Q.  Was he knowledgeable about the vendors that you

11   interacted with?

12     A.  Yes.

13     Q.  Was he in a position to know who had provided

14   services and who had not?

15     A.  Yes.

16     Q.  What was Mr. Bertrand's reaction when you showed

17   him this invoice?

18     A.  He -- he said, "Approve it.  Pay it."

19     Q.  Did you also agree to pay it?

20     A.  Yes.

21     Q.  Why did you agree to pay this invoice even though

22   you knew it was fake?

23     A.  To continue to support -- to get support services

24   work that we were receiving.

25     Q.  Sir, if you could now turn to Government

1   Exhibit 1-3.

2             MR. BURKE:   And, Your Honor, we would ask to

3   publish 1-3, which has already been admitted.

4             THE COURT:   You may.

5   BY MR. BURKE:

6     Q.   Sir, what is Government Exhibit 1-3?

7     A.   Additional invoice from CPE to Team America

8   Contractors for engineer services in the amount of

9   $15,000.

10    Q.   Mr. Bedford, how did you first receive Government

11  Exhibit 1-3?

12    A.   Through routine channels.   The bookkeeper

13  processed the invoices and brought them to me for

14  review.

15    Q.   And physically where were you at the time?

16    A.   At my office in Manassas, Virginia.

17    Q.   And what are the -- what letters do we see in the

18  top center of this invoice?

19    A.   "CPE."

20    Q.   Sir, what work is described on the face of this

21  invoice?

22    A.   "Engineering services."

23    Q.   And what is the amount listed on the face of the

24  invoice?

25    A.   $15,000.

1    Q.  Did The Chicken Place Express perform the $15,000

2  of engineering services described in this invoice?

3    A.  No.

4    Q.  Did Raushi Conrad perform the $15,000 of

5  engineering services reflected in this invoice?

6    A.  No.

7    Q.  Does this invoice reflect any real work?

8    A.  No.

9    Q.  What's the date of the invoice?

10    A.  The date is 6-17-2011.

11    Q.  Approximately when did you receive the invoice?

12    A.  I guess around that time.  I have marked on there

13  6-20-2011.

14    Q.  June of 2011?

15    A.  Yes.

16    Q.  Sir, when you received this invoice marked as

17  Government Exhibit 1-3 in June of 2011, did you

18  recognize at the time that it was fake?

19    A.  Yes.

20    Q.  Although it says "engineering services" on its

21  face, what did you understand this invoice actually to

22  be?

23    A.  It's payment to continue to support work for the

24  data migration project.

25    Q.  Meaning you would pay who?

1    A.   I'm sorry?

2    Q.   Meaning that you would pay who?

3    A.   Raushi Conrad.

4    Q.   And what -- what did you expect in return?

5    A.   Continue to get the support services work for

6    data migration.

7    Q.   After you received this fake invoice, did you

8    show it to anyone?

9    A.   Yes.

10   Q.   Who?

11   A.   My partner, Glen Bertrand, Senior.

12   Q.   And what was Mr. Bertrand's reaction when you

13   showed this to him?

14   A.   He gave authorization to pay the invoice.

15   Q.   Did you also agree to pay?

16   A.   Yes, sir.

17   Q.   Why did you agree to pay an invoice that you knew

18   was fake?

19   A.   To continue to get support service work for the

20   data migration project.

21   Q.   If you could turn now to Government Exhibit 1-4.

22        MR. BURKE:  And Your Honor, this has been

23   admitted.  We ask to publish it.

24        THE COURT:  You may publish it.

25   BY MR. BURKE:

1    Q.   Sir, what is Government Exhibit 1-4?

2    A.   An invoice from CPE to Team America Contractors

3    for engineering services.

4    Q.   How did you receive this invoice?

5    A.   From my bookkeeper, Alice Bertrand.

6    Q.   And physically where were you when you received

7    it?

8    A.   Manassas, Virginia, in my office.

9    Q.   What -- what three letters do we see at the top

10   center of this invoice?

11   A.   "CPE."

12   Q.   What work is described in the face of this

13   invoice?

14   A.   "Engineering services."

15   Q.   And what's the price quoted?

16   A.   $15,000.

17   Q.   Did The Chicken Place Express perform any of this

18   engineering services work?

19   A.   No.

20   Q.   Did Raushi Conrad perform the engineering

21   services described in this invoice?

22   A.   No.

23   Q.   Does this invoice reflect any real work?

24   A.   No.

25   Q.   What's the date of the invoice?

1    A.   8-11-2011.

2    Q.   When did you receive it?

3    A.   8-15-2011.

4    Q.   And where were you?

5    A.   In my office at Manassas, Virginia.

6    Q.   When you received this invoice in August, 2011,

7    did you recognize at the time that it was fake?

8    A.   Yes.

9    Q.   Now, on its face, the invoice says "engineering

10   services."  When you received it, what did you

11   understand the invoice to actually be?

12   A.   Payment for support services for the data

13   migration work.

14   Q.   Meaning you would pay who?

15   A.   Mr. Conrad.

16   Q.   And in exchange for what?

17   A.   Continued services for data migration.

18   Q.   After you received the fake invoice marked as

19   1-4, did you show it to anyone?

20   A.   Yes, sir.

21   Q.   Who?

22   A.   My business partner, Glen Bertrand, Senior.

23   Q.   And what was Mr. Bertrand, Senior's response when

24   you showed him this fake invoice?

25   A.   He gave approval to pay the invoice.

1    Q.   Did you also agree?

2    A.   Yes, I did.

3    Q.   Why did you agree to pay the fake invoice marked

4    as Government Exhibit 1-4?

5    A.   Because we wanted to keep the support work

6    continue.

7    Q.   Now, Mr. Bedford, with the assistance of the

8    court security officer, I would ask you now to please

9    take a look at Government Exhibits 21 and 21-1 through

10   21-7.

11        Sir, do you have Government Exhibit 21 in front

12   of you?

13   A.   Yes, sir.

14   Q.   What is Government Exhibit 21?

15   A.   Government Exhibit 21 is a bank -- bank

16   authorization signature card.

17   Q.   For what bank account?

18   A.   For PNC Bank.

19   Q.   PNC Bank for what entity?

20   A.   For PNC Bank for Team America Contractors,

21   Incorporated.

22   Q.   And could you describe what are 21-1 through

23   21-7.

24   A.   They are bank records and checks for instruments

25   written from Team America Contractors.

1     Q.   And, sir, was this a bank account that your

2    company used in 2010 and 2011?

3     A.   Yes, it is.

4     Q.   Were payments made out of this bank account to

5    the defendant?

6     A.   Yes.

7          MR. BURKE:  Your Honor, we move to admit

8    Government Exhibit 21 and 21-1 through 21-7.

9          I will note, Your Honor, they're also

10   subject to a stipulation between the parties that they

11   are authentic business records.

12         THE COURT:  21-1 and 21-7?

13         MR. BURKE:  It's 21 and then 21-1, 21-2,

14   21-3, 21-4, 21-5, 21-6 and 21-7.

15         THE COURT:  Exhibits 21, 21-1, 21-2, 21-3,

16   21-4, 21-5, 21-6 and 21-7 will be received.

17   BY MR. BURKE:

18    Q.   Now, sir, if you could turn now to Government

19   Exhibit 27 and 27-1 through 27-4.

20         Sir, do you have those exhibits in front of you?

21    A.   Yes.

22    Q.   What is Government Exhibit 27?

23    A.   27-1?

24    Q.   Just bulk 27.

25    A.   27 is another bank signature card for Team

1    America Contractors.

2        Q.   Does that exhibit also include bank statements?

3        A.   Yes.

4        Q.   And it's a -- you said it was for Team America

5    Contractors?

6        A.   Yes.

7        Q.   Did your company use this -- that bank account

8    reflected in Exhibit 27 in 2010 and 2011?

9        A.   Yes.

10       Q.   And are 27-1 through 27-4 individual checks drawn

11   on that account?

12       A.   Yes.

13       Q.   Were payments made to the defendant out of those

14   exhibits?

15       A.   Yes.

16            MR. BURKE:   Your Honor, the government moves

17   to admit 27 and 27-1 through 27-4.

18            There is also a stipulation that these

19   exhibits are authentic business records.

20            THE COURT:   Received.

21            MR. BURKE:   Your Honor, may we publish 21-1,

22   please?

23            THE COURT:   Yes.

24            MR. BURKE:   Ms. Sandvig, if we could just --

25   thank you.

1   BY MR. BURKE:

2       Q.   Sir, what is 21-1?

3       A.   It's a check made payable to CPE from Team

4   America Contractors for $18,000.

5       Q.   Now, who signed the check?

6       A.   Alice Bertrand.

7       Q.   And what was her role at the time?

8       A.   The bookkeeper.

9       Q.   She was the bookkeeper?

10      A.   Yes.

11      Q.   Who authorized Alice Bertrand to issue this check

12  to CPE for $18,000?

13      A.   Myself and Glen Bertrand, Senior.

14      Q.   What work, if any, did the defendant do to earn

15  this $18,000?

16      A.   None.

17      Q.   What work, if any, did his company, The Chicken

18  Place Express, do to earn this $18,000?

19      A.   None.

20      Q.   So, why did you approve this payment of $18,000?

21      A.   As stated previously, to continue data migration

22  support work.

23              MR. BURKE:  Your Honor, may we publish 21-2?

24              THE COURT:  Yes.

25              MR. BURKE:  Ms. Sandvig -- thank you.

1    BY MR. BURKE:

2    Q.   Sir, what is Government Exhibit 21-2?

3    A.   A check made payable to CPE from Team America

4    Contractors in the amount of $55,000.

5    Q.   And whose signature appears on this check?

6    A.   Alice Bertrand.

7    Q.   Who approved the payment of this $55,000 to the

8    defendant's company?

9    A.   Myself and Glen Bertrand, Senior.

10   Q.   Now, if I could direct your attention to the

11   address that appears above the memo line.  What address

12   is listed there?

13   A.   It's CPE, PO Box 2898, Centreville, Virginia

14   20120.

15   Q.   Is that a real address?

16   A.   No.

17   Q.   What does the memo line say on Government

18   Exhibit 21-2?

19   A.   "Support services, Number 127."

20   Q.   Did The Chicken Place Express perform support

21   services as reflected in this memo line?

22   A.   No.

23   Q.   What about the defendant; did he?

24   A.   No.

25   Q.   Did the defendant do any work to earn this

1    $55,000?

2    A.  No.

3    Q.  Did his company, The Chicken Place Express, do

4    any work to earn this $55,000?

5    A.  No.

6    Q.  So, sir, why did you approve this $55,000

7    payment?

8    A.  To continue to receive data migration support

9    work.

10              MR. BURKE:  Now, Ms. Sandvig, if you could

11   please put up 21-2 and 1-1 on the screen next to each

12   other.

13              The Court's indulgence, Your Honor.

14   BY MR. BURKE:

15   Q.  Sir, do you have 21-2 and 1-1 on your screen?

16   A.  Yes.

17   Q.  How, if at all, does the check marked as 21-2

18   relate to the fake invoice marked as 1-1?

19   A.  One is a submission for a request for payment and

20   the other one is the instrument used to pay for that

21   request.

22   Q.  So, the check paid the fake invoice?

23   A.  Yes.

24              MR. BURKE:  Your Honor, may we publish 21-3?

25              THE COURT:  Yes.

1   BY MR. BURKE:

2       Q.   Sir, do you have 23-3 in front of you?

3       A.   Yes.

4       Q.   What is Government Exhibit 21-3?

5       A.   A check from Team America Contractors to pay --

6   made payable to CPE for $35,000.

7       Q.   Who approved this payment of $35,000 to the

8   defendant's company?

9       A.   Myself and Glen Bertrand, Senior.

10      Q.   If you could look at the address that's listed

11  above the memo line.  Do you see that address?

12      A.   Yes.

13      Q.   Is that a real address?

14      A.   No.

15      Q.   What does the memo line of this check say?

16      A.   "Document conversion Project-137."

17      Q.   Sir, did the defendant's company actually perform

18  the work listed in this memo line?

19      A.   No.

20      Q.   Did the defendant do any work to earn this money?

21      A.   No.

22      Q.   So, why did you approve the check that's marked

23  as 21-3?

24      A.   To continue to receive the data migration support

25  service work.

1          MR. BURKE:  Ms. Sandvig, could we publish

2   21-3 and 1-2.

3   BY MR. BURKE:

4       Q.  Sir, do you have 21-3 and 1-2 on your screen?

5       A.  Yes, sir.

6       Q.  Sir, how, if at all, does the check marked as

7   21-3 relate to the fake invoice marked as Government

8   Exhibit 1-2?

9       A.  It's the instrument used to pay the invoice for

10  support services.

11      Q.  So, that check was used to pay the fake invoices?

12      A.  Yes.

13          MR. BURKE:  Your Honor, may we publish 27-1?

14          THE COURT:  Yes.

15  BY MR. BURKE:

16      Q.  Sir, what is Government Exhibit 27-1?

17      A.  27-1 is an invoice that ties to the check from

18  Team America Contractors, payable to CPE.

19      Q.  I'm sorry, sir.  Do you have 27-1 in front of

20  you?

21      A.  Yes.

22      Q.  Is this a check?

23      A.  Yes, this is a check.

24      Q.  A check from who?

25      A.  From Team America Contractors to CPE.

1    Q.   For how much money?

2    A.   For $50,000.

3    Q.   Who approved this payment of $50,000 to the

4    defendant's company?

5    A.   Myself and Glen Bertrand, Senior.

6    Q.   What does the memo line of this check say?

7    A.   "Support services."

8    Q.   Did The Chicken Place Express perform the support

9    services listed in this memo line?

10   A.   No.

11   Q.   Did the defendant perform the support services

12   listed in this memo line?

13   A.   No.

14   Q.   Did the defendant do any work to earn this

15   $50,000?

16   A.   No.

17   Q.   Did his company do any work to earn this $50,000?

18   A.   No.

19   Q.   Why did you agree to pay this $50,000 check to

20   the defendant's company?

21   A.   To -- to continue to receive the support service

22   work for the data migration project.

23             MR. BURKE:  Your Honor, may we publish 27-2?

24             THE COURT:  Yes.

25   BY MR. BURKE:

1    Q.   Sir, do you have 27-2 in front of you?

2    A.   Yes.

3    Q.   What is 27-2?

4    A.   A check payable to CPE from Team America

5    Contractors in the amount of $20,000.

6    Q.   Who signed this check?

7    A.   Alice Bertrand.

8    Q.   Who authorized Alice Bertrand to make this

9    payment to the defendant's company?

10   A.   Myself and Glen Bertrand, Senior.

11   Q.   What does the memo line on the face of this check

12   say?

13   A.   "Support services."

14   Q.   Sir, did The Chicken Place Express perform the

15   support services listed in the memo line of this check?

16   A.   No, sir.

17   Q.   Did the defendant perform the support services

18   listed in the memo line of this check?

19   A.   No sir.

20   Q.   Did the defendant's company perform any work to

21   earn this $20,000?

22   A.   No, sir.

23   Q.   Did the defendant perform any work to earn this

24   $20,000?

25   A.   No, sir.

1    Q.   Sir, why did you agree to make this payment of

2    $20,000 to the defendant?

3    A.   To continue the data management support service

4    work.

5                MR. BURKE:   Your Honor, may we publish 27-3?

6                THE COURT:   Yes.

7    BY MR. BURKE:

8    Q.   Do you have 27-3 in front of you, sir?

9    A.   Yes, sir.

10   Q.   What is 27-3?

11   A.   A check made payable from Team America

12   Contractors to CPE.

13   Q.   For how much money?

14   A.   $15,000.

15   Q.   Whose signature appears on this check?

16   A.   Alice Bertrand.

17   Q.   Who authorized Ms. Bertrand to write this $15,000

18   check to the defendant's company?

19   A.   Myself and Glen Bertrand, Senior.

20   Q.   What does the memo line on this check say?

21   A.   "Data migration."

22   Q.   Sir, did The Chicken Place Express perform any

23   work to earn this $15,000?

24   A.   No.

25   Q.   Did the defendant perform any work to earn this

1  $15,000?

2  A.  No.

3  Q.  Sir, why did you agree to pay this $15,000 check

4  to the defendant's company?

5  A.  To continue the data migration support work.

6      MR. BURKE:  Ms. Sandvig, if you could

7  publish 27-3 alongside 1-3.

8  BY MR. BURKE:

9  Q.  Sir, do you have 27-3 and 1-3 on your screen?

10  A.  Yes.

11  Q.  How, if at all, does the check marked as 27-3

12  relate to the fake invoice we see in 1-3?

13  A.  It's an instrument that was used to pay the

14  invoice.

15  Q.  When you say "the instrument," are you referring

16  to the check?

17  A.  The check, the check that was used to pay for the

18  invoice.

19      MR. BURKE:  Your Honor, may we publish 21-4?

20      THE COURT:  Yes.

21  BY MR. BURKE:

22  Q.  Sir, do you have 21-4 in front of you?

23  A.  Yes.

24  Q.  What is Government Exhibit 21-4?

25  A.  A check payable to CPE in the amount of $7,500.

1    Q.   Whose signature appears on this check?

2    A.   Alice Bertrand.

3    Q.   Who authorized Ms. Bertrand to make payment of

4    $7,500 to the defendant's company?

5    A.   Myself and Glen Bertrand, Senior.

6    Q.   Sir, what does the memo line of this check say?

7    A.   "Engineering services."

8    Q.   Sir, did The Chicken Place Express perform the

9    engineering services reflected on this check?

10   A.   No.

11   Q.   Did the defendant perform the engineering

12   services reflected on this check?

13   A.   No.

14   Q.   Did The Chicken Place Express perform any real

15   work to earn this money?

16   A.   No.

17   Q.   Did the defendant do any real work to earn this

18   money?

19   A.   No.

20   Q.   So, sir, why did you approve the payment of this

21   check?

22   A.   To continue to receive data migration support

23   service work.

24        MR. BURKE:  Your Honor, may we publish 27-4?

25        THE COURT:  Yes.

1  BY MR. BURKE:

2      Q.  Sir, do you have 27-4 in front of you?

3      A.  Yes.

4      Q.  What is 27-4?

5      A.  A check written from Team America Contractors to

6  CPE in the amount of $7,500.

7      Q.  Whose signature appears on the check?

8      A.  Alice Bertrand.

9      Q.  Who authorized Ms. Bertrand to make this payment

10  of $7,500 to the defendant's company?

11     A.  Myself and Glen Bertrand, Senior.

12     Q.  And, sir, what does the memo line of this check

13  say?

14     A.  "Engineering services."

15     Q.  Did The Chicken Place Express perform the

16  engineering services listed on the memo line of this

17  check?

18     A.  No, sir.

19     Q.  Did the defendant perform the engineering

20  services listed on the memo line?

21     A.  No, sir.

22     Q.  Did the defendant's company perform any real work

23  to earn this $7,500?

24     A.  No, sir.

25     Q.  Did the defendant perform any real work to earn

1    this $7,500?

2        A.   No, sir.

3        Q.   Sir, why did you agree to pay this $7,500 to the

4    defendant's company?

5        A.   To continue the data management contract and

6    support work.

7        Q.   Mr. Bedford, let's talk now about the actual

8    performance of the data migration work.

9            Sir, after your company, Bedford's Images, was

10   awarded the data migration subcontract, how did you know

11   what files needed to be migrated?

12       A.   The -- the files were provided to us via hard --

13   portable hard drives, outlined -- and whether they were

14   supposed to be left as native documents, meaning being

15   in the same format as they were given, or converted --

16   converted into an archivable file to be referenced for

17   storage.

18       Q.   You said "hard drives."  Were those hard drives

19   that your company bought?

20       A.   No, they -- no, they were not.  They were hard

21   drives and laptops which were government-furnished

22   equipment.

23       Q.   Who furnished the government equipment to you?

24       A.   Raushi Conrad and Robert Moffett.

25            MR. BURKE:  Your Honor, may we approach?

1          THE COURT:  Yes.

2          (Thereupon, the following sidebar conference

3    was had:)

4          MR. BURKE:  Your Honor, as I believe you

5    know, this witness has some severe health issues.

6          THE COURT:  It looks like he's starting to

7    fade to me.

8          MR. BURKE:  He appears to be in pain.  So I

9    would ask that --

10         THE COURT:  I was planning to take the

11   recess in five minutes.  I'll take it now.  Would

12   20 minutes be enough?

13         MR. BURKE:  Well, what I would request is --

14   because ordinarily we would not have any contact with

15   the witness.  We would ask permission to ask him if he

16   believes he can continue for some time, at the recess.

17         THE COURT:  Okay.

18         MR. BURKE:  And then we can address with him

19   how much longer he thinks he can go today.

20         THE COURT:  Okay.

21         MR. BURKE:  And then we can report back to

22   Your Honor outside the presence of the jury.

23         THE COURT:  Okay, sir?

24         MR. SIMMS:  Fine, Your Honor.  No objection.

25         THE COURT:  Okay.

1          MR. BURKE:  So, we'll recess now?

2          THE COURT:  Yes.  Just stay right here.

3          (Thereupon, the sidebar conference was

4     concluded.)

5          THE COURT:  Ladies and gentlemen, we're

6     going to take the morning recess now for about 15, maybe

7     20 minutes.  I'm not sure.  But 15 is about right.  It

8     might be 20.  I'll let you know if it's 20.

9          Again, please don't discuss the case.  Don't

10    permit the case to be discussed in your presence.  We

11    will resume at that point.

12          Thank you.

13          (Court recessed at 11:28 a.m. and reconvened

14          at 11:53 a.m.)

15          THE COURT:  You may bring our jury out,

16    Mr. Hendrick.

17          Thank you.

18          MR. HENDRICK:  Yes, sir.

19          THE COURT:  You may be seated.

20          All right.  Counsel, you may proceed.

21    BY MR. BURKE:

22    Q.   Mr. Bedford, when Bedford's Images was awarded

23    the data migration subcontract, did your company have

24    any employees?

25    A.   No.

1    Q.   So, who did you use to actually perform the data

2    migration work?

3    A.   Associates of -- of myself, and Bertrand's

4    family.

5    Q.   When you say "associates," are you referring to

6    friends?

7    A.   Friends, yes.

8    Q.   Neighbors?

9    A.   Yes.

10   Q.   Did all of those people have computer expertise?

11   A.   Expertise, no.

12   Q.   What did you direct these people to do?

13   A.   To convert -- convert the files from one format

14   to another; so from a source file either to a later

15   version of that file, being if it was a Word document,

16   it got converted to the prospective Word software

17   version at the current time.  If it was for our archive

18   purposes, the document got converted from its native

19   document into a PDF format.

20   Q.   And how were they directed to -- to do this

21   conversion?

22   A.   They were given laptops with the prospective file

23   convention that was to be converted, along with a

24   duplicate file structure that -- that they were to

25   convert the file into and put it into the new file

1   structure; if that makes any sense.

2      Q.   What tool or software, if any, were --

3      A.   Your standard Microsoft Office tool, there was

4   some virus software and an off-the-shelf PDF Converter,

5   professional software product.

6      Q.   With the assistance of the court security

7   officer, if you could now turn to Government Exhibit 20,

8   please.

9           Do you have Government Exhibit 20 in front of

10  you?

11     A.   Yes.

12     Q.   What is Government Exhibit 20?

13     A.   A receipt from Office Depot for the purchase of

14  PDF Converter.

15     Q.   Was this the software you asked the -- your

16  independent -- the people that you worked with to use?

17     A.   Yes.

18          MR. BURKE:   Your Honor, the parties have

19  stipulated that Government Exhibit 20 is an authentic

20  business record and we move to admit Exhibit 20.

21          THE COURT:   Twenty will be received.   Thank

22  you.

23          MR. BURKE:   Ms. Sandvig, could you publish

24  that, please.

25  BY MR. BURKE:

1    Q.   And, sir, where did you purchase the software

2    that you used to do this data migration work?

3    A.   Office Depot.

4    Q.   Did you have to purchase any other software in

5    order to perform the work you did?

6    A.   No, I did not.

7    Q.   Mr. Bedford, were the people who actually

8    performed the data migration work employees of yours or

9    independent contractors?

10   A.   No, they were independent contractors.

11   Q.   How did you keep track of what you needed to pay

12   these individuals?

13   A.   Individuals submitted their hours via invoice

14   that they performed services for, and those were

15   received in the normal format, and the vendor would

16   submit to our organization for review and payment.

17   Q.   Now, with the assistance of the court security

18   officer, if I could ask you to now turn to Government's

19   Exhibits 10-1 through 10-9.

20        Do you have 10-1 through 10-9 in front of you?

21   A.   Yes, sir, I do.

22   Q.   What are 10-1 through 10-9?

23   A.   Invoices submitted by the independent contractors

24   for hours submitted to perform conversion work.

25   Q.   Did you require the contractors who worked with

1  you to submit these records to you at or near the time

2  they performed the work?

3       A.   At the completion, yes, of the work being

4  performed.

5       Q.   Were the -- were the invoices submitted to you

6  from people who were personally involved in doing the

7  work?

8       A.   Yes.

9       Q.   Were they submitted from people who had firsthand

10  knowledge of what work they had performed?

11       A.   Yes.

12       Q.   Was it your regular practice to track this

13  information?

14       A.   Yes.

15       Q.   Did you -- did you keep these records in the

16  course of your regularly conducted business activity?

17       A.   Yes.

18       Q.   And did you rely on the -- these invoices in the

19  course of your business?

20       A.   Yes.

21            MR. BURKE:  Your Honor, the government moves

22  to admit 10-1 through 10-9.

23            THE COURT:  10-1 through 10-9 will be

24  received without objection.

25  BY MR. BURKE:

1     Q.   Sir, did your company prepare any tax

2  documentation reflecting what these people were paid?

3     A.   Yes.

4     Q.   What kind of forms?

5     A.   They were issued the contractor's 1099 at the end

6  of the prospective year the services were rendered.

7     Q.   And briefly, in lay terms, what is a 1099?

8     A.   A 1099 is a W-2 for contractors.

9     Q.   If I could ask you now to turn to Government

10  Exhibits 30-1 through 30-8.

11         What are Government Exhibits 30-1 through 30-8?

12     A.   Copies of 1099s issued to the contractors that

13  performed the conversion support.

14     Q.   Do these 1099 forms accurately reflect what you

15  paid the independent contractors?

16     A.   Yes, they do.

17     Q.   Do they accurately reflect what was paid to them

18  for the data migration work?

19     A.   Yes, they do.

20              MR. BURKE:   Your Honor, the parties have

21  stipulated that 30-1 -- 30-1 through 30-8 are authentic

22  business records, and we move for their admission.

23              THE COURT:   30-1 and (sic) 30-8 will be

24  received without objection.

25  BY MR. BURKE:

1    Q.   Mr. Bedford, aside from the Office Depot receipt

2    for the PDF conversion software and the payments made to

3    these independent contractors, did you incur any other

4    out-of-pocket expenses in performing the data migration

5    work?

6    A.   No out-of-pocket expense, no other.

7    Q.   Mr. Bedford, while you were performing the data

8    migration work, who did you bill for your -- for

9    Bedford's Images' work?

10   A.   The Tridea Works.

11   Q.   Did you prepare invoices?

12   A.   Yes, I did.

13   Q.   And if you could now look at Government

14   Exhibits 6-1 through 6-9.

15        Do you have 6-1 through 6-9 in front of you, sir?

16   A.   Yes, sir, I do.

17   Q.   What are Government Exhibits 6-1 through 6-9?

18   A.   Invoices prepared to bill Tridea Works for the

19   conversion of -- document management conversion work.

20   Q.   Who prepared these invoices?

21   A.   I prepared those invoices.

22   Q.   Sir, were you paid for each of these invoices?

23   A.   Yes, sir, we were paid.

24   Q.   Who paid you?

25   A.   Tridea Works paid us for the invoices, sir.

1     Q.  Now, Mr. Bedford, were your invoices, the

2  invoices that you submitted to Tridea Works, were they

3  truthful?

4     A.  No, they were not accurate.

5     Q.  Did you lie on those invoices?

6     A.  Yes.

7          MR. BURKE:  Your Honor, I believe 6-1

8  through 6-9 are already admitted, and we would ask to

9  publish 6-1.

10         THE COURT:  You can.

11 BY MR. BURKE:

12    Q.  Sir, do you have 6-1 in front of you?

13    A.  Yes.

14    Q.  What is Government Exhibit 6-1?

15    A.  Invoice.

16    Q.  An invoice from you?

17    A.  Invoice from Bedford's Images to Tridea Works.

18    Q.  Let's look at the number of hours listed on this

19 invoice.  Did you inflate the number of hours?

20    A.  Yes, sir.

21    Q.  So, fair to say the number of hours on this

22 invoice are false; is that right?

23    A.  That's correct.

24    Q.  And the profit line, what does this invoice list

25 as the amount of profit?

1    A.   $6,453.02.

2    Q.   Was the actual profit that you earned higher or

3    lower than that figure?

4    A.   Lower -- I mean higher.

5    Q.   It was much higher, wasn't it?

6    A.   Yes.

7    Q.   So, is the profit line on this invoice also

8    false?

9    A.   It is.

10   Q.   And, sir, by inflating the number of hours on the

11   invoice, you inflated the amount of money your company

12   would get paid, right?

13   A.   That's correct.

14   Q.   Was this invoice, 6-1, the only invoice where you

15   lied?

16   A.   No.   All the invoices that I submitted reflected

17   the same -- similar billing.

18   Q.   Similar lies?

19   A.   Yes.

20   Q.   Let's look at 6-2, sir.

21        Did you inflate the number of hours on this

22   invoice?

23   A.   Yes.

24   Q.   So, are the number of hours on this invoice, are

25   they false?

1    A.   Correct.

2    Q.   And the profit line, is that profit line false as

3    well?

4    A.   Yes.

5    Q.   Did you actually receive more than that in

6    profit?

7    A.   Yes.

8    Q.   And, sir, did you make similar false statement on

9    the other invoices you submitted?

10   A.   Yes.  Invoices through this series are the same,

11   sir.

12             MR. BURKE:  The Court's indulgence, Your

13   Honor.

14             THE COURT:  All right.

15   BY MR. BURKE:

16   Q.   Mr. Bedford, let me direct your attention now to

17   March of 2013.  In March of 2013, was a search warrant

18   executed at your house?

19   A.   Yes.

20   Q.   Were you interviewed by law enforcement agents

21   that day?

22   A.   Yes.

23   Q.   Did they ask you questions about this

24   investigation?

25   A.   Yes.

1    Q.   Did the agents ask you whether there was any

2    connection between the payments to Mr. Conrad and the

3    data migration contract?

4    A.   Yes.

5    Q.   What did you tell the agents that day?

6    A.   I told them that it was not.

7    Q.   That there was no connection?

8    A.   Yes.

9    Q.   Were you truthful that day?

10   A.   No.

11   Q.   Sir, why did you -- what did you tell the agents

12   that day?

13   A.   The -- I don't recall verbatim what I said to the

14   agents, but they asked if Mr. Conrad had performed any

15   of the services and whether or not I had paid him to

16   pay -- to get work from him for -- in exchange for the

17   loan or building of a restaurant.

18   Q.   What was your answer to them?

19   A.   I expressed to them that I had made payments, but

20   not for the -- to receive work, but to -- to assist with

21   the request for a loan.

22   Q.   So, were you truthful with the agents that day?

23   A.   No.

24   Q.   Why did you lie to the agents that day?

25   A.   Because I -- I was uncomfortable and I had

1   committed an act that was a bad decision on my -- my

2   behalf as a businessperson, and was lying to try to

3   minimize the amount of laws that I had potentially

4   broke.

5       Q.   Sir, since those interviews with law enforcement,

6   have you pled guilty?

7       A.   Yes, I have.

8       Q.   Why did you plead guilty?

9       A.   Because I decided that it -- it was the proper

10  thing for me to do, to come forth and to end the

11  back-and-forth with that portion of my involvement with

12  the investigation.

13              MR. BURKE:   The Court's indulgence, Your

14  Honor.

15              (Pause.)

16              MR. BURKE:   Your Honor, may we briefly

17  approach?

18              THE COURT:   Yes.

19              (Thereupon, the following sidebar conference

20  was had:)

21              MR. BURKE:   Your Honor, I would ask that the

22  witness be permitted to step down at this time, to

23  return to complete his testimony tomorrow morning.

24              THE COURT:   Okay.

25              MR. SIMMS:   No objection.

1          THE COURT:  All right.

2          (Thereupon, the sidebar conference was

3  concluded.)

4          THE COURT:  Mr. Bedford, we're going to

5  recess your testimony for today and have you come back

6  tomorrow.  You can step down now.  Thank you.

7          (Thereupon, the witness withdrew from the

8  stand.)

9          MR. BURKE:  Your Honor, the government calls

10  Maria Couvillon.

11          MR. HENDRICK:  Face the clerk.  Please raise

12  your right hand.

13          (Witness sworn.)

14          THE WITNESS:  Yes, I do.

15          THE CLERK:  Thank you.  Have a seat, please.

16          THE COURT:  You may proceed.

17          THEREUPON, MARIA COUVILLON, having been duly

18  sworn, testified as follows:

19                    DIRECT EXAMINATION

20  BY MR. BURKE:

21     Q.  Ma'am, could you please state your name and spell

22  it for the court reporter.

23     A.  Maria Couvillon, M-a-r-i-a, C-o-u-v-i-l-l-o-n.

24     Q.  Ma'am, where do you work?

25     A.  I'm currently employed as a postal inspector with

1   the United States Postal Inspection Service.

2      Q.   And briefly, what is the U.S. Postal Inspection

3   Service?

4      A.   U.S. Postal Inspection Service is the law

5   enforcement agency for the Postal Service.

6      Q.   How long have you worked for the Postal

7   Inspection Service?

8      A.   Approximately thirteen and a half years.

9      Q.   What is your position there?

10     A.   I currently am employed -- or am currently

11  assigned to mail fraud investigations.

12     Q.   Could -- could you very briefly describe your

13  duties?

14     A.   I conduct investigations that involve fraud

15  schemes with a postal nexus.

16     Q.   Inspector Couvillon, in your work as a postal

17  inspector, have you become familiar with something

18  that's referred to as the Postal Service's Address

19  Management System?

20     A.   Yes.

21     Q.   Could you describe for the jury, what is the

22  Address Management System?

23     A.   It's a postal database that maintains a list of

24  deliverable addresses.

25     Q.   And could you describe for the jury what type of

1   data, what type of addresses are maintained in that

2   database?

3       A.   Addresses for single-family residences, apartment

4   buildings, PO boxes, throughout the U.S.

5       Q.   Throughout the entire United States?

6       A.   Yes.

7       Q.   Is it possible to conduct a search or a query of

8   that database?

9       A.   Yes.

10      Q.   And do you use that database in the course of

11  your duties as a postal inspector?

12      A.   Yes, I do.

13      Q.   Have you found the database to be reliable?

14      A.   Yes.

15      Q.   Now, Inspector Couvillon -- Inspector Couvillon,

16  with the court -- with the assistance of the court

17  security officer, I would like you to now please take a

18  look at Government Exhibits 1-1, 21-2 and 21-3.

19           MR. BURKE:  And Your Honor, 1-1 has been

20  admitted.  May we publish it, please.

21           THE COURT:  Yes.

22           MR. BURKE:  And, Ms. Sandvig, if you could

23  blow up the address.

24  BY MR. BURKE:

25      Q.   Inspector Couvillon, what's the address listed

1   here?

2   A.   PO Box 2898, Centreville, Virginia 20120.

3            MR. BURKE:  And if we could publish

4   Government Exhibit 21-2, please.

5   BY MR. BURKE:

6   Q.   Inspector Couvillon, what's the address listed on

7   the -- above the memo line of that check?

8   A.   PO Box 2898, Centreville, Virginia 20120.

9            MR. BURKE:  And may we publish 21-3, Your

10  Honor?

11           THE COURT:  Yes.

12  BY MR. BURKE:

13  Q.   Inspector Couvillon, what's the address listed

14  above the memo line of that check?

15  A.   PO Box 2898, Centreville, Virginia 20120.

16  Q.   Inspector Couvillon, as a part of this

17  investigation, were you asked to conduct a query of the

18  Postal Service's Address Management System?

19  A.   Yes.

20  Q.   What address did you query in the database?

21  A.   PO Box 2898, Centreville, Virginia 20120.

22  Q.   What was the result of your search?

23  A.   It was determined that it was an undeliverable

24  address, that the PO Box was not existent.

25           MR. BURKE:  Court's indulgence, Your Honor.

 1              (Pause.)

 2              MR. BURKE:  Nothing further, Your Honor.

 3              MR. SIMMS:  Your Honor, the defense has no

 4    questions for this witness.

 5              THE COURT:  All right.

 6              May the witness be excused?

 7              MR. BURKE:  Yes, for the government.

 8              THE COURT:  You're free to leave or stay as

 9    you like.

10              Thank you.

11              THE WITNESS:  Thank you.

12              (Thereupon, the witness withdrew from the

13    stand.)

14              MR. WALKER:  Your Honor, the government

15    calls Sean Baer.

16              MR. HENDRICK:  Face the clerk.  Raise your

17    right hand, please.

18              (Witness sworn.)

19              THE WITNESS:  Yes.

20              THE CLERK:  Thank you.

21              Have a seat, please.

22              THEREUPON, DEREK SEAN BAER, having been duly

23    sworn, testified as follows:

24                      DIRECT EXAMINATION

25    BY MR. WALKER:

1    Q.   Sir, could you please state and spell your name

2    for the court reporter.

3    A.   Yes.  It's Derek Sean Baer, D-e-r-e-k, S-e-a-n,

4    last name is Baer, B-a-e-r.

5    Q.   Where do you work?

6    A.   I'm currently a special agent at the U.S. Postal

7    Service, Office of Inspector General.

8    Q.   How long have you worked there?

9    A.   I've been with the Postal Service for about three

10   years.

11   Q.   From September of 2012 to May of 2013, where were

12   you employed?

13   A.   I was assigned as a special agent with the

14   Department of Commerce, Office of Inspector General.

15   Q.   Can you briefly describe what your duties were as

16   a special agent of the Department of Commerce, Office of

17   Inspector General?

18   A.   Sure.  Like all office of inspector generals,

19   they're responsible for investigating incidents of

20   fraud, waste and abuse against a government agency; in

21   this case the Commerce Department and its employees.

22   Q.   Special Agent Baer, directing your attention to

23   March 13th, 2013, were you on duty that day?

24   A.   I was.

25   Q.   What was your assignment?

1     A.   I was assigned as a lead agent for a search

2   warrant of the home of Mr. Raushi Conrad.

3     Q.   Was that ██████████████ Court?

4     A.   Yes, in Bristow, Virginia.

5     Q.   Is that located within the Eastern District of

6   Virginia?

7     A.   Yes, it is.

8     Q.   Special Agent Baer, do you see Raushi Conrad in

9   the courtroom today?

10    A.   I do.

11    Q.   Could you please identify him by where he is

12  sitting and what he is wearing?

13    A.   Mr. Conrad is sitting there (indicating).  He's

14  wearing a white shirt with a gray tie.

15          MR. WALKER:  Your Honor, may the record

16  reflect that the witness has accurately identified the

17  defendant?

18          THE COURT:  So noted.

19  BY MR. WALKER:

20    Q.   Special Agent Baer, before the search took place,

21  did you have an opportunity to interview the defendant?

22    A.   Yes.  Myself and Special Agent Leanne Sailer from

23  the FBI interviewed Mr. Conrad in his home.

24    Q.   Aside from yourself and Special Agent Sailer, was

25  there anyone else present for the interview?

1    A.   No.

2    Q.   Where specifically did the interview take place?

3    A.   We conducted the interview, at Mr. Conrad's

4    behest, down in his basement.

5    Q.   I want to walk the jury through that interview.

6    Let's start with the defendant's employment.

7         What, if anything, did he tell you about where he

8    worked?

9    A.   That he had previously been employed by the

10   Commerce Department, but that at the time he was working

11   at The Chicken Place restaurant.

12   Q.   And where was that restaurant located?

13   A.   I believe that that restaurant was located in

14   Fairfax, Virginia.

15   Q.   Were you able to discuss the data migration

16   project with the defendant?

17   A.   Yes.

18   Q.   According to the defendant, whose idea was it to

19   award the data migration contract to Bedford's Images?

20   A.   It was his -- it was his decision.

21   Q.   During the course of your interview, were you

22   able to discuss payments made from Team America

23   Contractors to the defendant?

24   A.   Yes.

25   Q.   Were you able to show the defendant any financial

1   documents during that interview?

2       A.   Yes.   During the course of the interview, I

3   showed the defendant multiple checks that were written.

4       Q.   With Mr. Hendrick assistance, would you please

5   take a look at what has been previously admitted into

6   evidence as Government Exhibits 21-1 through 21-4, and

7   27-1 through 27-4.

8       A.   Okay.   I have them here.

9       Q.   Do you recognize those documents?

10      A.   Yes.   These are the checks that I showed Mr. --

11  Mr. Conrad.

12            MR. WALKER:   Your Honor, may we have

13  permission to publish 21-1 to the jury?

14            THE COURT:   Yes.

15  BY MR. WALKER:

16      Q.   Let's take a look at that first check, Special

17  Agent Baer, marked Government Exhibit 21-1.

18            What is the date on that check?

19      A.   The date is November 12th of 2010.

20      Q.   Who is the check from?

21      A.   The check is from Team America Contractors.

22      Q.   Who is the check made payable to?

23      A.   It's made payable to CPE.

24      Q.   Over the course of your interview with the

25  defendant, did he ever explain what "CPE" stood for?

1    A.   Yes.  Mr. Conrad stated that "CPE" was Chicken

2   Place Express, which was the -- the name of his

3   restaurant.

4    Q.   How much is this check for?

5    A.   It is for $18,000.

6    Q.   What, if any, work did the defendant say he

7   performed to receive this $18,000 check from Team

8   America Contractors?

9    A.   Mr. Conrad stated that he didn't do any work for

10   Team America for the money that was paid to him.

11        MR. WALKER:  Your Honor, may we publish

12   Government Exhibit 21-2 to the jury?

13        THE COURT:  Yes.

14   BY MR. WALKER:

15    Q.   Turning your attention now to the second check,

16   marked Government Exhibit 21-2, what is the date on that

17   check?

18    A.   The date is December 15th of 2010.

19    Q.   Who is the check from?

20    A.   The check is from Team America Contractors.

21    Q.   And who is it made payable to?

22    A.   To CPE.

23    Q.   What, if any, work did the defendant say he

24   performed to receive this check?

25    A.   The defendant, Mr. Conrad, stated he did not do

1   any work to receive this payment.

2       Q.   What's the amount of the check?

3       A.   It is for $55,000.

4       Q.   Directing your attention to the bottom left

5   corner of the check, to the memo line, what does the

6   memo line say?

7       A.   It states, "Support services Number 127."

8       Q.   What, if anything, did the defendant say about

9   whether he actually performed any support services for

10  Team America?

11      A.   The defendant stated he didn't do anything,

12  didn't do any work for this money.

13           MR. WALKER:  Your Honor, permission to

14  publish 21-3 to the jury.

15           THE COURT:  Yes.

16  BY MR. WALKER:

17      Q.   Let's take a look at the third check, marked

18  Government Exhibit 21-3, the check dated February 4th,

19  2011.

20           What is that?

21      A.   That is one of the checks that I showed

22  Mr. Conrad.

23      Q.   And who is the check from?

24      A.   It's from Team America Contractors.

25      Q.   And who is it made payable to?

1    A.   To CPE.

2    Q.   What, if any, work did the defendant say he

3    performed to receive this check?

4    A.   Again, the defendant, Mr. Conrad, stated he did

5    not do any work for this check -- for the money in this

6    check.

7    Q.   And directing your attention again to the memo

8    line in the bottom left corner, what does that memo line

9    say?

10    A.   It says, "Document conversion Project 137."

11    Q.   What, if any, document conversion project did the

12    defendant say he performed for Team America?

13    A.   Mr. Conrad stated that he did no work, including

14    no conversion, during the time we interviewed him, for

15    this money.

16            MR. WALKER:  Your Honor, permission to

17    publish Government Exhibit 21-4.

18            THE COURT:  Permission granted.

19    BY MR. WALKER:

20    Q.   Turning your attention now to the check marked

21    Government Exhibit 21-4, dated August 15th, 2011, who is

22    that check from?

23    A.   That is from Team America Contractors.

24    Q.   And who is it made payable to?

25    A.   To CPE.

1    Q.   What's the amount of that check?

2    A.   It is $7,500.

3    Q.   What, if any, work did the defendant say he

4    performed to receive this $7,500 check from Team

5    America?

6    A.   Mr. Conrad stated he didn't do any work for this

7    money.

8    Q.   Directing your attention to the memo line of this

9    check, in the bottom left corner, what does the memo

10   line say?

11   A.   "Engineering services."

12   Q.   What, if anything, did the defendant say about

13   whether he actually performed any engineering services

14   for Team America?

15   A.   Mr. Conrad stated he did not perform any work,

16   again, for this check -- for the money in this check.

17   Q.   And, Special Agent Baer, let's walk through the

18   last four checks at once.

19        Are Government Exhibits 27-1 through 27-4 also

20   checks the defendant received from Team America?

21   A.   Yes.  Those were the checks that he received, as

22   well as the ones I showed him during the interview.

23   Q.   Starting with Government Exhibit 27-1, dated

24   March 10th, 2011, what does that check say -- the memo

25   line say the check is for?

1      A.   For "Support services."

2      Q.   What about Government Exhibit 27-2, dated

3   May 3rd, 2011; what does the memo line say that check is

4   for?

5      A.   "Support services."

6      Q.   And Government Exhibit 27-3, dated June 20th,

7   2011, what does the memo line say that check is for?

8      A.   There's a number, it's -- I think "2112," and

9   then it says the "data migration."

10     Q.   And, finally, Government Exhibit 27-4, dated

11  August 19th, 2011, what does the memo line say that

12  check is for?

13     A.   "Engineering services."

14     Q.   The services that are listed on those memo lines

15  "support services," "data migration," and "engineering

16  services," what, if any, of those services did the

17  defendant say he performed for Team America?

18     A.   Mr. Conrad stated that he did not do any work for

19  the money that was paid to him through these checks.

20     Q.   And after receiving all of the checks we just

21  walked through, Government Exhibits 21-1 through 21-4,

22  and 27-1 through 27-4, what, if anything, did the

23  defendant say he did with those checks?

24     A.   Mr. Conrad stated that he cashed those checks.

25     Q.   Given the defendant's statements that he did not

1    perform any work for Team America, what, if any,

2    explanation did he provide for why he received the

3    money?

4        A.   He didn't provide an explanation; just stated

5    that he didn't do any work for the -- for the money that

6    he was provided in these checks.

7        Q.   Special Agent Baer, you testified earlier that

8    you conducted your interview of the defendant in his

9    basement at his behest.  Did you have an opportunity to

10   discuss his basement with him during the interview?

11       A.   Yes.  Yes, I did.

12       Q.   And were you able to ask him questions about

13   renovation work done on his basement?

14       A.   Yes.

15       Q.   During your interview, what, if anything, did

16   your ask the defendant about the work performed by Team

17   America Contractors at his residence?

18       A.   He had stated that Team America had done the

19   majority of the work in the basement.

20       Q.   According to the defendant, what did he pay for

21   that work?

22       A.   He stated that he paid some of the

23   subcontractors, but he didn't pay the entire amount.

24       Q.   Did he say that he paid for all of the work done

25   by Team America Contractors on his basement?

1      A.   He didn't state that he paid for any of the work

2   done by Team America, only that he paid some of the

3   contractors for some of the work.

4              MR. WALKER:  Nothing further, Your Honor.

5                    CROSS-EXAMINATION

6   BY MR. SIMMS:

7      Q.   Good afternoon.

8      A.   Good afternoon.

9      Q.   Special Agent Baer, right?

10     A.   Yes.

11     Q.   Okay.  So, Mr. Baer, you went to interview

12   Mr. Conrad on March 13th at (sic) 2013?

13     A.   Correct.

14     Q.   Okay.  And the government just went through

15   several checks with you and asked you had Mr. Conrad

16   done any work in order to receive those checks, right?

17     A.   Right.

18     Q.   And you went through each one and you said

19   Mr. Conrad said he didn't receive -- he didn't do any

20   work to receive that check, right?

21     A.   Correct.

22     Q.   All right.  Mr. Conrad also didn't say that he

23   provided contracts in order to receive those checks, did

24   he?

25              (Pause.)

1        Let me rephrase -- I'll rephrase the question.

2        Did he ever tell you that he provided contracts

3   to Bedford Images in order to get paid?

4   A.   No, he did not say that.

5   Q.   Okay.  On direct examination, you stated you

6   asked him what he did with those checks, and your answer

7   was that he cashed those checks.

8        But those checks were deposited, right?

9   A.   Yes.

10  Q.   Okay.

11  A.   I mean, according to the information that we

12  received, they were deposited into an account.

13  Q.   Okay.  Not just an account, but they were

14  deposited into his account, right?

15  A.   Correct.

16  Q.   It made it pretty easy to track, right?

17  A.   Yes.

18  Q.   Okay.  And in fact, your agency was able to

19  obtain bank records because they were deposited into

20  Mr. Conrad's account, right?

21  A.   I believe all these checks were deposited into

22  the account for CPE, which was an account for the

23  restaurant.

24  Q.   Okay.  Was Mr. Conrad's name associated with that

25  account?

1    A.   Yes.  Uh-huh.

2    Q.   Okay.

3    A.   He was one of the signatory -- signature for the

4    account.

5    Q.   Okay.  Now, you stated that Mr. Conrad told you

6    that he chose Bedford Images to do the data migration

7    project.

8    A.   Right.

9    Q.   I direct your attention to Defense Exhibit

10   binder, Tab 2.

11   A.   Okay.

12   Q.   Are you there?

13   A.   I am.

14   Q.   Okay.  Do you recognize this document?

15   A.   Yes.  It's what the FBI calls a 302.  It's a

16   written report for the investigation -- excuse me -- for

17   the interview of Mr. Conrad.

18   Q.   Okay.  So, in this situation you all didn't

19   record, make an audio recording of the interview.

20   A.   That is correct.

21   Q.   Okay.  And what a 302 is, is a write-up of the

22   interview that happened between you and whoever the

23   person may be that's being interviewed, right?

24   A.   Correct.

25   Q.   All right.  In this case, it was Mr. Conrad being

1   interviewed?

2      A.   Yes.

3      Q.   All right.  At the top of the document, it has

4   the date of entry, which is reflected, it says

5   March 14th, right?

6      A.   That's correct.

7      Q.   Okay.  So that means that this document was typed

8   up a day after the interview with Mr. Conrad?

9      A.   Yes.

10     Q.   All right.  And this document is supposed to

11  accurately reflect what was relayed to you and your

12  fellow agent during that interview, correct?

13     A.   That's correct.

14     Q.   All right.  Agent Baer, I want you to go through

15  this document and point out to me where it says that

16  Mr. Conrad says he got Bedford Images that contract.

17          MR. WALKER:  Objection, Your Honor.  He's

18  misstating the witness's testimony.

19          THE COURT:  I'm not familiar with that

20  objection, Mr. --

21          MR. WALKER:  He's mischaracterizing

22  the witness's -- Mr. Simms is mischaracterizing.

23          THE COURT:  Cross-examination for misleading

24  questions, Mr. Walker.  Objection overruled.

25          THE WITNESS:  I'm sorry.  Do you want me to

1  go ahead?

2           What was the question again?

3  BY MR. SIMMS:

4     Q.   Okay.  The question is:  Do you see anywhere in

5  this document where you see Mr. Conrad saying that he

6  got Bedford Images the contract for data migration?

7     A.   Do you want me to read from your exhibit?

8     Q.   Yes.  Do you see it?

9     A.   Yes, I do.

10    Q.   Okay.  What page is it?

11    A.   It's on page 2 of 12, the second paragraph.

12    Q.   Okay.  And here it says --

13           THE COURT:  Do you want him to read out

14  loud?

15           MR. SIMMS:  Yes.

16  BY MR. SIMMS:

17    Q.   Please read paragraph 2 out loud.

18    A.   It says, "When asked how BI got the data

19  migration contract, since it looked like it was

20  sole-sourced to them, Conrad responded that it was his

21  idea.  He has no idea what Kim Bryant did."

22    Q.   Okay.  So, the final say-so, according to what

23  Mr. Conrad told you and what's reflected in this report,

24  would have been with Kim Bryant.

25           MR. WALKER:  Objection, Your Honor.  Calls

1    for speculation.

2              THE COURT:  Sustained.

3    BY MR. SIMMS:

4        Q.  Why is Kim Bryant's name in this report?

5              MR. WALKER:  Objection, Your Honor.  Calls

6    for speculation.

7              THE COURT:  Is this his report, or someone

8    else's?  I'm not clear.

9              MR. SIMMS:  This report?  I can ask him,

10   Your Honor.

11             MR. WALKER:  Your Honor, the report was

12   written by someone else.

13             THE COURT:  Okay.  Well, I was asking

14   Mr. Simms.  Thank you.

15             Ask the witness who wrote the report.

16   BY MR. SIMMS:

17       Q.  Agent Baer, who wrote this report?

18       A.  It was written by Special Agent Leanne Sailer of

19   the FBI.

20       Q.  Did you have any input into it?

21       A.  I reviewed the report, I believe, before it was

22   finalized.

23       Q.  Did you review for its accuracy?

24       A.  Yes.

25       Q.  Did you agree that it was accurate after

1    reviewing it?

2      A.  Yes.

3             MR. SIMMS:  Your Honor, I would ask that the

4    witness be allowed to answer the question.

5             THE COURT:  He can answer the question now.

6             Go ahead.  Ask him the question again.

7             MR. SIMMS:  Okay.

8    BY MR. SIMMS:

9      Q.  Special Agent Baer, why is Kim Bryant's name in

10   the report?

11     A.  We interviewed Mr. Conrad about Mr. Bryant

12   because Mr. Bryant was the -- at the time, I think it

13   was SPAWAR, which is DOD demand.  They were the --

14   SPAWAR was the vehicle, the contractual vehicle that

15   allowed Commerce to hire certain contractors.  So, they

16   were the vehicle that was involved.  They are not a

17   decision authority.  They're just the contracting

18   vehicle.

19     Q.  Okay.  And are you familiar with the whole -- the

20   contracting process?

21     A.  I am.

22     Q.  Okay.  And are you aware that Tridea was the

23   prime -- the prime contractor in regards to migration

24   project?

25     A.  Correct.  They were a pass-through.

1    Q.  Okay.  And it was Tridea who picks their own

2  subcontractors, correct?

3          THE COURT:  Excuse me.  Are you asking about

4  the contracting process?

5          Does he have personal knowledge of that?

6          MR. SIMMS:  He said he did.  I asked him as

7  a foundation question.

8          THE COURT:  You have to lay a foundation --

9          MR. SIMMS:  Okay.

10         THE COURT:  -- about that.  He's here as a

11  law enforcement officer.  He's not a contracting

12  officer.

13         MR. SIMMS:  Understood, Your Honor.  I'll

14  lay a foundation.

15  BY MR. SIMMS:

16    Q.  Agent Baer, through this investigation and other

17  investigations, are you familiar with the contracting

18  process with the federal government?

19    A.  I am.

20    Q.  Okay.  And investigating this case, did you

21  become aware of the contracting process as it related to

22  Tridea and Bedford Images?

23    A.  As it relates to the Department of Commerce, yes.

24    Q.  Okay.  So, as the contracting process works with

25  the Department of Commerce, isn't Tridea, under policy,

1    supposed to pick their own subcontractor?

2              MR. WALKER:  Objection, Your Honor.  Calls

3    for speculation.

4              THE COURT:  Sustained.

5    BY MR. SIMMS:

6      Q.  In your experience, who picks the subcontractor?

7              MR. WALKER:  Objection, Your Honor.  Calls

8    for speculation.

9              MR. SIMMS:  Your Honor, may I respond?

10             THE COURT:  Yes, you can respond.

11             MR. SIMMS:  Your Honor, it does not call for

12   speculation.  In his experience and what he's seen --

13             THE COURT:  Is this case about what an

14   investigator finds out?

15             Because, Mr. -- Mr. Hodor from Tridea was on

16   the stand a moment ago.

17             MR. SIMMS:  Correct.

18             THE COURT:  All right.  So, objection

19   sustained.

20   BY MR. SIMMS:

21     Q.  Now, how long did you interview Mr. Conrad at his

22   residence?

23     A.  Um, I don't remember the exact amount of time.

24   Maybe an hour-ish.

25     Q.  Okay.  And at the same time there was a search

1    warrant conducted?

2        A.   Actually, it was prior to the search warrant.

3        Q.   Okay.  And were you privy to the results of the

4    search warrant?

5        A.   I was there for the search warrant, yes.

6        Q.   Okay.  And do you recall money being recovered

7    during the search warrant?

8        A.   I believe that money was found, if that's what

9    you're asking when you say "recovered."

10       Q.   Okay.  So, the money was found, but not taken

11   from the residence?

12       A.   No.  It was just -- I believe it was just

13   counted, and Mr. Conrad was brought up and shown the

14   amount.  But no money was taken from the residence.

15       Q.   Okay.  And do you recall the amount?

16       A.   I don't.  I'm sorry.

17       Q.   Okay.  If it was a hundred thousand dollars in

18   cash, would it have been taken?

19       A.   I don't remember the amount.

20       Q.   But, in your experience if it was over a hundred

21   thousand dollars in cash, would it have been seized by

22   your agency?

23            MR. WALKER:  Objection, Your Honor.

24   Relevance.

25            THE COURT:  Sustained.

1    BY MR. SIMMS:

2        Q.   Now, during the interview Mr. Conrad told you

3    that he believed that his actions created a conflict of

4    interest with his agency, correct?

5        A.   I believe he stated something about an ethical

6    violation.

7        Q.   Okay.  And he had resigned from his agency,

8    correct?

9        A.   I believe that he had resigned from the -- he

10   certainly was no longer working for the Department of

11   Commerce, and I don't remember now whether it was a

12   resignation or not.  I presume that it was.

13       Q.   And that was prior to your interview in 2013?

14       A.   Correct.

15       Q.   Agent, I'm going to refer your attention to

16   page 11 of that document.

17       A.   Okay.

18       Q.   I'm going to refer your attention page 11, the

19   second-to-the-last paragraph.

20            Do you recall what Mr. Conrad stated when you

21   asked him about a bribery scheme?

22       A.   I'm sorry, was that a question?

23       Q.   Yeah.  Do you recall what he told you?

24       A.   I don't remember asking him specifically about

25   the bribery scheme.  We were talking about the checks in

1   this case, so...

2       Q.   Okay.  And what was his response about the

3   checks?

4       A.   He actually wouldn't talk to us about -- well, he

5   talked to us about the checks, but he wouldn't -- he

6   told us he couldn't give us the entire story.

7       Q.   Referring your attention to the

8   second-to-the-last paragraph --

9       A.   Uh-huh.

10      Q.   -- so what's this discussion about?

11      A.   If memory serves, that Mr. Conrad had stated

12  that -- was kind of recapping.  It was towards the end

13  of the interview and he was kind of recapping what he

14  thought that we were there about.

15          And so he stated something along the lines

16  that -- that -- he said that we were concerned with

17  regards to an exchange of money for contracts awarded to

18  Team America, and he stated that, as it states here, "I

19  can tell you today that scenario, I did not do that."

20      Q.   Okay.

21          MR. SIMMS:  Thank you.  No further

22  questions.

23          MR. WALKER:  Your Honor, may the witness be

24  excused?

25          THE COURT:  Yes.

1            You can step down, sir.  Thank you.

2            (Thereupon, the witness withdrew from the

3    stand.)

4            MR. BURKE:  Your Honor, the government calls

5    Danielle Hodge.

6            MR. HENDRICK:  Face the clerk.  Raise your

7    right hand, please.

8            (Witness sworn.)

9            THE WITNESS:  I do.

10           THE CLERK:  Thank you.

11           Have a seat, please.

12           THEREUPON, DANIELLE HODGE, having been duly

13   sworn, testified as follows:

14                      DIRECT EXAMINATION

15   BY MR. BURKE:

16     Q.  Good afternoon, ma'am.

17          Could you please state your name and spell your

18   name for the court reporter.

19     A.  Danielle Hodge, D-a-n-i-e-l-l-e, H-o-d-g-e.

20     Q.  Ms. Hodge, what do you do for a living?

21     A.  I'm a secretary at a high school.

22     Q.  Could you briefly describe your educational

23   background?

24     A.  Some college.

25     Q.  Ms. Hodge, do you have any specialized training

1    in computer science?

2        A.   No.

3        Q.   Do you have any specialized training in

4    information technology?

5        A.   No.

6        Q.   Do you have any computer-related certifications?

7        A.   No.

8        Q.   Ms. Hodge, are you familiar with a man named

9    James Bedford?

10       A.   Yes.

11       Q.   How do you know James Bedford?

12       A.   We met in 1993 at a Lamaze child-birthing class.

13       Q.   And did you also meet other members of

14   Mr. Bedford's family at the time?

15       A.   One more time?  I'm sorry.

16       Q.   Who else did you meet at Lamaze class?

17       A.   His wife, Paula.

18       Q.   Are you friends with -- with James Bedford's

19   wife?

20       A.   Yes.

21       Q.   Have you remained in contact with his wife since

22   1993?

23       A.   Yes.

24       Q.   Ms. Hodge, let me ask you now to focus on 2010.

25   In 2010, did you have an opportunity to work for James

1  Bedford?

2     A.  Yes.

3     Q.  Could you explain to the jury what happened?

4     A.  James came to me about doing some extra work.

5  That's about it.

6     Q.  What kind of work -- how did he describe this

7  work?

8     A.  Saving files on a laptop, converting them using a

9  PDF Converter.

10    Q.  And what, if anything, did Mr. Bedford instruct

11  you to do?

12    A.  To save the files using the PDF Converter, and

13  then save them back to their original format.

14    Q.  Aside from that process, were you instructed to

15  do anything else?

16    A.  No.

17    Q.  Ms. Hodge, did you understand the purpose of the

18  work you were doing?

19    A.  No.

20    Q.  What kind of training, if any, did you receive

21  from James Bedford in relation to this work?

22    A.  Basic instructions on how to save the files.

23    Q.  Did the work you were doing require any kind of

24  specialized computer training?

25    A.  No.

1    Q.    Could you -- how would you describe the actual

2   work that you were doing?

3    A.    Long and tedious, repetitive, saving the files

4   over and over.

5    Q.    Aside from saving the files over and over, did

6   you do anything else on this project?

7    A.    No.

8    Q.    Ms. Hodge, were you paid for your work?

9    A.    Yes.

10   Q.    What was your hourly rate?

11   A.    $25 an hour, and it went to $30 an hour.

12   Q.    Who or what entity paid you for your work?

13   A.    Team America Contractors.

14   Q.    Ms. Hodge, did you prepare invoices for the work

15  you did?

16   A.    Yes.

17   Q.    With the assistance of the court security

18  officer, if I could ask you now to please turn to

19  Government Exhibit 10-3.

20          MR. BURKE:  And, Your Honor, I believe 10-3

21  has been admitted.  We would ask that it be published.

22          THE COURT:  You may publish.

23  BY MR. BURKE:

24   Q.    Ms. Hodge, what is Government Exhibit 10-3?

25   A.    These are my invoices.

1    Q.   And did you prepare them around the time you did
2    the work?
3    A.   Yes.
4    Q.   Did they accurately reflect the amount of hours
5    that you worked?
6    A.   Yes.
7    Q.   Ms. Hodge, are you married?
8    A.   Yes.
9    Q.   What is your husband's name?
10   A.   Kenneth Lamar Hodge.
11   Q.   And what, if any, involvement did Mr. Hodge have
12   in this project?
13   A.   He worked -- he did the files, also.
14   Q.   Did you assist your husband in preparing invoices
15   as well?
16   A.   Yes.
17   Q.   With the assistance of the court security
18   officer, if you could now look at 10-5.
19            MR. BURKE:  Your Honor, this has been
20   admitted.  May we publish?
21            THE COURT:  Yes.
22   BY MR. BURKE:
23   Q.   Ms. Hodge, what is Government Exhibit 10-5?
24   A.   The invoices for my husband, Kenneth.
25   Q.   Did you prepare these invoices around the time

1    that Mr. Hodge did the work?

2        A.   Yes.

3        Q.   Did they accurately reflect the number of hours

4    he worked?

5        A.   Yes.

6        Q.   Now, ma'am, did -- did you submit these invoices

7    for your husband's work also to Team America?

8        A.   Yes.

9        Q.   And were you paid?

10       A.   Yes.

11       Q.   Were both you and your husband paid?

12       A.   Yes.

13       Q.   Were you paid for all the work that you did?

14       A.   Yes.

15                MR. BURKE:  One moment, Your Honor.

16                (Pause.)

17                Nothing further from this witness, Your

18   Honor.

19                THE COURT:  All right.

20

21                    CROSS-EXAMINATION

22   BY MR. SIMMS:

23       Q.   Good afternoon, Ms. Hodges.

24       A.   Hodge.

25       Q.   Hodge.  I'm sorry.

1              How did you -- how did you get the invoices to
2    Mr. Bedford?
3        A.   Um -- (pause) --
4        Q.   Did you mail them or drop them off, e-mail them?
5        A.   From what I can recall, e-mailed.
6        Q.   E-mailed?
7        A.   I just -- I don't recall all the time, but
8    e-mail.
9        Q.   Okay.  And how did you receive your payment?
10             Did you pick up the checks or were they mailed to
11    you?
12       A.   No.  Delivery.  From what I can recall, his wife
13    dropped them off to me.
14       Q.   Okay.  And how long after submitting the invoices
15    would it be that his wife would drop the checks off to
16    you?
17       A.   Oh, I don't recall.
18       Q.   Okay.  And, Ms. Hodge, do you know Raushi Conrad?
19       A.   No.
20       Q.   Ever seen him before?
21       A.   No.
22       Q.   Ever talked to him?
23       A.   No.
24       Q.   Okay.
25             MR. SIMMS:  No further questions.

1           MR. BURKE:  No redirect, Your Honor.

2           May the witness be excused?

3           THE COURT:  You're free to leave or stay as

4    you like.  Thank you.

5           THE WITNESS:  Thank you.

6           (Thereupon, the witness withdrew from the

7    stand.)

8           MR. WALKER:  Your Honor, the government

9    calls Kenneth Hodge.

10          MR. HENDRICK:  Face the clerk and raise your

11   right hand, please.

12          (Witness sworn.)

13          THE WITNESS:  I do.

14          THE CLERK:  Thank you.

15          Have a seat, please.

16          THEREUPON, KENNETH HODGE, having been duly

17   sworn, testified as follows:

18                  DIRECT EXAMINATION

19   BY MR. WALKER:

20      Q.  Good afternoon, sir.

21          Could you please state and spell your name for

22   the court reporter.

23      A.  Kenneth Hodge, K-e-n-n-e-t-h, H-o-d-g-e.

24      Q.  And, Mr. Hodge, if you can lean a little closer

25   to the microphone so the members of the jury can hear

1    you.

2        A.   Okay.

3        Q.   Mr. Hodge, what do you do for a living?

4        A.   A technical support specialist.

5        Q.   What do you as a technical support specialist?

6        A.   I support the hardware and software in a school

7    system right now.

8        Q.   And what school system is that?

9        A.   Prince William County.

10       Q.   How long have you worked there?

11            MR. SIMMS:  Objection, relevance.

12            MR. WALKER:  Your Honor, his technical

13   background is relevant for purposes of the data

14   migration work.

15            THE COURT:  All right.  Objection overruled.

16   BY MR. WALKER:

17       Q.   How long have you worked there?

18       A.   Five years.

19       Q.   Prior to working at Prince William County

20   Schools, what, if any, other experience did you have

21   doing computer work?

22       A.   I have approximately 30 years in the field.  I

23   started off at EDS and then went to Errols (phonetics)

24   and then Fannie Mae.

25       Q.   Could you briefly describe your educational

1  background for the jury?

2  A.  High school, college and technical school.

3  Q.  Do you have any certifications?

4  A.  Currently, no.

5  Q.  Mr. Hodge, do you know an individual named James

6  Bedford?

7  A.  Yes.

8  Q.  How do you know him?

9  A.  I met him in Lamaze class when my son was being

10  born.

11  Q.  How long have you known Mr. Bedford?

12  A.  Twenty-four years.

13  Q.  I want to direct your attention now to 2010.

14      In 2010, did you have an opportunity to work for

15  Mr. Bedford?

16  A.  Yes.

17  Q.  How did you first come to work for Mr. Bedford?

18  A.  I think we were talking and he asked, did I want

19  to do some side work.

20      And I said, "Yes."

21  Q.  How did you first get started with the work?

22  A.  Um, he -- he brought it over to my house, some

23  laptops, and instructed me on what he wanted done, and

24  that was it.

25  Q.  What instructions did Mr. Bedford provide you on

1    what he wanted done?

2       A.   Um, basically, he wanted me to re-save some Excel

3    and Word files on the laptop.

4       Q.   In addition to the Word and Excel files, were

5    there PDFs involved as well?

6       A.   Yes, there were.

7       Q.   What, if anything, were you told to do with the

8    PDFs?

9       A.   On some of the files, he did want them converted

10   using a PDF Converter.

11      Q.   How did the PDF Converter get onto the laptops

12   you were using to convert the files?

13      A.   I installed it.

14      Q.   Based on the experience you have working with

15   computers, was there anything that appeared to be unique

16   about the PDF Converter you were using?

17      A.   No.  It was off-the-shelf.

18      Q.   Were you provided any instructions other than

19   those you just described?

20      A.   No.

21      Q.   Were you asked to run a virus scan on the files?

22      A.   No.

23      Q.   Were you asked to check for malware?

24      A.   No.

25      Q.   What was your understanding of the point of the

1   work you were asked to do?

2      A.   I actually didn't understand it.

3      Q.   To your knowledge, what were you accomplishing by

4   re-saving the files?

5      A.   Nothing other than changing the date on the file.

6      Q.   Mr. Hodge, where were you when you performed the

7   work?

8      A.   In my house.

9      Q.   What, if any, specialized knowledge did the work

10  seem to require?

11     A.   None.

12     Q.   Were you applying any of your 30-plus years of

13  specialized computer knowledge?

14     A.   No.

15     Q.   Mr. Hodge, were you paid for your work?

16     A.   Yes.

17     Q.   Were you paid a salary per file or per hour?

18     A.   Per hour.

19     Q.   What was your hourly rate?

20     A.   It started off at $25 per hour, and halfway

21  through I think it went up to 30.

22     Q.   How did you keep track of your hours?

23     A.   My wife actually kept track.

24     Q.   And did your wife prepare invoices for your work?

25     A.   Yes, she did.

1    Q.   Who were those invoices submitted to?

2    A.   To Team America.

3    Q.   Who specifically were they submitted to at Team

4    America?

5    A.   James Bedford.

6    Q.   Were you ultimately paid for your work?

7    A.   Yes.

8    Q.   Were you paid by Mr. Bedford personally or by his

9    business?

10   A.   We were paid by his business.

11   Q.   And what business was that?

12   A.   Team America.

13   Q.   How were you paid?

14   A.   By check.

15   Q.   How would you obtain those checks?

16   A.   He would bring it over to my house.

17            MR. WALKER:  One moment, Your Honor.

18            (Pause.)

19            Nothing further.

20

21                    CROSS-EXAMINATION

22   BY MR. SIMMS:

23   Q.   Good afternoon, Mr. Hodge.

24        Mr. Hodge, do you know Raushi Conrad?

25   A.   No.

1    Q.    Okay.  Have you ever seen him before?

2    A.    No.

3    Q.    Did Mr. Bedford ever mention Raushi Conrad to

4    you?

5    A.    No.

6    Q.    Okay.  You stated that you have somewhat of a

7    technical background when it comes to computers and

8    software, right?

9    A.    Yes.

10   Q.    When Mr. Bedford explained the process to you,

11   you said you really didn't understand what he was

12   talking about?

13   A.    Correct.

14   Q.    Okay.  Did you -- why didn't you ask him

15   questions?

16   A.    I did question him, and I was told to re-save the

17   file, the procedures again.

18   Q.    Okay.  And then you submitted your hours to him?

19   A.    Correct.

20   Q.    Okay.  And did you know that he was contracting

21   with the government?

22   A.    Um, I think he may have mentioned one time that

23   it was Department of Commerce, yes.

24   Q.    Okay.  And did you trust him -- you trusted him

25   to accurately submit your work and your hours, correct?

1    A.   Yes.

2              MR. SIMMS:  No further questions.

3              MR. WALKER:  Your Honor, may the witness be

4    excused?

5              THE COURT:  Yes.

6              You can step down, sir.

7              (Thereupon, the witness withdrew from the

8    stand.)

9              THE COURT:  Close enough.

10             Ladies and gentlemen, we're going to take

11   the luncheon recess now until 2:00 p.m.  Please do not

12   discuss the case.  Don't permit the case to be discussed

13   in your presence.

14             Leave your notes in the jury deliberation

15   room.

16             We'll resume at 2 o'clock.  Thank you.

17             (Jury not present.)

18             THE COURT:  In the old days, Judge Bryant

19   was rumored to have said, "If you run out of witnesses,

20   then you rest."  I'm not quite that rigid, but I do want

21   to keep the schedule.

22             MR. WALKER:  We will, Your Honor.

23             THE COURT:  Thank you.

24             (Court recessed at 12:57 p.m. and reconvened

25             at 2:02 p.m.)

1             THE COURT:  I apologize for the delay.

2             Mr. Hendrick, you can bring our jury out.

3             MR. HENDRICK:  Yes, sir.

4             (Jury present.)

5             THE COURT:  You may be seated.

6             All right.  Counsel, you may proceed.

7             MR. BURKE:  Your Honor, the government calls

8    Bina Martin-Giles.

9             MR. HENDRICK:  Face the clerk.  Please raise

10   your right hand.

11            (Witness sworn.)

12            THE WITNESS:  Yes.

13            THE CLERK:  Thank you.

14            Have a seat, please.

15            THEREUPON, BINA MARTIN-GILES, having been

16   duly sworn, testified as follows:

17                    DIRECT EXAMINATION

18   BY MR. BURKE:

19     Q.  Good afternoon.

20         Could you state your name and spell it for the

21   court reporter.

22     A.  Yes.  My name is Bina Martin-Giles.  My first

23   name is Bina, B- like in boy -i-n- for Nancy -a.  Last

24   name hyphenated, Martin, M- like in Mary -a-r-t- for

25   Thomas -i-n for Nancy, hyphen, G- for George -i-l-e-s

1    for Sam.

2    Q.   Ms. Martin-Giles, what do you do for a living?

3    A.   I -- my husband and I own our own business.

4    Q.   I'm sorry.  I couldn't hear your answer.

5    A.   My husband and I own our own business.

6    Q.   What's the name of your business?

7    A.   Reliable Rails, Inc.

8    Q.   What kind of company is Reliable Rails?

9    A.   We're a wrought iron rail company.

10   Q.   Does Reliable Rails provide information

11   technology consulting services?

12   A.   No, sir.

13   Q.   Does it sell computer expertise?

14   A.   No, sir.

15   Q.   Does it sell computer consulting?

16   A.   No.

17   Q.   Ms. Martin-Giles, are you familiar with a man

18   named James Bedford?

19   A.   Yes.

20   Q.   How do you know James Bedford?

21   A.   Through a company called Team America.

22   Q.   How did you first come to meet Mr. Bedford?

23   A.   I knew -- I knew some people that worked with --

24   that had another company, Diamond Management, Diamond

25   Management Group, or Diamond Management Utilities, and

1    then they also had a company, Team America.  Mr. Bedford

2    joined Team America at some point.

3        Q.  And you had known the other people involved in

4    that -- in that company, Team America?

5        A.  Yes.  Yes.

6        Q.  And that's how you came to know Mr. Bedford?

7        A.  Yes.

8        Q.  Ms. Martin-Giles, I'd like to direct your

9    attention now to the summer of 2010.

10           In the summer of 2010, were you asked to do some

11   work for James Bedford?

12       A.  Yes.

13       Q.  What type of work were you asked to perform?

14       A.  Um, I thought it was going to be data entry.

15       Q.  What type of work did it turn out to be?

16       A.  It turned out to be, um -- well, we worked with a

17   laptop, and it was, um -- we would click over on the

18   left, or he would, and move some -- like a

19   click-and-drag, a click-and-drag type of effort on the

20   laptop.

21       Q.  What kind of training, if any, did you receive

22   from James Bedford in doing this work?

23       A.  He worked with me.  When I would go in to work, I

24   would sit with him and he would basically do the work,

25   because I didn't understand what it was I was supposed

1   to do.

2       Q.   What physically were you doing?

3       A.   He would click and drag, and then he would tell

4   me -- point, and tell me where to, "Click here and drag

5   here."

6       Q.   Aside from clicking and dragging files, was there

7   anything else you were doing?

8       A.   No.

9       Q.   Ms. Martin-Giles, did you prepare an invoice for

10  the work that you did?

11      A.   Yes.

12      Q.   With the assistance of the court security

13  officer, if I could ask you to turn to Government

14  Exhibit 10-1.

15           MR. BURKE:  And, Your Honor, 10-1 has been

16  admitted.  May we publish it?

17           THE COURT:  Yes.

18           THE WITNESS:  Yes.

19  BY MR. BURKE:

20      Q.   Ms. Martin-Giles, what is Government Exhibit

21  10-1?

22      A.   I beg your pardon?

23      Q.   What is Government Exhibit 10-1?

24      A.   It's an invoice with my name on it, from Team

25  America, for data services for -- excuse me -- 40 hours,

1   at a rate of $23, and the amount paid was 920.

2       Q.   And did that invoice accurately reflect the

3   number of hours you worked?

4       A.   Yes.

5       Q.   Does it accurately reflect how much you were

6   paid?

7       A.   Yes.

8       Q.   Were you, in fact, paid?

9       A.   Yes.

10      Q.   What company paid you?

11      A.   Team America.

12      Q.   Ms. Martin-Giles, have you received any degree or

13  other formal education in the field of computer science?

14      A.   No.

15      Q.   Do you have any specialized computer

16  certifications?

17      A.   No.

18      Q.   Do you have any formalized computer-related

19  expertise?

20      A.   No.

21      Q.   Do you have any specialized training relating to

22  dealing with computer viruses?

23      A.   No.

24      Q.   Ms. Martin-Giles, when a computer problem arises

25  in your job at Reliable Rails, how do you handle it?

1    A.   I have an IT person in place.

2    Q.   And you call that person?

3    A.   Yes.

4         MR. BURKE:  Nothing further from this

5    witness, Your Honor.

6         THE COURT:  All right.

7                   CROSS-EXAMINATION

8    BY MR. SIMMS:

9    Q.   Good afternoon, Ms. Giles.

10   A.   Hi.

11   Q.   Ms. Giles, do you know Raushi Conrad?

12   A.   Who?

13   Q.   Raushi Conrad?

14   A.   No.

15   Q.   Okay.  Have you ever seen this gentleman seated

16   right here (indicating)?

17   A.   No.

18   Q.   Okay.  Have you ever heard the name Raushi Conrad

19   before today?

20   A.   I believe I've seen something on the Internet.

21   Q.   Okay.  Now, in terms of your payment from

22   Mr. Bedford, how did you receive payment?

23   A.   I believe by check.  It's been some time ago.

24   Q.   Okay.  And how would you get that check?

25        Would you pick it up?

1    A.   Oh, no.  It was probably mailed, I -- I can't

2    recall.

3    Q.   Okay.  How did you submit your invoices?

4    A.   I -- I believe it was by e-mail.

5    Q.   E-mailed it to him?

6    A.   I believe.

7    Q.   Okay.  And on your invoice you would put a

8    certain amount of hours, correct?

9    A.   Yes.

10   Q.   And as you stated, that -- those amount of hours

11   accurately reflected the amount of work that you did?

12   A.   Yes.

13   Q.   Okay.  You were aware that Mr. Bedford was

14   submitting information to the government to receive

15   payment, correct?

16   A.   I would imagine, yes.

17   Q.   Okay.  Did you know that he was lying on invoices

18   that he submitted to the government?

19   A.   Absolutely not.

20   Q.   And at the time that you were giving him your

21   hours, you trusted him to accurately reflect what you

22   worked, right?

23   A.   Yes.

24   Q.   Okay.

25        MR. SIMMS:  Thank you.  No further

1    questions.

2              MR. BURKE:  No redirect, Your Honor.

3              May the witness be excused?

4              THE COURT:  You're free to leave.  Thank you

5    for coming today?

6              THE WITNESS:  Thank you.

7              (Thereupon, the witness withdrew from the

8    stand.)

9              MR. WALKER:  Your Honor, the government

10   calls Wray Jones to the stand.

11             MR. HENDRICK:  Face the clerk.  Raise your

12   right hand, please.

13             (Witness sworn.)

14             THE WITNESS:  I do.

15             THE CLERK:  Thank you.

16             Have a seat, please.

17             THE COURT:  You may proceed.

18             THEREUPON, WRAY JONES, having been duly

19   sworn, testified as follows:

20                    DIRECT EXAMINATION

21   BY MR. WALKER:

22   Q.  Good afternoon, ma'am.

23       Could you please state and spell your name for

24   the court reporter.

25   A.  My name is Wray Jones; W-r-a-y, J-o-n-e-s.

1    Q.   Ms. Jones, where do you work?

2    A.   The Department of Veterans Affairs.

3    Q.   What is your title at the Department of Veteran

4    Affairs?

5    A.   I'm a program manager.

6    Q.   What does your role as a program manager entail?

7    A.   I run the Purchase Car Program with the

8    Department of Veterans Affairs.

9    Q.   Could you describe your educational background?

10   A.   I have about 26 credits in accounting.

11   Q.   I want to shift gears and talk about an

12   individual named James Bedford.  Do you know

13   Mr. Bedford?

14   A.   I do.

15   Q.   How do you know him?

16   A.   As a friend.

17   Q.   How long have you known Mr. Bedford?

18   A.   I met him in 2001.

19   Q.   Have you ever worked for Mr. Bedford?

20   A.   Yes, I did.

21   Q.   When did you work for Mr. Bedford?

22   A.   January, February of 2011.

23   Q.   How did you first come to work for Mr. Bedford?

24   A.   I -- we relocated -- my husband and I relocated.

25   He got a job in DC.  And I came the 1st of January 2011

1   and met James back in 2001 through my brother, who lived

2   in Dumfries.

3       Q.   How did you first get started with the work?

4       A.   We were at his house visiting, and I told him I

5   needed a job, asked if he had any work for me to do.

6            And he said, "Yes."

7       Q.   And when you say "he," who is it that you're --

8       A.   I'm sorry --

9            (Simultaneous speaking.)

10      Q.   -- referring to?

11      A.   -- Mr. Bedford.

12      Q.   Can you say that one more time?

13      A.   Mr. Bedford.

14      Q.   Where did you first get started with the work?

15      A.   I was trained in his home office, in

16   Mr. Bedford's home office.

17      Q.   And where is that located?

18      A.   In Dumfries.

19      Q.   What happened when you were at Mr. Bedford's

20   residence?

21      A.   He showed me -- in the office, he showed me how

22   to convert a document.

23      Q.   And what exactly was it that he showed you?

24      A.   To take a file, drop it in this PDF Converter,

25   and then it either came out as a PDF file or a Word

1    document, one or the other.

2       Q.   About how long did this instruction last?

3       A.   I don't know.   About 30 minutes.

4       Q.   During that time, did Mr. Bedford explain the

5    purpose of the work?

6       A.   No.

7       Q.   Were you asked to do anything with the files

8    other than what you just described?

9       A.   No.

10      Q.   Were you ever asked to run a virus scan on the

11   files?

12      A.   No.

13      Q.   Were you ever asked to check the files for

14   malware?

15      A.   No.

16      Q.   Before Mr. Bedford hired you to perform the work,

17   what, if anything, did he ask you about your knowledge

18   of computers?

19      A.   Only if I knew how to work a computer.

20      Q.   Where were you physically when you performed the

21   work?

22      A.   In my home.

23      Q.   Were you ever asked to check your work for

24   accuracy?

25      A.   No.

1    Q.  What, if any, specialized knowledge did the work

2  seem to require?

3    A.  None.

4    Q.  Did the work seem difficult or complex to you?

5    A.  No.

6    Q.  About how long did you work for Mr. Bedford?

7    A.  Maybe 40, 45 hours.

8    Q.  Were you paid a salary for your work?

9    A.  Yes.

10    Q.  Were you paid per file or per hour?

11    A.  Per hour.

12    Q.  How did you keep track of your hours?

13    A.  Just jotting it down on a piece of paper.

14    Q.  And how was your hourly rate determined?

15    A.  It was a base rate.  I think it was 30 --

16  somewhere between $30 and $35 an hour.

17    Q.  Were you ultimately paid for the work that you

18  did?

19    A.  Yes.

20    Q.  How were you paid for the work?

21    A.  By check.

22    Q.  What company, if any, paid you for your work?

23    A.  Team America.

24    Q.  And was there a specific individual in Team

25  America who paid you for the work?

1      A.   I don't understand the question.

2      Q.   Who at Team America were you dealing with when

3   you were doing the data migration work?

4      A.   Mr. Bedford.

5      Q.   Ms. Jones, have you received any degrees or

6   formal education in the field of computer science?

7      A.   No.

8      Q.   Do you have any specialized computer

9   certifications?

10     A.   No.

11     Q.   Do you have any formalized computer-related

12   experience?

13     A.   No.

14     Q.   Do you have any specialized training in dealing

15   with computer viruses?

16     A.   No.

17          MR. WALKER:  Nothing further, Your Honor.

18              CROSS-EXAMINATION

19   BY MR. SIMMS:

20     Q.   Good afternoon.

21     A.   Good afternoon.

22     Q.   Now, you said you've known Mr. Bedford for

23   11 years?

24     A.   I've known him since 2001, so 15 years.

25     Q.   Fifteen years?  Okay.

1        And you -- you considered him a friend?

2    A.   Yes.

3    Q.   Okay.  And during those 15 years, you had

4    occasion to socialize with him and his family?

5    A.   Yes.

6    Q.   Okay.  Did you know that Mr. Bedford was using

7    the hours that you submitted, and other people's hours,

8    to lie and steal from the government?

9    A.   No, I didn't.

10   Q.   Okay.  Have you heard that before today?

11   A.   No, I haven't.

12            MR. SIMMS:  Thank you.

13            No further questions.

14            MR. WALKER:  No redirect, Your Honor.

15            May the witness be excused?

16            THE COURT:  You're free to leave.  Thank you

17   for coming.

18            THE WITNESS:  Thank you.

19            (Thereupon, the witness withdrew from the

20   stand.)

21            MR. BURKE:  Your Honor, the government calls

22   Ronald Rolfe.

23            MR. HENDRICK:  Face the clerk.  Please raise

24   your right hand.

25            (Witness sworn.)

1          THE WITNESS:  I do.

2          THE CLERK:  Thank you.

3          Have a seat, please.

4          THEREUPON, RONALD D. ROLFE, having been duly

5    sworn, testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. BURKE:

8      Q.   Sir, could you spell and state your name for the

9    court reporter.

10     A.   My name is Ronald Dale Rolfe, R-o-n-a-l-d,

11   D-a-l-e, R-o-l-f-e.

12     Q.   Mr. Rolfe, where do you work?

13     A.   I work for the U.S. Department of Commerce,

14   downtown in DC, for the Bureau of Industry and Security.

15     Q.   How long have you worked for the Bureau of

16   Industry and Security at the Department of Commerce?

17     A.   Twenty-eight years.

18     Q.   Do you work -- you said you worked in the Bureau

19   of Industry and Security.  What's your title there?

20     A.   I'm a licensing officer and engineer in the

21   Nuclear Missile Technology Division.

22     Q.   Could you briefly describe what your duties as a

23   licensing officer and an engineer?

24     A.   Primary work is to process export licenses for

25   higher-end technology and materials being exported out

1   of the United States that may have detrimental effects

2   if handed over to the wrong party that wishes to do

3   something with it; many industrial goods and items like

4   that.  They are commodities that can be used for good

5   and bad things.

6      Q.   Mr. Rolfe, are you familiar with a man named

7   Raushi Conrad?

8      A.   Yes, I am.

9      Q.   Do you see Raushi Conrad in the courtroom?

10     A.   Yes, sir.  He's right there (indicating) in the

11  white shirt.

12     Q.   Could you be more specific?

13     A.   The white shirt with the black spotted tie, with

14  the glasses.

15          MR. BURKE:  Your Honor, we would ask that

16  the record reflect that the witness has identified the

17  defendant.

18          THE COURT:  So noted.

19  BY MR. BURKE:

20     Q.   Mr. Rolfe, during the time that you and the

21  defendant both worked at the Bureau of Industry and

22  Security, did you come to have an understanding of the

23  defendant's job duties?

24     A.   I'm sorry?

25     Q.   Did you come to have an understanding of the

1   defendant's job duties?

2       A.   Oh.   Yes.   He worked for the IT Department.

3       Q.   And what were your -- what was your understanding

4   what he did there?

5       A.   He did various projects for IT and was involved

6   in -- by the way it was designed, as needed, depending

7   upon the nature of the work, there were various clusters

8   in our IT Department, and he was involved in certain

9   sections of it.

10      Q.   Let me ask you to focus now on 2010 and 2011.

11           During that time, did you come to learn of an

12   effort to migrate some of the BIS's electronic files

13   from one computer network to another?

14      A.   Yes, sir.

15      Q.   And what did you understand this project to

16   entail?

17      A.   A contamination in the data required it to be

18   scanned, cleared and moved from one memory system to

19   another to get rid of that virus in the system.

20      Q.   And who did you understand to be in charge of

21   this data migration effort?

22      A.   Contacting our IT Department, I learned that --

23      Q.   Let's -- let's --

24      A.   Oh.

25      Q.   -- stick to things that -- let me rephrase the

R. Rolfe - Direct

1  question.

2      What, if anything, did the defendant say to you

3  about his role in the data migration project?

4      A.   He was the sole individual in charge of it.

5      Q.   Now, in your day-to-day job duties at the Bureau

6  of Industry and Security, what types of files do you

7  need to access?

8      A.   All sorts of files, a variety of word processing,

9  Excel spreadsheets, PowerPoint, large data files with a

10 great deal of back information on past case processing.

11     Q.   And when this data migration effort occurred, did

12 you request that those types of files be transferred

13 from the infected network to the new network?

14     A.   Yes, I did.

15     Q.   To whom did you submit this request?

16     A.   To Raushi Conrad.

17     Q.   Why did you submit it to Raushi Conrad?

18     A.   As was understood, he was the sole person in

19 charge of it.  Therefore, I went to the person in

20 charge.

21     Q.   Now, let's focus for a minute on your files that

22 you specifically asked to be transferred from the old

23 network to the new network.

24     Can you describe to the jury how well the file

25 transfer process worked?

 1     A.   It was rather ineffective.  You were able to view

 2   the files, but they had no functionality as you

 3   previously had.

 4     Q.   Describe what you mean by "no functionality."

 5     A.   It was like viewing a picture book.  You had --

 6   the word processing wouldn't allow you to adjust it,

 7   correct it.  You couldn't pull material from expel --

 8   Excel spreadsheets, or manipulate files that you wanted

 9   to correct or update.

10     Q.   And what other types of problems, if any, did you

11   observe with respect to your own files?

12     A.   The -- what I hoped were data transfer issues, I

13   found that data was corrupted, paragraphs were missing.

14   It was disconcerting because we were at times starting

15   from scratch.  A long document, you wouldn't know where

16   parts were missing in it, because the transfer mechanism

17   did not seem to function.

18     Q.   Now, sir, with respect to your own files, did

19   this -- was this an isolated problem or was it more

20   widespread?

21     A.   No.  Naturally, I would check with others.

22   Nobody was --

23     Q.   Let's stick with your files?

24     A.   None of my files seemed to be working well or

25   were able to be updated or adjusted.

R. Rolfe - Direct

1    Q.   Now, sir, without -- without getting into the
2    content of what other people told you, did you speak to
3    other people about their experiences?

4    A.   Yes, I did.

5    Q.   What, if anything, did you convey to the
6    defendant about the quality of the work being done on
7    the data migration project?

8    A.   That it was unsuitable.  There was nothing I
9    could do with my files, and they -- the formats did not
10   work so I could not manipulate them as I had before.

11   Q.   Was this a communication that you had once, or
12   was it multiple times?

13   A.   A number of times.  I spoke to him -- I visited
14   him upstairs and I sent e-mails to him.

15   Q.   Did you -- what did you say, if anything, to the
16   defendant about the scope of the problem?

17   A.   It -- it appeared to be rather extensive.  I was
18   unfamiliar with anybody getting updated, repaired files
19   working, just as I had none.

20   Q.   Did you convey to the defendant communications
21   you had with other people?

22   A.   Yes.

23   Q.   And what did you convey to the defendant about
24   what you had learned from other people?

25              MR. SIMMS:  Objection, hearsay.

1          MR. BURKE:  Offered for the effect on the

2    listener, Your Honor.

3          THE COURT:  Sustained.

4          MR. BURKE:  Your Honor, may we approach?

5          THE COURT:  You're talking about my ruling?

6          MR. BURKE:  Yes, Your Honor.

7          THE COURT:  No.  Keep going.

8    BY MR. BURKE:

9    Q.   Mr. Rolfe, did you ever communicate your concerns

10   to the defendant in an e-mail?

11   A.   In -- I'm sorry?

12   Q.   In an e-mail?

13   A.   Yes, I did.

14   Q.   With the assistance of the court security

15   officer, I'd ask you to now please turn to Government

16   Exhibit 102.

17   A.   Yes, sir.

18   Q.   What is Government Exhibit 102?

19   A.   It is an e-mail that I sent to Raushi Conrad, and

20   which he responded and then I responded back.

21   Q.   And what day did you send this e-mail to the

22   defendant?

23   A.   Last date was March 14th, 2011.

24          MR. BURKE:  Your Honor, we move to admit

25   Government Exhibit 102.  It goes to the defendant's

1    knowledge of the extent of the problem.

2              THE COURT:  Received.

3              MR. BURKE:  Now, if we could publish the

4    bottom portion of the first page, Ms. Sandvig.

5              THE WITNESS:  Oh.  Did you wish me to read

6    it?

7              MR. BURKE:  Hold on just a moment, sir.

8              THE WITNESS:  Okay.

9              MR. BURKE:  The bottom portion of the first

10   page.

11   BY MR. WALKER:

12   Q.  Mr. Rolfe, directing your attention to the bottom

13   portion of this first page of Government Exhibit 102,

14   the e-mail that you sent to the defendant on March 14th,

15   2011, at 10:38 a.m. -- are you looking at that?

16   A.  Yes, I am.

17   Q.  Now, sir, what did you say in your -- what did

18   you say to the defendant in the first sentence there

19   that begins with, "The promised magic..."?

20   A.  "The promised magic transfer of people's

21   necessary documentation so they can do their work

22   doesn't seem to have happened to anyone locally I've

23   spoken to.  And while I did provide a followup e-mail to

24   my first earlier one regarding the docs I wanted" -- "I

25   wanted transferred, I don't know where they went.  It

1   seems like a lot of stuff has disappeared, especially

2   any BIS faith in IT."

3       Q.   Now when you said here that a lot of stuff had

4   disappeared, what did you mean?

5       A.   I could not find material that I had in my normal

6   filing methods on my compilation of files.

7       Q.   And then, what did you write in the next sentence

8   beginning, "But, no matter..."?

9       A.   "But, no matter, the BI system is now apparently

10   just a big library book as best, so I'm moving on."

11       Q.   And then what did you tell the defendant in the

12   next sentence?

13       A.   "Please transfer over my document folder that I

14   created, as you had requested for everyone to do.  The

15   work isn't waiting and this colossal IT conversion snafu

16   is just making you guys look bad."

17       Q.   Now, when you wrote that this was a big library

18   book at best, what did you mean?

19       A.   It was viewable, but again, no functionality

20   existed to the documents.  You couldn't process Excel,

21   or pull the material out or update spelling corrections,

22   or just update statistics.

23       Q.   Sir, if I could direct your attention now to the

24   sentence that begins in the very bottom right corner of

25   this page with, "Assisting several others," do you see

1   that?

2      A.   Yes, sir.

3      Q.   What did you write to the defendant in that

4   sentence?

5           You may have to look at the paper version.

6      A.   Oh.

7           "Assisting several others who needed certain

8   documents, and tried this out, resulted in plenty of

9   documents that were clearly missing data, corrupting the

10   data, distorting the format, which makes it better

11   to" -- for -- "to reconstruct documents from scratch,

12   again not giving IT any points in becoming an enormous

13   time consumer, when we're already busy as it is, not

14   exactly what you had indicated."

15      Q.   And when you -- when you wrote to the defendant

16   about missing data, corrupting the data, or badly

17   distorting the format, what were you talking about?

18      A.   Again, documents that I was familiar with,

19   paragraphs would be missing, words would disappear in

20   sentences.  It became very unreadable.  And you had no

21   faith in the original document that you had being

22   correct without going through, in some regards,

23   extensive documentation to check everything over again.

24      Q.   Mr. Rolfe, after you sent this defendant -- this

25   e-mail to the defendant, did the quality of the work

1    improve?

2        A.   No, sir.

3        Q.   So, what did you do, if anything, to try to fix

4    the problem?

5        A.   It -- I was led to having to reconstruct, rather

6    painfully, sections that I needed and were most critical

7    to the nature of my work.

8             THE COURT:  Come to sidebar, please.

9             (Thereupon, the following sidebar conference

10   was had:)

11            THE COURT:  What is it you wanted to ask me?

12            MR. BURKE:  Your Honor, I think we

13   will abide by your ruling and move on.  I don't intend

14   to further ask about the question that I -- that I

15   intended to address.  We'll move on.

16            THE COURT:  All right.  Thank you.

17            (Thereupon, the sidebar conference was

18   concluded.)

19            MR. BURKE:  Nothing further, Your Honor.

20            THE COURT:  All right.

21                    CROSS-EXAMINATION

22   BY MR. SIMMS:

23       Q.   Good afternoon.

24       A.   Good afternoon.

25       Q.   Sir, you worked in the -- in a division within

1    the Department of Commerce?

2       A.   Worked in --

3       Q.   Which division did you work?

4       A.   Oh.  The Nuclear Missile Technology Division.

5       Q.   And how many individuals worked in that unit or

6    division with you?

7       A.   At the time, probably twelve.

8       Q.   Twelve of you.  Okay.

9            And out of those twelve people, are you familiar

10   with how many people had to -- or requested file

11   conversion?

12      A.   All -- all parties in the bureau had files, were

13   requested to consolidate a particular set size of their

14   necessary files for conversion to update and clearing it

15   and passing it forward.  So of the hundred licensing

16   officers, I believe in the divisions, everybody had to

17   do that.

18      Q.   Okay.  You say there were over a hundred?

19      A.   I believe so.

20      Q.   Okay.  So --

21      A.   Maybe more.

22      Q.   -- maybe a hundred license users.

23           And when you said -- well, to gather a certain

24   amount of files, there was a 250-file limit that was

25   placed on the license users, correct?

1    A.   You would have to consolidate a set volume in

2    data and have that converted.  So you have to select out

3    what was your most desired material.

4    Q.   Okay.  And so there was a -- there was a

5    limitation on the amount of files that were going to be

6    converted, right?

7    A.   Correct.

8    Q.   And Mr. Conrad set that limit, right?

9         MR. BURKE:  Objection, calls for

10   speculation.

11        THE COURT:  Sustained.

12   BY MR. SIMMS:

13   Q.   Do you know who set that file limit?

14   A.   Do I know --

15   Q.   Who set the 250 file --

16   A.   No, I do not know who set the size of the files.

17   Q.   But, you -- you did testify earlier that

18   Mr. Conrad was in charge of the process?

19   A.   He was as fully -- by what I was aware, only the

20   person to contact because he was in charge of it, yes.

21   Q.   So, we have 100 people, a 250-file limit.

22        Now, when we say "files," these files can include

23   one page or it could be 500 pages, correct?

24   A.   These were not really page files, but amount of

25   data that you were allowed to transfer.  Individuals had

1    extensive records that went back 15, 20 years or more,

2    and some were very detailed in the way that they kept

3    records, as many of the licensing officers and others in

4    the bureau aside from them.  All these had to be cleaned

5    up.

6        Q.   Okay.  So it was an extensive amount of data?

7        A.   It was a great deal of data, yes.  And you had to

8    discern what was your best to pick up and -- and move

9    forward.

10       Q.   Okay.  Now, you contacted Mr. Conrad in March of

11   2011, correct?

12       A.   Yes.

13       Q.   All right.  And that was right after BIS had

14   completed phase one of the migration project, right?

15       A.   I believe so.

16       Q.   Okay.  So, your division was on the front end of

17   a second phase while they were also going live with the

18   first phase.

19       A.   "Going live with the first phase"?

20       Q.   Yes.  The first phase was being completed and

21   implemented, and your division was under a second phase.

22            MR. BURKE:  Objection, calls for

23   speculation.

24            THE COURT:  If you would lay some foundation

25   and demonstrate relevance, Mr. Simms.

1          MR. SIMMS:  Okay.

2    BY MR. SIMMS:

3      Q.   What was your understanding -- did you have an

4    understanding of the different phases of the data

5    migration project?

6      A.   The -- as we were informed --

7          THE COURT:  Personal knowledge first,

8    Mr. Simms; a foundation.

9          MR. SIMMS:  Okay.

10   BY MR. SIMMS:

11     Q.   Do you have personal knowledge about the phases

12   of the migration project?

13     A.   To a degree.

14     Q.   Okay.  And I want you to only speak about your

15   personal knowledge about that.

16     A.   The -- as we were informed, corruption in the

17   data, I believe it was per -- due to a virus, led to

18   necessary transfer of all of your useful files over, and

19   that they would move it in stage by stage as the part of

20   a process to a cleaned up data file that you could work

21   from there forward.  So, they were upgrading the systems

22   and transferring this data forward and cleaning up what

23   you had in the process.

24     Q.   Okay.  And so, that was phase one.

25     A.   I -- if they called it stage one?  Perhaps.

1      Q.   Okay.  Now, the files that you contacted
2   Mr. Conrad about -- and this is, once again, in March
3   2011, right?

4      A.   Uh-huh.

5      Q.   Are you -- do you know when the data migration
6   project -- do you have personal knowledge when it began,
7   the time period?

8      A.   I don't know the exact timetable that it began,
9   no.

10     Q.   But in any event, it wasn't until March of 2011
11  that you sent this e-mail complaining to Mr. Conrad?

12     A.   Yes, I -- and there were other e-mails, and --
13  that I had sent.  We -- I wished to know when this thing
14  was really happening, because you -- obviously, for
15  various tools and documentation you need on a daily
16  basis, you would like them to be available to you; so,
17  the sooner the better.

18     Q.   Okay.  And in the e-mail that was shown to you,
19  Mr. Conrad is responding to your e-mail about the --
20  your complaints, correct?

21     A.   Yes, he was.

22     Q.   All right.  And at times, you got a little
23  condescending with him in your response, didn't you?

24     A.   As did he.

25     Q.   Now, in terms of the data migration, not all of

1    your files were unusable, were they?

2        A.   All of the files that you had major recorded

3    material was -- was pretty unusable, yes.

4        Q.   No --

5        A.   I ended up rebuilding it.

6        Q.   I'm asking you about all of your files.  Every

7    file that you submitted for a conversion or migration,

8    were they all messed up?

9        A.   All the files in that section that he was

10   converting, yes.

11       Q.   Okay.  And how many files were there?

12       A.   That's really hard to say.  It was a great deal

13   of historical data, jurisdictional issues, travel

14   issues.  It was a lot of material, probably, I don't

15   know, ten, fifteen years worth of material.

16       Q.   Okay.  And you have a pretty technical division,

17   correct?

18       A.   Yes, I do.

19       Q.   All right.  And some of the concerns that your

20   division had probably weren't involved in other people's

21   divisions.

22              MR. BURKE:  Objection --

23              THE WITNESS:  No, that's --

24              MR. BURKE:  -- calls for --

25              THE WITNESS:  -- that's not true --

 1            THE COURT:  Just a second.  Just a second,
 2   sir.
 3            Mr. Simms?
 4            MR. SIMMS:  I'll withdraw the question.
 5            THE COURT:  All right.
 6   BY MR. SIMMS:
 7     Q.  Did your division rely heavily on Excel data
 8   worksheets?
 9     A.  Rely on?
10     Q.  Did your division rely heavily on Excel
11   worksheets?
12     A.  Many people use them, yes.  It's a very solid
13   mechanism for compiling various lists, and that's not
14   uncommon.
15     Q.  And did you, yourself, rely on the Excel
16   worksheets?
17     A.  I used some, yes.
18     Q.  Okay.  Now, in your Excel worksheets there are
19   certain tabs, that may be Workbook 1, Workbook 2.
20   What's the average size of the workbooks that you had in
21   some of those Excel sheets?
22     A.  Well, they're all now defunct, and that was 2010.
23   I can't recall right off.
24            MR. SIMMS:  No further questions.
25            THE COURT:  All right.

1                    REDIRECT EXAMINATION

2   BY MR. BURKE:

3      Q.   Mr. Rolfe, the e-mail that you testified to on

4   direct, is that the only time you complained to the

5   defendant about the poor quality of the work?

6      A.   No, I -- I find that if nobody complains, nothing

7   gets done.  So, I would contact him, call him and, as I

8   said, I would go up to the sixth floor and visit, check

9   to see directly.

10             MR. BURKE:  Nothing further.

11             THE COURT:  May the witness be excused?

12             MR. BURKE:  For the government, yes.

13             MR. SIMMS:  Yes, Your Honor.

14             THE COURT:  You're free to leave, sir.

15   Thank you for coming.

16             (Thereupon, the witness withdrew from the

17   stand.)

18             MR. WALKER:  Your Honor, the government

19   calls Gerard Horner.

20             MR. HENDRICK:  Face the clerk.  Please raise

21   your right hand.

22             (Witness sworn.)

23             THE WITNESS:  Yes.

24             THE CLERK:  Thank you.

25             Have a seat, please.

1            THE COURT:  You may proceed.

2            THEREUPON, GERARD HORNER, having been duly

3    sworn, testified as follows:

4                    DIRECT EXAMINATION

5    BY MR. WALKER:

6       Q.  Sir, could you please state and spell your name

7    for the court reporter.

8       A.  First name Gerard, G-e-r-a-r-d, last name Horner,

9    H-o-r-n-e-r.

10      Q.  Mr. Horner, where do you work?

11      A.  U.S. Department of Commerce, Bureau of Industry

12   and Security.

13      Q.  How long have you worked at BIS?

14      A.  Since October 2006.

15      Q.  And what's your job title there?

16      A.  I'm currently director of the Office of

17   Technology Evaluation.

18      Q.  In layman's terms, can you generally describe

19   what your role as director of the Office of Technology

20   Evaluation entails?

21      A.  I oversee all the activities of the office.  In

22   particular, we are a data mining office.  We use data to

23   inform policy decision and measure the health and

24   competitiveness of the U.S. industrial base.

25      Q.  Mr. Horner, do you know an individual named

1  Raushi Conrad?

2    A.  I do.

3    Q.  How do you know Mr. Conrad?

4    A.  Mr. Conrad worked in our Office of the Chief

5  Information Officer, years ago, and provided support for

6  our office as a business office and IT solutions.

7    Q.  Do you see Mr. Conrad in the courtroom today?

8    A.  Yes, I do.

9    Q.  Could you please identify him by where he is

10  sitting and what he is wearing?

11    A.  Here (indicating), white shirt, dark tie.

12          MR. WALKER:  Your Honor, may the record

13  reflect that the witness has accurately identified the

14  defendant?

15          THE COURT:  So noted.

16  BY MR. WALKER:

17    Q.  During the time you and the defendant worked

18  together, did you form an understanding of what his role

19  was at BIS?

20    A.  I did.

21    Q.  And what was that?

22    A.  Supporting business -- program offices, like our

23  own in the Office of Technology Evaluations, with IT

24  support, IT solutions.

25    Q.  And when you say "IT solutions," what are you

1  referring to when you said "IT"?

2     A.   Information technology.

3     Q.   Mr. Horner, was there a project at BIS involving

4  migrating files from an old system to a new system?

5     A.   Yes.

6     Q.   What was your understanding as to why the

7  migration was necessary?

8     A.   My understanding is the old system or old network

9  that the information was on became compromised and

10  needed to be outdated (sic) and the information needed

11  to be moved over to -- over to a new network that was

12  not compromised.

13     Q.   Were some of your files among the files that were

14  going to be transferred?

15     A.   Yes.

16     Q.   Generally speaking, what types of files would you

17  have needed to access to perform the day-to-day

18  operations of your job?

19     A.   As a data mining office, many of the files were

20  Microsoft Excel files, and we also created many

21  PowerPoint, which are files to make presentations from.

22     Q.   Were those the type of files that you had

23  transferred?

24     A.   They were.

25     Q.   What was your understanding of what, if any, role

1    the defendant had in the data migration project?

2        A.   My understanding is that he was our point of

3    contact in ensuring that the files were moved over to

4    the new system.

5        Q.   Based on your understanding of the project, what

6    was your expectation as to how your files were supposed

7    to appear on the new system?

8        A.   Since we created them in the old system, when

9    they were moved to the new system, my expectations is

10   that what we had in the old system would be mirrored

11   when they came to the new system.

12       Q.   And when you say "mirrored," what do you mean?

13       A.   Identical.

14       Q.   And what was your understanding as to how the

15   formatting of your files that were transferred was

16   supposed to look?

17       A.   The formatting would be identical.

18       Q.   What was your standing -- understanding as to how

19   your old files were supposed to function on the new

20   network?

21       A.   They would function identically.

22       Q.   With that in mind, I want to turn your attention

23   now to how your files actually appeared on the new

24   system.  Could you describe for the members of the jury

25   what, if any, problems you had with your files that were

1  transferred.

2      A.  The details -- I don't know how well you know

3  Microsoft Excel, but in Microsoft Excel there are rows

4  and columns.  There are functions.  A lot of the labels

5  on the rows and the columns were missing.  Many of the

6  functions, such as a normal summing up a column of

7  values, those functions didn't work.  And then within a

8  particular file, you could have many workbooks or many

9  worksheets, and a lot of those worksheets were not

10  labeled either.

11          Particular to PowerPoint presentations, many of

12  our PowerPoint presentations had a master template,

13  "master template" meaning it had the Department of

14  Commerce, Bureau of Industry and Security background to

15  it.  So every time you create a PowerPoint presentation,

16  your background looks the same.

17          The new -- in the new system, those templates

18  were not there.  It was just the text.

19      Q.  Did you communicate the issues that you were

20  having with your files to the defendant?

21      A.  I did.

22      Q.  How did you communicate those concerns?

23      A.  Most of them, e-mail.

24      Q.  With the assistance of Mr. Hendrick, I would like

25  you to please take a look at what has been marked for

1    identification as Government Exhibit 103.

2    A.   Okay.

3    Q.   Do you recognize Government Exhibit 103?

4    A.   I do.

5    Q.   What is it?

6    A.   E-mail from myself to Mr. Conrad.

7    Q.   The two e-mails at the top of this chain, what

8    date were those sent?

9    A.   The Wednesday, February 23rd, 2011.

10        MR. WALKER:   Your Honor, at this time the

11   government moves to admit and publish Government

12   Exhibit 103.

13        THE COURT:   It may be admitted and you may

14   publish it.

15   BY MR. WALKER:

16   Q.   I want to direct your attention, Mr. Horner, to

17   the top of the -- the top e-mail chain dated

18   February 23rd.  Do you see that?

19   A.   I do.

20   Q.   Who is the sender of that e-mail?

21   A.   Myself.

22   Q.   And to whom did you send this e-mail?

23   A.   Mr. Conrad, with a courtesy copy to other members

24   of my office.

25   Q.   Why was it that you sent the defendant this

1  e-mail?

2      A.   I was not happy with the quality of the files

3  that were moved.

4           MR. WALKER:   Ms. Sandvig, can we blow up the

5  second paragraph of the e-mail?

6  BY MR. WALKER:

7      Q.   Mr. Horner, could you read the second paragraph

8  of that e-mail you sent to the defendant, that starts

9  with, "In addition..."

10     A.   "In addition, I don't know who you got to move

11 the Excel files from OTE's" -- which is the Office of

12 Technology Evaluations -- "S drive to CAI, but most of

13 them are not formatted correctly, missing spreadsheet

14 labels, et cetera.  We need each of these files moved

15 again and formatted correctly.  It would be impossible

16 for us to clean them up."

17     Q.   Mr. Horner, just to be clear for the members of

18 the jury, when you say "OTE's S drive" in this e-mail,

19 what are you referring to there?

20     A.   The network drive for the Bureau of Industry and

21 Security export administration was the S drive.  And

22 within that S drive, my own particular program office

23 had a directory dedicated to our files.  And so the OTE

24 was the directory specifically named for it.

25     Q.   And when you reference files from OTE's S drive

1   being moved to CAI, what's CAI?

2       A.   So, CAI was the new, non-compromised network that

3   the files were being migrated to, moved to.

4       Q.   Well, in that paragraph where you tell the

5   defendant that most of the files are not formatted

6   correctly and missing spreadsheet labels, were those

7   some of the problems that you were describing earlier

8   for the jury?

9       A.   Yes, sir.

10      Q.   And the fact that the files were not formatted

11  correctly and missing spreadsheet labels, was that a

12  problem for you?

13      A.   Yes, very much.

14      Q.   Why?

15      A.   Again, anyone that has ever worked with a

16  Microsoft Excel file knows that if you've got a file

17  containing many values, and you can't tell what the

18  labels are, either in the rows or the columns, it's

19  almost impossible.

20           In addition, the -- many Excel files had pivot

21  tables associated with them, and if those -- if you

22  understand what a pivot table is, a pivot table actually

23  is a -- it's almost like a program within the Microsoft

24  Excel file that gives you specific data results.  And

25  none of those pivot tables worked.

1    Q.   Mr. Horner, after you sent this e-mail to the

2 defendant, what, if any, changes did you notice in the

3 quality of the files that were being transferred for

4 your office?

5    A.   In the quality, none.

6    Q.   Mr. Horner, with the assistance of the courtroom

7 security officer, I would ask you now to please take a

8 look at what has been marked for identification as

9 Government Exhibit 104.

10        Do you recognize Government Exhibit 104?

11   A.   I do.

12   Q.   What is that?

13   A.   Another e-mail from myself to Mr. Conrad.

14   Q.   Starting with the two e-mails at the bottom of

15 the chain, when were those sent?

16   A.   First one is Monday, February 8th, 2011.

17   Q.   I'm sorry.  Did you say February 8th?

18   A.   I'm sorry, February 28th, 2011.

19   Q.   And what about the e-mail at the top of the

20 chain?  When was that sent?

21   A.   Tuesday, March 1st, 2011.

22        MR. WALKER:  Your Honor, at this time the

23 government moves to admit and publish Government

24 Exhibit 104.

25        THE COURT:  Received, and you may publish

 1   it.

 2   BY MR. WALKER:

 3       Q.   Mr. Horner, directing your attention to the top

 4   e-mail in this chain, dated March 1st, 2011, do you see

 5   that?

 6       A.   I do.

 7       Q.   Who sent this e-mail?

 8       A.   Myself.

 9       Q.   And to whom did you send it?

10       A.   Mr. Conrad.

11       Q.   Why did you send this e-mail?

12       A.   It's clear that my frustration with the quality

13   of the data grew.

14       Q.   What do you mean?

15       A.   I was -- was really getting upset at the

16   performance of the -- of the condition of the Microsoft

17   Excel files.

18       Q.   Mr. Horner, could you read for the members of the

19   jury that e-mail at the top of the chain that you sent

20   to the defendant?

21       A.   "I don't think OCIO got a full return on your

22   investment.  You paid for services that were not of

23   quality.  There are several Excel files that are

24   completely worthless, money thrown away.

25            "Then we had everything nicely organized in a

1   file called 'files to transfer,' as instructed by you

2   all in the fall.  The contractors only moved a portion

3   of those files.  I think the contractor should redeliver

4   these files for free.  Look in the contract and see if

5   any performance issues were noted.  Thanks."

6       Q.   In that first sentence, where you say, "I don't

7   think OCIO got a full return on your investment," what

8   is OCIO?

9       A.   The Office of the Chief Information Officer.

10      Q.   Is that within BIS?

11      A.   It is.

12      Q.   Is that the office within BIS where the defendant

13  worked?

14      A.   It is.

15      Q.   Based on your experience with the data migration

16  project specifically, why were you concerned that OCIO

17  did not get a full return on its investment?

18      A.   I'm familiar with acquisitions and contracts.

19  So, my concern is that their performance of this

20  contract did not meet what was specified in the

21  contract, meaning we did not get a full return on our

22  investment.

23      Q.   After you sent this e-mail to the defendant,

24  what, if anything, changed about the quality of the

25  files you were receiving?

1    A.   None that I can remember.

2    Q.   To your knowledge, did the quality of the work

3    improve at any point?

4    A.   No.  At certain points we just gave up.

5    Q.   What do you mean when you say you just gave up?

6    A.   One solution we had was we -- we just didn't use

7    the files that were moved any more.

8         MR. WALKER:  Nothing further.

9                   CROSS-EXAMINATION

10   BY MR. SIMMS:

11   Q.   Good afternoon, Mr. Horner.

12   A.   Good afternoon, sir.

13   Q.   Mr. Horner, would it surprise you if you were

14   told that -- do you know who Eddie Donnell is?

15   A.   Yes, I do.

16   Q.   Okay.  And who is he?

17   A.   He was -- he's -- currently works in the Office

18   of Chief Information Officer.

19   Q.   Okay.  Would it surprise you if he testified

20   during this trial that the conversion project was

21   complete?

22   A.   No, it would not.

23   Q.   That would not surprise you?  Okay.

24        And you're testifying today that it was not

25   complete?

1      A.   Testifying it was not of quality.

2      Q.   Okay.  So, the job got done, just not a quality

3   job?

4      A.   Correct.

5      Q.   Okay.  How many people -- well, actually, let me

6   refer your attention back to, I believe it's Government

7   Exhibit 104.

8              MR. SIMMS:  If you could pull that up.

9              THE WITNESS:  Uh-huh.

10  BY MR. SIMMS:

11     Q.   In the middle section, there's discussion from

12  Mr. Conrad about 250 files.

13     A.   Correct.

14     Q.   What is -- was there a limit placed on files that

15  were going to be converted?

16     A.   I believe it was the 250 files per person.

17     Q.   Okay.  Did Mr. Conrad talk to you about that?

18     A.   He did.

19     Q.   And tell me a little bit about the limit, the

20  250-limit conversion.

21     A.   Each individual that wanted files transferred had

22  a limit of 250 files to transfer.

23     Q.   Okay.  Were there individuals that wanted more

24  than 250 files converted?

25     A.   Yes, there were.

1    Q.   Okay.  And most of those individuals were denied

2    their request to get additional files converted, right?

3         MR. WALKER:  Objection, Your Honor.  Calls

4    for speculation.

5         THE COURT:  Sustained.

6    BY MR. SIMMS:

7    Q.   Do you know what happened with individuals that

8    wanted more than 250 files converted?

9    A.   I don't.

10   Q.   You don't?  Okay.

11        Did you want more than 250 files converted?

12   A.   We did.

13   Q.   Okay.  And did you get it?

14   A.   I believe so -- we did for some.

15   Q.   Okay.  But not all?

16   A.   No.

17   Q.   Okay.  How many people worked in your unit?

18   A.   At the time, I'll estimate and say ten.

19   Q.   Ten people.  Okay.

20        And you would agree with me that one file doesn't

21   mean one piece of paper.  It could be large amounts of

22   data or large amounts of documents, correct?

23   A.   To me, one file meant one named file --

24   Q.   Okay.

25   A.   -- so, a Word file with a "doc" ending on it, or

1    an Excel file with an "xls" ending on it, a PowerPoint

2    file with a "ppt."

3         Q.   So, for instance, one file could be entitled

4    "U.S. Constitution" and could be 200 pages long?

5         A.   Correct.

6         Q.   Okay.  Now, your e-mail to Mr. Conrad occurred in

7    late February, early March of 2011, correct?

8         A.   The -- which exhibit?  Is this one?

9         Q.   The e-mail that the government -- this would be

10   exhibit, once again --

11        A.   104?

12        Q.   Yes.

13        A.   Okay.

14             MR. SIMMS:  If we could zoom out.

15             THE COURT:  What portion are you referring

16   to, Mr. Simms?

17             MR. SIMMS:  The top portion.

18             THE COURT:  All right.

19             THE WITNESS:  Okay.

20   BY MR. SIMMS:

21        Q.   You agree with me that that e-mail is occurring

22   in the early parts of 2011?

23        A.   March 2011.

24        Q.   Okay.

25        A.   Yes.

1      Q.   And you would agree with me that Mr. Conrad is

2   attempting to work with you in resolving your issue?

3           Did he respond to you?

4                MR. SIMMS:  If we can zoom out.

5                THE WITNESS:  Well, in the e-mail of

6   February 28th, it's his response to me.

7   BY MR. SIMMS:

8      Q.   And he's checking to make sure that items were in

9   their correct place to be transferred?

10     A.   In the second part of this e-mail chain, it's

11  related to funding.

12     Q.   Okay.  And he's asking you about funding because

13  he says that the files that you're requesting weren't in

14  the S drive, I guess, is --

15                MR. WALKER:  Objection, Your Honor.  Calls

16  for speculation.

17                THE COURT:  Overruled.

18                THE WITNESS:  Could you repeat the question?

19  BY MR. SIMMS:

20     Q.   What is he telling you in his response?

21     A.   The first question down at the bottom, I was

22  looking for a specific file to be moved that was not

23  moved.

24     Q.   And what's his response to you?

25     A.   "Sure, but who is going to pay for it?  These are

 1    not actual files that will be updated and included in

 2    the 250 files for a person.  OCIO cannot move them

 3    without funding."

 4         Q.   Now, your -- a lot of the files that you

 5    discussed on direct and you're speaking about in an

 6    e-mail, related to Excel files, correct?

 7         A.   Correct.

 8         Q.   And if Excel files were printed and scanned from

 9    a paper source, would their functionality still exist?

10         A.   No, they wouldn't.

11         Q.   And did you ever see the statement of work in

12    the --

13         A.   I did not.

14         Q.   -- contract?

15         A.   Did not.

16         Q.   So, if the statement of work required for simply

17    scanning and printing of a document, would you

18    have had -- taken issue with that?

19         A.   I would.

20              MR. WALKER:  Objection, Your Honor.

21    Relevance.

22              THE COURT:  Relevance, Mr. Simms?

23              MR. SIMMS:  Your Honor, I think it goes

24    towards what was supposed to be done and what was done,

25    if it's in the statement of work.

1          THE COURT:  What does it tend to prove or

2  disprove about bribery?

3          MR. SIMMS:  I think, Your Honor, it tends to

4  show that Mr. Homer -- I'm sorry -- Mr. Horner is

5  complaining about things that weren't supposed to be

6  done according to the statement of work.

7          THE COURT:  If you have some document you

8  want to show him, you can do that now.

9          Objection sustained.

10  BY MR. SIMMS:

11    Q.  Mr. Horner, do you know of a way that an

12  individual can move an Excel file from one network to

13  another and keep its functionality?

14          MR. WALKER:  Objection, Your Honor.

15  Relevance.

16          THE COURT:  It sounds like we're getting

17  ready to litigate the contract.  I don't think that's

18  why we're here.

19          Objection sustained.

20          MR. SIMMS:  No further questions, Your

21  Honor.  Thank you.

22          MR. WALKER:  No redirect, Your Honor.

23          May the witness be excused?

24          THE COURT:  You're excused, sir.  Thank you

25  for coming.

1           THE WITNESS:  Thank you.

2           (Thereupon, the witness withdrew from the

3    stand.)

4           MR. BURKE:  Your Honor, the government calls

5    Kim Sins.

6           MR. HENDRICK:  Face the clerk.  Please raise

7    your right hand.

8           (Witness sworn.)

9           THE WITNESS:  I do.

10          THE CLERK:  Thank you.

11          Have a seat, please.

12          THE COURT:  You may proceed.

13          THEREUPON, KIM SINS, having been duly sworn,

14   testified as follows:

15                    DIRECT EXAMINATION

16   BY MR. BURKE:

17      Q.   Good afternoon, ma'am.

18           What is your name?

19      A.   Kim Sins.

20      Q.   Could you spell that for the court reporter,

21   please?

22      A.   K-i-m, S-i-n-s.

23      Q.   Ms. Sins, where do you work?

24      A.   Department of Commerce.

25      Q.   And where within the Department of Commerce do

1   you work?

2       A.   Bureau of Industry and Security.

3       Q.   How long have you worked for the Department of

4   Commerce?

5       A.   I've been there for 19 years.

6       Q.   What is your position within the Bureau of

7   Industry and Security?

8       A.   Currently, I am the chief information officer's

9   special assistant.

10      Q.   Ms. Sins, let me direct your attention now to

11  2010.  In 2010, were you working at the Bureau of

12  Industry and Security?

13      A.   Yes.

14      Q.   What was your position at the BIS in 2010?

15      A.   At that time, I was the product assurance

16  manager.

17      Q.   And could you describe in layman's terms what it

18  meant to be the product assurance manager?

19      A.   So, BIS -- Bureau of Industry and Security --

20  produces applications, IT support services for the --

21  for the employees, and along with exporters and so on.

22           So, product assurance is to ensure that what we

23  are providing for our customers is what they need.  It

24  meets their requirements and allows them to perform the

25  mission of the bureau.

1      Q.   Now, what -- what components within the Product

2   Assurance Division did you oversee at the time?

3      A.   At the time, any -- any new -- any new

4   requirements that came up for any kind of projects at

5   all.  If -- if the export administration licensing side

6   of the house needed their application improved or needed

7   additional components added, if they needed some new

8   application or new -- new -- new requirement came up,

9   then we would -- we would develop and implement to meet

10   that need on the -- on the IT side, of what we could do

11   for services.

12     Q.   Did the Bureau of Industry and Security have a

13   help desk?

14     A.   Yes.

15     Q.   And what role, if any, did you have with respect

16   to the help desk?

17     A.   I oversaw the customer service part of the help

18   desk at that time.

19     Q.   And what -- in layman's terms, what did the help

20   desk do?

21     A.   The help desk supported our customers, which were

22   BIS employees and exporters, with any IT problem they

23   had, or request that they needed to have put in place

24   with them.

25     Q.   Ms. Sins, do you know a man by the name of Raushi

1   Conrad?

2       A.   Yes.

3       Q.   Do you see Mr. Conrad in the courtroom?

4       A.   Yes, I do.

5       Q.   Could you point out where he's seated and what

6   he's wearing?

7       A.   He's there at the table (indicating) in a white

8   shirt and black tie.

9            MR. BURKE:  We would ask the record to

10  reflect the witness has identified the defendant.

11           THE COURT:  So noted.

12  BY MR. BURKE:

13      Q.   Ms. Sins, how do you know the defendant?

14      A.   I worked with Raushi Conrad.

15      Q.   Where did you work with him?

16      A.   At the Bureau of Industry and Security.

17      Q.   In 2010, what was the defendant's position within

18  BIS?

19      A.   At that time he was director, and his

20  responsibilities were over the infrastructure and

21  security of our -- of the networks.

22      Q.   And you said he was the director over

23  infrastructure and security?

24      A.   Yes.

25      Q.   What did -- what did his duties entail?

1     A.   He had full authority, management, control

2   over -- for the -- the chief information officer's

3   network services, systems.  He was operations -- he was

4   operational manager for all of that.

5     Q.   Could you describe for the jury the defendant's

6   level of technical competence?

7     A.   He was very technically competent.  He had -- he

8   had worked in the field by that time, I think, at least

9   15 years and was able to build, build our

10  infrastructure, rebuild it from nothing.  Our old

11  infrastructure had to be retired and he built the new

12  infrastructure.

13    Q.   Was he knowledgeable about computers?

14    A.   Yes.

15    Q.   Was he knowledgeable about computer systems?

16    A.   Yes.

17    Q.   Was he good at his job?

18    A.   Yes.

19    Q.   Now, Ms. Sins, are you familiar with a computer

20  virus that infected the BIS's computer systems in 2006?

21    A.   Yes.

22    Q.   Very briefly, describe what happened.

23           MR. SIMMS:  Objection, cumulative.

24           THE COURT:  Sustained.

25           MR. BURKE:  I'll move on, Your Honor.

1   BY MR. BURKE:

2      Q.   Ms. Sins, are you familiar with the data

3   migration project?

4      A.   Yes.

5      Q.   Who was in charge of the data migration project?

6      A.   Raushi Conrad.

7      Q.   Can you describe the defendant's level of control

8   over the data migration contract?

9      A.   He had full control over that.

10     Q.   What do you mean when you said "he had full

11  control"?

12     A.   He had control over the project.  So, when you

13  said "the contract," it's actually the project.  He had

14  full control over the project.

15     Q.   Describe his control over the project.

16     A.   He -- he developed how the users would provide

17  their files to him.  He picked them up.  He delivered

18  them to the contractor.  He received them back, and then

19  put them back for the customer -- the users to access

20  them.

21     Q.   Who was responsible for devising a process for

22  migrating the data?

23     A.   The process for migrating the -- do you mean the

24  process that the contractor used to convert the files,

25  or do you mean the process of the files being --

1    provided from the user and back to the user?

2        Q.   The process within BIS.

3        A.   Raushi Conrad did that.

4        Q.   And when -- when BIS employees needed files to be

5    transferred, who were they supposed to contact?

6        A.   Raushi Conrad.

7        Q.   And if the BIS employees had questions, who were

8    they directed to speak to?

9        A.   Raushi Conrad.

10       Q.   Who was responsible for deciding whether to use

11   an outside vendor?

12       A.   Who decided to use an outside vendor?

13            Well, Raushi Conrad made the decision to use an

14   outside vendor.

15       Q.   Who was the BIS's main point of contact with the

16   outside vendor?

17       A.   Raushi Conrad.

18       Q.   Now, at the time in 2010, did you know who the

19   outside vendor was?

20       A.   No.

21       Q.   Did you know how to contact that outside vendor?

22       A.   No.

23       Q.   If you needed to communicate with the vendor,

24   what did you do?

25       A.   I -- I would communicate with Raushi Conrad or

1    the contracting officer.  The -- the contracting

2    officer's technical representative.  Sorry.

3        Q.  Who within the BIS was responsible for verifying

4    that the vendor was doing the work correctly?

5        A.  Raushi Conrad.

6        Q.  And, Ms. Sins, you mentioned that in 2010, one of

7    your duties was overseeing the help desk.  Is that

8    correct?

9        A.  Yes.

10       Q.  In that role, did you have an opportunity to

11   speak with BIS employees about their experiences with

12   the data migration project?

13       A.  Yes.

14       Q.  Did you talk to the defendant about what you

15   heard?

16       A.  Yes.

17       Q.  What did you relay to the defendant about the

18   quality of the work?

19       A.  The BIS customers were very displeased with the

20   quality of the work.

21       Q.  What -- what were you relaying to the defendant

22   specifically about --

23       A.  I would tell him the specific user -- customers

24   that would call in with their complaints.  I told him

25   exactly why they were unhappy, if the files would not --

1   if they were in their native format and had to be

2   converted to native format, then the files weren't

3   functional for them, so they could not perform their

4   activities with them.

5        If they were PDF version files that were provided

6   back to them, characters weren't legible and usable.

7   So -- I -- and I always gave him the user's name and

8   what the complaint was.

9   Q.   How frequently did you convey complaints to the

10  defendant?

11  A.   While it was going on, practically daily, while

12  we had the issues going on.

13  Q.   Was this an isolated occurrence?

14  A.   No.

15  Q.   Did the complaints that you relayed to the

16  defendant ever stop?

17  A.   No.

18  Q.   When you told the defendant about these

19  complaints, the repeated complaints, what was his

20  response?

21  A.   That he would take care of it.

22  Q.   Now, Ms. Sins, if we could focus now on February

23  of 2011, in February of 2011 did your duties at the BIS

24  change?

25  A.   Yes.

1    Q.   How so?

2    A.   At that time, I became the point of contact for

3    the -- for BIS interacting with the contract services

4    that we were receiving at that time; so, with the COTAR.

5    Q.   How, if at all, did this change your involvement

6    with the data migration project?

7    A.   Then at that time I became responsible for

8    ensuring, from the BIS side, that we were receiving the

9    services that we were paying for.

10   Q.   And when you -- when you were responsible for

11   overseeing the project, what, if any, changes did you

12   attempt to make to the process?

13   A.   I attempted to stop the document migration.

14   Q.   What were the changes in the process, if any?

15   A.   I -- I asked that if documents needed to be

16   migrated over, converted and migrated, that I be told

17   exactly what was needed, what was the count, and then

18   provide the information back to me when it was

19   completed.

20   Q.   Why did you try to institute those changes in the

21   process?

22   A.   The customers were so dissatisfied.  They were

23   not getting the -- the documents they needed to perform

24   their jobs; daily complaints.  It -- we weren't -- BIS

25   wasn't getting what they were paying for at the time.

1    It just -- the result wasn't quality.

2        Q.   Now, ma'am, the new procedures that you attempted

3    to implement, were those new procedures actually

4    followed?

5        A.   No.

6        Q.   Why not?

7        A.   They would -- there would be workaround -- if I

8    wasn't in the office, there would be an urgency to get

9    some documents migrated, converted, back and forth, and

10   so Raushi Conrad could go to the deputy chief

11   information officer at that time to get his approval, or

12   possibly somebody else, some other manager.

13       Q.   When you say "workarounds," who was creating

14   these workarounds that you are describing?

15       A.   Well, if I wasn't -- if I were out of the office,

16   then Raushi would go to somebody else and get their

17   permission to perform the work.

18       Q.   Ms. Sins, after you became more involved in the

19   work, were you -- were you in contact with the vendor

20   directly?

21       A.   No.

22       Q.   Ma'am, even after you became involved or more

23   involved in the data migration project, did you continue

24   to have conversations with BIS employees about the

25   quality of the work?

1    A.   Yes.

2    Q.   Did you relay what you heard to the defendant?

3    A.   Yes.

4    Q.   What did you continue to relay to the defendant?

5              MR. SIMMS:  Objection, hearsay.

6              MR. BURKE:  Your Honor, goes to the

7    defendant's knowledge.

8              MR. SIMMS:  Your Honor --

9              MR. BURKE:  The defendant's knowledge of the

10   extent of the problem.

11             THE COURT:  Overruled.

12   BY MR. BURKE:

13   Q.   What did you continue to relay to the defendant?

14   A.   So, what would happen is that managers and

15   offices would get their staff together to relay to me

16   exactly what was not available to them, either their

17   documents were not in the folder where it was supposed

18   to be after the conversion, the documents weren't

19   usable.

20        And so I would go to these customer meetings.

21   The manager of the office would make sure I had the

22   information.  And that information, then, is what I

23   would convey back to Raushi.

24   Q.   Ma'am, were the problems with the quality of the

25   work ever resolved?

1    A.   No.

2    Q.   Was the work ever completed to your satisfaction?

3    A.   No.

4         MR. BURKE:  Nothing further, Your Honor.

5                   CROSS-EXAMINATION

6    BY MR. SIMMS:

7    Q.   Good afternoon.

8         So, Ms. Sins, you said that when you had a

9    problem with the vendor, or wanted to communicate to the

10   vendor, you either spoke to Raushi or you would

11   communicate that concern to the COR?

12   A.   To the -- yes.

13   Q.   And who was that?

14   A.   So, that's Kim Bryant.

15   Q.   So, these are the two individuals, Raushi and Kim

16   Bryant, that you expressed --

17   A.   Kim Bryant works for Naval -- SPAWAR, engineering

18   services.  It's SPAWAR is the name of it, S-P-A-W-A-R.

19   Q.   And you were having some general frustrations

20   with Kim Bryant, weren't you?

21   A.   I did have some.

22   Q.   Okay.  Did some of those concerns include his

23   refusal to provide information on invoices?

24   A.   I wanted detailed invoices.

25   Q.   Okay.  And were you able to get them from

1   Mr. Bryant?

2       A.   I did not get those from Mr. Bryant.

3       Q.   Okay.  Did you receive information on BIS's burn

4   rate?

5       A.   I did not receive timely information on the burn

6   rate.

7       Q.   And what's the burn rate?

8       A.   So, the burn rate is -- so what we -- how I would

9   use the burn rate is if -- if we had 500,000, that we

10  had to -- available to use in six months, let's say, my

11  burn rate, then, I'm going to watch and make sure that

12  in the six-month period, that that -- that the services

13  we're receiving will not exceed that.

14       So I'm watching monthly, weekly, sometimes daily,

15  how many hours the contractors are working and what --

16  how much money are they burning up as they work; so, the

17  burn rate.

18       Q.   Okay.  And you were unable to get this

19  information from Mr. Bryant?

20       A.   I did not get that -- it was usually two months

21  behind what I needed.  So -- I wanted realtime and it

22  was usually delayed six weeks to eight weeks, to get the

23  invoice.

24       Q.   Did he ever give you explanation for that?

25       A.   Yes.  Mr. Bryant said that that was property

1    of --

2              MR. BURKE:  Objection, hearsay.

3              MR. SIMMS:  I'll move on.

4              THE COURT:  Sustained.

5    BY MR. SIMMS:

6        Q.  Mr. Conrad had a supervisor within BIS, didn't

7    he?

8        A.  He had a supervisor, yes.

9        Q.  Okay.  Who was the supervisor?

10       A.  Eddie Donnell.

11       Q.  Okay.  And Mr. Donnell would approve things so

12   Mr. Conrad could get them done, correct?

13             MR. BURKE:  Objection, vague and calls for

14   speculation.

15             THE COURT:  Sustained.

16   BY MR. SIMMS:

17       Q.  Do you know the relationship, the working

18   relationship between Mr. Conrad and Mr. Donnell?

19       A.  Yes.

20       Q.  Okay.  And in terms of project management, how

21   would that relationship play out?

22             MR. BURKE:  Objection, vague and calls for

23   speculation.

24             THE COURT:  Sustained.

25             Help me with how this deals with the fact --

1   the issue in this case, which is bribery or attempted

2   bribery.  If you would focus on that, that would help

3   me.

4           MR. SIMMS:  Okay.  Your Honor, they're

5   trying to put Mr. Conrad out on an island --

6           THE COURT:  Well, hold on.  I'm going to

7   give you a chance to argue the case at the end.  If you

8   have a focused question you want to ask this witness, go

9   ahead.

10          MR. SIMMS:  Okay.

11  BY MR. SIMMS:

12      Q.  Did Mr. Donnell have knowledge of the migration

13  project?

14      A.  Yes.

15      Q.  Okay.  And when Mr. -- when Mr. Conrad needed

16  approval for something with the migration project, who

17  did he go to?

18          MR. BURKE:  Objection, speculation.

19          THE COURT:  Sustained.

20  BY MR. SIMMS:

21      Q.  Do you know who Mr. Conrad went to if he needed

22  approval for things with the migration project?

23          THE COURT:  As it relates to personal

24  knowledge.

25          Lay a foundation, Mr. Simms.

1    BY MR. SIMMS:

2       Q.   If you know, if you have a personal knowledge of

3    who Mr. Conrad would go to if he needed approval for

4    things with the migration project.

5            (Pause.)

6            If you don't recall, then, you don't recall.

7            Do you recall?

8                 THE COURT:   If you don't know, you don't

9    know.

10                Next question.

11                THE WITNESS:   The way the question's

12   phrased, I don't know the answer to that.

13                MR. SIMMS:   Okay.

14   BY MR. SIMMS:

15      Q.   Do you know if Mr. Conrad answered to anybody in

16   regards to the migration project?

17      A.   He had full control over the migration project.

18   I mean --

19      Q.   And when you say "full control," can you expand

20   on what -- what does that mean?

21      A.   So, there was a set amount of money that could be

22   used for the migration project, and he knew what that

23   limit was.  And so he could -- he had control over the

24   migration project for that amount of money.  And when

25   that money was gone, he could go and ask for more money

1   for more migration.

2       Q.   And when you say "ask," who would he have to ask?

3       A.   He would go to Eddie Donnell first.

4       Q.   Okay.  So he would go to his supervisor,

5   Mr. Donnell?

6       A.   As far as I know, yes.

7       Q.   Okay.  So, he couldn't just spend freely whatever

8   money he wanted to; he had to go ask somebody for

9   additional funds?

10      A.   Yes.

11      Q.   Okay.  Now, you talked about spending amounts.

12  Are you aware of any -- are you personally aware of any

13  limitation on the conversion of the files?

14           (Pause.)

15           The number of files that could be converted?

16      A.   There was a set number.  I don't remember the

17  number.

18      Q.   Okay.  Do you remember who came up with that

19  number?

20      A.   I -- the number was based on what the cost was

21  going to be.  And so, I believe the set number of files

22  was based on the cost.  And it would have to be

23  management that would determine how much money they

24  could spend.

25      Q.   Okay.  So, management, not Mr. Conrad, would have

1   came up with that?

2       A.   The amount of money, BIS would have had to

3   determine what money they had to spend for it.

4       Q.   Now, you said you took over the help desk in fall

5   of 2010?

6       A.   I don't remember the exact time I took over.

7       Q.   Was it 2010 or 2011?

8       A.   It was at least by 2010, maybe 2009.  I don't

9   remember exactly when I took over that.

10      Q.   Okay.  So, at that point, the complaints would

11  have been coming to you exclusively?

12      A.   The complaints were going to everybody, but, of

13  course, they came to me at that time because I was the

14  customer service for that.

15      Q.   At that point, you essentially became

16  Mr. Conrad's supervisor.

17      A.   No, I did not.

18      Q.   Okay.  Was there any point in time when you

19  became Mr. Conrad's supervisor?

20      A.   Yes.  It was September of 2011, sometime in that

21  timeframe.

22      Q.   Okay.  And you stated on direct that you did not

23  have any information about the vendor that was selected

24  in this case, right?

25      A.   Right.

1    Q.  Okay.  And even though you were Mr. Conrad's

2    supervisor, why didn't you just ask him for a name and a

3    number?

4    A.  By September, the -- by September 2011, the

5    migration -- our documents weren't -- September,

6    October, the document conversions had finally

7    practically ended as far as I know.  I think that they

8    were out of money.  I think the funding for that had

9    been expended, and so, more money would have had to have

10   been applied to, and I don't believe that happened.  So

11   at that time when I became supervisor, it was no longer

12   a funded project.

13   Q.  Let's talk about before you became a supervisor.

14   You would agree with me that you were very concerned

15   about some of the things you were hearing, right?

16   A.  Yes.

17   Q.  You were concerned about the complaints?

18   A.  Yes.

19   Q.  You were concerned about whether there was a

20   return on investment.

21       Did it ever occur to you just to ask Mr. Conrad

22   for the name of the vendor?

23   A.  I did ask him.

24   Q.  Okay.  And what was his response?

25   A.  He told me that this vendor had experience, and I

1    believe he said, doing this type of work for the Navy.

2       Q.  Okay.  But that didn't answer your question.

3       A.  No, it didn't.

4       Q.  Did you ask him again, "I need a name"?

5       A.  I asked him how are they doing the -- how are

6    they doing the work?  I'm product assurance --

7       Q.  I'm sorry.  I understand.

8            I'm asking you a specific question.  Did you ask

9    him a name?

10      A.  He did not give me a name.  I asked him for a

11   name.  I asked who it was, and he did not give me a

12   name.

13      Q.  Okay.  And when you asked him for a name, he gave

14   you their experience, did you say, "I understand, but I

15   want a name"?

16           Did you reask him for a name?

17      A.  I asked him for the name.  When he told me that,

18   I said, "What experience."  I wanted to know what

19   experience.

20      Q.  Okay.  So, you began to focus on experience.

21           Did you ask for any contact information?

22      A.  When you have a vendor working for you, you're

23   supposed to go through --

24      Q.  I'm sorry, ma'am.  I'm sorry.  I'm just asking,

25   did you ask him for --

1   A.   I would not --

2   Q.   -- a telephone number?

3   A.   -- do that, no.  That's not appropriate.  I

4   wouldn't do that.

5   Q.   It's not appropriate, even though, as you see --

6   as you saw it, government funds were being wasted?

7   A.   This was before I was the point of contact.  When

8   you asked -- you asked me, was I concerned, did I ask

9   him for a name, that was before I was the point of

10  contact, before I was involved in -- having the right to

11  have a need to know.  I approached managers.  I

12  approached other people.

13  Q.   What managers did you approach?

14  A.   I approached Eddie Donnell and --

15  Q.   Okay.  Let's stop there.

16       So you approached Eddie Donnell, and you told him

17  about some concerns you had, correct?

18  A.   Yes.

19  Q.   Okay.  And after that conversation, did you have

20  any concerns about Eddie Donnell's response?

21       MR. BURKE:  Objection, irrelevant.

22       THE COURT:  Sustained.

23  BY MR. SIMMS:

24  Q.   Other than Mr. -- and when did you approach

25  Mr. Donnell?

1      A.   The whole time I was receiving complaints, at

2   different times I discussed it with him.

3               THE COURT:  Counsel, we'll take the

4   afternoon recess now for 15 minutes.

5               Thank you.

6               (Court recessed at 3:30 p.m. and reconvened

7               at 3:48 p.m.)

8               THE COURT:  You can bring our jury out,

9   Mr. Hendrick.

10              MR. HENDRICK:  Yes, sir.

11              (Jury present.)

12              THE COURT:  You may be seated.

13              All right.  Counsel, you may proceed.

14              MR. SIMMS:  Thank you.

15   BY MR. SIMMS:

16      Q.   I just have a couple for questions for you, okay?

17           Ms. Sins, have you ever served in a capacity of a

18   COR?

19      A.   Yes.

20      Q.   Okay.  And what did you do in your capacity as a

21   COR?

22              MR. BURKE:  Objection, irrelevant.

23              MR. SIMMS:  I'm getting there, Your Honor.

24              THE COURT:  Well, if you want to focus on

25   this case, then -- I don't know what "COR" means.  I'm

1   not sure if the jury knows either.

2          So, what does that have to do with this

3   case?

4          MR. SIMMS:  The process of which the -- the

5   process by which a vendor is selected.  She testified on

6   direct about --

7          THE COURT:  All right.  If it's about the

8   process of how the vendor was selected in this case,

9   that would be relevant.  If it's not, it's not relevant.

10         MR. SIMMS:  Okay.

11         THE COURT:  All right.

12   BY MR. SIMMS:

13     Q.  On direct examination, Ms. Sins, you stated that

14   Raushi would have selected a vendor.  Is that accurate?

15     A.  Raushi would have recommended a vendor.

16     Q.  Okay.  Because Raushi, being in his role,

17   wouldn't have been the person to actually select a

18   vendor, would he?

19     A.  Correct.

20     Q.  Okay.  Tridea would have been the individual that

21   would have selected the vendor.

22         MR. BURKE:  Objection, calls for

23   speculation.

24         THE COURT:  Sustained.

25   BY MR. SIMMS:

1    Q.  How are -- who would have selected -- if you

2  know, who would have selected the subcontractor in this

3  case?  If you --

4              MR. BURKE:  Objection --

5              (Simultaneous speaking.)

6              THE COURT:  The objection is foundation?

7              MR. BURKE:  Foundation, calls for

8  speculation.

9              THE COURT:  All right.

10             If you want to lay a foundation, Mr. Simms,

11  you can.  If not, objection sustained.

12             MR. SIMMS:  Okay.

13  BY MR. SIMMS:

14    Q.  Are you familiar with how -- are you familiar

15  with Tridea?

16    A.  Yes.

17    Q.  Okay.  And BIS has contracted with individuals

18  where Tridea was a prime, correct?

19    A.  So, SPAWAR contracted Tridea to perform the

20  services for us.

21    Q.  Okay.  Now, the vendor in this case -- who would

22  have selected the vendor that was used?  If you know.

23             MR. BURKE:  Objection, calls for

24  speculation.

25             THE COURT:  Sustained.

1    BY MR. SIMMS:

2        Q.   So, just to clarify, when you stated that Raushi

3    selected the vendor --

4        A.   I don't remember stating that Raushi selected the

5    vendor.

6        Q.   Okay.  So, Raushi didn't select the vendor?

7        A.   I don't remember stating Raushi selected the

8    vendor.  I don't think I said that.

9        Q.   Okay.  Let me ask you now, then.  Did Raushi

10   select the vendor?

11       A.   Raushi didn't select the vendor.

12       Q.   Okay.

13       A.   He --

14       Q.   Thank you.

15            Now, also on direct, you talked about the -- the

16   process for the migration, and you stated that Raushi

17   would have been in charge of the process inside BIS,

18   correct?

19       A.   Correct.

20       Q.   Do you know who would have been in charge of the

21   process outside of BIS, the actual conversion process?

22       A.   Um --

23            THE COURT:  I thought you just asked her

24   this question about who did the work --

25            MR. SIMMS:  No.

1             THE COURT:  -- and that Mr. Conrad didn't

2    tell her the name of the person.  I thought you asked

3    her that.

4             MR. SIMMS:  I didn't.

5             THE COURT:  You didn't ask her that?

6             MR. SIMMS:  No.  I'm not referring to the

7    name.  I'm talking about whether it would be a vendor or

8    agent, not necessarily who it was in terms of the name.

9             THE COURT:  Then I don't understand your

10   question.

11            Do you understand his question?

12            THE WITNESS:  I don't understand.

13   BY MR. SIMMS:

14     Q.  Would the --

15            THE COURT:  Next question.

16   BY MR. SIMMS:

17     Q.  Would the vendor be responsible for coming up

18   with the process?

19            MR. BURKE:  Calls for speculation, Your

20   Honor.  Objection.

21            THE COURT:  Sustained.

22   BY MR. SIMMS:

23     Q.  Who comes up with the process of the -- who came

24   up with the process of the migration outside of BIS?

25            MR. BURKE:  Objection, asked and answered.

1  Calls for speculation.

2          THE COURT:  Sustained.

3  BY MR. SIMMS:

4    Q.  Ms. Sins, I'm going to refer your attention to

5  Defense Exhibit 71.

6          THE CLERK:  Mr. Simms, you said 71?

7          MR. SIMMS:  Yes.

8          THE CLERK:  Thank you.

9  BY MR. SIMMS:

10   Q.  And I'm going to ask you to go to page two.  I

11 want to ask you to go towards the middle of the page.

12 And there's an e-mail from Kim Bryant.  Do you see that?

13   A.  Yes.

14   Q.  And under "CC" it says "KimSins" -- or

15 "KSins@bis.doc.  Is that you?

16   A.  Yes.

17   Q.  And there's also a Rob Moffett, CC'd?

18   A.  Yes.

19   Q.  And there's an individual by the name of

20 J. Bedford, also -- that e-mail is addressed to,

21 correct?

22   A.  Yes.

23   Q.  And when is this dated?

24   A.  This is February 9th, 2011.

25   Q.  Okay.  And in this e-mail --

1          MR. BURKE:  Objection, hearsay.  She's not

2   the author of the e-mail.  It's not a court statement.

3          MR. SIMMS:  Your Honor, I'm not going for

4   the truth of the matter asserted, but knowledge.

5          MR. BURKE:  Knowledge of who is not

6   relevant.

7          THE COURT:  Who to do what?

8          MR. SIMMS:  Knowledge of the vendor,

9   Mr. Bedford being the vendor, CC'd on the e-mail.

10         THE COURT:  Well, you've already asked her

11  that question.  If you lay a foundation, maybe you can

12  do it this way.  But you can't cross-examine on somebody

13  else's e-mail --

14         MR. SIMMS:  This is --

15         THE COURT:  -- that she was CC'd on.  She's

16  not the author of it.

17         MR. SIMMS:  Okay.

18  BY MR. SIMMS:

19    Q.  After reviewing this e-mail that is addressed to

20  J. Bedford, is it your testimony that you still didn't

21  know who the vendor was?

22    A.  I see a --

23         THE COURT:  He's not asking you -- he's not

24  asking you from reading the e-mail.  He's asking you if

25  you remember the name.

1              THE WITNESS:  So, when I see that this is

2    JBedford@TACC2, I don't know who that vendor is.

3    BY MR. SIMMS:

4        Q.   Okay.

5        A.   I assume --

6              THE COURT:  No, don't assume.

7              Next question.

8    BY MR. SIMMS:

9        Q.   Now, in this e-mail --

10             THE COURT:  Are you still referring to

11   somebody else's e-mail?

12   BY MR. SIMMS:

13       Q.   Did you ask Kim Bryant to send this e-mail?

14       A.   I did not ask Kim to send the e-mail.

15       Q.   Did you have a discussion with Kim Bryant shortly

16   before this e-mail was sent?

17       A.   So --

18             THE COURT:  Excuse me.  He's just asking you

19   questions now -- excuse me.  Ms. Sins, look at me.

20             He's asking you questions now.  He's not

21   asking you to read the e-mail.  He's just asking you

22   questions.  Listen to his question.  Okay?

23   BY MR. SIMMS:

24       Q.   Did you have a conversation with Mr. Bryant

25   shortly before the e-mail was sent?

1      A.    I had conversations with Mr. Bryant often.

2      Q.    Okay.  And prior to this e-mail being sent, was a

3    part of that conversation concerns --

4                THE COURT:  Excuse me.

5                Ms. Sins --

6                (To the CSO)  Move the notebook out of her

7    way.

8                (To the witness)  He's not asking you about

9    the e-mail.  He's just asking you questions about what

10   you remember.  Okay?

11               THE WITNESS:  Okay.

12               MR. BURKE:  Objection, hearsay.

13               MR. SIMMS:  I didn't even finish the

14   question.

15               THE COURT:  Well, let's hear the question

16   again.

17   BY MR. SIMMS:

18     Q.    So, the conversation that you had with Mr. Bryant

19   prior to this e-mail, were you addressing to him

20   concerns about the vendor?

21     A.    I did address concerns about the migration

22   project that was going on.

23     Q.    Okay.  And then on that May 9th date you get an

24   e-mail, and you're CC'd on it, and it's from Mr. Bryant

25   to J. Bedford, correct?

1     A.  I think it was February 9th.

2         What was the date?

3     Q.  February 9th.  I'm sorry.

4         THE COURT:  Lean forward towards the

5    microphone.  I can barely hear you.

6         THE WITNESS:  Sorry.

7         Could you ask that question again?

8    BY MR. SIMMS:

9     Q.  So, shortly after addressing your concerns with

10   Mr. Bryant about the vendor, you get an e-mail from

11   Mr. Bryant -- you're CC'd on it, and it's to J. Bedford,

12   right?

13    A.  I -- my concern was about the migration project

14   and how that was going and the product that was being

15   produced.  It wasn't about the vendor that I had a

16   conversation with Mr. Bryant about.  It was about the

17   project that I thought was out of control and the

18   results were not usable by the BIS employees.  I wasn't

19   complaining about a vendor.

20    Q.  Okay.

21    A.  I wanted the project under control.

22    Q.  Okay.  So, after reviewing that e-mail, what was

23   your understanding as to what was to happen with the

24   project?

25    A.  I actually didn't read the e-mail just now, to

1   refresh my memory.  I -- I need to read the e-mail, if

2   you want me to answer that.

3       Q.   Okay.  That's fine.

4              MR. SIMMS:  Your Honor, if the witness can

5   refer to --

6              THE COURT:  Well, there's no question

7   pending, so I don't know what she's looking at the

8   e-mail for.

9              MR. SIMMS:  She said -- I asked her what was

10  her understanding of what was supposed to happen with

11  the migration work after this e-mail was sent.

12             She said she doesn't remember.

13             THE COURT:  Okay.

14             You can let her see the e-mail now.

15             This is not for you to read from the e-mail.

16  This is to see if you can refresh your present

17  recollection, remind you of what you were thinking when

18  that happened.

19             THE WITNESS:  Okay.

20             THE COURT:  Okay?

21             (Witness reading exhibit.)

22             THE COURT:  Does that help you remember?

23             THE WITNESS:  Yes.

24             THE COURT:  All right.

25             Ask your question now.

1   BY MR. SIMMS:

2     Q.  So, what was your understanding of what was to

3   happen with the migration project after that e-mail was

4   sent?

5     A.  It needed to -- it was going to stop.  It was

6   going to have control.  Funding was being used for other

7   projects in BIS, and the funding could not be dedicated

8   just for the migration project.

9         It needed to get control and stop, and not freely

10  just take files, hand them off, give them back, without

11  any oversight.

12    Q.  And what was your understanding of who this

13  e-mail was being sent to?

14    A.  It looked like it was being sent to a project

15  lead on the contractor side for the migration project.

16    Q.  Now, did you ever speak with -- do you know who

17  Robert Moffett is?

18    A.  Yes.

19    Q.  And did you ever have any conversation with him

20  about the funding for the contract?

21    A.  Yes.

22    Q.  Did you ever have any conversation with Kim

23  Bryant about funding for the project?

24    A.  Yes.

25    Q.  How about Mr. Donnell?

1    A.   Yes.

2    Q.   Kathy Ossi?

3    A.   I don't recall.

4    Q.   Okay.  And after this -- going back to this

5    e-mail from February 9th, 2011, did the migration work

6    actually stop at that point?

7    A.   It did not.

8    Q.   Okay.  How much longer did it go on?

9    A.   It went on, I believe, until the first part of

10   summer, middle summer, sometime around maybe July,

11   August, until absolutely no more funding was on it.

12   Q.   Okay.  And this is under your watch at this

13   point, because it's after this February 9th e-mail.  At

14   this point, you're in charge?

15   A.   No.  I am the point of contact.  Kim Bryant is

16   the COTR.  So he is the contracting officer's technical

17   representative for the contracting officer.

18        So I'm simply the point of contact for BIS.  It's

19   my responsibility, as that person, to ensure, best that

20   I can, that BIS is receiving the services that were paid

21   for.

22   Q.   Okay.  And still at this point you don't --

23   you're saying that you didn't know who the person was?

24   A.   I did not know who the vendor -- I don't know who

25   this vendor is.  I know this is -- now -- after that

1    time, I knew.  I can't -- I was -- I came to know them

2    as TAC2, which also, I believe, could be referred to as

3    Team America Contracting, a construction-type company.

4    And that's what I understood who was performing this

5    work for BIS, technical work.

6        Q.   That e-mail that I showed you, Mr. Conrad is not

7    CC'd on there, is he?

8        A.   He is not.

9        Q.   Okay.

10               MR. SIMMS:  Thank you.

11               I have no further questions.

12               MR. BURKE:  No redirect, Your Honor.

13               May the witness be excused?

14               THE COURT:  Yes.

15               You're free to leave.  Thank you for coming.

16               THE WITNESS:  Thank you.

17               (Thereupon, the witness withdrew from the

18    stand.)

19               MR. WALKER:  Your Honor, the government

20    calls Jian Mao.

21               MR. HENDRICK:  Face the clerk.  Please raise

22    your right hand.

23               (Witness sworn.)

24               THE WITNESS:  Yes.

25               THE CLERK:  Thank you.

1          Have a seat, please.

2          THE COURT:  You may proceed.

3          THEREUPON, JIAN MAO, having been duly sworn,

4    testified as follows:

5                    DIRECT EXAMINATION

6    BY MR. WALKER:

7      Q.   Sir, could you please state and spell your name

8    for the court reporter.

9      A.   My name is Jian Mao; last name, M-a-o, first

10   name, J-i-a-n.

11     Q.   And, Mr. Mao, if you could move a little bit

12   closer to the microphone so the members of the jury can

13   hear you.

14     A.   Okay.

15     Q.   Where do you work?

16     A.   I work for SIT Consultant, for many contracts for

17   federal government.

18     Q.   Do you own or are you the president of any

19   company?

20     A.   Yes.  I'm the president of Notion Consulting.

21     Q.   How long have you been the president of Notion

22   Consulting?

23     A.   Since its beginning, 1997.

24     Q.   What type of work does Notion do?

25     A.   We -- we do IT information technologies,

1  consulting service.  Most -- most clients are federal

2  government.

3      Q.  Sir, could you briefly describe your educational

4  background for the jury?

5      A.  I'm a doctor of philosophy in physics.

6      Q.  And where did you receive your doctorate in

7  physics from?

8      A.  University of Maryland at College Park.

9      Q.  And in addition to your doctorate in physics, do

10  you have any other degrees?

11      A.  Yes.  I have a master and bachelor degrees.

12      Q.  And are those degrees also in physics?

13      A.  Yes.

14      Q.  Let's walk the jury through your experience prior

15  to Notion Consulting.  Prior to becoming a president of

16  Notion, what sorts of other jobs have you held in the

17  field of IT?

18      A.  I worked as a senior engineer, principal engineer

19  and a senior technical advisor for Litton; Litton

20  Industries now part of Northrop Grumman.

21          Also --

22      Q.  I'm sorry.  Did you say Litton Industries?

23      A.  Yes.

24      Q.  And you said that was part of Northrop Grumman?

25      A.  Yes.

1          And I also worked for EDS, now part of Hewlett

2     Packard, IT service.

3          Q.    Earlier, you mentioned that Notion does IT

4     consulting.  What, if any, governmental agencies does

5     Notion perform work for?

6          A.    We did work for Department of Commerce,

7     Department of Labor, Department of Treasury, Department

8     of Defense, and the Smithsonian Institution.

9          Q.    Has Notion ever performed work for the Bureau of

10    Industry and Security?

11         A.    Yes, we did.

12         Q.    When were you first hired to work for BIS?

13         A.    I think it's in 2004.

14         Q.    What were you initially hired to do for BIS?

15         A.    I believe the first one is looking to the system

16    called the SNAP.  It is the BIS -- the main application

17    to -- that allow export -- exporters to apply for export

18    license from the government.

19         Q.    After you performed that initial work, did you

20    continue to work with BIS?

21         A.    Yes.  We worked at the BIS, you know, we did

22    architecture.  We do software application development.

23    We designed, implement and operated infrastructure for

24    BIS.

25         Q.    Dr. Mao, do you know an individual named Raushi

1   Conrad?

2       A.   Yes, I do.

3       Q.   Do you see him in the courtroom today?

4       A.   Yes.

5       Q.   If you could please identify him by where he is

6   sitting and what he is wearing.

7       A.   He's right here (indicating).  He is wearing a

8   white shirt.

9       Q.   Could you be a little more specific than just the

10  white shirt?

11           MR. SIMMS:  Your Honor, we agree he

12  identified the defendant.

13           THE COURT:  So noted.  Thank you.

14           The record will reflect he has identified

15  the defendant.

16           Thank you.

17  BY MR. WALKER:

18      Q.   How do you know the defendant?

19      A.   We used to work -- he's a government employee,

20  project manager, director of network and operation.

21      Q.   And who is he -- who was he the director of

22  network and operations for?

23      A.   He manages and supervise, I guess, contract like

24  us --

25           MR. SIMMS:  Objection, speculation.

1          THE COURT:  Only tell us what he knows.

2    BY MR. WALKER:

3       Q.   Have you -- had you spoken to the defendant about

4    his job at BIS?

5       A.   We worked daily, I guess.  That's for several

6    years.

7       Q.   And based on your working with him daily, what

8    was your understanding of what his job was?

9       A.   He -- he's the government side supervisor for all

10   infrastructure-related projects, and also directs us in

11   terms of operational responsibility, like how to manage

12   the network and server infrastructure.

13      Q.   In that role, would the defendant assign IT

14   projects to Notion?

15      A.   He managed our project.  That's when we provide

16   network and operational projects, any IT project like

17   that.  He's government side lead.

18      Q.   Dr. Mao, from 2010 to 2012, about how many Notion

19   employees were working to support BIS?

20      A.   About -- I think about 30 to 35.

21      Q.   Were those employees working on site at BIS?

22      A.   Yes.

23      Q.   Did they have offices at BIS?

24      A.   Yes.

25      Q.   Were you working on site at BIS during that time

1  period?

2      A.  Yes.

3      Q.  Did you have an office at BIS?

4      A.  Yes.

5      Q.  Where was your office located?

6      A.  My office is in a suite right across the CIO's

7  suite, which -- so, I have a cubicle in that suite.

8      Q.  When you say "CIO," what do you mean?

9      A.  Chief information officer.

10     Q.  Where was your office in relation to where the

11 defendant's office was?

12     A.  About, maybe five office away.

13     Q.  To your knowledge, was the defendant aware of

14 where your offices were located?

15     A.  Yes.  We meet very often.

16     Q.  I want to take a step back and discuss the BIS

17 computer networks.  Are you familiar with those

18 networks?

19     A.  Yes.  We helped to design and implement the

20 infrastructure, at least what they have right now.

21     Q.  Is it the case that you actually designed the

22 networks?  Is that what you said?

23     A.  Yes.  My team designed it.  But as the program

24 manager and technical lead for Notion, I did review all

25 the deliverable, all the design.

1   Q.   Let's talk about those networks.  First, are you

2   familiar with the network called BECCI 2?

3   A.   Yes.

4   Q.   What is BECCI 2?

5   A.   It's the BIS exporter control infrastructure

6   network.

7   Q.   And what was the purpose of that network?

8   A.   We were tasked to redesign it, after BIS learned

9   the IT system has been hacked and, you know, in

10  Washington Post.  So, we help to redesign a secure

11  network for BIS.

12  Q.   And is BECCI 2 an acronym?

13  A.   Yes.

14  Q.   Could you spell that for the jury?

15  A.   B, like boy, E, like export, C, like control, C,

16  cyber -- infrastructure.

17  Q.   Are you also familiar with a network called CAI

18  Moderate?

19  A.   Yes.

20  Q.   What was that network?

21  A.   I think that's -- it's a compartmentalized

22  infrastructure or something like that.

23  Q.   And what was the purpose of that network?

24  A.   To make sure the application we develop it is

25  deployed in a secure infrastructure.

1      Q.   Were users' files for BIS located on that CAI

2  network?

3      A.   On CIA Moderate.

4      Q.   You said a moment ago that you and your team

5  actually designed those new networks.  Once you designed

6  the new networks, were you also responsible for

7  implementing those networks?

8              MR. SIMMS:  Your Honor, I would object to

9  relevance.

10             THE COURT:  Relevance.

11             MR. WALKER:  Your Honor, it's absolutely

12  relevant because these are the very networks that the

13  data migration project was going onto.

14             THE COURT:  Well, I guess we need to figure

15  out what it has to do with bribery and attempted

16  bribery.  If you would focus a question that -- bearing

17  on that, that would help me.

18             So I sustain the objection.

19  BY MR. WALKER:

20     Q.   As president of the company who designed,

21  operated and implemented the network, to your knowledge,

22  was the defendant aware of the fact --

23             MR. SIMMS:  Objection, leading, speculation.

24             MR. WALKER:  Your Honor, I asked the witness

25  if he was aware.  If he wasn't aware, he is free to

1   answer.

2              THE COURT:  He was, but a question that

3   suggests the answer is leading, Mr. Walker.

4              Objection sustained.

5   BY MR. WALKER:

6       Q.   What, if any, conversations did you have with the

7   defendant about your creation of the network?

8       A.   We -- we designed, implemented the network with

9   Mr. Conrad guiding us for requirements, review our

10  design, make sure we did the network to the common

11  satisfaction.

12      Q.   Dr. Mao, are you familiar with data migration?

13      A.   Yes.

14      Q.   How are you familiar with that concept?

15      A.   The -- in general, like a data migration, for

16  example, once we rewrote the application system for the

17  BIS, we actually migrate the -- all the data into the

18  new database, like a Oracle database, and we deploy it

19  in the new network infrastructure.  So, it's secure

20  and operate correctly.

21      Q.   So, have you ever performed data migration work

22  for BIS?

23      A.   Yeah.  Like all this application, we developed

24  it, we have to -- every time we have to migrate the data

25  associated with that application.  Whether it's from

1    mainframe or from existing Legacy application, we move

2    the data and/or the -- you know, put it so the user can

3    access the data to that application on the new system.

4        Q.   Were you working with the defendant when you did

5    perform that data migration?

6        A.   Yes.  He -- he make sure -- he is the government

7    side, to make sure all the application we deployed are

8    working properly.  He's in charge of operation.

9        Q.   Regarding the specific data migration project in

10   this case, were you familiar with that project?

11       A.   This one you're talking about?

12       Q.   Yes.

13       A.   You're talking about the -- normally, there is

14   another portion of migration.  It's a file system.

15   Normally, every --

16           THE COURT:  It might help us if you focus on

17   the time, Mr. Walker.

18           MR. WALKER:  Okay.

19   BY MR. WALKER:

20       Q.   Directing your attention to approximately 2010,

21   2011 timeframe, are you familiar with the data migration

22   project that took place at that point?

23       A.   Yes.

24       Q.   At -- were you ever asked to submit a formal bid

25   on that work?

1    A.   No.

2    Q.   Were you ever asked to --

3              MR. SIMMS:  Objection, leading.

4              THE COURT:  Questions that suggest the

5    answer are leading.

6              Objection sustained.

7    BY MR. WALKER:

8    Q.   What, if any, formal proposal were you ever asked

9    to come up with for that work?

10   A.   We never -- I was not aware that there was a

11   request for proposal.

12   Q.   What, if any, conversations did you have with the

13   defendant about that work?

14   A.   I don't recall any much conversation with him.

15   Q.   What, if any, formal written estimate were you

16   asked to provide for the project?

17   A.   We never provide any formal written estimate.

18   Q.   What, if any, knowledge, based upon your

19   interactions with him, did the defendant have about

20   Notion's capabilities to do computer work?

21   A.   I think he really liked my team, many times told

22   me our engineers are excellent.

23   Q.   What, if anything, did the defendant ask you

24   about the best approach to take on the data migration

25   work?

1    A.   We were not really involved in that project.

2    Q.   So, what, if anything, did he ask you about the

3    project?

4    A.   I don't recall -- I don't -- I wasn't involved,

5    so I don't remember much about that.

6    Q.   What, if anything, did he ever say to you about

7    the project at all?

8    A.   I don't recall.

9    Q.   Just to be clear for the jury, at the time the

10   data migration work was being performed, what, if any,

11   Notion employees were working at BIS?

12   A.   Yes, we were all working at the BIS.

13   Q.   Were those employees -- did that include you?

14   A.   Yes.

15   Q.   Were you working on site?

16   A.   Yes.

17   Q.   Dr. Mao, were you ever asked to perform the work?

18        MR. SIMMS:   Objection, asked and answered.

19        THE COURT:   Sustained.

20   BY MR. WALKER:

21   Q.   Dr. Mao, if some other employee from Notion had

22   been asked to submit a bid for the data migration work,

23   as president of the company, what, if any, involvement

24   would you have had in that process?

25        MR. SIMMS:   Objection.

1              THE COURT:  It's better if you stand when

2   you object.

3              What's your objection, Mr. Simms?

4              MR. SIMMS:  Sorry.

5              It goes to relevance.

6              THE COURT:  All right.

7              MR. WALKER:  Your Honor, it's relevant that

8   there was --

9              THE COURT:  "What if"?

10             MR. WALKER:  What, if anything, yes.

11             THE COURT:  I sustain the objection.

12  BY MR. WALKER:

13     Q.   To your knowledge, before the data migration

14  contract was awarded, who, if anyone, from your company

15  was asked to perform the work?

16     A.   No one.

17             MR. WALKER:  Nothing further.

18                    CROSS-EXAMINATION

19  BY MR. SIMMS:

20     Q.   Good afternoon.

21          Mr. Mao, do you have a business partner?

22     A.   No.  I didn't bring any.

23     Q.   Okay.  Do you know a Jun Wu (phonetics)?

24     A.   Yes.

25     Q.   Okay.  And who is he?

1    A.   He's my -- our company's senior vice-president.

2    He's the lead network engineer.

3    Q.   Okay.  So he's a vice-president and network

4    engineer?

5    A.   Yes.

6    Q.   Okay.

7    A.   He work part-time, but it's a key employee,

8    technical guy, supporting -- supporting --

9    Q.   Mr. Conrad?

10   A.   Yes.

11   Q.   Okay.  So, he had more contact with Mr. Conrad

12   than you did?

13   A.   Yes.  I would -- for the detailed perform,

14   actually performing network work, yes, he should.

15   Q.   You stated that at the time that the data

16   migration contract was started, around 2010, 2011, your

17   company was working at BIS, right?

18   A.   Yes.

19   Q.   Okay.  And what was your company doing at BIS at

20   that time?

21   A.   We actually cover several things:  application

22   development and, you know, the -- supervisor is director

23   of system organization.  We also support network and the

24   infrastructure design and the operation.  The lead is

25   Conrad.

1    Q.    Okay.  And how many employees did you all have?

2    A.    We have a total of about 30 to 34.

3    Q.    And they're all were working on those aspects?

4    A.    Yes.

5              MR. SIMMS:  No further questions, Your

6    Honor.

7              MR. WALKER:  Your Honor, may the witness be

8    excused?

9              THE COURT:  Yes.

10             You're free to leave.  Thank you for coming,

11   sir.

12             THE WITNESS:  Thank you.

13             (Thereupon, the witness withdrew from the

14   stand.)

15             MR. BURKE:  Your Honor, the government calls

16   Delaney Harris.

17             MR. HENDRICK:  Face the clerk.  Please raise

18   your right hand.

19             (Witness sworn.)

20             THE WITNESS:  I do.

21             THE CLERK:  Thank you.

22             Have a seat, Please.

23             THEREUPON, DELANEY HARRIS, having been duly

24   sworn, testified as follows:

25                      DIRECT EXAMINATION

1  BY MR. BURKE:

2      Q.  Good afternoon, sir.

3          What is your name?

4      A.  Delaney Harris.

5      Q.  Could you spell your name for the court reporter.

6      A.  D-e-l-a-n-e-y --

7          THE COURT:  Move closer to the microphone,

8  please.

9          THE WITNESS:  D-e-l-a-n-e-y, H-a-r-r-i-s.

10  BY MR. BURKE:

11     Q.  Mr. Harris, where do you work?

12     A.  For myself.

13     Q.  What's the name of your company?

14     A.  Delaney Harris Heating and Cooling.

15     Q.  What kind of work you do?

16     A.  Heating and ventilation.

17     Q.  How long have you operated your own company?

18     A.  Right at 20 years or so.

19     Q.  Mr. Harris, have you ever done work for a company

20  called Team America Contractors?

21     A.  Yes, I have.

22     Q.  What kind of work have you done for Team America?

23     A.  Heating and contract -- heating and ventilation.

24     Q.  Now, Mr. Harris, I would like to direct your

25  attention to the summer of 2011.  In the summer of 2011,

1    what kind of work were you doing?

2        A.   Heating and ventilation.

3        Q.   And, at that time, were you an employee of Team

4    America?

5        A.   Not at that time, no.

6        Q.   What kind of relationship did you have, if any,

7    with Team America?

8        A.   Just subcontract work from them.

9        Q.   When you were an independent subcontractor or

10   subcontractor to Team America, who were your main points

11   of contact?

12       A.   Glen Bertrand and Alice Bertrand.

13       Q.   Now, in the summer of 2011, did there come a time

14   when you were directed to perform some work at a

15   residence?

16       A.   Yes, sir.

17       Q.   How did you first come to learn about this work

18   at a residence?

19       A.   Glen Bertrand had called me and asked me if I

20   would take care of some work.

21               MR. SIMMS:  Objection.

22               MR. BURKE:  Coconspirator statement, Your

23   Honor.

24               THE COURT:  It wasn't clear to me, the name.

25   Bertrand, is this male or female?

D. Harris - Direct

1         Is this the person who worked, allegedly?

2         MR. BURKE:  Yes, Your Honor.

3         THE WITNESS:  Yes, sir.

4         THE COURT:  Objection overruled.

5    BY MR. BURKE:

6         Q.  And what did -- what did Glen Bertrand say to

7    you, sir?

8         A.  He asked me to -- would I do some work for him,

9    and I performed the work.

10        Q.  Where, if anywhere, did Mr. Bertrand tell you to

11   go?

12        A.  Uh --

13        Q.  Physically, like what location?

14        A.  Gainesville, Virginia.

15        Q.  And where was this -- what was it that you were

16   going to?

17        Was this an office?

18        Was it a residence?

19        A.  Residence.

20        Q.  Whose residence what it?

21        A.  Mr. Raushi here (indicating).

22        Q.  Okay.

23        A.  Raushi, yeah.

24        Q.  When you say "Raushi," you're referring to the

25   defendant here?

 1    A.   Yes, sir.  Uh-huh.

 2    Q.   Mr. Harris, did you in fact go to Mr. Conrad's

 3  residence?

 4    A.   Yes, I did.

 5    Q.   And what timeframe was this?

 6    A.   Probably morning.

 7    Q.   And what time of year?

 8    A.   Probably right about now, May or June or

 9  something, when it started getting warm.

10    Q.   Summer of --

11    A.   Summer.

12    Q.   -- 2011?

13    A.   Summer.  Yeah.  It was hot.

14    Q.   When you arrived at the defendant's residence,

15  who was present?

16    A.   Mr. Conrad was there.

17    Q.   And what, if anything, did you observe about the

18  condition of the defendant's residence?

19    A.   How nice it was.

20    Q.   Specifically with regard to the basement, what,

21  if anything, did you observe?

22    A.   How new and pristine it was, you know.

23    Q.   Mr. Harris, when you arrived at the defendant's

24  residence, what, if anything, did you discuss with

25  Mr. Conrad?

1    A.   His heating and ventilation.  And we walked

2  around the basement area, showed me the bath and stuff

3  like that.

4    Q.   He showed you a bath in the basement?

5    A.   Uh-huh.

6    Q.   Was it new?

7    A.   Yes, brand new, yes.

8    Q.   Sir, what, if any, work did you perform while you

9  were there?

10   A.   I performed -- I repaired a system that was

11  attached to the home, heating and ventilation system.

12   Q.   After you did that work, the repair of the

13  system, what, if any, conversation did you have with the

14  defendant about who would pay for that work?

15   A.   It would be Team America Contracting.

16   Q.   Did the defendant tell you that it would be Team

17  America that paid?

18   A.   Yes, sir.

19   Q.   Mr. Harris, with the assistance of the court

20  security officer, I'd ask you to please take a look now

21  at Government Exhibit 11.

22   A.   Yes, sir.  Uh-huh.

23   Q.   Do you have Government Exhibit 11 in front of

24  you, sir?

25   A.   Do I --

1     Q.   Do you have Government Exhibit 11 in front of

2  you?

3     A.   Yes, sir.

4     Q.   What is Government Exhibit 11?

5     A.   It's a purchase order from the work I performed.

6     Q.   Did you prepare this purchase order near the time

7  you performed the work?

8     A.   Yes, I did.

9     Q.   Did you prepare it based on your knowledge of the

10 work you had performed?

11    A.   Absolutely.

12    Q.   Does it accurately reflect the work you

13 performed?

14    A.   Yes, it does.

15    Q.   And was it your regular practice to prepare

16 invoices such as this in the course of your duties?

17    A.   Yes, it was.

18    Q.   And were records like this kept in the course of

19 your regular business activities?

20    A.   Yes, it was.

21         MR. BURKE:  Your Honor, the government moves

22 to admit Exhibit 11.

23         THE COURT:  Eleven will be received.

24 BY MR. BURKE:

25    Q.   Now, sir --

1           MR. BURKE:  May we publish Exhibit 11, Your

2     Honor?

3           THE COURT:  Yes.

4     BY MR. BURKE:

5     Q.   Now, Mr. Harris, if you could look at the paper

6     copy that's in front of you -- not on the screen, but

7     the paper.

8     A.   Okay.

9     Q.   The paper copy in front of you, is that -- is

10    that redacted or not redacted?

11          Is the address visible on the paper copy?

12    A.   Yes, it is.

13    Q.   Okay.  Without reading the exact address, can you

14    tell us whose address that was?

15    A.   Mr. Conrad's.

16    Q.   Is that where you performed the work?

17    A.   That's where I performed the work, yes.

18    Q.   Sir, after you completed the purchase -- or this

19    purchase order that's marked as Government Exhibit 11 --

20    A.   Uh-huh.

21    Q.   -- who, if anyone, did you call?

22    A.   I called Alice Bertrand and Glen Bertrand and

23    told them the work had been performed.

24    Q.   Where, if anywhere, did you go after you finished

25    the work?

1    A.   I went to Team America Contracting on Residency
2    Road and picked the check up.
3    Q.   And if I could ask you now to turn to Government
4    Exhibit 21-7.
5         Your Honor, may we publish?  This has been
6    admitted.
7              THE COURT:  Yes.
8              THE WITNESS:  Okay.
9    BY MR. BURKE:
10   Q.   What is Government Exhibit 21-7?
11   A.   It's a check.
12   Q.   A check?
13   A.   Yeah.
14   Q.   A check for what?
15   A.   For the contract work that I did for Mr. Conrad.
16   Q.   Now, sir, where did you go to pick up this check?
17   A.   Team America Contracting on Residency Road.
18   Q.   Now, on the face of the check it says "Teresa
19   Walker."  Could you explain to the jury why this says
20   "Teresa Walker" instead of "Delaney Harris"?
21   A.   Yes, sir, I can.  I was in between changing bank
22   accounts, and she was my fiance, and I asked them, could
23   they just write the check to her instead of me
24   because -- just transactions through the banks.  You
25   know, we were changing banks.

1    Q.   Mr. Harris, did the defendant, Raushi Conrad, pay

2    you for any of the work that you did at his house?

3    A.   No, sir.

4         MR. BURKE:  Nothing further, Your Honor.

5                   CROSS-EXAMINATION

6    BY MR. SIMMS:

7    Q.   Good afternoon, sir.

8         Sir, you performed this work in 2011?

9    A.   Yes, sir.

10   Q.   Okay.  And you were interviewed by the government

11   about it in 2016?

12        You were first interviewed by the government

13   about it in 2016?

14   A.   Yes, sir.

15   Q.   Okay.  So about five years, actually over five

16   years, after the work was completed?

17        MR. BURKE:  Objection, relevance.

18        THE COURT:  Sustained.

19   BY MR. SIMMS:

20   Q.   Mr. Harris, how many units have you worked on

21   since visiting Mr. Conrad's house on that date?

22        MR. BURKE:  Objection, irrelevant.

23        MR. SIMMS:  May I respond, Your Honor?

24        THE COURT:  Yes.  I'm listening.

25        MR. SIMMS:  Okay.  Thank you.  Your Honor,

D. Harris - Cross

1    it goes towards his ability --

2            THE COURT:  Memory?

3            MR. SIMMS:  Yes.

4            THE COURT:  Okay.  Ask it.

5            MR. SIMMS:  Okay.

6            THE COURT:  Objection overruled.

7    BY MR. SIMMS:

8        Q.  You've installed numerous AC units since that

9    time, correct?

10       A.  Thousands, yes.

11       Q.  Okay.  And how is it that you specifically

12   remember Mr. Conrad's unit?

13       A.  Through the paperwork.

14       Q.  Okay.  So you don't have independent memory; it's

15   by looking at your records?

16       A.  Do I -- say that again.

17       Q.  You don't have independent memory; it's through

18   looking at your receipt, your invoice?

19       A.  Oh, yeah, I do.  My mind is clear.  Yeah, very

20   clear.

21       Q.  I think you have a clear mind.  You seem very

22   sharp.

23           But I'm asking you, other than -- I asked you:

24   How do you remember Mr. Conrad's -- the work that you

25   did, and you said because of the invoice.

1    A.   Well, I remember it clearly.  Yeah.  I don't know
2    what you're asking, but I remember it very clear.
3    Q.   Okay.  All right.  Now, do you have a receipt
4    that you kept in your records for the unit that you
5    purchased?
6    A.   Not with me, but I do have receipts on my
7    computer at home, yes.
8    Q.   Okay.  How do you get them on your computer on
9    home?
10   A.   How do I get them on the computer at home?  I
11   type them in.
12   Q.   You type in a receipt?
13   A.   Yeah.  I just type it in and whose address it was
14   and where it was, yeah.
15   Q.   Okay.  So you don't have physical copies of the
16   receipt?
17   A.   No, I don't keep them, no.
18   Q.   Okay.  And where did you get the unit from in
19   this case?
20   A.   It wasn't a unit.
21   Q.   Okay.  Where did you get the parts from?
22   A.   From the -- the -- I think his was actually from
23   a company called Johnstone Supply.
24   Q.   Okay.  And what -- do you know or are you just
25   thinking?

1    A.   Well, I know.

2    Q.   Okay.  And what does the unit look like?

3         What is it?

4    A.   Well, it's a box with a compressor and a fan on

5    it.  It's kind of normal.

6    Q.   Okay.  And how did you transport it from the

7    retail location to Mr. Conrad?

8    A.   We did not buy a unit, sir.  It was just a

9    circuit board and a few other items.

10   Q.   Okay.  How do you wish me to address it?

11   A.   Sir?

12   Q.   How did you transport the circuit board?

13   A.   In my --

14        MR. BURKE:  Objection.

15        THE WITNESS:  -- truck.  In my truck, yeah.

16   BY MR. SIMMS:

17   Q.   Was your wife with you?

18        THE COURT:  Sustained.

19        I'd like very much for you to focus in on

20   the charges here, which are bribery or conspiracy to

21   commit bribery.  If you would focus on that, that would

22   help me.

23        MR. SIMMS:  Understood, Your Honor.

24   BY MR. SIMMS:

25   Q.   Now, your wife's name is on the invoice and the

1    check.  Was she with you when you installed the -- uh --

2        A.   Yes, she was.

3        Q.   And when you left Mr. Conrad's residence, you

4    said you went directly to Team America's office?

5        A.   Yes.  I called them and went directly to the

6    office, yes.

7        Q.   Around what time was that?

8        A.   During the day, or what -- be a little more

9    specific.  What time it was?  Day?  Year?

10       Q.   What time of day was it?

11       A.   What time of day?  It was probably -- I would say

12   1:00 or 2:00 in the afternoon.

13       Q.   And do you recall what time you got to

14   Mr. Conrad's house?

15       A.   Probably about 8:00 or 9:00 in the morning.

16       Q.   And that conversation that you had with

17   Mr. Bertrand, did that happen the same day that you went

18   to Mr. Conrad's house?

19       A.   No.  It was the day before.

20       Q.   Where is the place that you brought -- purchased

21   the unit from?

22            Where is it located?

23            MR. BURKE:  Objection.

24            THE WITNESS:  Gainesville, Virginia.

25            MR. BURKE:  Objection.

1           THE COURT:  Well, he actually answered that

2    question before the objection.  So overruled.

3           MR. SIMMS:  Thank you.

4           No further questions.

5           MR. BURKE:  No redirect.

6           May the witness be excused?

7           THE COURT:  You're free to leave, sir.

8    Thank you for coming.

9           THE WITNESS:  Thank you.

10          (Thereupon, the witness withdrew from the

11   stand.)

12          MR. BURKE:  Your Honor, the government calls

13   Quentin Powell.

14          MR. HENDRICK:  Please face the clerk.  Raise

15   your right hand.

16          (Witness sworn.)

17          THE WITNESS:  I do.

18          THE CLERK:  Thank you.

19          Have a seat, please.

20          THEREUPON, QUENTIN POWELL, having been duly

21   sworn, testified as follows:

22                   DIRECT EXAMINATION

23   BY MR. BURKE:

24     Q.  Good afternoon, sir.

25          What is your name?

1     A.   Quentin Powell.

2     Q.   Could you spell that, please?

3     A.   Q-u-e-n-t-i-n, P-o-w-e-l-l.

4     Q.   Mr. Powell, what do you do for a living?

5     A.   Remodeler.

6     Q.   I'm sorry?

7     A.   I do remodeling work.

8     Q.   Do you have a business?

9     A.   Yes, sir.

10    Q.   What's the name of your business?

11    A.   Powell Contracting.

12    Q.   You said you did remodeling.  What kind of

13    remodeling work do you do?

14    A.   I do electrical work and just interior

15    renovations.

16    Q.   Could you scoot a little bit closer to the

17    microphone, sir, so we can hear you.

18         Thank you.

19         Mr. Powell, are you familiar with a man by the

20    name of Glen Bertrand, Senior?

21    A.   Yes, sir.

22    Q.   How do you know Mr. Bertrand?

23    A.   I work for him as a subcontractor.

24    Q.   You said that you work for him as a

25    subcontractor.  As a subcontractor to what company?

1      A.   Team America Contractors.

2      Q.   Are you also familiar with a man named James

3   Bedford?

4      A.   Yes, sir.

5      Q.   How do you know James Bedford?

6      A.   I was -- I worked for both of them as a

7   subcontractor for Team America.

8      Q.   Let me direct your attention now to the spring of

9   2011.  In the spring of 2011, were you asked to perform

10  some work at a residence?

11     A.   Yes, sir.

12     Q.   Explain to the jury what happened.

13     A.   I was told to go to the residence and look at the

14  basement and see what it needed, and perform the

15  electrical work.

16     Q.   Who directed you to go to the basement -- or to

17  go to the residence?

18     A.   Mr. Bertrand.

19     Q.   And what did Mr. Bertrand instruct you to do at

20  this residence?

21     A.   Just go there and look at it, see what it needs,

22  and just install the electrical work.

23     Q.   Did you go to the residence?

24     A.   Yes, sir.

25     Q.   Whose residence was it?

1    A.   Mr. Conrad's.

2    Q.   Who was present when you arrived at the

3  residence?

4    A.   Some Team America employees were there, and as

5  well, Mr. Conrad, I believe.

6    Q.   And you said some Team America employees.  What

7  Team America employees did you observe present at the

8  defendant's residence?

9    A.   At the time, I knew Charly was there, and

10  Mr. Harris.

11   Q.   A man named Charly?

12   A.   Yes, sir.

13   Q.   And is -- how was Charly related to Team America,

14  if at all?

15   A.   I knew him to be a contractor, like -- he was an

16  employee, but he did contracting work, like carpentry.

17   Q.   He did carpentry work for Team America?

18   A.   Yes.

19   Q.   And you said also a Mr. Harris?

20   A.   Yes, sir.  Delaney Harris.

21   Q.   Delaney Harris.

22        When you arrived at the defendant's residence,

23  what happened?

24   A.   I walked around the back of the residence into

25  the basement and met with Charly, and we walked the job

Q. Powell - Direct

1    and kind of told me what they were doing.

2       Q.   What conversations, if any, did you have with the

3    defendant?

4       A.   He just kind of gave me a rough idea of what he

5    wanted in certain locations, as far as lighting and

6    plugs.

7       Q.   What the defendant wanted?

8       A.   Yes, sir.

9       Q.   In -- after the defendant described what kind of

10   work he wanted done in terms of lighting, et cetera,

11   what, if anything, did you do?

12      A.   Um, purchased the material and installed as

13   directed.

14      Q.   What kind of work -- describe for the jury what

15   work you did.

16      A.   It was electrical work:  installing light

17   fixtures, outlets, switches.

18      Q.   While you were doing this work at the defendant's

19   residence -- and what portion of the residence was it?

20   Where in the residence?

21      A.   The basement.

22      Q.   What else did you observe, if anything, being

23   done in the basement while you were there?

24      A.   Drywall, bathroom, just interior remodeling.

25      Q.   Now, with the assistance of the court security

Q. Powell - Direct

1   officer, I would ask you to please now take a look at

2   Government Exhibits 23 and 24.

3       Do you have 23 in front of you?

4   A.   Yes, sir.

5   Q.   If you could turn to the second page of

6   Government Exhibit 23.

7       What is -- what do we see on the second page of

8   Government Exhibit 23?

9   A.   It's an invoice I created, made out to Team

10  America Contractors.

11  Q.   An invoice related to what work?

12  A.   Work done in Mr. Conrad's basement.

13  Q.   And, sir, if you could turn now to Government

14  Exhibit 24, and specifically to the second page of

15  Government Exhibit 24.

16      What is -- what do we see in Government

17  Exhibit 24?

18  A.   It's also an invoice made out to Team America

19  Contractors for -- for the work done in Mr. Conrad's

20  basement.

21  Q.   Now, sir, are these invoices you prepared -- did

22  you prepare these invoices at or near the time that you

23  performed the work?

24  A.   Yes, sir.

25  Q.   Did you prepare them based on your firsthand

1    knowledge of the work you did?

2       A.  Yes, sir.

3       Q.  Do the invoices accurate reflect the work you did

4    at the defendant's basement?

5       A.  Yes, sir.

6       Q.  Was it your regular practice to prepare invoices

7    such as these?

8       A.  Yes, sir.

9       Q.  And was it your regular practice to keep and

10   maintain records like this in the course of your

11   business?

12      A.  Yes, sir.

13              MR. BURKE:  Your Honor, the government moves

14   to admit Exhibits 23 and 24.

15              THE COURT:  Received.

16              MR. BURKE:  If we could publish the second

17   page of Government Exhibit 23, please.

18              Would you blow up the description, please,

19   Ms. Sandvig.

20   BY MR. BURKE:

21      Q.  Mr. Powell, could you describe -- or could you

22   read to the jury the description of the work that you

23   performed at the defendant's residence?

24      A.  It says, "Work to rough-in basement per

25   description given.  Material supplied by others."

1      Q.  And then below that?

2      A.  Three men at 145 an hour, one tech, two

3  electricians, two days.  Two men at 115 an hour, one

4  tech, one election, five hours.

5      Q.  In that description, when you were referring to

6  work to rough-in basement per description given, who

7  gave you the description about what work to do?

8      A.  Mr. Conrad.

9      Q.  What's the amount of this invoice?

10     A.  2,895.

11     Q.  Sir, were you paid for this work?

12     A.  Yes, sir.

13     Q.  Who paid you for the work?

14     A.  Team America Contractors.

15     Q.  Sir, did -- did the defendant pay you for any

16  portion of this invoice?

17     A.  No, sir.

18     Q.  Turn now to Government Exhibit 24, page two.

19          MR. BURKE:  And Ms. Sandvig, if we could

20  publish page two of Government Exhibit 24.

21  BY MR. BURKE:

22     Q.  Now, sir, again, what is Government Exhibit 24?

23     A.  It's an invoice for the work done in the basement

24  of Mr. Conrad.

25     Q.  Could you read the description here that's

1    reflected in your invoice?

2       A.   "Necessary work to trim out basement, one man at

3    $85 an hour, two men at $115 an hour, installation of

4    outlets, switches, fixtures, breakers, et cetera.

5    Material, recessed lights purchased by electrician from

6    Home Depot for a cheaper price."

7       Q.   And in your invoice where you say "recessed

8    lights purchased by electrician," who are you referring

9    to there?

10      A.   Myself.

11      Q.   So, the lighting, the lighting equipment itself,

12   who purchased that equipment?

13      A.   I purchased it.

14      Q.   Sir, who paid you for the work reflected in this

15   invoice?

16      A.   Team America Contractors.

17      Q.   Did the defendant pay you for any portion of this

18   work?

19      A.   No, sir.

20           MR. BURKE:   If we could publish 21-5, Your

21   Honor.   It's been admitted into evidence.

22           THE COURT:   Yes.

23   BY MR. BURKE:

24      Q.   Do you have 21-5 in front of you, sir?

25      A.   Yes, sir.

1     Q.   What is 21-5?

2     A.   This is a copy of a check made out to my company.

3     Q.   From who?

4     A.   From Team America Contractors.

5     Q.   And how, if at all, does this relate to the

6     invoices we just looked at?

7     A.   It's payment for Invoice 23, or -- what is it?

8     Exhibit 23.  I'm sorry.

9              MR. BURKE:  Nothing further.

10                    CROSS-EXAMINATION

11    BY MR. SIMMS:

12    Q.   Good afternoon, Mr. Powell.

13    A.   Good afternoon.

14    Q.   So, this work was completed in the summer of

15    2011?

16    A.   Yes, sir.

17    Q.   Okay.  And you received directions to complete it

18    by Mr. Bertrand?

19    A.   Yes, sir.

20    Q.   Now, you -- you knew Mr. Conrad prior to going to

21    his house that day, right?

22    A.   Yes, sir.

23    Q.   Okay.  Because you had performed work at The

24    Chicken Place, right?

25    A.   Correct.

1    Q.   And it's the one on Fair Oaks Mall, right?

2    A.   Yes, sir.

3    Q.   And that work was performed in early -- well, I

4    guess the beginning of 2009, right?

5    A.   I can assume, yes.

6    Q.   What type of work did you do there?

7    A.   Electrical work.

8    Q.   Now, you stated that when you arrived at

9    Mr. Conrad's home, you proceeded to go to the

10   basement -- basement area, right?

11   A.   Yes, sir.

12   Q.   All right.  And you said that there were several

13   Team of (sic) America employees there?

14   A.   I believe so, yes, sir.

15   Q.   Okay.  And at that time -- you also said that

16   Mr. Harris was there, Delaney Harris?

17   A.   Yes, sir.

18   Q.   Okay.  The condition of the basement looked as

19   though it was undergoing a remodeling, correct?

20   A.   Correct.  It was in the early stages.

21   Q.   Okay.  So you wouldn't call it a finished,

22   pristine product, would you?

23   A.   Not at that time, no.

24   Q.   And were you able to see what Mr. Delaney Harris

25   was doing?

1      A.   No, sir.  I was assuming he was looking at the

2   project like myself, getting a handle on it.

3      Q.   Okay.  And did you ever see -- did you see

4   Mr. Delaney leave that day?

5      A.   I don't recall, sir, but I'm sure he did.

6      Q.   Okay.  How long did he stay at the residence?  Do

7   you recall?

8      A.   No, sir.  I wasn't sure.

9      Q.   Now, after you completed your work -- and it was

10  you and several other individuals doing the electrical

11  work, right?

12     A.   Yes, sir.

13     Q.   Okay.  You left and you squared payment up with

14  Mr. Bertrand, right?

15     A.   Yes, sir.

16     Q.   Do you know Mr. Bertrand's business partner?

17     A.   Yes, sir.

18     Q.   Mr. Bedford?

19     A.   Yes, sir.

20     Q.   Okay.  He didn't have any communication with you

21  in regard to this basement, did he?

22     A.   No, sir.  No direction.

23     Q.   Okay.  And you saw Mr. Conrad again after the

24  basement project, didn't you?

25     A.   Yes, sir, I'm sure I did.

1      Q.   And that would have been in 2012, when he and

2   Mr. Bedford were looking at restaurant space, right?

3      A.   Yes, sir.

4      Q.   Okay.  And you knew about Mr. Conrad being a

5   consultant to Bertrand and Bedford for the restaurant

6   business, right?

7            MR. BURKE:  Objection, speculation and

8   irrelevant.

9            MR. SIMMS:  Your Honor, I'm asking him if he

10  knew.

11           THE COURT:  Sustained.

12           THE WITNESS:  Yes, sir.

13           THE COURT:  The jurors will disregard that

14  response.

15           In other words, when I said "sustained,"

16  that means you should not have answered.  But that's

17  okay.

18  BY MR. SIMMS:

19     Q.   Did you know about Mr. Conrad doing any work with

20  Mr. Bedford and Bertrand in 2012?

21           MR. BURKE:  Objection, foundation.

22           THE COURT:  Sustained.

23  BY MR. SIMMS:

24     Q.   Did you visit a restaurant location with

25  Mr. Bedford and Mr. Conrad in 2012?

1    A.   I believe so, yes.

2    Q.   Okay.  And what was your understanding, if you

3    know, why were they there to look at that restaurant?

4                   MR. BURKE:  Objection.

5                   THE COURT:  Objection sustained.

6                   MR. SIMMS:  Your Honor, may we approach,

7    briefly?

8                   THE COURT:  Sure.

9                   (Thereupon, the following sidebar conference

10   was had:)

11                  THE COURT:  Yes.

12                  MR. SIMMS:  Your Honor, defense's

13   contention, which is also supported by statements that

14   have been made by Mr. Conrad and Mr. Bedford, that a

15   part of his repayment was for him to be a consultant to

16   Mr. Bedford and Mr. Bertrand in regards to their opening

17   of the restaurant.

18                  So, I would submit that him being present

19   while they're scoping out restaurant locations and

20   him -- Mr. Conrad being there is highly relevant to his

21   defense in this case.

22                  MR. BURKE:  Your Honor, that was not the

23   question that was asked.  He's already testified he was

24   present.

25                  But the next question was, why?

1          So that gets into asking the witness to
2    speculate about what was in the mind of the other people
3    there and what they were doing there, which is improper.
4          MR. SIMMS:  Well, I can -- I can ask him why
5    he was there, and what -- why would they want him there.
6          MR. BURKE:  Well, why he was --
7          MR. SIMMS:  Because --
8          THE COURT:  Hold on a second.
9          MR. SIMMS:  Because if -- if I just say,
10   "Were you there in the restaurant," I mean, that's like
11   saying he could have been there to eat.
12         THE COURT:  Well, I can't tell you what to
13   ask, but you can't ask him what other people understood
14   about why he was there.
15         MR. SIMMS:  Uh-huh.  Okay.
16         THE COURT:  You understand my question --
17   what I'm trying -- I can't really tell you what to say,
18   but you can't ask him --
19         MR. SIMMS:  What other people --
20         THE COURT:  -- what other people understood
21   about why he was there.
22         MR. SIMMS:  Okay.
23         THE COURT:  I get that he's a contractor,
24   but --
25         MR. SIMMS:  Uh-huh.

 1              THE COURT:  -- you could ask him about his

 2   personal knowledge about --

 3              MR. SIMMS:  Why he was -- okay.

 4              THE COURT:  Well, not understanding, but --

 5              MR. SIMMS:  "Why were you..."

 6              MR. BURKE:  Your Honor, our position is, his

 7   reason for being there is irrelevant as well.  He is not

 8   alleged to be a part of any of this conspiracy.  So, his

 9   thinking really doesn't go to any fact that's at issue.

10              THE COURT:  Well, it's not his thinking.

11   It's his actions.  So, why he was there, meaning did he

12   just decide to show up there or did somebody ask him to

13   come there?

14              But, in terms of what was said by Mr. Conrad

15   or anyone else, that would not be admissible, would it?

16              I think Mr. Conrad's statements would be

17   hearsay.

18              MR. SIMMS:  Correct.  Correct.

19              THE COURT:  Okay.

20              (Thereupon, the sidebar conference was

21   concluded.)

22   BY MR. SIMMS:

23     Q.  Mr. Powell, I'm going to repeat -- or rephrase my

24   last question.

25              Why were you there with Mr. Bedford and

1    Mr. Conrad at that restaurant location?

2              MR. BURKE:  Objection, irrelevant.

3              THE COURT:  Overruled.

4              Not "why."

5              Who asked you to be there?

6              THE WITNESS:  Mr. Bedford had asked me to

7    come by.

8              MR. SIMMS:  Your Honor, I would argue that

9    why he was there would be relevant.

10             THE COURT:  Only if it's something that --

11   the "why" doesn't -- we could -- it's obvious who he is

12   and what he does.  I'm not sure the why is relevant.

13   The why would call for hearsay.  So I sustain the

14   objection.

15             MR. SIMMS:  Your Honor, I would submit that

16   there's another reason in terms of -- people have side

17   ambitions and goals --

18             THE COURT:  You know, we just talked about

19   this at sidebar.

20             If you have another question to ask about

21   what he did there, that's different; but not what he

22   thought about what somebody else thought.

23             I sustain the objection to those questions.

24             MR. SIMMS:  Okay.

25   BY MR. SIMMS:

1    Q.   Did you have an interest in going into the
2   restaurant business with Mr. Conrad and Mr. Bedford?
3    A.   Yes, sir.
4    Q.   Okay.  And would that have been in the 2012
5   timeframe?
6    A.   Yes, sir.
7    Q.   How many different restaurant locations did you,
8   Mr. Conrad and Mr. Bedford go to?
9    A.   One.
10    Q.   And where was that located at?
11    A.   It was facility in Old Town, Manassas.
12    Q.   Where?
13    A.   Old Town, Manassas.
14    Q.   Old Town, Manassas?
15    A.   Yes, sir.
16    Q.   And what type of restaurant was it going to be?
17          MR. BURKE:  Objection, relevance.
18          THE COURT:  Sustained.
19          MR. SIMMS:  No further questions.
20               REDIRECT EXAMINATION
21   BY MR. BURKE:
22    Q.   Sir, did you ever open a restaurant business?
23    A.   No, sir.
24    Q.   And this one trip, what year was that?
25    A.   I believe 2012.

1           MR. BURKE:  Nothing further.

2           May the witness be excused, Your Honor?

3           THE COURT:  All right.  You're free to

4   leave, sir.  Thank you very much.  Thank you for coming.

5           MR. BURKE:  We have a short witness.  Can we

6   try to get him on?

7           THE COURT:  Sure.

8           Short in stature or short in time?

9           (Laughter.)

10          MR. BURKE:  Short in time.

11          THE COURT:  All right.  Bring him in.  Okay.

12          MR. BURKE:  The government calls Charles

13  Boyd.

14          MR. HENDRICK:  Face the clerk.  Please raise

15  your right hand.

16          (Witness sworn.)

17          THE WITNESS:  I do.

18          THE CLERK:  Thank you.

19          Have a seat, please.

20          THEREUPON, CHARLES A. BOYD, having been duly

21  sworn, testified as follows:

22                     DIRECT EXAMINATION

23  BY MR. BURKE:

24      Q.  Good afternoon, sir.

25          What is your name?

1    A.   Charles Alexander Boyd.

2    Q.   And how do you spell that, sir?

3    A.   The whole thing?

4    Q.   Why don't you spell your last name, sir.

5    A.   Okay.  B-o-y-d.

6    Q.   Mr. Boyd, what do you do for a living?

7    A.   Plumbing and AC contractor.

8    Q.   Do you have a business?

9    A.   Yes.  It's Boyd Plumbing, Heating and

10   Air-condition.

11   Q.   And who is the owner of that business?

12   A.   I am.

13   Q.   Are you the sole owner?

14   A.   My wife has ten percent.

15   Q.   You own the rest?

16   A.   Yes, sir.

17   Q.   Mr. Boyd, are you familiar with a man named Glen

18   Bertrand, Senior?

19   A.   Yes.

20   Q.   How do you know Mr. Bertrand?

21   A.   I've known Glen about 20 years.  Did some work

22   for him at his property on, I think it's Airport Road.

23   Put in a septic system -- I mean not a septic system, a

24   pump system.  And I've done other work for him on

25   buildings and different things that he needed work done.

1    Q.   For him personally or for his company?

2    A.   For his company.

3    Q.   What's the name of his company?

4    A.   Um --

5    Q.   At the time that you did the work.

6    A.   At the time it was Team America.

7    Q.   Are you familiar with who Mr. Bertrand's business

8    partner was at that time?

9    A.   Yes.  I can't remember his name right now.  Um --

10   it will come to me.

11        I can't -- I'm sorry.  It's escaping me right

12   now.

13   Q.   He had a business partner?

14   A.   Yes.

15   Q.   Could you describe the man, even if you can't

16   remember his name?

17   A.   A black man -- I'm sorry, I can't remember it.

18   Q.   If you heard the name, would you remember it?

19   A.   Yes.  Yes.

20   Q.   Does the name James Bedford ring a bell?

21   A.   Yes, Bedford.  That's it.  I called him Bedford,

22   yes.  Sorry.

23   Q.   What kinds of work have you done for Team

24   America?

25   A.   I've done contracting work.  And then

1    subsequently I actually was employed by Team America.

2        Q.   Now, let me ask you to focus on the spring of

3    2011.

4        A.   Okay.

5        Q.   In the spring of 2011, were you asked to perform

6    some work at a residence?

7        A.   Yes.

8        Q.   Explain to the jury what happened.

9        A.   I was called to do some work at Raushi Conrad's

10   home, and --

11       Q.   Let me interrupt for just a moment.

12            You said you were called.  Who called you and

13   asked you to do that work?

14       A.   I don't know who called me.  They just said, was

15   I interested in doing some work.  I don't even remember

16   if Mr. Conrad called or Mr. Bertrand asked me to contact

17   him.  I'm not sure what -- you know, how it transpired.

18       Q.   Was it definitely one of those two people?

19       A.   Yes.

20       Q.   Do you see Mr. Conrad in the courtroom?

21       A.   Yes.

22       Q.   Could you describe what he's wearing?

23       A.   He's -- (indicating) -- white shirt and tie.

24            MR. BURKE:  Your Honor, may the record

25   reflect the witness has identified the defendant?

1          THE COURT:   The witness has identified

2     Mr. Conrad.

3     BY MR. BURKE:

4          Q.   Mr. Boyd, did you, in fact, go to the defendant's

5     residence?

6          A.   Yes.

7          Q.   And when you arrived at the residence, who was

8     present?

9          A.   I think it was just Mr. Conrad explained to me

10    what he wanted done in his house.

11         Q.   And what kind of work did the defendant ask you

12    to do?

13         A.   I did change the rough-in for the plumbing and

14    did rough-in, and eventually did rough-in in walls, and

15    extended the ductwork out for a soffit that was -- the

16    ductwork was already installed.  I just extended the

17    registers.

18         Q.   After you performed the plumbing and other

19    rough-in work, did you prepare an invoice describing

20    what you did?

21         A.   Yes, I did.

22         Q.   With the assistance of the court security

23    officer, could you look at Exhibit 9, please.

24              Sir, do you have Government Exhibit 9 in front of

25    you?

C. Boyd - Direct

1    A.   Yes.

2    Q.   What is Government Exhibit 9?

3    A.   It's an invoice from -- to Team America

4 Contracting from my company, Boyd Plumbing, Heating and

5 Air-conditioning.

6    Q.   And in relation to what work?

7    A.   For the work done at Mr. Conrad's home.

8    Q.   Who prepared this invoice?

9    A.   Myself and my wife.

10    Q.   Was it prepared near in time to when the work was

11 done?

12    A.   Yes.

13    Q.   Was it based on your firsthand knowledge of the

14 work that was actually done?

15    A.   Yes.

16    Q.   Does it accurately reflect the work you did?

17    A.   Yes.

18    Q.   Was it your regular practice to prepare invoices

19 such as this?

20    A.   Yes.

21    Q.   And are invoices such as Government Exhibit 9

22 kept in the course of your regularly conducted business

23 activity?

24    A.   Kept by us?

25    Q.   Yes.

1     A.   Yes.

2              MR. BURKE:   Your Honor, the government moves

3     to admit and to publish Government Exhibit 9.

4              THE COURT:   Received.

5              MR. BURKE:   Now, if I could ask Ms. Sandvig

6     to blow up the first line of the description, where it

7     says, "Job Name."

8     BY MR. BURKE:

9     Q.   Sir, where it says, "Job Name," what's written

10    there in the description?

11    A.   "Raushi's residence, install water piping for

12    bathroom and install bath vent."

13    Q.   And when you referenced Raushi's residence, who

14    are you talking about?

15    A.   Mr. Conrad Raushi -- or Raushi Conrad.

16    Q.   The gentleman sitting to my right?

17    A.   Yes.  Yes.

18    Q.   And then --

19             THE COURT:   Do you have more than one

20    question?

21             (No response.)

22             THE COURT:   Do you have more than one

23    question?

24             MR. BURKE:   I do, Your Honor.

25             THE COURT:   All right.

1          Ladies and gentlemen, we're going to recess

2    for the evening.

3          Please don't discuss the case.  Don't permit

4    the case to be discussed in your presence.  Don't do any

5    research on the case.  And leave your notes in the jury

6    deliberation room.

7          We will resume tomorrow at 10:00 o'clock.

8    Thank you.

9          (Jury not present.)

10          THE COURT:  We're in recess.

11          (Proceedings concluded at 5:02 p.m.)

12

13                    ---

14

15

16

17

18

19

20

21

22

23

24

25

1

2                         CERTIFICATE OF REPORTER

3

4              I, Renecia Wilson, an official court

5    reporter for the United States District Court of

6    Virginia, Alexandria Division, do hereby certify that I

7    reported by machine shorthand, in my official capacity,

8    the proceedings had upon the jury trial in the case of

9    UNITED STATES OF AMERICA v RAUSHI J. CONRAD.

10             I further certify that I was authorized and

11   did report by stenotype the proceedings in said jury

12   trial, and that the foregoing pages, numbered 1 to 259,

13   inclusive, constitute the official transcript of said

14   proceedings as taken from my shorthand notes.

15

16             IN WITNESS WHEREOF, I have hereto

17   subscribed my name this  12th  day of  January , 2018.

18

19                       /s/
                         _____
20                       Renecia Wilson, RMR, CRR
                         Official Court Reporter

21

22

23

24

25