```
           IN THE UNITED STATES DISTRICT COURT FOR THE
                    EASTERN DISTRICT OF VIRGINIA
                        Alexandria Division

UNITED STATES OF AMERICA,        )
                                 )
                    Plaintiff,   )
                                 ) Crim. No. 1:16cr169
     vs.                         )
                                 )
RAUSHI J. CONRAD,                ) June 14, 2017
                                 )
                    Defendant.   )
_____  )
```

## JURY TRIAL

BEFORE:      THE HONORABLE GERALD BRUCE LEE
             UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                  BY:  MATTHEW BURKE, AUSA
                       JAMAR WALKER, AUSA

FOR DEFENDANT:    JONATHAN SIMMS, ESQ.


                            ---


OFFICIAL COURT REPORTER:

                  RENECIA A. SMITH-WILSON, RMR, CRR
                  U.S. District Court
                  401 Courthouse Square, 5th Floor
                  Alexandria, VA 22314
                  (703)501-1580

1                            <u>INDEX</u>

2

3   <u>WITNESS (Government)</u> <u>DIRECT</u>   <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>

| WITNESS (Government) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Charles A. Boyd (Cont) | 4 | 7 | 8 | --- |
| Charly Orellana-Nogales | 10 | 19 | --- | --- |
| James Bedford (Cont) | 24 | 30 | 74 | --- |
| Patricia A. Woodberry | 86 | 99 | --- | --- |
| Chris Gaffney | 108 | 115 | 116 | --- |
| Kevin Luebke | 118 | 133 | --- | --- |
| Showlatha Johnson | 146 | 177 | 185 | --- |
| <u>WITNESS (Defendant)</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
| Jun Wu | 189 | --- | --- | --- |

13  RULE 29 MOTION BY THE DEFENDANT            203

14  INSTRUCTIONS CONFERENCE                    221

15
16      (Court recessed)

17                       ---

18

19

20

21

22

23

24

25

## PROCEEDINGS

1

2

3          (Thereupon, the following was heard in open

4     court at 10:16 a.m.:)

5               (Jury not present.)

6               THE COURT:  Mr. Hendrick, you can bring our

7     jury out.  Thank you.

8               MR. BURKE:  Your Honor, should we bring the

9     witness up?

10              THE COURT:  You can bring the witness out,

11    please.

12              (Witness resumed stand.)

13              THE COURT:  We'll finish you today,

14    Mr. Boyd.  We won't keep you very long.

15              (Jury present.)

16              THE COURT:  You may be seated.

17              Good morning, ladies and gentlemen.

18              THE JURORS:  Good morning.

19              THE COURT:  Good morning, Counsel.

20              Good morning, Mr. Conrad.

21              Good morning, Mr. Boyd.

22              THE WITNESS:  Good morning, Your Honor.

23              THE COURT:  Ladies and gentlemen, I delayed

24    the proceedings this morning because I had another case

25    that took a little longer than I anticipated.  And I

1    hope you understand that I have more than one case, but

2    I try to be mindful of your time and respectful of your

3    time and the parties' time.  So I apologize for any

4    delay.

5                 You may proceed.

6                 MR. BURKE:  Thank you, Your Honor.

7                 DIRECT EXAMINATION CONTINUED

8    BY MR. BURKE:

9      Q.  Mr. Boyd, when we broke yesterday afternoon, I

10   believe we were talking about Government Exhibit 9, an

11   invoice that you prepared.

12                MR. BURKE:  Could we publish Government

13   Exhibit 9, Your Honor?

14                THE COURT:  Yes.

15   BY MR. BURKE:

16     Q.  Now, sir, just so that we can reorient ourselves,

17   what does Government -- what is the work related

18   to Government -- let me back up.

19          Where did you perform the work that's reflected

20   in Government Exhibit 9?

21     A.  Mr. Conrad's residence, in his basement.

22     Q.  And if we could focus on the description here,

23   can you describe for the jury what exactly you did at

24   the defendant's basement.

25     A.  The basement was roughed in.  We modified the

1  rough-in according to the layout for the plumbing, then

2  installed the piping in the wall for the new fixtures,

3  and modified the ductwork to extend the registers out to

4  the soffit, and installed the bath fan.

5      Q.  So there is a description -- one of the lines in

6  this description says -- it's in all caps.  It says

7  "Material HVAC."  Do you see that?

8      A.  No, I don't see it.  Oh, yes, "Material HVAC."

9  Yes, sir.

10     Q.  Could you describe for the jury what that means.

11     A.  I don't remember really what it's -- it was

12 material for the HVAC system.

13     Q.  And then there's a line item -- there's a dollar

14 figure to the right of that.

15             MR. BURKE:  If we could scroll over.

16             THE WITNESS:  Oh, I see.  I'll look at this

17 one, if it's okay.

18             MR. BURKE:  Yeah, look at the paper.

19             THE WITNESS:  288.  That's what I paid for

20 the material.

21 BY MR. BURKE:

22     Q.  And -- I'm sorry, you paid for that material?

23     A.  Yes.

24     Q.  And then below that, there's some line items for

25 "labor."  Do you see that?

1    A.   Yes.

2    Q.   What's the first line item for labor?

3    A.   Plumbing.  After that, and then the labor is

4    24 hours for a mechanic, and then 8 hours for me.

5    Q.   The "Chuck" referenced there, that's you?

6    A.   That's me.

7    Q.   And then, two lines below that, there's a --

8    there's a line with an open parenthesis that says, "Team

9    America."

10   A.   Right.

11   Q.   What does that line item say?

12   A.   They provided some material there on some of the

13   jobs they had.  They would have a few fittings left

14   over, some pipe, and that was utilized in this project.

15   Q.   When you say "they provided material," who are

16   you referring to?

17   A.   Team America.

18   Q.   Sir, after you completed the work that's

19   reflected in Government Exhibit 9, were you paid for

20   your work?

21   A.   Yes.

22   Q.   Who paid you?

23   A.   Team America.

24   Q.   If I could ask you now to direct your attention

25   to Government Exhibit 21-6.

1                    MR. BURKE:  Your Honor, this is in evidence.

2    May we publish?

3                    THE COURT:  Yes.

4    BY MR. BURKE:

5      Q.   Sir, what is Government Exhibit 21-6?

6      A.   That is the payment for the work that I performed

7    for that invoice that we just referenced.

8      Q.   The work you performed at the defendant's

9    residence?

10     A.   Yes.

11     Q.   Sir, did the defendant pay you for any portion of

12   the work reflected in Government Exhibit 9?

13     A.   No.

14                   MR. BURKE:  Nothing further, Your Honor.

15                   THE COURT:  Mr. Simms.

16                        CROSS-EXAMINATION

17   BY MR. SIMMS:

18     Q.   Good morning, Mr. Boyd.

19     A.   Good morning.

20     Q.   Mr. Boyd, how long have you been employed in your

21   industry?

22     A.   How long I've been --

23     Q.   Employed in the plumbing --

24     A.   How long have I been doing this?

25     Q.   Yes.

1    A.   Since 1970.

2    Q.   Okay.  And in your job duties, are there times

3    when you work for a contractor who is doing a rehab on a

4    house?

5    A.   Sure.

6    Q.   Okay.  And during those times, isn't it that the

7    contractor pays you rather than the resident of the

8    house?

9    A.   Yes.

10   Q.   Okay.  Thank you?

11   A.   The contract is with the contractor, yes.

12   Q.   Okay.  Not the person that lives there, right?

13   A.   Yes.

14   Q.   Okay.

15              MR. SIMMS:  No further questions.

16              THE COURT:  May the witness be excused?

17              MR. BURKE:  Brief redirect.

18              THE COURT:  Okay.

19                  REDIRECT EXAMINATION

20   BY MR. BURKE:

21   Q.   Mr. Boyd, do you have any knowledge of the

22   defendant reimbursing Team America for your work?

23   A.   I have no way of know that.  No.

24              MR. BURKE:  Nothing further, Your Honor.

25              THE COURT:  Now may he be excused?

1          MR. BURKE:  For the government, yes.

2          MR. SIMMS:  Yes.

3          THE COURT:  You're free to leave, sir.

4  Thank you.

5          THE WITNESS:  Thank you.

6          (Thereupon, the witness withdrew from the

7  stand.)

8          MR. BURKE:  Your Honor, the government calls

9  Charly Orellana-Nogales.

10          This witness will require a Spanish-English

11  interpreter, who is also present.  And the interpreter's

12  name is Jaime de --

13          THE COURT:  de Castellvi.

14          MR. BURKE:  Yes.  Thank you, Your Honor.

15          THE COURT:  Mr. de Castellvi, if you would

16  come forward and let me have you administered the oath.

17          THE INTERPRETER:  Good morning, Your Honor.

18          THE COURT:  Good morning, Mr. de Castellvi.

19          The record should reflect that Mr. Jaime de

20  Castellvi, court certified interpreter, is present.

21          We will have you take the oath

22  Mr. de Castellvi.

23          (Interpreter sworn.)

24          THE INTERPRETER:  Yes, I do, to the best of

25  my ability.  Thank you.

1              (Witness sworn.)

2              THE WITNESS:  Yes.

3              THE CLERK:  Thank you.

4              Have a seat, please.

5              THEREUPON, CHARLY ORELLANA-NOGALES, having

6    been duly sworn, testified as follows through an

7    interpreter:

8                    DIRECT EXAMINATION

9    BY MR. BURKE:

10     Q.   Good morning, sir.

11     A.   Good morning.

12     Q.   Could you please tell us your name.

13     A.   Charly Orellana-Nogales.

14     Q.   Sir, where do you work?

15     A.   Here (sic) in Manassas.

16     Q.   For what company do you work?

17     A.   Right now I'm working for Diamond Managing Group.

18     Q.   Before you worked for Diamond Management Group,

19   where did you work?

20     A.   I was working for Team America, which is located

21   in Manassas as well.

22     Q.   How long did you work for Team America?

23     A.   Approximately seven years.

24     Q.   Who was your boss when you worked for Team

25   America?

1    A.    Glen Bertrand.

2    Q.    Is Mr. Bertrand still your boss?

3    A.    Yes.

4    Q.    Mr. Orellana, I'd like to direct your attention

5    to the Summer of 2011.  In the Summer of 2011, were you

6    asked to do some work at a residence?

7    A.    Yes.

8    Q.    Explain how you first learned about the work to

9    be done at the residence?

10   A.    Okay.  Well, simply, my boss gave me the address

11   and told me to go work.

12   Q.    When you say your boss, who are you referring to?

13   A.    Glen Bertrand.

14   Q.    And you mentioned that your -- Mr. Bertrand gave

15   you an address?

16   A.    Yes.

17   Q.    What address was this?

18   A.    I don't remember the address.

19   Q.    What was located at the address?

20   A.    Well, he just gave me the address.  I put it in

21   the GPS, and that took me to a house over in Manassas --

22   well, more or less close to Manassas.

23   Q.    Was this a residence?

24   A.    Yes.

25   Q.    When you arrived at the residence, who, if

1   anyone, did you meet?

2       A.   With Mr. Raushi.

3       Q.   When you say "Mr. Raushi," do you see that same

4   man in the courtroom?

5       A.   Yes.

6       Q.   Could you describe where he's sitting and what

7   he's wearing?

8       A.   He's over here (indicating) with kind of a

9   lead-color looking shirt and a tie.

10          MR. BURKE:  Your Honor, we'd ask that the

11  record reflect that the witness has identified the

12  defendant.

13          THE COURT:  So noted.

14          THE WITNESS:  Sorry, I didn't hear you.

15  BY MR. BURKE:

16      Q.   Mr. Orellana, what, if anything, did your boss

17  tell you that you should do when you went to

18  Mr. Conrad's residence?

19      A.   Yes.  Do everything that he asks me to do.

20      Q.   When you say do everything that he asked you to

21  do, who are you talking about?

22      A.   Mr. Raushi.

23      Q.   So, your boss's instruction was to do whatever

24  the defendant told you to do?

25      A.   Yeah.  In a few words, my boss told me, "Just do

1    the job.  Do whatever he tells you."  That's all.

2        Q.   Sir, did you do work at Mr. Conrad's residence?

3        A.   Yes.

4        Q.   What kind of work did you do?

5        A.   So, I raised some walls out of wood.  I put on

6    some drywall.  I put the joists with the drywall.

7    Afterwards, I sandblasted it all and left it ready to be

8    painted.  And I also connected the bathtub and the

9    shower, and I installed a door.

10            I also laid tile on the floor and on the wall.

11   But that was on my own.  I also put a platform there for

12   soffits.  And that was also on my own.

13       Q.   Sir, how many people worked on this project with

14   you?

15       A.   Three.  That would be my brother, my father, and

16   a friend of ours who also worked for the company.

17       Q.   What was your friend's name?

18       A.   Zuberto Salazar.

19       Q.   How long did it take you to complete the work you

20   performed at the defendant's residence?

21       A.   Possibly almost about a month and a week, or two

22   weeks.

23       Q.   Did all -- did all of you, all four of you, work

24   for the entire five or six weeks?

25       A.   No.  Mainly I worked there with my dad.  But the

1  others would come to help me whenever we didn't have
2  work at some other place.
3      Q.   So, with regard to you and your father, did the
4  two of you work the entire five or six weeks?
5      A.   No.  Mainly one of us would leave, go work
6  somewhere else.  Somebody else would come help, and then
7  somebody else would leave, and the other one would come
8  help.  And my dad mainly worked there about three or
9  four weeks.
10     Q.   How many weeks did you personally work there?
11     A.   Possibly I work fully about four, five weeks,
12 six weeks.
13     Q.   And how many weeks did your brother work?
14          How many weeks did your brother work?
15     A.   Possibly, two weeks.
16     Q.   And Mr. Zuberto?
17     A.   Possibly, he almost worked about three or four
18 weeks, I think.
19     Q.   When you were doing this work, sir, were these
20 full eight-hour days or only partial days?
21     A.   Eight hours.
22     Q.   On the weeks that you worked, how many hours did
23 you work?
24     A.   Forty hours a week.
25     Q.   On the weeks that your father worked, how many

1  hours a week did he work?

2      A.   The same, 40.

3      Q.   What about your brother?  How many hours per week

4  did he work?

5      A.   Well, no, he wouldn't work the whole week.

6  Sometimes he would come for three days, which would be

7  eight, eight, eight, thirty-two or something like that.

8  And then sometimes he would work less.

9      Q.   And Mr. Zuberto, on the three to four weeks that

10  he worked, how many hours per week did he work?

11      A.   Well, possibly Zuberto worked during that entire

12  work, possibly a hundred hours, or maybe more.

13      Q.   Now, sir, a few minutes ago you mentioned some

14  work and you said some of it you did on your own.  Can

15  you describe what you -- what distinction you're making

16  between the work that you did on your own and the other

17  work?

18      A.   You mean specifically what I did, or how much it

19  cost?

20      Q.   Well, sir, I'm trying to understand what you mean

21  when you said some of this work you did on your own.

22      A.   Well, I lay tiles on the shower and on the

23  bathtub and also on the floor.  I also afterwards built

24  a platform, two-by-six, which was probably eight-by-ten

25  feet, and I laid drywall on top.  That's all.

1    Q.  Was that the work that you did, as you described

2    it, on your own?

3    A.  Yes.

4    Q.  The rest of the work you described, who -- was

5    that done for the company?

6    A.  Yes.

7    Q.  Sir, I'd like you to focus on the work you did

8    for Team America.

9    A.  Okay.

10   Q.  How much of your time did you spend on the work

11   you were doing for Team America?

12   A.  Like -- I didn't understand.

13   Q.  Well, sir, you just described yourself and your

14   brother and father and friend working several weeks.

15   A.  Yes.

16   Q.  Were those weeks that you performed work for Team

17   America or work on your own?

18   A.  For Team America.

19   Q.  So all of the weeks you just described was time

20   you were working for Team America?

21   A.  Yes.

22   Q.  Now, sir, at the time, what was your hourly rate

23   for this kind of work that was paid to you by the

24   company?

25   A.  As far as I can remember, it seems it would have

1    been $17 to $18 an hour.

2        Q.   Do you know what rate your father was paid?

3        A.   Eighteen.

4        Q.   Do you know what rate your brother was paid?

5        A.   The same, 18 an hour.

6        Q.   And for the six weeks of work you did at the

7    defendant's residence, who paid you for that six weeks'

8    worth of labor?

9        A.   I bought it with the card from Team America.

10       Q.   Sir, I'm focusing on the time for your hours.

11   Who paid you for your six weeks' worth of labor?

12       A.   Team America.

13       Q.   Do you know who paid your father for his three to

14   four weeks' worth of labor?

15       A.   Also Team America.  They paid us everything with

16   Team America.

17       Q.   Your brother, who paid for his labor?

18       A.   Team America.

19       Q.   Who paid for Zuberto's labor?

20       A.   Team America.

21       Q.   Now, sir, you mentioned that you installed some

22   walls in the defendant's basement.  Is that correct?

23       A.   Yes.

24       Q.   Where did you get the supplies to build those

25   walls?

1       A.   I bought them at Home Depot.

2       Q.   How did you buy them?

3       A.   Oh, I would go with the company's truck and I

4   would buy it with the company's card.

5       Q.   The company credit card?

6       A.   Yes.

7       Q.   When you say "the company," are you referring to

8   Team America's credit card?

9       A.   Yes.

10      Q.   Sir, where did you get the supplies for the

11  drywall that you installed?

12      A.   Also from Home Depot.

13      Q.   How did you pay for that drywall?

14      A.   The same, with the card from the company.

15      Q.   And the joists that you installed, where did you

16  get those supplies?

17      A.   The same, with Home Depot.

18      Q.   What about the rest of the supplies you needed

19  for the six weeks' worth of work you performed at the

20  defendant's house; where did you get all those supplies?

21      A.   From Home Depot.  I mean, everything I needed I

22  would go purchase it at Home Depot.

23      Q.   And how did you purchase all of those supplies?

24      A.   With the company's card.

25      Q.   Sir, did the defendant pay you for any of the six

1  weeks' worth of work that you described?

2      A.   No, only for the jobs, the two extras that I did

3  for him.

4      Q.   And these two extra jobs, were they after the six

5  weeks' worth of work?

6      A.   More or less, it would have been towards the

7  later end of the weeks, four, five, six weeks.  I mean,

8  the bath took me two days to finish it and the platform

9  about two, three hours.

10     Q.   And who paid you for the work on the bathtub and

11 the platform?

12     A.   Mr. Raushi.  He paid me cash.

13     Q.   Did Team America pay you for all of the rest of

14 the work?

15     A.   Yes.

16             MR. BURKE:  Nothing further, Your Honor.

17                    CROSS-EXAMINATION

18 BY MR. SIMMS:

19     Q.   Good morning, sir.

20     A.   Good morning.

21     Q.   Mr. Nogales, when you arrived at Mr. Conrad's

22 residence, did you speak to him directly?

23     A.   Yes, I spoke with him.  After that, if I had any

24 doubts, I'd always speak with him.

25     Q.   Okay.  And he didn't speak Spanish to you, did

1  he?

2              THE INTERPRETER:  Sorry?

3  BY MR. SIMMS:

4      Q.  He didn't speak Spanish to you, did he?

5      A.  No.

6      Q.  The conversations were in what language?

7      A.  English.  Around that time, I more or less

8  already spoke English.

9      Q.  Okay.  Now, you said that Mr. Bertrand sent you

10  to that residence to perform work, right?

11     A.  Yes, right.

12     Q.  And that's not the only time that Mr. Bertrand

13  has sent you to a residence to do work, right?

14     A.  No.  He sent me to other residences to do work,

15  also.

16     Q.  Okay.  And during some of those other times, you

17  didn't receive payment directly from the residents, the

18  homeowner, did you?

19             MR. BURKE:  Objection, irrelevant.

20             THE COURT:  Sustained.

21  BY MR. SIMMS:

22     Q.  When you went to those other jobs, who paid you?

23             MR. BURKE:  Objection, irrelevant.

24             THE COURT:  I think the point was if you

25  want to focus on his testimony about what happened as it

1  relates to this case, you may.  But other matters have
2  nothing to do with this trial.
3          MR. SIMMS:  Your Honor, I believe it does.
4  Because the government is trying to portray it as --
5          THE COURT:  Well, I would like you to focus
6  on the allegations in the indictment in this case, which
7  has to do with bribery and attempted bribery, if you
8  would.
9          Thank you.
10 BY MR. SIMMS:
11     Q.  So, Mr. Bertrand sent you to Mr. Raushi's house
12 and told you to perform whatever he asked you to do.
13     A.  Yes.
14     Q.  Okay.  And one of the things that Mr. Conrad
15 asked you to do was to put tile down in the bathroom,
16 right?
17     A.  Yes.
18     Q.  Okay.  And he paid you for that.
19     A.  Yes, he paid me for that, $200 or $300.
20     Q.  Now, you also did work at Mr. Conrad's restaurant
21 at Fair Oaks Mall, didn't you?
22     A.  Yes, mainly that's where I started.  Well, they
23 had given the contract to my brother-in-law, and so I
24 went to work there.
25          And when Mr. Glen saw me work there, he asked me

1    to come work for him, and that's how I started with him.

2        Q.   Okay.  So, I just want to be clear.  Your

3    brother-in-law had a contract with who?

4             MR. BURKE:  Objection, irrelevant and

5    foundation.

6             THE COURT:  Overruled.

7             THE WITNESS:  Should I go on?

8             THE COURT:  You may answer.

9             THE WITNESS:  Yes, with Glen Bertrand.

10   BY MR. SIMMS:

11       Q.   Okay.  And do you have personal knowledge of what

12   that contract was for?

13       A.   No.  Mainly, I just knew that it was a

14   restaurant.  I mean, earlier on I used to just work and

15   do whatever my brother-in-law would tell me.  But then

16   when I started working for Mr. Glen, then I would do

17   what Mr. Glen told me to do.

18       Q.   And what time period did you do work at The

19   Chicken Place at Fair Oaks Mall?

20       A.   Possibly, I think -- I guess nearly a month.

21   Because when I went there, it was -- some of it had been

22   finished.

23       Q.   Okay.  And this would have happened in early

24   2010?

25       A.   2002?  Hmm --

1       Q.  No, 2010.

2               THE INTERPRETER:  The interpreter misheard

3       that.

4               MR. SIMMS:  Okay.

5               (Interpreter repeats question.)

6               THE WITNESS:  It seems so, yes.  Yes.

7       BY MR. SIMMS:

8       Q.  And after completing the work -- you did

9       carpentry work at The Chicken Place at Fair Oaks Mall,

10      right?

11              MR. BURKE:  Objection, irrelevant.

12              THE COURT:  Timeframe, Mr. Simms?

13              Objection sustained.

14      BY MR. SIMMS:

15      Q.  In 2010, around early 2010, you did carpentry

16      work at The Chicken Place in Fair Oaks Mall?

17              MR. BURKE:  Objection, irrelevant.

18              THE COURT:  Sustained.

19              If you want to direct it to the timeframe in

20      the indictment, that would be different, but you have

21      not done that.

22      BY MR. SIMMS:

23      Q.  Who paid you for the work -- who ultimately paid

24      you for the work that was done at Fair Oaks Mall?

25      A.  For about a week, or almost a week, I worked for

1  my brother-in-law because I owed him a favor.

2  Afterwards, when I was working for Mr. Glen, he paid me.

3      Q.  Okay.

4            MR. SIMMS:  Thank you.

5            MR. BURKE:  No redirect, Your Honor.

6            May the witness be excused?

7            THE COURT:  You're free to leave, sir.

8  Thank you for coming.

9            THE WITNESS:  That's all?

10           THE COURT:  Yes, that's all.  Thank you.

11           (Thereupon, the witness withdrew from the

12  stand.)

13           MR. BURKE:  Your Honor, the government

14  recalls James Bedford.

15           THE COURT:  All right.

16           (Witness resumed stand.)

17           THE COURT:  Good morning, Mr. Bedford.  You

18  remain under oath.

19           Go ahead, Counsel.

20           THEREUPON, JAMES C. BEDFORD, previously

21  sworn, testified further as follows:

22              DIRECT EXAMINATION (Continued)

23  BY MR. BURKE:

24      Q.  Mr. Bedford, I'd like to ask you to focus your

25  attention now on the Spring and Summer of 2011.  In the

1    Spring and Summer of 2011, what did you learn, if

2    anything, about work being performed at Raushi Conrad's

3    residence?

4       A.   I received -- I received some invoices from the

5    bookkeeper for payment of services that had been

6    performed at Mr. Conrad's residence.

7       Q.   And when you say "bookkeeper," who are you

8    referring to?

9       A.   Alice Bertrand.

10      Q.   Okay.  With the assistance of the court security

11   officer, if I could ask you to now please look to

12   Government Exhibits 9, 11, 23 and 24.

13            MR. BURKE:  Your Honor, could we publish 23?

14   It's been admitted into evidence.

15            THE COURT:  Yes.

16            MR. BURKE:  And if we could turn to the

17   second page, Ms. Sandvig, please.

18   BY MR. BURKE:

19      Q.   Mr. Bedford, do you have Government Exhibit 23 in

20   front of you?

21      A.   Yes.

22      Q.   What is Government Exhibit 23?

23      A.   Invoice from Powell Contracting to Team America

24   contract.

25      Q.   And what is -- what is Powell Contracting?

1    A.    Electrical contractor.

2    Q.    And an invoice relating to work where?

3    A.    Performed at Mr. Conrad's residence.

4    Q.    Sir, who authorized Powell Contracting to perform

5    the work at the defendant's residence?

6    A.    Glen Bertrand, Senior.

7    Q.    When you received Government Exhibit 23, what, if

8    anything, did you do?

9    A.    When I received it, I reviewed it with Glen

10   Bertrand, Senior, with other invoices to be paid.

11   Q.    And what, if any, decision did you make about

12   whether to paid?

13   A.    We paid the invoice.

14   Q.    Mr. Bedford, did you ever ask the defendant to

15   reimburse you for this work?

16   A.    No.

17   Q.    If you could turn now to Government Exhibit 24.

18         MR. BURKE:  Your Honor, may we publish?

19   This has already been admitted.

20         THE COURT:  Yes.

21         MR. BURKE:  Ms. Sandvig, could you publish

22   the second page, please.

23   BY MR. BURKE:

24   Q.    Do you have Government Exhibit 24 in front of

25   you?

1    A.   Yes.

2    Q.   What is Government Exhibit 24?

3    A.   Invoice from Powell Contracting.

4    Q.   For what work?

5    A.   For services to be performed at Mr. Conrad's

6    residence, for payment.

7    Q.   How -- how did this invoice first come to you?

8    A.   This was brought to me via the bookkeeper.

9    Q.   Ms. Bertrand?

10   A.   Yes.

11   Q.   After you received the invoice marked as

12   Government Exhibit 24, what, if anything, did you do

13   with it?

14   A.   Showed it to my partner to get approval.

15   Q.   And what happened next?

16   A.   He approved it -- agreed to approve it, and it

17   was paid for.

18   Q.   And did you also agree to pay it?

19   A.   Yes.

20   Q.   Sir, did you ever ask the defendant to reimburse

21   you for this work?

22   A.   No.

23   Q.   Could you turn now to Government Exhibit 9,

24   please.

25        Do you have Government Exhibit 9 in front of you?

1    A.   Yes.

2              MR. BURKE:   And may we publish Exhibit 9,

3    Your Honor?

4              THE COURT:   Yes.

5    BY MR. BURKE:

6    Q.   Sir, what is Government Exhibit 9?

7    A.   Invoice from Boyd Plumbing to Team America

8    Contractors.

9    Q.   In relation to what work?

10   A.   Work -- work to be completed at Mr. Conrad's

11   residence.

12   Q.   How did this invoice come to you?

13   A.   Via my bookkeeper.

14   Q.   And where were you when you received it?

15   A.   In my office in Manassas, Virginia.

16   Q.   After you received Government Exhibit 9, what, if

17   anything, did you do with it?

18   A.   My partner and I reviewed it for payment for

19   approval.

20   Q.   Did you decide to --

21   A.   Yes.

22   Q.   -- approve it?

23        Sir, why did you agree to approve payment of this

24   invoice?

25   A.   This was work that had been performed, and my

1  partner asked to have it approved.

2    Q.  And what -- did you ultimately approve payment?

3    A.  Yes, sir, I did.

4    Q.  What -- did you ever ask the defendant to

5  reimburse you for any of this work?

6    A.  No, I didn't.

7    Q.  If I could ask you to turn now to Government

8  Exhibit 11.

9        Do you have Government Exhibit 11 in front of

10  you?

11   A.  Yes.

12         MR. BURKE:  May we publish Exhibit 11, Your

13  Honor?

14         THE COURT:  Yes.

15  BY MR. BURKE:

16   Q.  Sir, what is Government Exhibit 11?

17   A.  Invoice -- invoice from Delaney Harris for work

18  performed at Mr. Conrad's residence.

19   Q.  Sir, how did this invoice first come to you?

20   A.  Via the bookkeeper at Team America Contractors,

21  Alice Bertrand.

22   Q.  Your office is in Manassas?

23   A.  Yes.

24   Q.  When you received this invoice, what, if

25  anything, did you do with it?

1    A.   My partner and I reviewed it and approved for

2    payment.

3    Q.   Sir, did you ever ask the defendant to reimburse

4    you for this work?

5    A.   No.

6    Q.   Mr. Bedford, yesterday we reviewed several checks

7    that Team America paid to Raushi Conrad's business.  Of

8    the hundreds of thousands of dollars that you gave to

9    Raushi Conrad's business, how much of it did he pay

10   back?

11   A.   None.

12   Q.   And for all of the work that was performed by

13   these subcontractors at the defendant's residence, how

14   much of it did the defendant reimburse Team America for?

15   A.   None.

16   Q.   One moment, Your Honor.

17            (Pause.)

18            MR. BURKE:  Nothing further.

19                  CROSS-EXAMINATION

20   BY MR. SIMMS:

21   Q.   Good afternoon -- good morning, Mr. Bedford.

22   A.   Good morning, sir.

23   Q.   Mr. Bedford, you and -- you've talked about a

24   Mr. Bertrand throughout your testimony.  And this is

25   your business partner, correct?

1      A.   That's correct.

2      Q.   Okay.  And, Mr. Bedford, you're aware that

3  Mr. Bertrand and Mr. Conrad are related, correct?

4      A.   That's correct.

5      Q.   I'm sorry.  Could you speak --

6      A.   That's correct, To my understanding.

7      Q.   Okay.  Now, you and Mr. Bertrand kind of formed a

8  company out of your two separate companies, right?

9      A.   We formed a company, yes.

10     Q.   Okay.  You had Bedford Images and he had Diamond

11  Management Group, right?

12     A.   That's correct.

13     Q.   And then you formed together to become Team

14  America Contractors?

15     A.   That's correct.

16     Q.   Okay.  Now, your company, Bedford Images, dealt

17  with digital work, IT work, right?

18     A.   Conversion work, yes.

19     Q.   And Mr. Bertrand's company dealt with more of a

20  construction side, right?

21     A.   That's correct.

22     Q.   All right.  And the two companies merged in late

23  2009?

24     A.   Correct.

25     Q.   All right.  Now, in late 2009, one of the first

1  contracts that Team America got was a build-out for

2  The Chicken Place, right?

3     A.   Yes.

4     Q.   Okay.

5     A.   Actually, it was obtained through Diamond

6  Management Group initially.

7     Q.   Okay.  So the build-out for The Chicken Place was

8  obtained through Diamond Management Group --

9     A.   Yes.

10    Q.   -- and then it converted over to the joint

11 business?

12    A.   Correct.

13    Q.   All right.  And it was Mr. Conrad that owned The

14 Chicken Place that was going to be built out, right?

15    A.   Yes.

16    Q.   And that build-out was happening at Fair Oaks

17 Mall?

18    A.   That's correct.

19    Q.   Okay.  So, Mr. Conrad used -- you and

20 Mr. Bertrand's company, you all were the contractor for

21 this, and you employed subcontractors to do the work,

22 right?

23    A.   That's -- that's correct.

24    Q.   Okay.  And some of those contractors were Charly

25 Nogales, carpenter?

 1      A.   Yes.

 2      Q.   Quentin Powell, electrician?

 3                MR. BURKE:  Objection, irrelevant.

 4                MR. SIMMS:  Your Honor, may I respond?

 5                THE COURT:  Yes.  Relevance.  What does it

 6      have to do with bribery?

 7                MR. SIMMS:  I submit it is certainly

 8      relevant based upon --

 9                THE COURT:  Come to sidebar.

10                MR. SIMMS:  Okay.

11                THE COURT:  Come to sidebar.

12                (Thereupon, the following sidebar conference

13      was had:)

14                THE COURT:  I'm listening.

15                MR. SIMMS:  Your Honor, I would submit that

16      it's relevant because the government is putting on

17      evidence, trying to keep it in the vacuum that

18      individuals are doing work and not getting paid.

19                There was a contract that Mr. Bedford and

20      Mr. Bertrand had with Mr. Conrad to build out The

21      Chicken Place.  Not only were they paid by Mr. Conrad a

22      substantial amount, but they, in turn, paid

23      subcontractors, which included several individuals that

24      were called in to testify today, that said, "Oh, I

25      didn't work for a place owned by Mr. Conrad, but was

1   never paid.  I was paid by Team America."

2              THE COURT:  Okay.  I had the impression the

3   testimony was about his home.

4              MR. BURKE:  Yes, Your Honor.  None of this

5   work, the build-out, has anything -- which happened in

6   2009 --

7              MR. SIMMS:  No, it happened --

8              MR. BURKE:  -- has anything to do with the

9   renovation work they did at the defendant's private

10  residence in 2011.

11             And it also has nothing to do with the data

12  migration contract.  So it has nothing to do with any of

13  the allegations in the complaint -- or in the

14  indictment.

15             MR. SIMMS:  Your Honor, if I can respond

16  back.

17             So the build-out wasn't in 2009.  It started

18  in late 2009 and went into the middle of 2010.

19             In addition to that --

20             THE COURT:  Is the build-out related to this

21  case, Mr. --

22             MR. SIMMS:  I would submit that it is,

23  because it was going on around the same time that

24  Bedford Images was getting contract work awarded to

25  them, that Mr. Conrad was still paying them for the

1  build-out.

2         So, it makes it less likely that he's going

3  to take a bribe or accept a bribe if he's still paying

4  them.  He is paying them money for the build-out.  So --

5         THE COURT:  Is the witness going to take the

6  stand and say he paid for the build-out, Mr. Simms?

7         MR. SIMMS:  Mr. Bedford testified to that,

8  that he paid for the build-out of the --

9         THE COURT:  The build-out was in 2009 --

10        MR. SIMMS:  It started in December of 2009

11  and concluded in June -- no, July of 2010.

12        THE COURT:  Okay.

13        MR. SIMMS:  The government's allegation is

14  this bribe happened in June 2010.

15        THE COURT:  Okay.  Then you can certainly

16  ask him if he -- his company was paid for the work that

17  was done for the build-out of the restaurant.  But I

18  don't need you to go into what every subcontractor was

19  paid, because I assume that the prime pays the

20  subcontractor.

21        Isn't that how it normally works?

22        MR. SIMMS:  It is.

23        THE COURT:  Is that what happened here?

24        MR. SIMMS:  It is.

25        THE COURT:  Okay.

1         MR. SIMMS:  I just wanted to explain that to
2    the jury, so they understood.
3         THE COURT:  Explain what to the jury?
4         That the subcontracts were paid?
5         MR. SIMMS:  The subcontractors were paid by
6    Team America.
7         THE COURT:  Well, ask him:  Did he pay the
8    subcontractors?
9         MR. SIMMS:  Okay.
10        THE COURT:  All right.  And then we'll focus
11   on the house, right?  Because that's the fight here, it
12   looks like, what work was done at Mr. Conrad's house and
13   who paid for it and all that.
14        MR. SIMMS:  Well, I just wanted to talk --
15        THE COURT:  I understand.
16        You want to talk about what else?
17        MR. SIMMS:  No, I'm not going to bring up
18   the house with Mr. Bedford.
19        THE COURT:  You're not?
20        MR. SIMMS:  No.  There is many other things
21   I'm going to bring up.
22        THE COURT:  Okay.  All right.
23        So you're not going to bring up the house?
24        MR. SIMMS:  No.
25        THE COURT:  Okay.  All right.  Thank you.

1              (Thereupon, the sidebar conference was
2    concluded.)
3              THE COURT:   You may proceed.
4              MR. SIMMS:   Thank you.
5    BY MR. SIMMS:
6      Q.   Mr. Bedford, do you recall that, the build-out of
7    The Chicken Place, beginning in around December 2009?
8      A.   Yes.
9      Q.   And it continued up until July 2010?
10     A.   Somewhere in there.
11     Q.   Okay.   Summer of 2010?
12     A.   Yes.
13     Q.   Okay.   And Mr. Conrad paid your company for the
14   build-out, correct?
15     A.   That's correct.
16     Q.   Okay.   As a matter of fact, it was a substantial
17   amount of money.
18     A.   I don't recall the exact amount of money, but --
19     Q.   Was it over $200,000?
20     A.   I don't recall.
21     Q.   Okay.   And you stated earlier that there were
22   subcontractors working for you.   Did your company pay
23   the subcontractors?
24     A.   Yes.
25     Q.   And that was paid out of money that Mr. Conrad

1   paid you, right?

2       A.   Yes.

3       Q.   Now, I want to talk about the migration project.

4   Now, your company, Bedford Images, had a background in,

5   you said, data conversion?

6       A.   Correct.

7       Q.   Okay.  And you've done several contracts with the

8   Navy?

9       A.   That's correct.

10      Q.   Can you tell me about the experience that your

11  company had with data conversion?

12      A.   Well, my company had -- had over 20 years of

13  experience doing -- doing data conversions and systems

14  integrations.

15      Q.   Okay.  And how many different governmental

16  agencies did your company contract with in order to

17  perform this work?

18      A.   About three different agencies through -- through

19  the one primary agency.

20      Q.   Now, around the time that the migration project

21  came up, you spoke with Mr. Conrad about that project,

22  right?

23      A.   That's correct.

24      Q.   Okay.  And you spoke with him because you kind of

25  passed by -- in passing, you heard him complaining about

1  the migration project.

2      A.  That's correct.

3      Q.  Okay.  And you told him that your company had the

4  capability to perform the work.

5      A.  I did tell him that.

6      Q.  Okay.  You told him about the experience -- that

7  over years of 20 years of experience that you had, and

8  that you had worked with the Navy in the past in doing

9  the work, right?

10     A.  That's correct.

11     Q.  Okay.  And you told him about the website that

12  you had, that showed that some of the migration

13  experience, right?

14     A.  That's correct.

15     Q.  Okay.  And he told you he would look into it,

16  right?

17     A.  He did say that.

18     Q.  Okay.  Now, this would have been in early June of

19  2010?

20     A.  Somewhere in that timeframe, yes.

21     Q.  Okay.  Now, you knew Mr. Conrad to work in the

22  Department of Commerce, right?

23     A.  Yes.

24     Q.  Okay.  And you also knew that he had a

25  restaurant, a Chicken Place restaurant, right?

1      A.   Yes, sir.

2      Q.   And you and Mr. Conrad -- are you okay, sir?

3      A.   Yes.  Yes.

4      Q.   Okay.  Let us know -- the Court know if you need

5  a break.  Okay?

6           You and Mr. Conrad had several conversations

7  about going into business together to open a restaurant,

8  correct?

9           MR. BURKE:  Objection, vague as to time.

10          THE COURT:  Sustained.

11  BY MR. SIMMS:

12     Q.   In 2010, you and Mr. Conrad had conversations

13  about opening a restaurant, correct?

14     A.   That's correct.

15     Q.   Okay.  Now, let's talk about this request for a

16  loan.  On direct you stated that Mr. Conrad showed up to

17  your offices unsolicited, correct?

18     A.   That's correct.

19     Q.   And you and your business partner, Mr. Bertrand,

20  were there?

21     A.   Correct.

22     Q.   Okay.  And during this visit, he asked you and

23  Mr. Bertrand if you could invest into his business,

24  right?

25     A.   That's correct.  Initial request was for a loan,

1   and later it was requested as a -- to be an investment

2   into his chicken business, restaurant.

3       Q.  Okay.  And when you say "later," it's still

4   within the same conversation, right?

5       A.  Yes.

6       Q.  Okay.  And you told -- at that time, you told

7   Mr. Conrad that you all weren't going to do that, right?

8       A.  At that time, I did not state that.  I responded

9   that we didn't have that type of resources.

10      Q.  Okay.  And when you say "that type of resources,"

11  you're saying resources to pay $180,000 all at one time?

12      A.  Correct.

13      Q.  Okay.  So, at the conclusion of that meeting it

14  was understood that the loan/investment wasn't going to

15  happen.

16      A.  At the conclusion of that meeting, it was kind of

17  left open-ended.  There was no commitment on either

18  party.

19      Q.  Okay.  But you told him that you couldn't do it,

20  right?

21      A.  I did tell him that we didn't have the resources

22  to do that.

23      Q.  Okay.  So, considering what you told him, there

24  would be no need for any type of loan documentation,

25  would there?

1    A.   I guess not.  At the end of the conversation it
2    was left open, and I didn't commit to him to making a
3    loan or -- or investment at that particular time.
4        Q.   Okay.  Now, during the conversation about the
5    loan or the investment, you recall Mr. Conrad mentioning
6    a way of -- a repayment could be him assisting you and
7    Mr. Bertrand with opening a restaurant?
8        A.   I don't recall having that statement made at
9    the -- that particular time, sir.
10       Q.   Were you ever interested -- around that time,
11   were you interested in consulting with Mr. Conrad about
12   the chicken sauce that his restaurant used?
13       A.   Yes.
14       Q.   And you would agree with me that that, we'll call
15   it the secret sauce, was valuable?
16       A.   Yes.
17       Q.   So, after this conversation -- so, before this
18   conversation, there's no migration project that has been
19   awarded, correct?
20       A.   No.
21       Q.   Okay.  So, you tell Mr. Conrad about the
22   capabilities of your company to do the migration work,
23   and you subsequently get the award for the migration
24   contract, right?
25       A.   Eventually, yes.  We received a solicitation to

1  bid for the work and was awarded the work.

2     Q.   And the person -- the company that you signed the

3  contract with was Tridea Works, correct?

4     A.   That's correct.

5     Q.   You didn't sign a contract with Mr. Conrad, did

6  you?

7     A.   No.

8     Q.   So, you begin -- your company begins work in

9  late -- I guess late June 2010, right?

10    A.   Approximately in that timeframe, yes.

11    Q.   Okay.  And you start getting payments as early as

12  September 2010, correct?

13    A.   I can't recall when the initial payments start

14  coming in.

15    Q.   Would it have been in the Fall of 2010?

16    A.   It was in 2010.  I'm not sure what -- how soon

17  after that the payments came in, sir.

18    Q.   Okay.  I'm going to refer your attention to the

19  defense exhibit binder.  If you can go to Tab 6, sir.

20  And under Tab 6, can you go to 6-B?

21    A.   Okay.

22    Q.   Do you recognize that document?

23    A.   Yes.

24    Q.   Okay.  This is an invoice that you've already

25  discussed, correct?

1    A.  Yes.

2    Q.  All right.  This invoice is for migration work

3  that was done for BIS, right?

4    A.  I'm sorry?

5    Q.  This is for -- this invoice is for migration work

6  that was done?

7    A.  Correct.

8    Q.  All right.  And this invoice was sent to Tridea

9  Works?

10   A.  Yes, sir, it was.

11   Q.  All right.  And what's the date on this invoice?

12   A.  7-8-2010.

13   Q.  Okay.  So, you were invoicing Tridea as early as

14  July 8th, 2010.

15   A.  Yes.

16   Q.  And what's the amount at the bottom there?

17   A.  60,228 -- 60,228.24.

18   Q.  Okay.  Now, yesterday -- and you -- the invoices

19  continued pretty much, sometimes once a month, sometimes

20  more than that, right?

21   A.  I don't recall the frequency, but we invoiced --

22   Q.  Was it frequently?

23   A.  On the completion of my -- of work that was come

24  over, when it was completed, it was processed for

25  invoicing.

1    Q.  Okay.

2    A.  I don't recall the amount of times.

3    Q.  Okay.  We could -- let's go through them real

4    quick.

5        So, we have one for July 8th, 2010, right?

6        If we turn to Tab C, another invoice on

7    July 19th, 2010.  And that invoice is for $49,821.

8    A.  Uh-huh.

9    Q.  Another invoice in September 23, 2010.  And that

10   invoice is for $125,000, right?

11   A.  Correct.

12       THE COURT:  Are you referring to another

13   exhibit now, Mr. Simms?

14       MR. SIMMS:  It would be Exhibit 6-D.  I

15   apologize, Your Honor.

16       THE COURT:  Thank you.

17   BY MR. SIMMS:

18   Q.  Going to Exhibit 6-E, that's dated November 9th,

19   2010?

20   A.  Correct.

21   Q.  And it's for $424,000.24?

22   A.  Correct.

23   Q.  And then we go to 6-F, and that's dated

24   February 7th, 2011.

25       Is that the correct date?

1     A.   Correct.

2     Q.   All right.  So, yesterday you testified that all

3    of the -- all of these invoices contained falsehoods,

4    right?

5     A.   That's correct.

6     Q.   All right.  You increased your costs above what

7    they actually were and showed a lower profit than you

8    were actually receiving.

9     A.   Correct.

10     Q.   And you would admit with me, that's lying to the

11    government?

12     A.   That's correct.

13     Q.   And you would agree with me that that's stealing

14    from the government.

15     A.   I agree.

16     Q.   Okay.  And you would agree with me that

17    Mr. Conrad didn't advise you to lie to the government on

18    these invoices, did he?

19     A.   No, Mr. Conrad had -- Mr. Conrad did not ask me

20    to lie on these invoices.

21     Q.   Now, so we've just established the first invoice

22    went out in July -- on July 8th, 2010.  And yet,

23    yesterday you testified that you didn't receive what the

24    government called a fake invoice from Mr. Conrad until

25    November, late November of 2010?

1    A.   I don't recall saying a specific date.  I do
2    recall going through the series of invoices submitted by
3    Mr. Conrad.  I don't recall the specific date, sir.
4    Q.   Okay.
5              MR. SIMMS:  Court's indulgence.
6              (Pause.)
7              MR. SIMMS:  With Ms. Sandvig's assistance,
8    if we could go to Government's 1-1.
9    BY MR. SIMMS:
10   Q.   Do you see that document?
11   A.   Yes.
12   Q.   Okay.  And this is the invoice -- the first
13   invoice the government asked you about yesterday on the
14   stand, correct?
15   A.   I don't recall if it was the first one.  I do
16   remember the invoices, though, sir.
17   Q.   Okay.  And what's the date on that invoice?
18   A.   12-10-2010 and 12-15-2010.
19   Q.   Okay.  So, December 10th, 2010?
20   A.   Correct.
21   Q.   Okay.
22             MR. SIMMS:  If we can go to Government
23   Exhibit 1-2.  Zoom in on the date, please.
24   BY MR. SIMMS:
25   Q.   The date on that invoice is February 2nd, 2011.

1    A.   Correct.

2         MR. SIMMS:  Go to Government 1-3, please.

3    BY MR. SIMMS:

4    Q.   The date on that exhibit is June 2011, right?

5    A.   June 17th and June 20th, 2011.

6    Q.   Thank you.

7         MR. SIMMS:  And the last one, Government

8    Exhibit 1-4.

9    BY MR. SIMMS:

10   Q.   And that's dated August 11th, 2011, right?

11   A.   Correct.

12   Q.   So, based upon you getting -- you invoicing the

13   government in July of 2010, it's your testimony

14   yesterday that Mr. Conrad showed up with that invoice

15   out of the blue in December 2010?

16   A.   Yes.

17   Q.   Okay.  He didn't call?

18   A.   No.

19   Q.   Didn't e-mail you or anything about -- he just

20   presented an invoice?

21   A.   Correct.

22   Q.   As a matter of fact, he -- the invoice didn't

23   even come to you.  It went to, you said, Ms. Alice,

24   right?

25   A.   That's correct.

1    Q.  Okay.

2             THE COURT:  Counsel, let's take the morning

3    recess now for 15 minutes.  Thank you.

4             (Court recessed at 11:31 a.m. and reconvened

5             at 11:49 a.m.)

6             THE COURT:  You can bring our jury out,

7    Mr. Hendrick.  Thank you.

8             MR. HENDRICK:  Yes, sir.

9             (Jury present.)

10            THE COURT:  You may be seated.

11            All right, Counsel, you may proceed.

12            MR. SIMMS:  Thank you.

13   BY MR. SIMMS:

14   Q.  Mr. Bertrand -- I'm sorry -- Mr. Bedford, just to

15   pick up where we left off, you stated that you didn't

16   even receive that invoice from Mr. Conrad.  You got it

17   from Ms. Alice, right?

18   A.  Yes.  Ms. Bertrand.

19   Q.  Okay.  You got it from Alice Bertrand.

20        Now, after getting the invoice from Mr. Conrad,

21   you said you showed it to Mr. Bertrand, right?

22   A.  After the invoice came into our business, yes.

23   It comes through the bookkeeper.  She brings them to me

24   for review.  And Mr. Glen Bertrand, Senior, and I sit

25   down and evaluate the invoice.

1    Q.  Okay.  So, invoice comes in to Alice.  You get
2    the invoice.  You and Mr. Bertrand sit down and look at
3    the invoice and discuss it.

4         But at no time did you call Mr. Conrad to ask him
5    about the invoice?

6    A.  On the initial invoice, I don't think so.

7    Q.  Okay.  Did you e-mail Mr. Conrad about that
8    invoice?

9    A.  I don't recall e-mailing him.

10   Q.  So, there was no contact between yourself and
11   Mr. Conrad about an invoice that you received from him,
12   but you just decided to pay -- you and Mr. Bertrand
13   decided to pay it.

14   A.  Correct.

15   Q.  Now, going back to the migration project, you
16   received notification of the award from Robert Moffett,
17   correct?

18   A.  I -- I don't recall -- I know that I had
19   initially received a -- a notification about the award,
20   but I don't recall if it initially came from Mr. Moffett
21   or not.

22        To my recollection about the award of the
23   subcontract, I vaguely remember that coming, I think,
24   via, initially, an e-mail from a gentleman, Kim Bryant.
25   And then I think later on there was documentation, maybe

1    from Mr. Moffett, that a subcontract was going to be

2    awarded to Bedford's Images.

3        Q.   Okay.  And the invoices that you were shown, you

4    submitted all of those invoices to Tridea Works, right?

5              MR. BURKE:  Objection, vague as to which

6    invoices we're talking about.

7              THE COURT:  Sustained.

8    BY MR. SIMMS:

9        Q.   Invoices shown to you as Defense Exhibits B

10   through F.

11             THE COURT:  Did you say just B through F?

12             MR. SIMMS:  I'm sorry, 6-B --

13             THE COURT:  Okay.

14             MR. SIMMS:  -- through 6-F.

15             MR. BURKE:  Your Honor, may I have a moment

16   with opposing counsel?

17             THE COURT:  Sure.

18             (Counsel conferring off the record.)

19   BY MR. SIMMS:

20       Q.   Mr. Bedford, let me make it a little bit easier

21   for you so you can use it on the computer screen.  We're

22   going to go to Government Exhibits 6-1 through 6-9.  And

23   I want you to just glance at them as they flash on the

24   screen.

25             So that's 6-1.

1           Now if we can go to 6-2.

2      A.   Yes.

3      Q.   6-3.  6-4.  6-5.  6-6.  6-7.  6-8.  And 6-9.

4      A.   Uh-huh.

5      Q.   So, does that refresh your memory in term of all

6  of the invoices being submitted to Tridea?

7      A.   Yes.

8      Q.   Okay.  And you never submitted any invoices to

9  Mr. Conrad, did you?

10     A.   To Mr. Conrad?

11     Q.   Yes.

12     A.   No.

13     Q.   And, Mr. Bedford, your company made over

14 $1.2 million in revenue from that data migration

15 project, didn't it?

16     A.   Yes.

17     Q.   And a lot of that money was based upon lies that

18 you -- or invoices that you falsified, correct?

19     A.   That's -- that's correct.

20     Q.   Mr. Bedford, you had the opportunity to meet with

21 federal agents several times in this case, didn't you?

22     A.   Correct.

23     Q.   I want to direct your attention to the date of

24 July 10th, 2012.  Do you recall meeting with federal

25 agents on that date?

 1     A.   I don't recall the -- that particular meeting,
 2   but I met with the agents several times.  I'm not --
 3     Q.   Well, let's just call it the first meeting.
 4     A.   Okay.
 5     Q.   During the first meeting with agents, you didn't
 6   make any discussion of what you call bribe payments to
 7   Mr. Conrad, did you?
 8     A.   I don't recall.
 9     Q.   Okay.  Mr. Bedford, I'm going to refer your
10   attention to Defense Tab Number 4.
11          Are you there?
12     A.   Yes.
13     Q.   Okay.  And when you see July 10th, 2010, on that
14   document, does that refresh your memory?
15     A.   Yes.
16     Q.   And on that date, you met with federal -- Special
17   Agent Daniel Coney.  You recall that?
18     A.   Yes.
19          MR. BURKE:  Your Honor, objection.  The
20   witness is not testifying from his memory.  He's just
21   reading the document.
22          MR. SIMMS:  I'll rephrase the questions.
23          THE COURT:  All right.
24          Mr. Bedford, you can put that away.  He's
25   going to ask you just questions.  You don't have to look

1  at that.

2          You can take it away, Mr. Hendrick.  That

3  way he's not distracted by it.

4  BY MR. SIMMS:

5    Q.  So, as you're testifying today, you said you

6  don't recall if you mentioned bribe payments from -- to

7  Mr. Conrad at all during that interview?

8    A.  I don't recall mentioning bribe payments during

9  the interview.

10    Q.  Okay.  I just want to be clear, to make sure I'm

11  not misunderstanding.  Does that mean you didn't bring

12  it up during the interview?

13    A.  I don't recall bringing that up during the

14  interview.

15    Q.  Okay.  After that, agents met with you again

16  about a year later.  Do you remember that?

17    A.  Like I say, I met with the agents about four or

18  five times, sir.  I don't recall each specific meeting

19  with the agents.

20    Q.  Do you remember a time where they came and they

21  executed a search warrant on your house?

22    A.  I do remember the execution of the search

23  warrant, yes.

24    Q.  Okay.  And when they executed the search warrant

25  at your house, you spoke with them as well, right?

1     A.   Yes.

2     Q.   And do you recall at that meeting telling them

3  that there was a -- a restaurant that you and Mr. Conrad

4  were thinking about opening, and that's why you paid

5  $180,000, because Mr. Conrad was going to repay the

6  company by his consulting?

7     A.   I recall having a conversation about the

8  restaurant that Mr. Conrad and I looked at -- actually

9  two.

10    Q.   Two restaurants?

11    A.   Yes.

12    Q.   And they involved -- they involved chicken,

13  correct?

14             MR. BURKE:  Objection, vague as to place and

15  time.

16             THE COURT:  Sustained.  If you'd lay a

17  foundation, then frame it within the indictment,

18  Mr. Simms.

19  BY MR. SIMMS:

20    Q.   When was it that you and Mr. Conrad would have

21  looked at those restaurants?

22    A.   I don't recall the specific date we looked at

23  one.  I would say it was in 2010 that we looked at the

24  restaurant.

25    Q.   Okay.  And you told the agents about the

1    restaurant as an answer to why your company would have
2    paid Mr. Conrad $180,000, right?
3        A.   I told them about the restaurant.  I didn't -- I
4    don't remember explaining why or the conditions.
5             Asked me, was I interested or trying to get into
6    the business.
7             And I do recall telling them that I was
8    interested in the -- the chicken and restaurant business
9    that -- what Mr. Conrad was operating, and had looked at
10   a facility.
11       Q.   Okay.  You don't remember why you would have told
12   them about that?
13       A.   They -- they asked me what -- as I can recall,
14   sir, what relationship or what -- what business had I
15   conducted with Mr. Conrad.
16       Q.   Okay.  Do you remember telling the agents that
17   the loan that you provided to Mr. Conrad was not tied to
18   any government contracts?
19       A.   I don't recall.  I --
20       Q.   If I show you --
21       A.   -- I may have said that.  I just don't recall,
22   Counsel.
23       Q.   Okay.  If I show you a document with, maybe --
24   would that help you?
25       A.   Sure.

1    Q.  Okay.

2         MR. SIMMS:  With the assistance of the

3    court security officer, if I could show him defense

4    binder Tab 5.

5         If you go to page nine when you get there.

6    Let me know when you're there.

7         You're there?

8    A.  Yes.

9    Q.  Okay.  You can go to paragraph -- the second

10   paragraph under "Payments of The Chicken Place."  If you

11   can go to the last sentence, and let me know -- don't

12   read it, but let me know if that refreshes your memory

13   as to what you told the agents about the loan.

14        Does that help you recall?

15   A.  Yes.

16   Q.  Okay.  So, when the agents asked you about the

17   loan that was given to Mr. Conrad, what did you tell

18   them?

19   A.  I -- my response was that I didn't have an

20   explanation.

21   Q.  So, you're saying today that you told the agents

22   in 2013 that you didn't have an explanation about the

23   loan to Mr. Conrad?

24   A.  That's the bottom paragraph.  You said to read

25   that.

1    Q.  I said the -- the middle paragraph on the page,
2  last sentence.

3    A.  Yes.

4    Q.  Where it states, "Bedford advised that the
5  loan" --

6              MR. BURKE:  Your Honor, objection.

7              THE COURT:  Is this to refresh recollection?

8              MR. SIMMS:  It is, Your Honor.

9              THE COURT:  He needs to read it and then put
10  it aside and tell us what he remembers now; not to read
11  what somebody else wrote.

12              MR. SIMMS:  Okay.  Understood.

13  BY MR. SIMMS:

14    Q.  Okay.  Can you close the book for me?

15        Okay.  Now, do you recall what you told agents in
16  2013 about the loan to Mr. Conrad?

17    A.  Yes.

18    Q.  And what did you tell them when they asked you
19  about the loan?

20    A.  In the statement, I stated that it wasn't tied to
21  any contracts.

22    Q.  Okay.  So you told them it wasn't tied to any
23  contracts?

24    A.  Correct.

25    Q.  Now, you also met with agents in July of 2016,

1   right?

2          You don't recall?

3      A.   I don't recall.

4      Q.   Okay.  Do you recall speaking to the agents

5   specifically about the data migration project and what

6   details you shared with Mr. Conrad about it?

7      A.   No, I -- I don't recall.

8          On several occasions in regards to Mr. Conrad,

9   the interviewers asked if he had performed data -- data

10  migration work, is what comes to mind right now.

11     Q.   Okay.  Do you remember telling agents that you

12  told Conrad what software was being used, but not how

13  the software was being used?

14     A.   I do remember him inquiring about what software

15  was used to perform the work.

16     Q.   Okay.  And you told him the software, but you

17  didn't tell him how you were using the software, did

18  you?

19     A.   No, I did not.  He had questioned me about what

20  the process was, and I would not reveal to them how --

21  how -- how the process was completed via the product

22  that we were using to do the conversion work.

23     Q.   Okay.  Now, Mr. Bedford, you pled guilty to a

24  two-count indictment, didn't you?

25     A.   Yes.

1    Q.   Okay.  You pled guilty to one count of bribery of
2  a public official, right?

3    A.   Yes.

4    Q.   And you pled guilty to conspiracy to pay and
5  receive bribes, right?

6    A.   Yes.

7    Q.   Okay.  I'm going to refer your attention to -- to
8  your plea agreement that you signed.  I believe it's
9  Government Exhibit -- (pause) --

10            MR. BURKE:   501.

11  BY MR. SIMMS:

12   Q.   -- 501.

13        Mr. Bedford, if you would take a look at the
14  screen.  The government showed you this document during
15  your testimony yesterday.  That's your plea agreement,
16  right?

17   A.   Yes.

18   Q.   Okay.  And based upon the two counts that you
19  pled guilty to, this plea agreement lays out that you
20  could potentially receive a sentence of 20 years in
21  prison, correct?

22   A.   Correct.

23   Q.   Have you go to --

24            MR. SIMMS:   If we -- Ms. Sandvig, if we can
25  go to page eight of the plea agreement, and zoom in on

1    paragraph 13.

2    BY MR. SIMMS:

3       Q.   Now, a part of your plea agreement includes this

4    paragraph, "Motion for Downward Departure," correct?

5       A.   Yes.  Yes.

6       Q.   Okay.  And your attorney is here in court.  Has

7    he explained what a motion for downward departure is?

8       A.   Yes.

9       Q.   Okay.  And what's your understanding of what that

10   is?

11      A.   That upon my sentencing, that the judge has a

12   right to decide how -- how much time I'm awarded for my

13   act.

14      Q.   Okay.  And that motion that's filed is filed by

15   the government, right, the motion for the downward

16   departure?

17      A.   I'm not understand- -- I'm not sure.

18      Q.   I refer you back to that same paragraph.  And

19   after reading that paragraph, tell me if you would agree

20   that it's the government that reserves the right to seek

21   the departure?

22      A.   Yes.

23      Q.   And that departure is based upon your cooperation

24   and testimony, right?

25      A.   Correct.

1      Q.   And it's -- although the judge decides your
2   sentence, it's up to the government to file that motion
3   for that departure, right?
4      A.   I'm not sure, sir.  I was explained that the
5   Honorable Judge Lee was the individual to decide my --
6   my sentence.
7      Q.   Now, I'm going to also refer you to page seven of
8   your plea agreement, and going to paragraph 11.
9           Now, that paragraph is entitled "Prosecution in
10  other jurisdictions," right?
11     A.   Yes.
12     Q.   And under this paragraph, the government is
13  agreeing not to voluntarily turn over information about
14  you to aid in your prosecution in other courts or
15  states, jurisdictions, right?
16     A.   Yes.
17     Q.   And we know, based upon your testimony, that
18  you've committed crimes that are not included in this
19  plea agreement, right?
20     A.   That's correct.
21     Q.   Okay.  And one of those crimes includes the theft
22  of over a million dollars from the United States
23  Government; is that correct?
24     A.   That's correct.
25     Q.   And pursuant to the plea agreement, the

1   government is not holding you accountable for that

2   theft, are they?

3       A.   They -- they are.

4       Q.   Okay.  In terms of money?

5       A.   In terms of forfeiture, restitution, repayment

6   for all of the proceeds earned from support services

7   that were charged to the -- the government.

8       Q.   But you're not looking at additional criminal

9   convictions based upon that, are you?

10      A.   No.

11      Q.   Okay.  Mr. Bedford, I'm going to refer your

12  attention to Defense Tab 9.

13           Now, Mr. Bedford, do you recognize this document?

14      A.   Yes.

15      Q.   Okay.  This is a document that you drafted, isn't

16  it?

17      A.   Yes.

18      Q.   Okay.  And it's entitled, "Defendant's Version of

19  Events," right?

20      A.   Correct.

21      Q.   All right.  So, let's start at the introduction.

22           Who did you submit this -- who did you submit

23  this to?

24      A.   To the -- the U.S. Probation Office.

25      Q.   Okay.  And you submitted it to them to, as the

1  title states, to explain your version of the events.

2      A.  Correct.

3      Q.  All right.  So, let's start at the "Introduction"

4  paragraph.  You state that, "So many times I put in bids

5  and some companies seemed to me to be much less

6  qualified and would get the contract over me."

7              MR. BURKE:  Objection, irrelevant.

8              THE COURT:  Overruled.

9  BY MR. SIMMS:

10     Q.  You put that in your statement, right?

11     A.  Yes.

12     Q.  So, based upon prior experiences you had with

13 bidding for contracts, you had a frustration that it was

14 kind of a "good ole boy" system or something of that

15 nature, right?

16     A.  Yes.

17     Q.  And you felt like that there was a pay-for-play

18 type system, and that you were on the outside looking

19 in, right?

20     A.  Yes.

21     Q.  And you state that:  Everyone else seemed to be

22 getting inside deals, so you thought -- I'm not quoting

23 you now -- so you thought, quote:  "this is how it must

24 be done."  Is that what you said?

25     A.  Correct.  Correct.

1    Q.  So then in the next paragraph, going down, you

2    begin to talk about the conversation that you had with

3    Mr. Conrad around the summer of 2010.

4    A.  Yes.

5    Q.  And you said that:  Conrad never said this

6    payment is in exchange for my directing work to Team

7    America and Bedford Imaging.

8         Right?

9              MR. BURKE:  Objection, rule of completeness.

10             THE COURT:  You'll have a chance on redirect

11   to ask him any questions you want.  This is

12   cross-examination.  Objection is overruled.

13   BY MR. SIMMS:

14   Q.  Right?

15   A.  Correct.

16   Q.  Okay.  So, during that meeting, Mr. Conrad never

17   said, "If you give me money, I'm going to ensure that

18   you get government contracts," did he?

19   A.  No.

20   Q.  He never said, "If you give me any money, I'll

21   take any action to make sure that you get government

22   contracts," right?

23   A.  Say it again.

24   Q.  He never promised you any action -- to take any

25   action to get your company a government contract if you

1    gave him money?

2        A.   No.

3        Q.   Okay.  But here it states that:  Despite him not

4    saying that, you took it to basically mean the classic

5    wink and a nod.

6        A.   Yes.

7        Q.   So you chose how to interpret Mr. Conrad's

8    statements to you?

9        A.   I chose to interpret what I understood, not --

10   not stating that I chose to make Mr. Conrad's statements

11   for him or to insinuate his thought.

12       Q.   So, later on, going under "Payments to Conrad,"

13   you state that -- you state that, "Conrad approached my

14   partner, Glen Bertrand, and me about investing money in

15   his chicken restaurant."

16            And you say, "I felt compelled to assist Conrad,

17   being that he and my partner are like family, and he had

18   recommended Team America to SPAWAR."

19       A.   Yes.

20       Q.   So, that's something that you chose to do based

21   upon your feelings, correct?

22       A.   Can you repeat that?

23       Q.   Mr. Conrad never asked you, "Hey, I got you this

24   contract, so now give me the money."

25       A.   No, Mr. Conrad never asked that.

1   Q.   In your statement, you said that you felt

2   compelled to do it based upon getting the contract?

3              MR. BURKE:  Objection, rule of completeness.

4   He's misstating the statement.

5              THE COURT:  Well, this is cross-examination.

6   Leading questions are permitted.  You'll be given a

7   chance on redirect to ask whatever questions you have

8   about this document.

9              Objection is overruled.

10             MR. BURKE:  Your Honor, may I have a

11  standing objection to this line of questions?

12             THE COURT:  You certainly can.  But under

13  the Rules of Evidence, on cross-examination leading

14  questions are permitted.

15             MR. BURKE:  Thank you.

16             THE COURT:  Thank you.

17  BY MR. SIMMS:

18   Q.   Mr. Conrad never told you -- sorry.  I'll back

19  up.  I lost my place.

20        You're saying in your statement that because your

21  company got the contract, you felt personally compelled

22  to assist Mr. Conrad with a loan?

23   A.   Yes, that's what I said in my statement.

24   Q.   Okay.  And you would agree with me that there was

25  never any discussion -- any more discussion between you

1  and Mr. Conrad about a loan after that Summer of 2010

2  meeting?

3          And I'll rephrase the question.

4          Between the discussion that happened in June of

5  2010 and when you received an invoice from CPE, there

6  was never any more discussion about the loan?

7      A.  No.

8      Q.  Mr. Bedford, the data migration project ended in

9  Spring of 2011, correct?

10     A.  Approximately.

11     Q.  And after the data migration project ended, Team

12 of (sic) America was awarded other contracts, weren't

13 they?

14          MR. BURKE:  Objection, vague as to what

15 contracts.

16          THE COURT:  Is this towards the timeframe of

17 the indictment, Mr. Simms?

18          MR. SIMMS:  It's still within the timeframe,

19 Your Honor.

20          THE COURT:  All right.

21          MR. SIMMS:  I'll be more specific.

22          THE COURT:  All right.  Objection sustained

23 to the question that was previously asked.

24 BY MR. SIMMS:

25     Q.  Do you remember getting additional contracts

1  through SPAWAR in the Summer of 2011?

2      A.  I recall getting -- doing additional services.

3          You mean outside of the data migration?

4      Q.  Yes.

5      A.  Yes.

6      Q.  Okay.  And did those services have anything to do

7  with IT work, or was it construction work?

8      A.  It was construction and support work for more --

9  not SCIFs, but they were other classified networks.

10     Q.  Okay.  Now, Mr. Bedford, you stated previously on

11 direct that not only did you lie and steal from the

12 government and -- from 2010 to 2011, but you also lied

13 to them during several interviews, is what you said.

14 Right?

15     A.  That's correct.

16     Q.  Okay.  Now, when the government came and

17 interviewed you in 2016, do you remember the first time

18 you told them about the invoices that were inflated?

19     A.  I don't recall the specific setting, the initial

20 time that I spoke with them about the invoices, but --

21     Q.  Okay.

22     A.  -- I did make mention.  We did discuss the

23 invoices several times.

24     Q.  Okay.  And it was shortly after discussing those

25 invoices that you pled guilty, right?  In 2016?

1    A.   I don't recall, Counsel.  I don't recall placing

2    the time where I pled guilty with -- with discussing

3    invoices.

4         Like I said, we had several conversations

5    regarding the invoices and the -- my explanation behind

6    lying and falsifying invoices in lieu of support, the

7    request to prepare the invoices in the format in which I

8    submitted them being -- resulting in the preparation and

9    submittal, and that fact being a lie.

10        Due to the fact that we were subcontractors to a

11   primary contractor for the FBI, we were asked

12   specifically to break out the invoices to reflect time

13   and material.  And we were not qualified to submit

14   invoices as a firm fixed price.  So, therefore, every

15   invoice that I submitted was a false document and -- and

16   a lie.

17   Q.   Okay.  And it was -- it was during the discussion

18   of these invoices and your admission to criminal conduct

19   that your story changed and this loan to Mr. Conrad, you

20   say, you took it to be a bribe?

21   A.   Yes.

22             (Pause.)

23             MR. SIMMS:  Court's indulgence.

24             (Pause.)

25   BY MR. SIMMS:

1     Q.  Last few questions, Mr. Bedford.

2         Mr. Bedford, it's been clear today and also

3  yesterday that you are suffering -- I don't need you to

4  say whatever it is -- but suffering from a health

5  ailment, correct?

6     A.  That's correct.

7     Q.  Okay.  And your condition has deteriorated over

8  time?

9     A.  That's correct.

10    Q.  Okay.  The state of your condition as it presents

11 to this Court today was not your condition during the

12 years of 2010 and 2011, was it?

13    A.  It existed; not to this degree.

14    Q.  Okay.  You were able to speak a little bit more

15 clearly?

16    A.  Yes.

17    Q.  Get around a lot more -- easier?

18    A.  Yes.

19    Q.  Okay.

20         MR. SIMMS:  Thank you.  No further

21 questions.

22         MR. BURKE:  Your Honor, may we approach?

23         THE COURT:  All right.

24         (Thereupon, the following sidebar conference

25 was had:)

1          MR. BURKE:  Your Honor, I have approximately

2     15 to maybe 20 minutes of redirect.  I would like

3     permission to ask the witness if he believes he's up to

4     it -- he appears to be fading -- whether he's up to it

5     to push through the day, or if he thinks that he can't

6     do that.

7          THE COURT:  Well, my preference would be for

8     him to let us know if he has a problem, as opposed to

9     you suggesting if he has one.

10         MR. BURKE:  Okay.

11         THE COURT:  And I think he was told that if

12    he has a problem, just let us know.

13         MR. BURKE:  Very well.

14         Your Honor, while we're here, I also have a

15    motion to admit Defense Exhibit 9, which is the document

16    that the defendant was -- defense counsel was reading

17    from repeatedly.

18         Under the Rule of Completeness, he has read

19    in numerous portions and not others.  And, in fairness,

20    we ask that the document be admitted so that the jury

21    can read the declarant -- the writer of this document is

22    on the stand and he can cross-examine him, so there

23    really is no hearsay problem.  And so we would move for

24    the admission of Defense Exhibit 9.

25         MR. SIMMS:  I would object to that.  If they

1    want to redirect him on that, but nonleading questions,

2    then I don't -- I think that's fine under the Rules of

3    Evidence -- and permissible.  And that's the proper way

4    to do it.

5            MR. BURKE:  Your Honor, under Rule 105 --

6    I'm sorry -- 106:  If a party introduces all or part of

7    a writing, an adverse party may require the introduction

8    at that time of any other part or any other writing or

9    recorded statement, that, in fairness, ought to be

10   considered at the same time.

11           MR. SIMMS:  And --

12           MR. BURKE:  Mr. Simms --

13           THE COURT:  Just a second.

14           MR. BURKE:  Mr. Simms read in numerous

15   portions of this.

16           THE COURT:  Well, he asked -- he asked the

17   witness questions about statement he made, didn't he?

18           MR. BURKE:  Yes, sir, about this writing --

19           THE COURT:  He did.

20           MR. BURKE:  -- specifically.

21           THE COURT:  I understand your theory, but

22   I'm not going to do it --

23           MR. BURKE:  Okay.

24           THE COURT:  -- because it was

25   cross-examination.  The statement was not admitted.  And

1    he asked the questions about what he said in the

2    statement, which, to me, was just a way of confirming

3    the things in there without offering the whole

4    statement.

5                That's a statement he wrote for the

6    presentence report, which I guess I get to see at some

7    point.

8                MR. BURKE:  Yes, Your Honor.

9                THE COURT:  All right.  If you want to ask

10   him questions about the statement, you can --

11               MR. BURKE:  I will.

12               THE COURT:  -- and point out the parts that

13   were missed, you can do that.

14               MR. BURKE:  Thank you, sir.

15               (Thereupon, the sidebar conference was

16   concluded.)

17               THE COURT:  You may proceed.

18               MR. BURKE:  Thank you, sir.

19                     REDIRECT EXAMINATION

20   BY MR. BURKE:

21      Q.   Mr. Bedford, on cross-examination defense counsel

22   asked you numerous questions about the statement that

23   you wrote, correct?

24      A.   Yes, sir.

25      Q.   And that's Defense Exhibit Number 9, correct?

1    A.   Yes, sir.

2    Q.   Do you have that in front of you, sir?

3    A.   Yes, sir.

4    Q.   Now, let me direct your attention to the

5    paragraph -- the third paragraph on the first page, and,

6    in particular, the last two sentences of that paragraph.

7         Do you see those?

8    A.   Yes.

9    Q.   Now, sir, defense counsel asked you some

10   questions about the last two sentences, correct?

11   A.   Yes.

12   Q.   But, he didn't -- he didn't read the entirety of

13   those two sentences, did he?

14   A.   No.

15   Q.   Sir, what did you say in those last two sentences

16   of this paragraph?

17   A.   In --

18   Q.   That begins with, "While Conrad never..."

19   A.   "While Conrad never said, 'This payment is in

20   exchange for my directing work to Team America and

21   Bedford's Images.' Both Bertrand and I knew it was.  It

22   was basically a classic wink and nod."

23   Q.   Okay.  And then, the paragraph beneath that,

24   defense counsel asked you some questions about that

25   paragraph, correct?

1    A.   Yes.

2    Q.   And what do you say in the first two sentences of

3  that very next paragraph?

4    A.   "Conrad recommended" -- "recommended us to SPAWAR

5  and we got the contract.  Conrad then approached my

6  partner, Glen Bertrand, and me about investing money in

7  his chicken restaurant."

8    Q.   Okay.  And then a few sentences down you say, "So

9  I rationalized..."

10   A.   Yes.

11   Q.   What do you say there, sir?

12   A.   "So I rationalized this investment as a means

13  to" -- "to help a friend and diversify our business."

14   Q.   And what did you say in the very next sentence?

15   A.   "But, in reality, my partner, Glen Bertrand, and

16  I paid Conrad because he helped us get the SPAWAR

17  contract for Team America."

18   Q.   And then, "We knew," what did you say there?

19   A.   "We knew his requests for payments were disguised

20  payments for him delivering us the SPAWAR contract."

21   Q.   And then the next sentence, "And while..."

22   A.   "And while this was a decision made by both Glen

23  Bertrand and me, I individually could have said no, and

24  I did not."

25   Q.   And the next sentence?

1    A.  "I failed" -- "I failed to do the right thing and

2    was wrong for paying and investing in his restaurant and

3    doing work on his home when he was in the position in

4    government, directing government contracts to my

5    company."

6    Q.  Okay.  Then the next sentence, the very last

7    sentence on this page, "I knew...," what did you say

8    there?

9    A.  "I knew this was pay for play, but Bertrand and I

10   pretended to ourself that it was not."

11   Q.  Sir, let me ask you to look at the second page of

12   your statement.  There is a paragraph that begins, "We

13   were awarded..."

14   A.  Yes.

15   Q.  What did you write there?

16   A.  "We were awarded data conversion for Tridea

17   Works.  As the work started, Conrad requested

18   incremental payments via false invoices."

19   Q.  And then the next sentence, where you say, "I

20   signed off..."

21   A.  "I signed off on the invoices to get funds to

22   Conrad in exchange for him making continued

23   recommendations for the work."

24   Q.  Okay.  And then the very bottom paragraph, sir,

25   the sentence that begins after the parentheses, "Even

1  though..."

2     A.   "Even" --

3     Q.   I'm sorry, sir.  Let me back up a few sentences.

4  The last paragraph, "Bertrand authorized..."

5     A.   "Bertrand authorized that Team America to perform

6  work on Conrad's basement."

7     Q.   Okay.  And then the next sentence that says,

8  "Even though..."

9     A.   "Even though this worked was initiated by my

10 partner, I authorized the payment."

11    Q.   "So I..."

12    A.   "So I am also holding myself responsible for

13 these payments, too."

14    Q.   "While Conrad..."

15    A.   "While Conrad never said that this work was in

16 exchange for" -- "for directing contracts to Team

17 America or Bedford's Images, it was a wink and nod, and

18 Bertrand and I knew that Conrad expected this work to be

19 performed for free."

20    Q.   Sir, is this statement accurate?

21    A.   Yes.

22    Q.   Sir, on cross, defense counsel asked you some

23 questions about timing, the timing of invoices and

24 payments.  So, let's talk about that, sir.

25              MR. BURKE:  Ms. Sandvig, if we could publish

1   Government Exhibit 41, page two.

2               And if you could blow up the check,

3   Ms. Sandvig.

4   BY MR. BURKE:

5       Q.   Sir, looking at Government Exhibit 41, page two,

6   what is Government Exhibit 41, page two?

7       A.   A check made payable to -- from Tridea Works to

8   Bedford's Images, Incorporated.

9       Q.   How much?

10      A.   $125,000.

11      Q.   And was this $125,000 payment for the data

12  migration work?

13      A.   Yes, I -- actually, sir, I'm not sure without

14  seeing the invoice to relate to that.  There was some

15  additional work that Tridea had paid for during the

16  migration that was in checks, so I'm not sure.

17      Q.   What's the date of this check?

18      A.   11-05-2010.

19      Q.   So, November 5th?

20      A.   Yes.

21      Q.   And up at the top, in the top left corner,

22  there's a paid date from the bank records.  Do you see

23  that?

24      A.   Yes.

25      Q.   And does it show that it paid on November 8th,

1    2010?

2       A.   Yes.

3       Q.   All right.  And this is for $125,000; is that

4    correct?

5       A.   Yes.

6                (Pause.)

7                MR. BURKE:  Court's indulgence, Your Honor.

8                (Pause.)

9                MR. BURKE:  Ms. Sandvig, if we could pull up

10   Government Exhibit 6-3.

11   BY MR. BURKE:

12      Q.   And, sir, do you have 6-3 in front of you?

13      A.   Yes, sir.

14      Q.   And is that an invoice from your company?

15      A.   Yes, sir, it is.

16      Q.   For $125,000?

17      A.   Yes, sir.

18      Q.   And is that for data migration work?

19      A.   Yes, sir.

20      Q.   So, the November 5th, 2010, check we just looked

21   at for $125,000, is that payment for data migration?

22      A.   Yes, sir.

23                MR. BURKE:  Ms. Sandvig, can we publish

24   21-1, please.

25                Can you blow that up?

1    BY MR. BURKE:

2        Q.   21-1 is a check from Team America to CPE,

3    correct?

4        A.   Yes.

5        Q.   For how much money?

6        A.   $18,000.

7        Q.   And I believe your testimony yesterday was that

8    the defendant did no work to earn this money; is that

9    correct?

10       A.   Yes.

11       Q.   What's the date of this check?

12       A.   11-12-2010.

13       Q.   So, one week after you were paid $125,000 for the

14   data migration work?

15       A.   Yes.

16            MR. BURKE:  Ms. Sandvig, can we publish

17   Government Exhibit 41, at page three.

18   BY MR. BURKE:

19       Q.   Sir, what is Government Exhibit 41, at page

20   three?

21       A.   A check made payable to -- from Tridea Works to

22   Bedford's Images in the amount of $51,807.

23       Q.   51,000 or 518,000?

24       A.   $518,075.80.

25       Q.   What's the date of this check for -- that's for

1  over half a million dollars?

2      A.  12-07-2010.

3      Q.  And the paid date that you see in the top left

4  corner of the bank records, what date is that?

5      A.  It's 12-10-2010.

6      Q.  Sir --

7          MR. BURKE:  Ms. Sandvig, could you pull up,

8  I believe it's 21-2, please.

9  BY MR. BURKE:

10     Q.  Sir, what's the date of the check that's marked

11 as 21-2?

12     A.  12-15-2010.

13     Q.  Five days after your company received over half a

14 million dollars?

15     A.  Yes.

16     Q.  And who is this check made payable to?

17     A.  CPE.

18     Q.  For how much money?

19     A.  $55,000.

20         MR. BURKE:  Ms. Sandvig, could you publish

21 Government Exhibit 41, page five.

22 BY MR. BURKE:

23     Q.  Sir, what do we see in Government Exhibit 41,

24 page five?

25     A.  Check from Tridea payable to Bedford's Images in

1  the amount $241,855.

2  Q.  What's the date on the face of the check?

3  A.  February 15th, 2011.

4          MR. BURKE:  Now, Ms. Sandvig, could you

5  publish Government Exhibit 21-3.

6  BY MR. BURKE:

7  Q.  Sir, what's -- what do we see in Government

8  Exhibit 21-3?

9  A.  A check from Team America Contractors to CPE.

10  Q.  And for how much money?

11  A.  $35,000.

12  Q.  What's the date of this check?

13  A.  February 4, 2011.

14  Q.  So, 11 days from the $241,000 payment?

15  A.  Yes.

16          MR. SIMMS:  Your Honor, I'm going to object.

17  This is mischaracterization.  It was actually before.

18          MR. BURKE:  I said 11 days from, Your Honor.

19          THE COURT:  Overruled.

20          MR. BURKE:  Ms. Sandvig, could you publish

21  Government Exhibit 41, page six.

22  BY MR. BURKE:

23  Q.  Sir, what do we see in Government Exhibit 41,

24  page six?

25  A.  A check from Tridea to Bedford's Images in the

1    amount of $397,320.48.

2    Q.  And, sir, what's the paid date that we see in the

3    top left corner of the bank records?

4    A.  03-09-2011.

5    Q.  March 9th, 2011?

6    A.  2011.

7         MR. BURKE:  Ms. Sandvig, could you publish

8    Government Exhibit 27-1.

9    BY MR. BURKE:

10   Q.  What do we see in 27-1?

11   A.  A check payable to CPE.

12   Q.  For how much?

13   A.  $50,000.

14   Q.  One day later?

15   A.  Yes.

16        (Pause.)

17        MR. BURKE:  Court's indulgence, Your Honor.

18        (Pause.)

19   BY MR. BURKE:

20   Q.  Mr. Bedford, you were asked questions on

21   cross-examination about your plea agreement.

22        Sir, how, if at all, are you being held

23   responsible for the money you obtained under the data

24   migration contract, under the terms of your plea

25   agreement?

1    A.   I -- I'm held responsible to pay back all of the
2  proceeds that I received from that work.

3    Q.   All of the money you got?

4    A.   Correct.

5    Q.   And, sir, is it your understanding that Judge Lee
6  can consider your entire history when rendering a
7  sentence here?

8    A.   Sorry?

9    Q.   Can Judge Lee consider your entire history when
10  rendering a sentence?

11    A.   Yes.

12              MR. BURKE:   Nothing further, Your Honor.

13              THE COURT:   May the witness be excused?

14              MR. BURKE:   Certainly for the government.

15              MR. SIMMS:   Yes.

16              THE COURT:   All right.  You're free to
17  leave, sir.  Thank you.  You can step down.

18              (Thereupon, the witness withdrew from the
19  stand.)

20              MR. WALKER:   Your Honor, the government
21  calls Patricia Woodberry.

22              MR. HENDRICK:   Please face the clerk and
23  raise your right hand, ma'am.

24              (Witness sworn.)

25              THE WITNESS:   I affirm.

1           THE CLERK:  Thank you.

2           Have a seat, please.

3           THE COURT:  You may proceed.

4           THEREUPON, PATRICIA ANN WOODBERRY, having

5  been duly sworn, testified as follows:

6                      DIRECT EXAMINATION

7  BY MR. WALKER:

8     Q.  Good afternoon, ma'am.

9         Could you please state and spell your name for

10 the court reporter.

11    A.  Patricia, P-a-t-r-i-c-i-a, Ann, A-n-n, Woodberry,

12 W-o-o-d-b-e-r-r-y.

13    Q.  Ms. Woodberry, where do you work?

14    A.  I work for the Department of Commerce.

15    Q.  Is there a branch of the Department of Commerce

16 that you work for?

17    A.  Bureau of Industry and Security.

18    Q.  How long have you worked for the Bureau of

19 Industry and Security?

20    A.  Ten years.

21    Q.  What is your title at the Bureau of Industry and

22 Security?

23    A.  IT specialist.

24    Q.  In 2011, were you working as an IT specialist at

25 BIS?

P. Woodberry - Direct                                87

1     A.   Yes.

2     Q.   What were your responsibilities as an IT
3  specialist in 2011?

4     A.   In 2011, my responsibilities were procurement and
5  acquisitions.

6     Q.   When you say "procurement and acquisitions,"
7  could you briefly describe what that means?

8     A.   Procurement is involved with purchases for goods
9  and services within the bureau.

10     Q.   And acquisitions?

11     A.   Acquisitions is the part of getting the funding
12  availability for those purchases.

13     Q.   Ms. Woodberry, is there a specific division of
14  BIS that you work for?

15     A.   The Office of the Chief Information Officer.

16     Q.   What sorts of services does the Office of the
17  Chief Information Officer provide?

18     A.   Software, network services, software
19  applications, help desk.

20     Q.   Earlier you mentioned that in 2011, part of your
21  responsibilities involved acquisition and procurement.
22  Based on your experience working at BIS, are you
23  familiar with how BIS's procurement policies worked in
24  2011?

25     A.   Yes.

1    Q.  I want to focus on that timeframe and walk the
2    jury through how the procurement process was supposed to
3    work.
4         Are you familiar with what's called the CD-435?
5    A.  Yes.
6    Q.  What is that?
7    A.  CD-435 is the requisition form for supplies and
8    services.
9    Q.  Generally speaking, what kind of information does
10   the CD-435 include?
11   A.  The CD-435 includes a description of the
12   requirement that is being purchased, has the
13   requisitioner's name, signature area, and moneys
14   amounts.
15   Q.  In 2011, when a BIS employee filled out a CD-435
16   for services, to whom did they provide that completed
17   form?
18   A.  The completed form went initially to myself and
19   for -- to the CIO for signatures.
20   Q.  And once you received the completed form, what
21   did you do next?
22   A.  I proceeded to get the funds availability on that
23   form and then made the purchase.
24   Q.  In 2011, when BIS employees submitted a CD-435
25   request for services, what, if any, cost estimates from

1  multiple vendors had to be submitted with that request?

2     A.   Under the micro-purchase threshold, the -- there

3  is -- $3,000, there is a requirement to have at least

4  three cost estimates with each requisition form, CD-435.

5     Q.   And was that if a specific request was above

6  $3,000?

7     A.   Above $3,000, we needed three quotes.  And it

8  would go into another system.

9     Q.   In 2011, would those cost estimates typically

10 accompany the CD-435 that the employees provided to you?

11    A.   Yes.

12    Q.   If a BIS employee submits a request for over

13 $3,000, and that request also has the three cost

14 estimates or quotes, what's the next step in the

15 process?

16    A.   If it's over -- it has to be over the $3,000

17 threshold for three quotes to go into another system,

18 and it is required to have that information attached to

19 the form.

20    Q.   Ms. Woodberry, over the course of your time

21 working at BIS, did you ever meet an individual named

22 Raushi Conrad?

23    A.   Yes.

24    Q.   Do you see Mr. Conrad in the courtroom today?

25    A.   Yes.

1    Q.   Could you please identify him by where is he
2    sitting and what he is wearing?
3    A.   Mr. Conrad is sitting to my left with a blue
4    shirt, blue tie.
5              MR. WALKER:   Your Honor, may the record
6    reflect that the witness has accurately identified the
7    defendant?
8              THE COURT:   So noted.
9    BY MR. WALKER:
10   Q.   Ms. Woodberry, what was your understanding of the
11   defendant's role at BIS?
12   A.   Mr. Conrad was the director over the Network
13   Operations Unit.
14   Q.   To your knowledge, based on your interactions
15   with the defendant, was he aware of the BIS policies for
16   procurement requests that you described?
17   A.   Yes.
18   Q.   Ms. Woodberry, are you familiar with something
19   called the data migration project?
20   A.   Yes.
21   Q.   To your knowledge, who oversaw the data migration
22   project?
23   A.   Mr. Conrad.
24   Q.   Who provided specifications on the types of files
25   that could be transferred?

1    A.   Mr. Conrad.

2    Q.   Ms. Woodberry, were your files transferred during

3    the data migration project?

4    A.   They were supposed to be.

5    Q.   What was your understanding of how your files

6    were supposed to look on the new system?

7    A.   The files were supposed to be identical as to

8    what we provided, once we had changed them over to a PDF

9    file.

10   Q.   Did your files look like you expected them to

11   look --

12   A.   No.

13   Q.   -- once they were transferred?

14   A.   No.

15   Q.   Could you briefly describe what was wrong with

16   your files?

17   A.   The files that I was able to see, they had

18   different characters on them.  Like in that time it was

19   like the OCR characters.  Those were on the form, that

20   were not legible.

21   Q.   Ms. Woodberry, I want to turn your attention now

22   to September 2011.

23        During that time, what, if any, additional

24   funding did the defendant request for the data migration

25   project?

1    A.   Some funds were requested to do the data

2  migration in the amount of $55,000.

3    Q.   With the assistance of Mr. Hendrick, I would like

4  you to please take a look at what has been marked for

5  identification as Government Exhibit 117.

6            THE COURT:  Mr. Walker, this might be a

7  convenient place to stop for the luncheon recess.

8            MR. WALKER:  Yes, Your Honor.

9            THE COURT:  Ladies and gentlemen, remember,

10 please do not discuss the case.  Don't permit the case

11 to be discussed in your presence.

12            Don't do any research on the case.  And

13 leave your notes in the jury deliberation room.

14            We will resume at 2:00 o'clock.  Thank you.

15            (Court recessed at 12:59 p.m. and reconvened

16            at 2:01 p.m.)

17            THE COURT:  You can bring our jury out,

18 Mr. Hendrick.  Thank you.

19            MR. HENDRICK:  Yes, sir.

20            (Jury present.)

21            THE COURT:  You may be seated.

22            All right, Counsel, you may proceed.

23            MR. WALKER:  Thank you, Your Honor.

24             DIRECT EXAMINATION (Continued)

25 BY MR. WALKER:

1     Q.  Ms. Woodberry, when we left off, we were talking

2   about the defendant requesting an additional $55,000 in

3   funding.

4          Do you have Government Exhibit 117 in front of

5   you?

6     A.  Yes.

7     Q.  Do you recognize Government Exhibit 117?

8     A.  Yes.

9     Q.  What is that?

10    A.  It's an e-mail communication from Mr. Conrad to

11  myself.

12    Q.  Did you receive that e-mail on or about

13  September 7th, 2011?

14    A.  Yes.

15    Q.  Is it a fair and accurate copy of the e-mail that

16  you received?

17    A.  Yes.

18          MR. WALKER:  Your Honor, at this time the

19  government moves to admit and publish Government

20  Exhibit 117.

21          THE COURT:  Received without objection.

22  BY MR. WALKER:

23    Q.  Ms. Woodberry, directing your attention to the

24  top e-mail in the chain, dated September 7th, 2011,

25  could you read the defendant's e-mail to you?

1     A.   "From:  Raushi Conrad; To:  Patricia Woodberry;
2   Subject:  Estimate for Team American Contractors, Inc."
3     Q.   Could you read the body of the e-mail?
4     A.   "Please prepare the paperwork and leave it on
5   Jack's desk.  I will get the signatures.  Thanks."
6     Q.   Earlier you testified that the defendant
7   requested additional funding.  Was this e-mail sent in
8   connection with that request?
9     A.   Yes.
10    Q.   When the defendant says, "Please prepare the
11  paperwork," to your knowledge, what paperwork is this
12  referring to?
13    A.   That would be the procurement package to submit
14  for procurement purchase.
15    Q.   Could you take a look at the second page of this
16  exhibit.
17         Ms. Woodberry, what is this?
18    A.   This is a cost estimate from the vendor, Team
19  America Contractors, Inc.
20    Q.   Who provided you with this cost estimate?
21    A.   Mr. Conrad.
22    Q.   At the bottom of this estimate, where it says
23  "Total," could you read the total for the members of the
24  jury?
25    A.   $54,984.63.

1    Q.   After you received this e-mail with the estimate

2    from the defendant, what, if anything, did you do?

3    A.   I sent communication back to Mr. Conrad and asked

4    for the additional quotes, or cost estimates.

5    Q.   Did you prepare paperwork after you received this

6    e-mail?

7    A.   Yes.

8    Q.   With the assistance of the courtroom security

9    officer, I would like you to please take a look at what

10   has been marked for identification as Government

11   Exhibit 25.

12        Do you have Government Exhibit 25 in front of

13   you?

14   A.   Yes.

15   Q.   Do you recognize it?

16   A.   Yes.

17   Q.   What is it?

18   A.   This is the form requisition for supplies and

19   services that has to go with the cost estimates for

20   purchase.

21   Q.   And the top right corner, what is the date on the

22   submission of this form?

23   A.   September 7th, 2011.

24   Q.   Who created this form?

25   A.   I created this form.

1    Q.   And from whom did you get the information that
2  you included in this form?

3    A.   Mr. Conrad.

4    Q.   Is it a fair and accurate copy of the form you
5  created?

6    A.   Yes.

7         MR. WALKER:  Your Honor, at this time the
8  government moves to admit and publish Government
9  Exhibit 25.

10        THE COURT:  25 will be received.  You may
11 publish it.

12        MR. WALKER:  Ms. Sandvig, if we could blow
13 up Box 18.

14        Yes.

15 BY MR. WALKER:

16   Q.   Ms. Woodberry, Box 18 there is called "Purpose."
17 What information is the employee requesting services
18 supposed to provide in that box?

19   A.   They are supposed to provide the information that
20 indicates what the purpose for the purchase is, or what
21 the requisition is for.

22   Q.   In this case, what does Box 18 say was the
23 purpose of the defendant's request?

24   A.   "Data transfer services for CAI moderate."

25   Q.   To your knowledge, were these data transfer

1  services for the same data migration project we
2  discussed earlier?
3      A.   Yes.
4      Q.   Let's go to the second page of this document, if
5  we could.
6          In the column that lists "Supplies and Services,"
7  could you tell the members of the jury what company was
8  to receive the award of money here?
9      A.   Team America.
10     Q.   According to this document, what was the total
11  award amount for this request?
12     A.   $54,984.63.
13     Q.   Prior to receiving the e-mail that we just
14  discussed from the defendant, what, if any,
15  conversations did you observe the defendant having about
16  this request?
17     A.   I heard Mr. Conrad talking with the deputy chief
18  financial officer in regards to getting funds for this
19  service.
20     Q.   Who was the deputy chief financial officer?
21     A.   Brad Burke.
22     Q.   Did you say Brad Burke?
23     A.   Brad Burke.
24     Q.   Just to be clear for the members of the jury, is
25  the Brad Burke you're referring to any way related to

1   Mr. Burke?

2       A.   Not to my knowledge.

3       Q.   You mentioned earlier that the Budget Office is

4   responsible for approving funding for CD-435s.  At the

5   time of this request in 2011, would Mr. Burke have been

6   responsible for approving funding?

7       A.   He or one of his associates in the office, budget

8   analysts.

9       Q.   So what happened after you saw the defendant and

10  Mr. Burke speaking?

11      A.   I, shortly thereafter, received the e-mail

12  communication from Mr. Conrad to proceed with making the

13  purchase for the services.

14      Q.   Were you able to verify whether or not Mr. Burke

15  approved the request?

16      A.   According to this form, yes.

17      Q.   Earlier, you mentioned that in 2011, when a

18  request was made above $3,000, the employee must obtain

19  three competing vendor quotes.  To your knowledge, what,

20  if any, quotes did the defendant provide for this

21  request?

22      A.   I did not receive any other form requests.

23      Q.   At BIS, what, if anything, do you call a contract

24  that is provided to a single vendor without competing

25  bends?

1    A.   Sole source.

2    Q.   If a contract was provided sole source in 2011,

3    what, if any, steps needed to be taken to allow the

4    contract to proceed as sole source?

5    A.   They need to provide justification as to why it

6    was being offered only to one vendor.

7    Q.   In the defendant's request for almost $55,000, to

8    your knowledge, was there sole source justification

9    provided?

10    A.   No.

11          MR. WALKER:  Nothing further, Your Honor.

12                    CROSS-EXAMINATION

13    BY MR. SIMMS:

14    Q.   Good afternoon, ma'am.

15    A.   Good afternoon.

16    Q.   You just testified about -- I believe it's

17    Government Exhibit 25.

18          MR. SIMMS:  If you could pull that back up,

19    Ms. Sandvig, please.

20    BY MR. SIMMS:

21    Q.   So this document is dated September 8th, I guess

22    it was funds available September 8th, 2011, correct?

23    A.   September 7th, according to this form, yes.

24    September 7th, 2011.

25    Q.   Is that the date that the document was completed

1   or is that when the funds were made available?

2       A.   Funds available, September 8th.

3       Q.   Okay.  And you executed that document yourself,

4   correct?

5       A.   Yes.

6       Q.   Okay.  I'm going to refer your attention to

7   Defense Exhibit 61-B.

8            Are you there?

9       A.   Yes.

10      Q.   Okay.  And 61-B is an e-mail chain between you

11  and several other people, correct?

12      A.   Yes.

13      Q.   Okay.  Let's start at the bottom of the page.

14  That's an e-mail from you to Brad Burke, and Raushi

15  Conrad is CC'd on it, correct?

16      A.   Yes.

17      Q.   Okay.  And the title is, "Approval of Obligation

18  of Funds," right?

19      A.   Yes.

20      Q.   And this e-mail is dated in August 2011, right?

21      A.   August 31st, 2011.

22      Q.   And in this e-mail you state to Brad -- can you

23  please state what you wrote to Brad?

24      A.   "Brad:  Per communications with Raushi, we need

25  to have approval of funds for data transfer in the

1   amount of $55,000.  Is a CD-435 necessary for this?  If

2   so, will I have this to" -- "I will have this to you

3   shortly."

4       Q.  Okay.  And why are you asking Brad about a CD-435

5   here?

6       A.  In some instances, a CD- -- the form that we

7   previously talked about is sufficient to submit into the

8   system.  CD-435s are -- goes along with that, if

9   necessary.

10      Q.  Okay.  And despite the amount, 55,000, you're not

11  sure if a CD-435 is needed or not?

12      A.  The CD-435 is needed.  In the C request system,

13  this form that I just previously talked about, that had

14  the $55,000 in there, was the form that goes into the

15  system for higher amounts.  CD-435 was just a proof for

16  our records in the office, that we are providing funds

17  availability.

18      Q.  Okay.  In any event, it had to go up a higher

19  chain before that money was approved, correct?

20      A.  Yes.

21      Q.  All right.  Raushi couldn't just come into your

22  office and tell you to give him $55,000 for data

23  migration.

24      A.  That was not my job to add monies to anything.  I

25  was just to get the form, the purchase request, the cost

1   estimates, and then get the signatures for those who are
2   higher up.
3       Q.   Okay.  So he had to come through you, and you had
4   to check with Brad Burke.
5       A.   Or one of his office budget analysts --
6       Q.   Okay.
7       A.   -- would stamp the funds availability.
8       Q.   And that's what was done in this case, right?
9       A.   Yes.
10      Q.   Okay.  Going up to the next e-mail, that's from
11  Brad Burke to several individuals in your office.  And
12  you're CC'd on it, correct?
13      A.   Yes.
14      Q.   All right.  And in this e-mail, you agree with me
15  that he's approving the transfer of those funds.
16      A.   Yes.
17      Q.   Okay.  And he's approving it for IT and data
18  transfer, correct?
19      A.   Yes.
20      Q.   That same day, on August 31st, you get an e-mail
21  from Linda Cusick about those same funds?
22      A.   Yes.
23      Q.   She's asking you, "What line item will this be
24  placed on?"
25      A.   Yes.

1    Q.   And you tell her to place it on Line Item 10.

2    A.   Yes.

3    Q.   And you tell her -- it's in parentheses, "CAI-M"?

4    A.   Yes.

5    Q.   Okay.

6    A.   CAI-M.

7    Q.   What does that mean?

8    A.   That indicates -- according to our office

9    records, line items were assigned to specific purchases.

10   Line Item 10 was specifically for the CAI-moderate data

11   transfer project.

12   Q.   Okay.  So, you're the one that told her to put it

13   on that item with that description?

14   A.   According to the paperwork that I had, that was

15   the line item assigned for CAI-M.

16   Q.   Okay.  So that document that was shown in the

17   government's exhibit, you didn't write that document;

18   Ms. Cusick wrote it?

19   A.   Which document, sir?

20   Q.   The document going back to the government's last

21   exhibit that was shown to you.

22   A.   She did not prepare that form.  I created the C

23   request form with the information.

24   Q.   Okay.

25            MR. SIMMS:  Your Honor, if we can admit

1   Defense Exhibit 61-B.

2               THE COURT:  Received.

3               MR. SIMMS:  Okay.

4   BY MR. SIMMS:

5     Q.  Now, you would agree with me that the information

6   in this -- I guess this request, was an estimate from

7   the company, correct?

8     A.  A cost estimate is what we call it, yes.

9     Q.  Okay.  And why do companies submit cost

10  estimates?

11              MR. WALKER:  Objection, Your Honor.  Calls

12  for speculation.

13              THE COURT:  As it relates to this case.

14  Overruled.

15  BY MR. SIMMS:

16    Q.  Ms. Woodberry, in regards to this project, why

17  would a company submit a cost estimate?

18    A.  They would submit a cost estimate to give their

19  cost for the particular services that they were

20  rendering -- going to render.  It would be a bid.

21  That's why we ask for three, to compare.  And that would

22  go off to be submitted.

23    Q.  Okay.  Is there a specific time of year that --

24  that correlates to when a company would submit a cost

25  estimate?

1    A.   When they would not?

2    Q.   When they would.

3    A.   They are supposed to submit cost estimates with

4    anything over the $3,000 threshold.

5    Q.   Okay.  Now, in this case you said that you didn't

6    get three quotes, correct?

7    A.   Correct.

8    Q.   And there's reasons -- there's like, you stated,

9    sometimes contracts are single sourced, right?

10   A.   Sole source.

11   Q.   Sole source.

12        And if it's sole source, then you wouldn't need

13   three quotes, right?

14   A.   If it's sole source, we would get just the one

15   estimate, but we would also have the paperwork to back

16   up the sole source.  Because there's a justification on

17   that form that has to be filled out.

18   Q.   Okay.  Now, in this case, you didn't get any

19   documentation with back-up sole source contract, did

20   you?

21   A.   No.

22   Q.   And, in this case, you also didn't get three

23   quotes, right?

24   A.   No.

25   Q.   But, you still processed the request?

1    A.   In my communication with Mr. Conrad, Mr. Conrad

2    indicated that he had spoken to the contracting officer,

3    who would be the next person in line to get that,

4    indicating that she did not -- he did not need another

5    quote.

6    Q.   Okay.  And who would be the contracting officer?

7    A.   At that time it was a Vivian McPherson.

8    Q.   Okay.  And was Vivian McPherson in your office?

9    A.   She was a contracting officer assigned to our

10   bureau, and she was not in my office.  She had her own

11   separate office.

12   Q.   Okay.  Were you familiar with Ms. McPherson?

13   A.   Yes.

14   Q.   Okay.  Did you call and ask her about whether or

15   not this was a single source contract, or why there

16   weren't any other quotes?

17             MR. WALKER:  Objection, Your Honor.  The

18   question calls for hearsay.

19             THE COURT:  Sustained.

20             MR. SIMMS:  Your Honor, I'm asking her what

21   she asked her, not the answer.

22             THE COURT:  I sustained the objection.

23             MR. SIMMS:  Okay.

24             THE COURT:  It's a compound question.

25             MR. SIMMS:  Okay.

1   BY MR. SIMMS:

2       Q.  Did you -- did you call Ms. McPherson?

3       A.  No.

4       Q.  As a part of your job duties in 2011, you had to

5   ensure that proper paperwork is submitted before funds

6   are issued, correct?

7       A.  Yes.

8       Q.  And part of that is verifying that what someone

9   is saying is accurate, correct?

10      A.  Yes.

11      Q.  And you do that through written protocol, written

12  forms, like you testified to today earlier, right?

13      A.  Yes.

14      Q.  Okay.  But you're saying you didn't do that in

15  this case?

16      A.  In this case it was not done.

17      Q.  Okay.  And you didn't do it?

18      A.  I didn't do it.

19      Q.  Okay.

20              MR. SIMMS:  Thank you.

21              MR. WALKER:  Your Honor, may the witness be

22  excused?

23              THE COURT:  Yes.

24              You're free to go.  Thank you for coming.

25              (Thereupon, the witness withdrew from the

1   stand.)

2              MR. BURKE:  Your Honor, the government calls

3   Special Agent Chris Gaffney.

4              MR. HENDRICK:  Face the clerk.  Please raise

5   your right hand.

6              (Witness sworn.)

7              THE WITNESS:  I do.

8              THE CLERK:  Thank you.

9              Have a seat, please.

10             THEREUPON, CHRIS GAFFNEY, having been duly

11  sworn, testified as follows:

12                    DIRECT EXAMINATION

13  BY MR. BURKE:

14     Q.   Good afternoon, sir.

15     A.   Good afternoon.

16     Q.   What's your name?

17     A.   Chris Gaffney.

18     Q.   Sir, could you spell your name, please?

19     A.   Sure.  C-h-r-i-s, G-a-f-f-n-e-y.

20     Q.   Sir, where do you work?

21     A.   I work for the Environment Protection Agency,

22  Office of Inspector General.

23     Q.   What's your position with the EPA OIG?

24     A.   I am a special agent in charge.

25     Q.   Now, Special Agent Gaffney, how long have you

1   worked for the EPA, Office of Inspector General?

2       A.   Since approximately 2012.

3       Q.   And before you worked for the EPA OIG, where did

4   you work?

5       A.   I worked for the Department of Commerce, Office

6   of Inspector General.

7       Q.   And could you very briefly describe the duties of

8   the Department of Commerce's Office of Inspector

9   General?

10      A.   The Department of Commerce OIG operates under the

11  Inspector Generals Act of 1978 to investigate

12  allegations of fraud, waste and abuse.

13      Q.   During what time period did you work for the

14  Department of Commerce's Office of Inspector General?

15      A.   Approximately 2010 to 2012.

16      Q.   Special Agent Gaffney, I would like to direct

17  your attention now to October 19th, 2011.

18           Were you on duty that day?

19      A.   Yes, sir.

20      Q.   What was your assignment on October 19th, 2011?

21      A.   To conduct an interview.

22      Q.   An interview with who?

23      A.   Mr. Raushi Conrad.

24      Q.   Do you see Raushi Conrad in the courtroom?

25      A.   Yes, sir.

1    Q.  Could you point him out about where he's sitting
2    and what he's wearing?
3    A.  Yes, sir.  Sitting right there (indicating),
4    wearing a blue shirt, blue tie.
5            MR. BURKE:  Your Honor, may I ask that the
6    record reflect that the witness has identified the
7    defendant?
8            THE COURT:  So noted.
9    BY MR. BURKE:
10   Q.  Special Agent Gaffney, where did you interview
11   the defendant on October 19th, 2011?
12   A.  The offices at the Department of Commerce OIG,
13   which is in Washington, DC.
14   Q.  Who was present for the interview?
15   A.  Along with Mr. Conrad, Special Agent in Charge
16   Dustin Wright.
17   Q.  And where is -- where did Special Agent Dustin
18   Wright work at the time?
19   A.  He worked also for the Department of Commerce
20   OIG.
21   Q.  Special Agent Gaffney, was that interview
22   recorded?
23   A.  Yes, sir.
24   Q.  Now, with the assistance of the court security
25   officer, I would ask you to now please take a look at

1    Government Exhibits 42-1 and 42-2.

2           Do you have 42-1 and 42-2 in front of you?

3    A.   Yes, sir.

4    Q.   And are each of those disks?

5    A.   Yes, they are.

6    Q.   Special Agent Gaffney, before your testimony here

7    today, did you have an opportunity to listen to the

8    recordings that are contained on Government Exhibit 42-1

9    and 42-2?

10   A.   Yes, sir, I did.

11   Q.   Does Government Exhibit 42-1 fairly and

12   accurately record a portion of your interview with the

13   defendant on October 19th, 2011?

14   A.   Yes, sir.

15   Q.   Does Government Exhibit 42-2 fairly and

16   accurately record a portion of your interview of the

17   defendant on October 19th, 2011?

18   A.   Yes, sir.

19          MR. BURKE:   Your Honor, the government moves

20   to admit 42-1 and 42-2.

21          THE COURT:   Received.

22   BY MR. BURKE:

23   Q.   With the assistance of the court security

24   officer, if I could ask you to now turn to Government

25   Exhibit 42-T.

1          Do you have 42-T in front of you?

2     A.   I do.

3     Q.   And take a moment to review 42-T, if you could.

4     A.   (Complies.)

5     Q.   Sir, what is Government Exhibit 42-T?

6     A.   This is a transcript recording of the sections

7     from 42-1 and 42-2.

8     Q.   Does the transcript marked as 42-T fairly and

9     accurately reflect the excerpts that are recorded in

10    42-1 and 42-2?

11    A.   Yes, sir.

12    Q.   Does 42-T accurately reflect the words spoken?

13    A.   Yes, sir.

14    Q.   Does it accurately identify the speakers on the

15    recordings?

16    A.   Yes, sir.

17         MR. BURKE:  Your Honor, we offer Government

18    Exhibit 42-T as a demonstrative aid to the jury.

19         And we have copies that we would ask to pass

20    out to the jury at this time, while we play the

21    recordings.

22         THE COURT:  So you do intend to play the

23    recordings?

24         MR. BURKE:  Yes.  We intend to play the

25    recordings, and we would ask that the jurors be given

1  the transcript to follow along as we play the

2  recordings.

3            THE COURT:  All right.  Without objection,

4  you may.

5            MR. BURKE:  Thank you.

6            (Copies of Exhibit 42-T distributed to

7  jurors.)

8            MR. BURKE:  Your Honor, at this time, we

9  would ask to play Government Exhibit 42-1.

10           THE COURT:  Is 42-1 the same as 42-2?

11           MR. BURKE:  42-1 is an excerpt.  42-2 is

12 another excerpt.  Both of them are covered by the

13 transcript.

14           THE COURT:  Let me see what you have.  What

15 I have in my book says 42-T.

16           MR. BURKE:  There should also be 42-1 and

17 42-2, which are disks.

18           THE COURT:  Right.  I want to make sure I

19 have the same transcript that you just gave the jury.

20 And so my question is:  What I have is 42-T.  I don't

21 have another one.  Is there another one I'm supposed to

22 have?

23           MR. BURKE:  No, Your Honor.  You have the

24 correct transcript.

25           THE COURT:  Okay.  You may proceed.

1          MR. BURKE:  Thank you.

2          May we publish --

3          THE COURT:  Yes.

4          MR. BURKE:  -- and play 42-1?

5          THE COURT:  Yes.

6          (Government Exhibit 42-1 played at

7    2:28 p.m.)

8    BY MR. BURKE:

9    Q.  Special Agent Gaffney, during the clip that we

10   just listened to, who is the voice that we hear

11   answering the questions?

12   A.  It's Mr. Conrad.

13          MR. BURKE:  Your Honor, at this time we

14   would ask to play Government Exhibit 42-2.

15          THE COURT:  You may.

16          (Government Exhibit 42-2 played at

17   2:30 p.m.)

18   BY MR. BURKE:

19   Q.  Special Agent Gaffney, during the second clip we

20   just listened to, who is the voice that we hear

21   answering the questions?

22   A.  Mr. Conrad.

23   Q.  Sir, were you in possession of the defendant's

24   bank records when you conducted that interview?

25   A.  No, sir.

1    Q.  Now, turning back now for a moment to the first

2    clip that we listened to.

3         When the defendant stated that he had no

4    relationship with Team America aside from giving them

5    files, did the defendant ever seek to clarify that

6    statement?

7    A.  No, sir.

8    Q.  What else, if anything, did the defendant tell

9    you about his relationship with Team America?

10   A.  That's it, sir.

11   Q.  What, if anything, did the defendant disclose to

12   you during this interview about money he received from

13   Team America?

14   A.  Nothing, sir.

15   Q.  What did the defendant disclose to you, if

16   anything, about free work done at his house by Team

17   America?

18   A.  Nothing, sir.

19            MR. BURKE:  Nothing further, Your Honor.

20                 CROSS-EXAMINATION

21   BY MR. SIMMS:

22   Q.  Special Agent Gaffney?

23   A.  Yes, sir.

24   Q.  Okay.  Government counsel just played a little

25   two-minute clip for you.  Maybe together they were two

1   minutes, a minute each.

2           How long was that interview?

3   A.   I believe -- I would want to check, but I believe

4   it was approximately 70 minutes.

5   Q.   Okay.  So, about an hour and ten minutes?

6   A.   Yes, sir.

7   Q.   Okay.  And have you seen the full transcript of

8   that interview?

9   A.   Yes, sir.

10  Q.   Here, government counsel has shown you, I guess

11  it's two pages of transcripts.  How long are those

12  transcripts?

13  A.   Again, I'd have to look at the -- to see the

14  exact page count.  I'd have to check the -- check the

15  actual transcript to see how many pages it is.

16  Q.   But in any event, the entire conversation was

17  over an hour and ten minutes between you and Mr. Conrad

18  and your colleague, correct?

19  A.   I believe so.  Yes, sir.

20  Q.   Okay.

21          MR. SIMMS:  Thank you.

22          No further questions.

23                  REDIRECT EXAMINATION

24  BY MR. BURKE:

25  Q.   Special Agent Gaffney, with the assistance of the

1   court security officer, could you turn to Government

2   Exhibit 42, please.

3         Do you have 42 in front of you, sir?

4   A.   Yes, sir.

5   Q.   What is Government Exhibit 42?

6   A.   42 is the entire recording of the interview.

7   Q.   So, if someone wanted to see if we had left out

8   something important, is it on 42?

9   A.   Yes, sir.

10              MR. SIMMS:  Objection, Your Honor.

11              THE COURT:  What's the objection?

12              MR. SIMMS:  Sidebar, please.

13              THE COURT:  No.  Objection overruled.

14              MR. SIMMS:  The objection would be, for the

15   record, burden shifting.

16              THE COURT:  Overruled.  Thank you.

17   BY MR. BURKE:

18   Q.   Your Honor (sic), is 42 a complete and accurate

19   recording of your interview with the defendant that day?

20   A.   Yes, sir.

21   Q.   Does the entire interview appear on Government

22   Exhibit 42?

23   A.   Yes, sir.

24              MR. BURKE:  The government moves to admit

25   Exhibit 42.

1              THE COURT:  Received.

2              MR. BURKE:  Nothing further.

3              THE COURT:  May the witness be excused?

4              MR. BURKE:  Yes, for the government.

5              THE COURT:  You're free to leave, sir.

6   Thank you.

7              (Thereupon, the witness withdrew from the

8   stand.)

9              MR. WALKER:  Your Honor, the government

10  calls Kevin Luebke.

11             (Witness sworn.)

12             THE WITNESS:  I do.

13             THE CLERK:  Thank you.

14             Have a seat, please.

15             THEREUPON, KEVIN LUEBKE, having been duly

16  sworn, testified as follows:

17                     DIRECT EXAMINATION

18  BY MR. WALKER:

19     Q.  Sir, please state and spell your name for the

20  court reporter.

21     A.  My name is Kevin Luebke.  The last name is

22  L-u-e-b- -- as in boy -- -k-e.

23     Q.  Where do you work?

24     A.  I work at the Federal Bureau of Investigation.

25     Q.  What is your position within the FBI?

1    A.   Currently, I'm a supervisory special agent of a

2    securities fraud squad in Manassas, Virginia.

3    Q.   How long have you worked with the FBI?

4    A.   Over 20 years.

5    Q.   Supervisory Special Agent Luebke, directing your

6    attention to September 4th, 2013, were you on duty that

7    day?

8    A.   Yes, I was.

9    Q.   What was your assignment?

10   A.   My assignment, I was assigned to the public

11   corruption squad in Manassas, Virginia.  I was

12   investigating -- federal public corruption

13   investigations.

14   Q.   Did you conduct an interview that day?

15   A.   Yes, I did.

16   Q.   Whom did you interview?

17   A.   I interviewed Mr. Raushi Conrad.

18   Q.   Where did this interview take place?

19   A.   It occurred at a Foster's Grill in Bristow,

20   Virginia.

21   Q.   Was that within the Eastern District of Virginia?

22   A.   Yes, it is.

23   Q.   Do you see Raushi Conrad in the courtroom today?

24   A.   I do.

25   Q.   Could you please identify him by describing where

1  he is sitting and what he is wearing.

2      A.   Mr. Conrad is sitting in the front row on the

3  left side.  He has a blue shirt and blue tie.

4           MR. WALKER:  Your Honor, may the record

5  reflect that the witness has accurately identified the

6  defendant?

7           THE COURT:  So noted.

8  BY MR. WALKER:

9      Q.   Supervisory Special Agent Luebke, who was present

10  for that interview?

11     A.   Also present was Christian Patton, who is a

12  special agent with the Department of Commerce, Office of

13  Inspector General.

14     Q.   I want to walk the jury through that interview.

15          Were you able to discuss the data migration

16  project with the defendant?

17     A.   Yes.

18     Q.   Who, according to the defendant, was in charge of

19  the data migration project?

20     A.   Mr. Conrad said he was in charge of the data

21  migration project.

22     Q.   And who, according to the defendant, came up with

23  the idea to use Bedford's Images for the data migration

24  project?

25     A.   Mr. Conrad said it was his idea.

1    Q.   What, if anything, did the defendant say about

2    who set the pricing for the data migration project?

3    A.   He gave Mr. Bedford a dollar figure for, per

4    file, approximately three dollars per file.

5    Q.   Did you also discuss the process by which the

6    files would be delivered to Bedford's Images?

7    A.   Correct.  He said he would provide the files --

8    Mr. Conrad would provide the files to Mr. Bedford, and

9    Mr. Bedford would return those files to Mr. Conrad.

10   Q.   According to the defendant, what would happen if

11   there were delays in Bedford's Images getting paid for

12   the data migration project?

13   A.   Mr. Conrad would ask Mr. Bryant to make payment

14   on behalf of Mr. Bedford.

15   Q.   Why, according to the defendant, was he the one

16   who followed up about the payments?

17   A.   Because he was in charge of the data migration

18   project, and he wanted to make sure the work got done.

19   Q.   Supervisory Special Agent Luebke, during your

20   interview with the defendant, did you show him any

21   financial documents regarding money he received from

22   Team America?

23   A.   Yes, I did.

24   Q.   What did you show him?

25   A.   I showed him invoices that he had provided --

1    that were provided to Team America.

2        Q.  With the assistance of Mr. Hendrick, I would ask

3    you to please take a look at what has been admitted into

4    evidence as Government's Exhibits 1-1 through 1-4.

5            Do you have those documents in front of you?

6        A.  Yes, I do.

7        Q.  What are they?

8        A.  These are invoices from CPE to Team America.

9        Q.  Supervisory Special Agent Luebke, how did you

10   obtain these invoices?

11       A.  We obtained these invoices through Team America.

12       Q.  Did you have those invoices with you at the time

13   you interviewed the defendant?

14       A.  Yes, I did.

15       Q.  To your knowledge, who prepared these invoices?

16       A.  Mr. Conrad said he prepared these invoices.

17       Q.  Let's walk through a couple of these invoices.

18           MR. WALKER:  Your Honor, may we publish

19   Government Exhibit 1-1 to the jury?

20           THE COURT:  Yes.

21   BY MR. WALKER:

22       Q.  Supervisory Special Agent Luebke, what is the

23   date on this invoice?

24       A.  December 10, 2010.

25       Q.  Did you show this invoice to the defendant during

1  your interview with him?

2     A.   Yes, I did.

3     Q.   What, if anything, did the defendant say about

4  whether this invoice was real?

5     A.   He said it wasn't real, that he simply made it

6  up.

7             MR. WALKER:   Ms. Sandvig, can we blow up the

8  invoice description, please.

9  BY MR. WALKER:

10    Q.   Supervisory Special Agent Luebke, what

11  description is listed on this invoice?

12    A.   "Support services."

13    Q.   What, if anything, did the defendant say about

14  whether he performed support services for Team America?

15    A.   He said he did not.  He made it up.

16    Q.   Directing your attention to the top left corner

17  of this exhibit.

18         What, if anything, did the defendant say "CPE"

19  stood for?

20    A.   It stood for his company, Chicken Place Express.

21    Q.   According to the defendant, who told Team America

22  Contractors to make the payments out to CPE?

23    A.   He did.

24    Q.   Who, according to the defendant, was the owner of

25  CPE?

1    A.   Mr. Conrad.

2    Q.   What, if anything, did the defendant say about

3    the address that is written at the top of this invoice

4    under the name of his business?

5    A.   He said he didn't recognize the address.   He

6    didn't know where that address came from.

7    Q.   Well, given that the defendant told you he made

8    up the description, what, if any, work did he say he did

9    to send an invoice for $55,000?

10   A.   He provided no services.

11   Q.   Did he say he did any work for that invoice?

12   A.   No.

13   Q.   Directing your attention now to the third

14   invoice, Government Exhibit 1-3.

15        Your Honor, may we publish that to the jury?

16             THE COURT:  Yes.

17   BY MR. WALKER:

18   Q.   Supervisory Special Agent Luebke, what is the

19   date on this invoice?

20   A.   June 17, 2011.

21   Q.   What, if anything, did the defendant say about

22   whether this invoice was real?

23   A.   He said it wasn't real.  He made it up.

24             MR. WALKER:  Ms. Sandvig, can we blow up the

25   description, please.

1   BY MR. WALKER:

2       Q.   Now, earlier, the invoice we looked at that was

3   Government Exhibit 1-1 said "Support services."

4            What is the description provided here?

5       A.   "Engineering services."

6       Q.   What, if any, engineering services did the

7   defendant say he performed for Team America?

8       A.   None.  He just -- he said he made it up.

9       Q.   What, if any, work did the defendant say he did

10  to send an invoice for $15,000?

11      A.   He said none.

12      Q.   Special Agent Luebke, of all the exhibits that

13  you just looked at, the Government Exhibits 1-1, 1-2,

14  1-3 and 1-4, what, if anything, did the defendant say

15  about whether any of those invoices were real?

16      A.   He said they weren't real.  He fabricated those

17  invoices.

18      Q.   What, if any, services did the defendant say he

19  performed for Team America in order to send those

20  invoices?

21      A.   He didn't provide any service.

22      Q.   What, if anything, did the defendant say about

23  who delivered these fake invoices to Team America?

24      A.   He said he delivered them to Team America's

25  offices.

1    Q.  And where were Team America's offices located?

2    A.  In Manassas, Virginia.

3    Q.  Is that within the Eastern District of Virginia?

4    A.  Yes, it is.

5    Q.  Supervisory Special Agent Luebke, during your

6    interview with the defendant, what, if anything, did he

7    say about whether Team America paid all of these

8    invoices?

9    A.  He said they paid all the invoices.

10   Q.  How, according to him, did the -- did Team

11   America pay him?

12   A.  They paid him via check.

13   Q.  And once Team America paid the invoices, where,

14   according to the defendant, did he put the checks?

15   A.  He deposited the checks to a checking account

16   under the name, Chicken Group.

17   Q.  Supervisory Special Agent Luebke, what, if any,

18   explanation did the defendant give as to why he got

19   money from Team America Contractors?

20   A.  He said he was desperate for money and that he

21   needed the money.

22   Q.  How, if at all, did he describe his emotional

23   state at that time?

24   A.  He said he was desperate.

25   Q.  What did the defendant tell you he did as a

1    result of his financial situation?

2        A.   What he did?

3             Can you rephrase that question?

4        Q.   Sure.

5             Did the defendant approach Mr. Bedford and

6    Mr. Bertrand --

7                  MR. SIMMS:  Objection, leading.

8                  THE COURT:  Questions that suggest the

9    answer are leading.  Objection sustained.

10   BY MR. WALKER:

11       Q.   What, if anything, did the defendant do as a

12   result of his financial situation?

13       A.   He approached Mr. Bedford and Mr. Bertrand.

14       Q.   According to the defendant, who was Mr. Bertrand?

15       A.   Mr. Bertrand was an owner at Team America.

16       Q.   According to the defendant, what, if anything,

17   did he ask Mr. Bedford and Mr. Bertrand for?

18       A.   He asked them for $180,000.

19       Q.   What, if anything, did he say he planned to do

20   for Team America in exchange for that money?

21       A.   He said he was going to help them open their own

22   chicken restaurant.

23       Q.   How, if at all, did the defendant describe the

24   money he received from Team America?

25       A.   He described it as, like a loan.

1    Q.   What, if anything, did the defendant say about
2    whether he signed a loan agreement with Team America?
3    A.   He said he had not signed a loan agreement.
4    Q.   If this was a loan, what, if anything, did the
5    defendant say about whether he paid it back?
6    A.   He said he didn't pay it back.
7    Q.   What, if anything, did the defendant say about
8    whether he was ever asked to pay it back?
9    A.   He said he was never asked to pay it back.
10   Q.   What, if anything, did the defendant say about
11   where he picked up the checks?
12   A.   He would pick them up from Team America's office
13   in Manassas, Virginia.
14   Q.   Supervisory Special Agent Luebke, earlier you
15   testified that the defendant told you that the money he
16   received was a loan.
17        Regarding this money the defendant claimed was a
18   loan, was there ever a loan agreement signed at any
19   point during the time Team America was providing him
20   money, to your knowledge?
21             MR. SIMMS:  Objection, asked and answered.
22             THE COURT:  Overruled.
23             THE WITNESS:  Not that I'm aware of.
24   BY MR. WALKER:
25   Q.   Supervisory Special Agent Luebke, over the course

1   of this investigation, what, if any, search warrants

2   were executed by you and the other case agents?

3       A.   We conducted four search warrants in March of

4   2013.  We executed a search warrant on Mr. Conrad's

5   residence.  We executed a search warrant at

6   Mr. Bedford's residence.  And we executed search

7   warrants at two location offices for Team America, both

8   which were in Manassas, Virginia.

9       Q.   What, if any, electronic evidence did you and the

10  other case agents seize from those locations?

11      A.   We seized laptops.  We seized servers.  We -- we

12  received -- we seized a lot of digital evidence.

13      Q.   To your knowledge, approximately how much data

14  did you collect from those search warrants?

15      A.   Over three terabytes of data.

16      Q.   In that over three terabytes of data that you

17  seized, what, if any, evidence did you find of a loan

18  agreement between the defendant and James Bedford?

19      A.   We found none.

20      Q.   Regarding the money the defendant claimed Team

21  America loaned him, what, if any, evidence did you find

22  of a loan agreement between The Chicken Place and any of

23  the businesses owned by James Bedford?

24      A.   None.

25      Q.   What, if any, promissory notes did you find?

1    A.   None.

2    Q.   What, if any, lien documentation did you find?

3    A.   None.

4    Q.   What, if any, interest notes did you find?

5    A.   None.

6    Q.   What, if any, evidence of a repayment schedule

7    did you find?

8    A.   None.

9    Q.   What, if any, evidence did you find that the

10   defendant paid any of the money back?

11   A.   We found no evidence.

12   Q.   In addition to the evidence you obtained from the

13   search warrant, what, if any, documents did you subpoena

14   from Team America?

15   A.   We subpoenaed documents from Team America.  We

16   also subpoenaed their, you know, digital evidence as

17   well.

18   Q.   Can you describe the volume of evidence you

19   received from the subpoena to Team America?

20   A.   We received approximately seven boxes of physical

21   documents from Team America, as well as a portable hard

22   drive containing data.

23   Q.   Did you and the other case agents review those

24   documents?

25   A.   Yes.

1    Q.   In those subpoena returns, what, if any, evidence
2    did you find of a loan agreement between the defendant
3    and James Bedford?

4    A.   None.

5    Q.   In those subpoena returns, what, if any, evidence
6    did you find of a loan agreement between The Chicken
7    Place Express and any of the businesses owned by James
8    Bedford?

9    A.   None.

10   Q.   What, if any, promissory notes did you find?

11   A.   None.

12   Q.   What, if any, lien documentation did you find?

13   A.   None.

14   Q.   What, if any, interest notes did you find?

15   A.   None.

16   Q.   What, if any, evidence of a repayment schedule
17   did you find?

18   A.   None.

19   Q.   What, if any, evidence did you find that the
20   defendant paid any of the money back?

21   A.   We didn't find any.

22   Q.   Supervisory Special Agent Luebke, were you and
23   the other case agents able to review e-mails during the
24   investigation?

25   A.   Yes, we were.

1    Q.   What sources of e-mails did you review?

2    A.   We received e-mails from the Department of

3    Commerce.  We received Mr. Conrad's e-mails.  We

4    reviewed his e-mails.  We reviewed other employees at

5    the Department of Commerce.  We also reviewed e-mails of

6    employees at Team America.

7    Q.   The e-mails you obtained from the Department of

8    Commerce, did those include the defendant's work

9    e-mails?

10   A.   Yes.

11   Q.   How many e-mails did you receive from the sources

12   you just mentioned?

13   A.   Thousands.

14   Q.   In the thousands of e-mails you collected, what,

15   if any, evidence of a loan agreement between the

16   defendant and James Bedford did you find?

17   A.   None.

18   Q.   What, if any, evidence did you find of a loan

19   agreement between The Chicken Place Express and any of

20   the businesses owned by James Bedford?

21   A.   None.

22   Q.   What, if any, promissory notes did you find?

23   A.   None.

24   Q.   What, if any, lien documentation did you find?

25   A.   None.

1    Q.   What, if any, interest notes did you find?

2    A.   None.

3    Q.   What, if any, evidence of a repayment schedule

4    did you find?

5    A.   None.

6    Q.   What, if any, evidence did you find that the

7    defendant paid any of the money back?

8    A.   We didn't find any.

9    Q.   Supervisory Special Agent Luebke, during your

10   interview, what, if anything, did the defendant say

11   about Team America doing work at his basement?

12   A.   He said that they finished his basement at his

13   residence.

14   Q.   According to the defendant, who sent Team America

15   workers over to his basement?

16   A.   Glen Bertrand.

17   Q.   What, if anything, did the defendant say about

18   whether he paid Team America for the work done on his

19   basement?

20   A.   He said he didn't pay for any of the work done by

21   Team America.

22           MR. WALKER:   Nothing further, Your Honor.

23                    CROSS-EXAMINATION

24   BY MR. SIMMS:

25   Q.   Good afternoon.

1    A.   Good afternoon.

2    Q.   Agent -- I just want to make sure I'm pronouncing

3  your last name right:  Luebke?

4    A.   Luebke.

5    Q.   Luebke.  Okay.

6         Agent Luebke, you just testified to, during your

7  discussion, my client talked about him being in

8  financial distress, right?

9    A.   Correct.

10   Q.   And this was in 2013?

11   A.   The interview was conducted in 2013, yes.

12   Q.   Okay.  When he said he was in financial distress,

13 was he referring to 2013 or 2011?

14   A.   I assumed he was talking about 2010 and 2011.

15   Q.   Okay.  Was it clearly established or you don't

16 know?

17   A.   In context, yes.

18   Q.   Okay.  And a part of being in financial distress

19 is basically being in debt, right?

20   A.   Yes.  I'm familiar with that.

21   Q.   Okay.  And being in debt is when you borrow money

22 from people and don't pay them back, right?

23   A.   Can you repeat that question?

24   Q.   Part of being in debt is when you borrow money

25 from people and you don't pay it back; is that what a

1  debt is?

2      A.  I don't think that's a proper definition of

3  "debt."  I mean, it's something you owe to someone else,

4  money that you owe to another individual, company, or

5  entity.

6      Q.  Okay.

7      A.  Rather, if you pay it back, it's that person's

8  decision to pay it back or not.

9      Q.  Right.

10         So, basically, you did a financial analysis of

11  Mr. Conrad's records, right?

12     A.  I reviewed his financial records.  I didn't --

13  I'm not the one who did the financial analysis of his

14  financial records.

15     Q.  Okay.  So is it safe to say that he owed a lot of

16  people money?

17     A.  I would -- I would say he owed people money.  I

18  wouldn't say how many people he owed, but he did owe

19  people money.

20     Q.  Okay.  Now, you testified that during the search

21  warrant, you recovered three terabytes of data from

22  Mr. Conrad's home, correct?

23     A.  No.  In total, we recovered three terabytes of

24  data.

25     Q.  Okay.  But you recovered laptops and computers

1   and phones from Mr. Conrad's home, correct?

2      A.   I believe we recovered several computers, several

3   laptops, and, I believe like one or two phones.

4      Q.   Did he attempt to stop you?

5          Did he attempt to stop you from taking those

6   items?

7      A.   We had a search warrant for his residence.

8      Q.   Did he show you where the items were at?

9      A.   I was not physically present for the search

10  warrant done at his residence.  I was at Mr. Bedford's

11  residence during the execution of that search warrant.

12     Q.   So all the stuff you just testified to about,

13  what was seized, wasn't --

14     A.   No --

15     Q.   -- based upon you being there?

16     A.   -- I reviewed all the data that was seized from

17  the search warrants.  I just was not physically present

18  during the execution of the search warrant at his

19  residence.

20     Q.   Okay.

21     A.   Ultimately, I reviewed all that evidence, after

22  the fact.

23     Q.   Okay.  So, let's talk about that evidence you

24  reviewed.  The government was asking you about any

25  evidence of promissory notes, loan schedules, things of

1  that nature, and you said you didn't see any evidence of

2  that, right?

3      A.   Of -- between Mr. Conrad and Team America,

4  Mr. Bedford and Mr. Bertrand, yes.

5      Q.   Okay.  You also didn't see any documentation of

6  an agreement for Mr. Conrad to get government contracts

7  for Team of (sic) America or Bedford Images, did -- did

8  you?

9      A.   What was that question again?

10     Q.   Did you see any documentation of Mr. Conrad

11 agreeing to get government contracts for Team of America

12 if they paid him money?

13     A.   No.

14     Q.   You also didn't see any e-mails or any

15 documentation from Team of America or Bedford Images

16 thanking Mr. Conrad for getting them government

17 contracts, did you?

18     A.   No.

19     Q.   Did you see any documentation of Mr. Conrad

20 requesting money from Team of America or Bedford Images

21 for getting government contracts?

22     A.   Well, that's kind of a two-part question.

23     Q.   Did you see documentation of Mr. Conrad asking

24 for payment from Team of America because he got them a

25 contract?

1      A.   Well, I saw documentation regarding Mr. Conrad
2   getting -- providing invoices to Team America to get
3   money.
4      Q.   Okay.  So, let's talk about that.  On that
5   invoice -- on that invoice, did he write, "Hey, James,
6   this is for that contract I got you five months ago"?
7      A.   No.
8      Q.   Now, when you interviewed Mr. Conrad in 2013, he
9   was no longer with the Department of Commerce, was he?
10     A.   At that time, no.
11     Q.   He told you he resigned, right?
12     A.   I believe he said he -- I'm not sure if he said
13  that.  I would have to refer to my --
14     Q.   Well, you're the supervisory agent on this case,
15  right?
16     A.   Yes.
17     Q.   You've been sitting in trial because you're the
18  lead agent.
19          What's your understanding of how Mr. Conrad came
20  to leave the Department of Commerce?
21     A.   I understood that he resigned from the Department
22  of Commerce.  Whether we discussed it that day during
23  the interview, I'm not sure if he told that to me or if
24  I already knew that --
25     Q.   Okay.

1    A.   -- during the interview.

2    Q.   And based upon your investigation, Mr. Conrad

3  resigned because of conflict -- conflict of interest,

4  correct?

5              MR. WALKER:  Objection, Your Honor.  Calls

6  for speculation.

7              THE COURT:  Sustained.

8  BY MR. SIMMS:

9    Q.   Do you know why Mr. Conrad resigned from the

10  Department of Commerce?

11    A.   He simply resigned.  I don't know why he

12  resigned, but he resigned.

13    Q.   Okay.  During your discussions with Mr. Conrad in

14  2013, he asked you to give him a lie detector test,

15  didn't he?

16    A.   I don't recall that.

17    Q.   Did you have the opportunity to review interviews

18  conducted with James Bedford?

19    A.   Yes.

20    Q.   And you would agree with me that throughout the

21  various interviews, Mr. Bedford changed his story

22  several times.

23              MR. WALKER:  Objection, Your Honor.

24  Hearsay.

25              THE COURT:  Sustained.

1  BY MR. SIMMS:

2      Q.  Agent Luebke, I'm not going to ask you what

3  Mr. Bedford said, but did his story stay consistent

4  during each respective interview?

5              MR. WALKER:  Objection, Your Honor.  Calls

6  for hearsay.

7              THE COURT:  Sustained.

8  BY MR. SIMMS:

9      Q.  Did you question Mr. Bedford about invoices that

10 he submitted to Tridea?

11     A.  Yes, I did.

12     Q.  And do you recall when that interview was?

13     A.  I interviewed him that day of the search warrant

14 back in September 2013.

15     Q.  And during that interview -- you interviewed him

16 on -- in 2013.

17     A.  What was your question?

18     Q.  I said:  During that interview in 2013, did he

19 say anything about bribe payments to Mr. Conrad?

20              MR. WALKER:  Objection, Your Honor.  Calls

21 for hearsay.

22              MR. SIMMS:  Your Honor, it's not being

23 admitted for the truth of the matter asserted.

24              THE COURT:  Well, one person can't testify

25 what someone said outside of court.

1                    Objection sustained.

2    BY MR. SIMMS:

3       Q.   When was the first date that Mr. Bedford -- I'm

4    asking for a date here.

5            When was the first date that Mr. Bedford said

6    anything about receiving a bribe payment or giving a

7    bribe payment to Mr. Conrad?

8       A.   I would say when he was interviewed in 2016.

9       Q.   And that's four years after his initial

10   interview?

11      A.   This is -- that's what I know from others.  I

12   wasn't physically there for the interview of Mr. Bedford

13   in 2016.

14      Q.   Okay.  When was his first interview?

15      A.   2013.

16      Q.   His first interview was 2013?

17           Okay.  So three years --

18      A.   With me, it was 2013.

19      Q.   Okay.  When was his first interview with your

20   agency?

21      A.   With my agency?

22      Q.   Yes.

23      A.   2013.

24      Q.   Okay.  So, three years after the initial

25   interview with your agency was the first time that you

1   brought up bribe payments to Mr. Conrad?

2              MR. WALKER:  Objection, Your Honor.

3   Hearsay.

4              THE COURT:  Sustained.

5   BY MR. SIMMS:

6       Q.   Were you present for Mr. Bedford's plea hearing?

7       A.   Um, I don't believe I was present for his plea

8   hearing.

9       Q.   Okay.  Did it happened in 2016?

10      A.   Yes.

11      Q.   And how long --

12      A.   Actually, I think I was present.  Now I remember.

13      Q.   You were there?

14      A.   Yes.  I recall now.

15      Q.   Okay.  And how long after your interview with

16  Mr. Bedford in 2016 was it that he pled guilty?

17      A.   I think five or six months later.

18      Q.   And it was also during that interview in 2016

19  that you all confronted him again with those inflated

20  invoices, correct?

21      A.   I wasn't present for that interview in 2016.  I

22  was -- I was not in the country at that time.  I was out

23  of the country.

24      Q.   Now, you testified to checks being written out to

25  CPE?

1    A.   Yes.

2    Q.   Okay.  Those checks were deposited into

3  Mr. Conrad's account, right?

4    A.   Well, accounts controlled by Mr. Conrad, yes.

5    Q.   Okay.  They weren't -- any money he received from

6  Bedford Images and Team of America wasn't in cash; it

7  was checks.

8    A.   Correct.

9    Q.   Okay.  Checks deposited into an account

10  controlled by him, right?

11    A.   Correct.

12    Q.   That allowed your agency to easily find the check

13  numbers and the amounts, right?

14    A.   Well, once we determined -- we were able to

15  eventually learn of the bank accounts and we were able

16  to subpoena those bank records and then obtain those

17  checks.  It's a little bit of a lengthy process.

18    Q.   But it was -- it was there.  The checks were

19  there.  You could see the checks written out.  That's

20  how you got the -- the government got the checks that

21  were presented as evidence today, right?

22    A.   Right.  We got them through bank subpoenas, yes.

23    Q.   Okay.  Now, when you interviewed Mr. Conrad in

24  2013 at the Foster Grill, you stated that you asked him,

25  "What did you do to get paid for these invoices?"

1      And you said that his response was, "I didn't do
2  anything," right?

3      A.   Correct.

4      Q.   But he told you that these were loans, loan
5  payments from Bedford Images and Team of America, right?

6      A.   He -- the story kind of changed.  Initially it's
7  for a restaurant.  It's a loan.  He never definitively
8  said what it was for.  His story kind of changed.

9      Q.   Like a loan/investment?

10     A.   Right, either a loan/investment -- yes.

11     Q.   And he did talk to you about providing work -- or
12  assisting Mr. Bedford and Mr. Bertrand in opening a
13  restaurant?

14     A.   He didn't say about performing any work.  He had
15  mentioned that he was -- in exchange for the money he
16  was going to help them open a chicken restaurant.
17  Whether that ever happened or not, he didn't say that.

18     Q.   And he at no point during the interview said that
19  he was receiving money from Bedford and Bertrand because
20  he had gotten them government contracts.

21     A.   No.

22          MR. SIMMS:  Thank you.

23          No further questions.

24          MR. WALKER:  Your Honor, may the witness be
25  excused?

1          THE COURT:  Yes.

2          (Thereupon, the witness withdrew from the

3  stand.)

4          MR. BURKE:  Your Honor, at this time the

5  government has a stipulation it would like to read into

6  the record.

7          THE COURT:  All right.

8          Ladies and gentlemen, a stipulation is an

9  agreement by the lawyers as to the state of evidence

10  that you must consider in weighing the evidence in the

11  case.  So, it's an agreement about what the facts may

12  be.

13          MR. BURKE:  Your Honor, the stipulation in

14  question is marked as Government Exhibit 201.

15          THE COURT:  All right.

16          MR. BURKE:  And the stipulation provides --

17          THE COURT REPORTER:  I'm sorry.

18          THE COURT:  At the podium, please.

19          MR. BURKE:  Oh.

20          Your Honor, the stipulation is marked as

21  Government Exhibit 201, and the stipulation provides:

22          The undersigned parties agree and stipulate

23  that beginning in or around 2003, and continuing through

24  on or about October 28, 2011, the defendant, Raushi J.

25  Conrad, was an employee of the United States Department

1    of Commerce, and therefore a public official within the

2    meaning of 18 United States Code Section 201.

3              Signed by the defendant and his counsel, and

4    signed by counsel for the government.

5              And, Your Honor, the government offers into

6    evidence Government Exhibit 201, the written

7    stipulation.

8              THE COURT:  Received.

9              MR. BURKE:  Your Honor, the government calls

10   Showlatha Johnson.

11             MR. HENDRICK:  Please face the clerk and

12   raise your right hand.

13             (Witness sworn.)

14             THE WITNESS:  Yes.

15             THE CLERK:  Thank you.

16             Have a seat, please.

17             THE COURT:  You may proceed.

18             THEREUPON, SHOWLATHA JOHNSON, having been

19   duly sworn, testified as follows:

20                    DIRECT EXAMINATION

21   BY MR. BURKE:

22   Q.  Good afternoon, ma'am.

23       Could you tell us your name, please.

24   A.  Showlatha Johnson.

25   Q.  Could you spell your name, ma'am.

1    A.   S-h-o-w-l-a-t-h-a, J-o-h-n-s-o-n.

2    Q.   Ms. Johnson, where do you work?

3    A.   The Federal Bureau of Investigation.

4    Q.   And what is your position within the FBI?

5    A.   A forensic accountant.

6    Q.   How long have you worked for the FBI?

7    A.   A little over 13 years.

8    Q.   Could you briefly describe your duties as a

9    forensic accountant with the FBI?

10   A.   I review and analyze financial documents for

11   investigations.

12   Q.   Ms. Johnson, were you asked to review and analyze

13   and summarize financial records and transactional

14   records as a part of this investigation?

15   A.   Yes.

16   Q.   Now, if I could ask the court security officer to

17   please hand to you now Government's Exhibits 601, 602,

18   603, 604, and 605.

19        Ms. Johnson, do you have 601 in front of you?

20   A.   Yes.

21   Q.   What is Government Exhibit 601?

22   A.   It's a listing of things of value to and for the

23   benefit of Raushi J. Conrad.

24   Q.   Who prepared Government Exhibit 601?

25   A.   I did.

1      Q.   And could you describe for us what it is that's

2   being summarized?

3      A.   The top part of the chart is a listing of checks

4   from Team America Contractors to The Chicken Place

5   Express.  And the bottom part is the listing of

6   renovation work at Raushi Conrad's residence.

7      Q.   What types of records did you review in order to

8   prepare Government Exhibit 601?

9      A.   Bank statements, canceled checks, deposit

10  records, and invoices.

11     Q.   Could you describe the volume of underlying

12  records that support the summary chart marked as 601?

13     A.   Thousands and thousands of records.

14     Q.   Would it be inconvenient to examine all those

15  records here in court?

16     A.   Yes.

17     Q.   Does Government Exhibit 601 fairly and accurately

18  summarize the underlying records that you reviewed?

19     A.   Yes.

20          MR. BURKE:  Your Honor, we move to admit and

21  to publish Exhibit 601.

22          THE COURT:  Received.

23          You may publish.

24          MR. BURKE:  Thank you.

25  BY MR. BURKE:

1    Q.  Ms. Johnson, let's focus for a moment on the top
2   half of the chart that's marked as 601.
3        Ms. Johnson, can you -- can you describe in
4   general terms what's being summarized in the top half of
5   this chart?
6    A.  Transaction details for checks that were paid
7   from Team America Contractors' bank accounts and
8   deposited in bank accounts maintained by Raushi Conrad.
9    Q.  And the far left column that says, "Check date,"
10  could you just explain what information is listed in
11  that column?
12   A.  That would be the date on the face of each check.
13   Q.  And the checks that you've summarized here, they
14  were drawn on the accounts of what entity?
15   A.  Team America Contractors.
16   Q.  And then there's a column immediately to the
17  right that says, "Payor account."  Do you see that?
18   A.  Yes.
19   Q.  Describe for us what information is reflected in
20  that column.
21   A.  The name that appears on the account.
22   Q.  I'm sorry.  The one that says "Payor account."
23   A.  That's Team America Contractors, Inc.
24   Q.  The third column from the left is what I'm
25  talking about.

1    A.   Oh, I'm sorry.  Okay.  The third one is the
2    account number, which includes the name of the bank and
3    the last four digits of the account number.
4    Q.   So, how many different accounts did you find
5    where there were checks going from Team America to the
6    defendant?
7    A.   Two.
8    Q.   Then there's a column that's, I guess, the fourth
9    from the far right, where the header is "Payee."  Can
10   you describe what we see there in the "Payee"?
11   A.   The name that appears on each check.
12   Q.   And what was the name you found on each check?
13   A.   CPE.
14   Q.   Ma'am, now, the title of this chart is "Things of
15   Value to or for the Benefit of Raushi J. Conrad."
16        How is it that you were able to identify these
17   checks as going to the defendant, based on your review
18   of the records?
19   A.   Because the checks were deposited into accounts
20   maintained by Raushi Conrad.
21   Q.   And when you say "maintained," what do you mean
22   by that?
23   A.   He is listed as the account holder and signatory.
24   Q.   Were the account where these checks were
25   deposited accounts in the defendant's name?

1    A.   No.  They were in the name of The Chicken Place

2    Express, and one account was Chicken Place Group.

3    Q.   And so then how is it -- how is it that you were

4    able to determine the defendant was associated with

5    those accounts?

6    A.   His name is on the signature card for the

7    account.

8    Q.   And where is that information listed on your

9    chart?

10   A.   Under the account titled "Receiving Account

11   Signatories."

12   Q.   Now, ma'am, let's just look at the very top row

13   of this chart.  There is an entry there for a check on

14   November 12th, 2010, for $18,000.  Do you see that

15   entry?

16   A.   Yes.

17   Q.   And immediately to the right of the dollar figure

18   there's a column that says "GX."  Could you explain to

19   the jury what information is reflected in that column

20   that says "GX"?

21   A.   The government exhibit numbers where the

22   supporting documentation is located for the items.  On

23   the first row, the GX 21-1 would be the $18,000 check

24   from the payor account.  The bottom number, GX 05, would

25   be the financial documents for the receiving account,

1  which includes the back statements and the deposit

2  records.

3      Q.  So, if the jury wanted to double-check the

4  accuracy of your chart, where could they find the

5  underlying records?

6      A.  In the government exhibit numbers located in the

7  column to the right of each amount.

8      Q.  Why is it that there are two government exhibits

9  numbers listed for each entry on your chart?

10     A.  One for the paying account and one for the

11  receiving account.

12     Q.  Ms. Johnson, in your review of the financial

13  records, in total, how many checks did you find from

14  Team America to accounts controlled by the defendant?

15     A.  Eight.

16     Q.  For a total value of how much money?

17     A.  $208,000.

18     Q.  If we could focus now on the bottom half of your

19  chart.  What information is summarized in the bottom

20  half of your chart?

21     A.  Renovation work that was done at Raushi Conrad's

22  residence.

23     Q.  And what type of documentation did you review in

24  creating the -- the information that we see in this

25  bottom half of the chart?

1    A.    Invoices, bank statements and canceled checks.

2    Q.    How many invoices did you find, based on your

3    review of the records, for work done on the defendant's

4    house?

5    A.    Four.

6    Q.    And, in total, what was the value of those

7    invoices?

8    A.    $7,821.75.

9    Q.    So, in total, in your review of the financial

10   records, how many -- what's the total dollar value of

11   things of value you identified going to the defendant?

12   A.    $215,821.75.

13   Q.    If I could ask you to turn now to Government

14   Exhibit 602.

15         Ms. Johnson, do you have Government Exhibit 602

16   in front of you?

17   A.    Yes.

18   Q.    What is Government Exhibit 602?

19   A.    Payments from Tridea Works to Bedford's Images

20   for data migration.

21   Q.    Who prepared Government Exhibit 602?

22   A.    I did.

23   Q.    Can you describe the types of records and

24   documentation you reviewed in preparing 602?

25   A.    Bank statements, deposit records, canceled

1  checks, and invoices.

2      Q.  What is the volume of underlying records that you

3  reviewed in preparing Government Exhibit 602?

4      A.  Thousands and thousands of records.

5      Q.  And, ma'am, would it be inconvenient to examine

6  all of those records here in court?

7      A.  Yes.

8      Q.  Does Government Exhibit 602 fairly and accurately

9  summarize the underlying records you reviewed?

10     A.  Yes.

11         MR. BURKE:  Your Honor, the government moves

12  to admit and to publish Government Exhibit 602.

13         THE COURT:  602 will be received.  You may

14  publish it.

15         MR. BURKE:  Thank you, Your Honor.

16  BY MR. BURKE:

17     Q.  Ms. Johnson, for the transactions that we see

18  listed in Government Exhibit 602, describe for us what

19  it -- well, let me ask it this way, Ms. Johnson:  Can

20  you describe for us what types of transactions we see

21  here in Exhibit 602?

22     A.  These are all the financial details for checks

23  that were paid from accounts maintained in the name of

24  Tridea Works and deposited into accounts maintained in

25  the name of Bedford's Images.

1    Q.   Now, let's look for a moment -- there are two
2    columns on your -- on your chart, Exhibit 602, right
3    next to each other.  One is labeled "Check Amount" and
4    the other is labeled "Amount for Data Migration."  Do
5    you see those two check -- those two columns?
6    A.   Yes.
7    Q.   Let's start with the column that says, "Check
8    Amount."  What information is listed in the "Check
9    Amount" column?
10   A.   The amount that was on the face of the check
11   drawn on the account in the name of Tridea Works.
12   Q.   And these were all checks from Tridea Works made
13   payable to what entity?
14   A.   Bedford's Images.
15   Q.   Then the column immediately to the right of that,
16   the heading is, "Amount for Data Migration."  Do you see
17   that?
18   A.   Yes.
19   Q.   And, ma'am, could you explain why it is that
20   sometimes the number is the same and sometimes it's
21   different?
22   A.   Because the invoices -- the checks were used to
23   pay for multiple invoices in some cases, and the amount
24   that's listed under the data migration column is the
25   amount that was included on the invoice for data

1    migration work.

2       Q.   All right.  So, let's look at the third entry as

3    an example, the check on December 7, 2010, for $518,000.

4    Do you see that?

5       A.   Yes.

6       Q.   Your chart here lists a check amount of 518,000,

7    but the amount for data migration is approximately

8    424,000.

9         Walk us through how it was that you go from the

10   amount on the face of the check to the amount that

11   you've isolated as revenue from data migration.

12      A.   In this instance, there would have been more than

13   one invoice, and the invoice that's listed, 1684, on the

14   same line under the column title "Bedford's Images

15   Invoices," is the invoice that included the total

16   $424,000 as data migration work.

17        The other invoice would have include services

18   that were not for data migration work, so it would not

19   have been included in the amount that's under the

20   "Amount for Data Migration."

21      Q.   So, this is an instance in which there was a

22   check from Tridea Works to pay multiple invoices from

23   Bedford's Images?

24      A.   Yes.

25      Q.   And only some of those invoices related to data

1   migration?

2       A.   Yes.

3       Q.   So, the figure we see in the "Amount for Data

4   Migration" includes only revenue related to data

5   migration work.

6       A.   That's correct.

7       Q.   Ms. Johnson, based on your review of the

8   financial records, in total, how much revenue did

9   Bedford's Images receive under the data migration

10  contract?

11      A.   $1,138,724.14.

12      Q.   And, ma'am, again, you've got a column in this

13  chart that's marked "GX."  What's listed in that -- in

14  that column?

15      A.   The supporting documentation for the

16  transactions.  The top number would be the check and the

17  check stub for the paying account.  The GX 06 numbers

18  are the invoice numbers.  And the last line item would

19  be the bank statements and deposit records for the

20  receiving account in the name of Bedford's Images, Inc.

21      Q.   So if the jury wanted to double-check your work,

22  they could do so by reviewing those exhibits?

23      A.   Yes.

24      Q.   Ma'am, could you turn now to Government

25  Exhibit 603.

1      Ms. Johnson, 602 that we just looked at tracked
2  the flow of revenue from Tridea Works to Bedford's
3  Images.  After the data migration revenue was received
4  into the Bedford's Images account, what, if anything,
5  did you find about what happened to that revenue?
6      A.   On the same day or within days of the deposits of
7  the check from Tridea Works, Bedford's Images issued
8  checks to Team America Contractors.
9      Q.   Do you have 603 in front of you?
10     A.   Yes.
11     Q.   And what is Government Exhibit 603?
12     A.   This exhibit includes financial details for the
13 checks issued from Bedford's Images bank account to
14 account -- to Team America Contractors and the details
15 for the deposits of those checks into accounts
16 maintained in the name of Team America Contractors.
17     Q.   So is this tracing the revenue from Team
18 America -- the data migration from Team America on to
19 Team -- I'm sorry -- from Bedford's Images on to Team
20 America?
21     A.   Yes.
22     Q.   What -- what types of documentation and records
23 did you review in preparing Government Exhibit 603?
24     A.   Bank statements, deposit records, and canceled
25 checks.

1    Q.   Could you describe the volume of the underlying

2    records?

3    A.   Thousands and thousands of records.

4    Q.   Would it be inconvenient to review all of those

5    records here in court?

6    A.   Yes.

7    Q.   Does Government Exhibit 603 fairly and accurately

8    summarize the underlying records that you reviewed?

9    A.   Yes.

10        MR. BURKE:  Your Honor, we move to admit and

11   publish 603.

12        THE COURT:  603 will be received.  You may

13   publish it.

14   BY MR. BURKE:

15   Q.   Ms. Johnson, let's -- let's -- I would like you

16   to walk through the two columns that say "Check Amount"

17   and then "Portion Attributable to Data Migration

18   Invoices."  Do you see those two columns?

19   A.   Yes.

20   Q.   Okay.  First of all, explain to us what

21   information is listed in the "Check Amount" column.

22   A.   That's the amount that was on the face of each

23   check.

24   Q.   And these are checks coming from what entity?

25   A.   Bedford's Images.

1    Q.   Made payable to who?

2    A.   Team America Contractors.

3    Q.   And then immediately to the right of that, you

4    have a column that says, "Portion Attributable to Data

5    Migration Invoices."  Do you see that?

6    A.   Yes.

7    Q.   Walk us through how it was that you converted or

8    determined the portion of the revenue that was

9    attributable to data migration.

10   A.   Based on initial invoices issued from Bedford's

11   Images to Tridea Works for payments.

12   Q.   And did you pro rate the amounts?

13   A.   In three cases, the amounts were pro rated.

14   Q.   In total, how much did you determine -- how much

15   of the revenue -- data migration revenue did you

16   determine was forwarded on from Bedford's Images to Team

17   America?

18   A.   $866,316.55.

19   Q.   Ms. Johnson, could you turn now to Government

20   Exhibit 604.

21        Ms. Johnson, what is Government Exhibit 604?

22   A.   The computation of project revenue -- data

23   migration project revenue and cost for Bedford's Images.

24   Q.   Who prepared Government Exhibit 604?

25   A.   I did.

1    Q.   What types of records and documentation did you

2    review in preparing Exhibit 604?

3    A.   Bank statements, canceled checks, invoices --

4    Q.   What was the volume -- I'm sorry.  Go ahead.

5    A.   -- time reports and Forms 1099 miscellaneous for

6    nonemployee compensation.

7    Q.   What was the volume of underlying records you

8    reviewed in preparing Exhibit 604?

9    A.   Thousands and thousands of records.

10   Q.   Would it be inconvenient to review all that here

11   in court?

12   A.   Yes.

13   Q.   Does Exhibit 604 fairly and accurately summarize

14   the underlying records you reviewed?

15   A.   Yes.

16            MR. BURKE:  Your Honor, we move to admit and

17   to publish 604.

18            THE COURT:  604 will be received.  You may

19   publish it.

20   BY MR. BURKE:

21   Q.   So, Ms. Johnson, let's focus on the top half of

22   this chart here.  What information did you summarize

23   here in the top half of Exhibit 604?

24   A.   The total revenue from the data migration

25   contract.

1   Q.   And what -- how did you calculate the total data

2   migration revenue?

3   A.   I used the invoices that were issued to

4   Tridea Works from Bedford's Images for data migration

5   project.

6   Q.   And how, if at all, does this information relate

7   to the revenue figures we saw in Exhibit 602?

8   A.   It's exactly the same.

9   Q.   So, the bottom -- bottom line number for revenues

10  is the same?

11  A.   Yes.

12  Q.   Is the information arranged in a slightly

13  different way?

14  A.   Yes.

15  Q.   Explain to the jury how the format differs in

16  this chart.

17  A.   The other exhibit concentrated on payments from

18  the receiving -- from the paying accounts to the

19  receiving account.  This presents the information using

20  the invoices.

21  Q.   Did you come to the exact same total?

22  A.   Yes.

23  Q.   Now, looking to the bottom half of your chart --

24           MR. BURKE:  If we could blow that up,

25  Ms. Sandvig.

1    BY MR. BURKE:

2       Q.   -- could you explain for the jury what

3    information you summarize here in the bottom half of

4    Exhibit 604?

5       A.   The costs associated with the data -- data

6    migration project, which included payments to

7    contractors in 2010 and 2011, and a PDF conversion

8    software purchase.

9       Q.   In your review of the -- the financial records

10   and transaction records, in total, what did you identify

11   as the out-of-pocket costs incurred by Bedford's Images?

12      A.   $59,563.12.

13      Q.   And did you then calculate the profit to

14   Bedford's Images?

15      A.   Yes.

16      Q.   And how did you calculate the profit?

17      A.   By subtracting the total out-of-pocket costs from

18   the total revenue.

19      Q.   What did you identify as the total profits earned

20   by Bedford's Images?

21      A.   $1,079,161.02.

22      Q.   Ms. Johnson, with the assistance of the court

23   security officer, I would ask you to now please look at

24   Government Exhibits 4, 5, 22, and 40.

25            THE COURT:   Counsel, we'll do that right

1   after the afternoon recess now for 15 minutes.

2             Let me ask the jury to step out and let me

3   ask counsel a question, please.

4             Take the afternoon recess now for

5   15 minutes.  Thank you.

6             (Jury not present.)

7             THE COURT:  Actually, I'll resist asking any

8   questions.  We'll take a 15-minute recess now.  I'll

9   resist asking any questions.

10             (Court recessed at 3:31 p.m. and reconvened

11             at 3:48 p.m.)

12             THE COURT:  You can bring the jury out,

13   Mr. Hendrick.  Thank you.

14             MR. HENDRICK:  Yes, sir.

15             (Jury present.)

16             THE COURT:  You may be seated.

17             All right, Counsel, you may proceed.

18             MR. BURKE:  Thank you, Your Honor.

19   BY MR. BURKE:

20     Q.  Ms. Johnson, do you have Government Exhibits 4,

21   5, 22, and 40 in front of you?

22     A.  Yes.

23     Q.  Could you very briefly describe -- what is

24   Government Exhibit 4?

25     A.  Four are the bank records for The Chicken Place

1   Express, BB&T account ending in 9546, along with the

2   signature card.

3       Q.   What is Government Exhibit 5, very briefly?

4       A.   The BB&T account in the name of Chicken Place

5   Group, account number ending in 9554, with the signature

6   card.

7       Q.   If you could turn to Government Exhibit 22,

8   please.

9       A.   I'm sorry?

10      Q.   Government Exhibit 22, please.

11      A.   I have it.

12      Q.   What is Government Exhibit 22?

13      A.   It's bank records for PNC bank account ending in

14  0924, in the name of The Chicken Place Express.

15      Q.   And then, finally, Government Exhibit 40, please.

16      A.   40 is Wachovia bank account ending in 293 -- I'm

17  sorry -- bank account number ending in 2939, in the name

18  of Bedford's Images, Incorporated.

19      Q.   Ms. Johnson, did you review Government

20  Exhibits 4, 5, 22, and 40 in preparing your summary

21  charts?

22      A.   Yes.

23           MR. BURKE:  Your Honor, the government --

24  the parties have stipulated that Exhibits 4, 5, 22, and

25  40 are authentic business records.  We move to admit

1    Exhibits 4, 5, 22 and 40.

2              THE COURT:  Government's 4, 5, 22 and 40

3    will be received.  Thank you.

4    BY MR. BURKE:

5    Q.   Ms. Johnson, did you make any effort to determine

6    whether the defendant repaid or reimbursed anyone for

7    the things of value you identified in the Exhibit 601?

8    A.   Yes.

9    Q.   Could you describe for the jury what it was that

10   you did?

11   A.   I reviewed bank account records, which consisted

12   of bank statements, canceled checks and deposit records,

13   for accounts maintained by Raushi Conrad or his

14   companies, as well as Bed- -- James Bedford and his

15   companies.

16   Q.   Could you turn now to Government Exhibit 605.

17   A.   I have it.

18   Q.   Who prepared Government Exhibit 605?

19   A.   I did.

20   Q.   Could you describe for us, in general terms,

21   what's being summarized here?

22   A.   The top part of the chart are account -- accounts

23   that were maintained by Raushi Conrad, and the bottom

24   part of the chart are accounts that were maintained by

25   James Bedford.

1       And the accounts were reviewed to determine if

2  there were any payments from Raushi Conrad and his

3  companies to James Bedford and his companies.

4       Q.   Could you describe the types of records you

5  reviewed?

6       A.   Bank statements, deposit records and canceled

7  checks.

8       Q.   What was the volume of records you reviewed in

9  preparing Exhibit 605?

10      A.   Thousands and thousands of records were reviewed.

11      Q.   Did -- does Government Exhibit 605 fairly and

12 accurately summarize the records that you reviewed?

13      A.   Yes.

14           MR. BURKE:   Your Honor, the government moves

15 to admit and to publish Exhibit 605.

16           THE COURT:   605 will be received.

17 BY MR. BURKE:

18      Q.   Ms. Johnson, let's focus first on the top half of

19 your chart.   What -- what's being summarized in the top

20 half of your chart?

21      A.   Bank accounts that were maintained by Raushi

22 Conrad.

23      Q.   Just in his name?

24      A.   Some of the accounts were jointly held and some

25 were in the name of The Chicken Place Express, and one

1   is in the name of Chicken Place Group.

2       Q.   Did you also look at accounts the defendant held

3   jointly with family members?

4       A.   Yes.

5       Q.   In total, how many accounts did you review that

6   were associated with the defendant?

7       A.   Eleven.

8       Q.   And when you reviewed those accounts, those

9   eleven accounts associated with the defendant, what in

10  particular were you looking for in those accounts?

11      A.   Any checks that were made payable to James

12  Bedford, Bedford's Images, or Team America Contractors.

13      Q.   Now, the far right column in the top half of your

14  chart, what's summarized there?

15      A.   If there was evidence of any payment.

16      Q.   In reviewing the accounts associated with the

17  defendant, what, if any, evidence did you find of

18  repayment to James Bedford or any of his companies?

19      A.   I found one check paid to James Bedford for

20  $3,100, with the check date May 5, 2012.  And the check

21  memo included the words, "The hut truck."

22      Q.   Aside from that one payment of $3,100 on May 5th,

23  2012, what other evidence did you find of repayment in

24  the defendant's accounts?

25      A.   None.

1    Q.   Let's focus on the bottom half of your chart.
2    What's -- what's shown on the bottom half of your chart?
3        A.   Accounts maintained by James Bedford, either --
4        Q.   What -- go ahead.
5        A.   -- either jointly or in the names of his
6    companies, Bedford's Images and Team America
7    Contractors.
8        Q.   In total, how many accounts did you review
9    associated with James Bedford or his companies?
10       A.   Fifteen.
11       Q.   In reviewing those accounts, specifically what
12   were you looking for?
13       A.   Any deposits from Raushi -- accounts in the name
14   of Raushi Conrad, The Chicken Place Express or The
15   Chicken Place Group.
16       Q.   What evidence of repayment from the defendant did
17   you find, if any, in reviewing James Bedford's accounts?
18       A.   None.
19       Q.   Ms. Johnson, did you also review other
20   documentation to determine whether there was any
21   evidence of a loan agreement between the defendant and
22   James Bedford?
23       A.   Yes.
24       Q.   If I could ask you now to turn to Government's
25   Exhibits -- I'm sorry -- Government Exhibit 15.

1    A.   I have it.

2    Q.   Ma'am, what is Government Exhibit 15?

3    A.   It's a corporate income tax return for the year

4    2010 in the name of The Chicken Place Express.

5              MR. BURKE:  Your Honor, the parties have

6    stipulated that Government Exhibit 15 is an authentic

7    business record, and we move to admit Exhibit 15.

8              THE COURT:  Fifteen will be received.

9              MR. BURKE:  Ms. Sandvig, could you publish

10   page 4 of Exhibit 15, please.

11             And in particular, could you blow up

12   Schedule L, please.

13   BY MR. BURKE:

14   Q.   Ms. Johnson, what do we see on page 4 of

15   Exhibit 15?

16   A.   The Schedule L is a balance sheet which includes

17   balances for assets and liabilities at the beginning of

18   the tax year and at the end of the tax year.

19   Q.   Now, is a loan something that is an asset or a

20   liability?

21   A.   A liability.

22             MR. BURKE:  Ms. Sandvig, could we blow up

23   the portion of Schedule L that identifies liabilities.

24   BY MR. BURKE:

25   Q.   Ms. Johnson, could I focus your attention now on

1    line 17?

2        A.   Yes.

3        Q.   What does it say on line 17?

4        A.   "Mortgages, notes, bonds payable in less than one

5    year."

6        Q.   And how much -- how much mortgages, notes, bonds

7    payable in less than one year -- what's the dollar value

8    identified at the end of tax year 2010?

9        A.   Zero.

10       Q.   And then what's the category of liabilities in

11   line 18?

12       A.   "Other current liabilities."

13       Q.   And what's identified at the end of tax year

14   2010?

15       A.   Zero.

16       Q.   Look at line 19.  What is line 19?

17       A.   "Loans from shareholders."

18       Q.   Ma'am, are you aware of any evidence that

19   Bedford's Images was a shareholder in The Chicken Place

20   Express?

21       A.   No.

22       Q.   What is identified in line 20?

23       A.   "Mortgages, notes, bonds payable in one year or

24   more."

25       Q.   What's the amount identified in the beginning of

1    tax year 2010?

2       A.   $180,393.

3       Q.   And does this number go up or go down?

4       A.   It goes down.

5       Q.   And then, finally, what's identified on line 21?

6       A.   "Other liabilities."

7       Q.   What's the amount identified at the end of tax

8    year 2010?

9       A.   Zero.

10      Q.   Ms. Johnson, is there any other entry in this

11   Schedule L where a loan might appear?

12      A.   No.

13      Q.   Ms. Johnson, did you examine the corporate tax

14   returns for The Chicken Place Express for tax year 2011?

15      A.   No.

16      Q.   Why not?

17      A.   Because the IRS indicated there was not any

18   evidence a return was filed.

19              MR. BURKE:  Your Honor, the --

20   BY MR. BURKE:

21      Q.   Could you turn to Government Exhibit 16,

22   Ms. Johnson.

23           What is Government Exhibit 16?

24      A.   "Certification of Lack of Record."

25      Q.   From who?

1    A.   The Internal Revenue Service.

2          MR. BURKE:  Your Honor, the parties have

3    stipulated that Government Exhibit 16 is an authentic

4    business record.  We move for its admission.

5          THE COURT:  Sixteen will be received.

6          MR. BURKE:  May we publish that, Your Honor?

7          THE COURT:  Yes.

8    BY MR. BURKE:

9    Q.   Ms. Johnson, what information do we see in

10   Government Exhibit 16?

11   A.   The description of the records sought, which was

12   the 2011 United States income tax return for an

13   S-corporation filed by The Chicken Place Express for --

14   Q.   And what is certified?

15   A.   That there is not any record of that record.

16   Q.   Ms. Johnson, could you turn now to Government

17   Exhibit 3, please.

18   A.   Okay.  I have it.

19   Q.   What is Government Exhibit 3?

20   A.   United States Bankruptcy Court filing.

21   Q.   Bankruptcy filing by who?

22   A.   Raushi J. Conrad.

23         MR. BURKE:  Your Honor, the parties have

24   stipulated that Exhibit 3 is an authentic business

25   record, and we move for its admission.

1            THE COURT:  Received.

2            MR. BURKE:  May we publish the first page,

3   Your Honor?

4            THE COURT:  Yes.

5   BY MR. BURKE:

6       Q.  Ms. Johnson, can you explain what we see here in

7   Government Exhibit 3?

8       A.  It's the summary of the schedules attached in the

9   bankruptcy filing.

10      Q.  And what type of information is summarized in

11  these schedules?

12      A.  Assets and liabilities.

13      Q.  Let me ask you to turn to Schedule D, which

14  appears on page 10 of Exhibit 3.

15           What category of information is summarized in

16  Schedule D?

17      A.  "Creditors holding secured claims."

18      Q.  In Schedule D, what information, if any, did the

19  defendant identify about a loan owed to Team America

20  Contractors?

21      A.  None.

22      Q.  What information, if any, did the defendant

23  identify about a loan owed to Bedford's Images?

24      A.  Not any.

25      Q.  What information, if any, did the defendant

1   identify about a loan owed to James Bedford?

2       A.   None.

3       Q.   What information did the defendant identify, if

4   any, about a loan owed to Glen Bertrand?

5       A.   Not any.

6       Q.   Could you turn now to Schedule E, which is page

7   11.

8            What category of information is called for by

9   Schedule E?

10      A.   "Creditors holding unsecured priority claims."

11      Q.   And below that there's a box that's checked.  Do

12  you see that?

13      A.   Yes.

14      Q.   What's the information right next to the box

15  that's checked?

16      A.   "Check this box if debtor has no creditors

17  holding unsecured priority claims to report on this

18  Schedule E."

19      Q.   Could you turn now to Schedule F on page 12.

20           What category of information is called for by

21  Schedule F of the defendant's bankruptcy schedule?

22      A.   "Creditors holding unsecured nonpriority claims."

23      Q.   And what information, if any, did the defendant

24  disclose in the schedule about a loan owed to Team

25  America Contractors?

1    A.   None.

2    Q.   What information did the defendant disclose about

3    a loan owed to Bedford's Images?

4    A.   None.

5    Q.   Was there any information disclosed in this

6    schedule about a loan owed to James Bedford?

7    A.   No.

8    Q.   What information, if any, was there about a loan

9    owed to Glen Bertrand?

10   A.   Not any.

11   Q.   Ms. Johnson, have you reviewed the entirety of

12   this bankruptcy schedule?

13   A.   Yes.

14   Q.   Was there anywhere else in this schedule where

15   the defendant disclosed a loan owed to Team America?

16   A.   No.

17   Q.   How about to Bedford's Images?

18   A.   No.

19   Q.   Glen Bertrand?

20   A.   No.

21   Q.   James Bedford?

22   A.   No.

23   Q.   Could you turn now to page 19, please.

24        On page 19, what does it say with the sentence

25   that begins, "I declare..."?

1     A.   "I declare under penalty of perjury that I have

2    read the foregoing summary and schedules consisting of

3    17 sheets, and that they are true and correct to the

4    best of my knowledge, information and belief."

5     Q.   And whose name is listed next to the signature?

6     A.   Raushi J. Conrad.

7              MR. BURKE:  Nothing further, Your Honor.

8                       CROSS-EXAMINATION

9    BY MR. SIMMS:

10    Q.   Good afternoon.

11         I refer your attention back to Government's

12   Exhibit -- Government's Exhibit 3.

13             MR. SIMMS:  Ms. Sandvig, if you would pull

14   that up for me, please.  Thank you.

15   BY MR. SIMMS:

16    Q.   Now, this document that the government just went

17   through with you, is this a personal bankruptcy or a

18   corporate bankruptcy?

19    A.   Personal.

20    Q.   Okay.  And you would agree with me that the

21   checks that were written out were made out to Chicken

22   Place Express, correct?

23    A.   Yes.

24    Q.   And that's not an individual; that's a

25   corporation, right?

1    A.   Yes.

2    Q.   Okay.  I'll refer your attention now to

3    Government Exhibit 602.

4              MR. SIMMS:  If you could put that back up,

5    please.  Thank you.

6    BY MR. SIMMS:

7    Q.   And this is a chart that you prepared, a summary

8    chart, right?

9    A.   Yes.

10   Q.   Okay.  I'm going to refer your attention to the

11   top line, August 9th, 2010.

12   A.   Okay.

13   Q.   So, this is the first check that Bedford's Images

14   received from Tridea for the data migration progress --

15   program?

16   A.   Yes.

17   Q.   Okay.  So the date you have is August 9th, 2010.

18   And that check amount is for $110,000 -- $110,000 and

19   49 -- I think -- it's late afternoon.  I'm sorry.

20   A.   $110,049.92.

21   Q.   Thank you.

22        So, that was on August 9th.

23        Let me refer your attention to Novem- -- to

24   Government Exhibit 601.

25              MR. SIMMS:  Let's go to the first line.

1   BY MR. SIMMS:

2       Q.   This is listed -- listed under the chart, "Things

3   of Value to or for the Benefit of Raushi Conrad,"

4   correct?

5       A.   Correct.

6       Q.   So, you have in your summary chart, based upon

7   the records, a first payment in November on --

8   November 12th, 2010, of $18,000.

9       A.   Yes.

10      Q.   Okay.

11              MR. SIMMS:  If we can -- if we can go back

12  to 602, Government Exhibit 602.

13              If we can go down to the last payment from

14  Tridea Works.  Okay.

15  BY MR. SIMMS:

16      Q.   So this chart once again are payments that Tridea

17  Works sent to Bedford Images for the data migration

18  project, right?

19      A.   Yes.

20      Q.   Okay.  And the last check that you noted on your

21  summary chart is for June 7th, 2011.  And that payment

22  was for 11,000 dollars -- 899 dollars and 67 cents.

23      A.   Yes.

24              MR. SIMMS:  Now if we can go back to

25  Government Exhibit 601.

1            If we can go down to the last check.

2   BY MR. SIMMS:

3      Q.  Now, the previous chart showed that

4   Bedford Images received their last check from Tridea in

5   June 2011.  But under this chart you have a payment

6   still going to Mr. Conrad in August 2011, correct?

7      A.  Yes.

8      Q.  I want to refer your attention to Government

9   Exhibit 603.

10          Now, this summary chart that you prepared was for

11  payments from Bedford Images to Team of America for data

12  migration, right?

13     A.  Yes.

14     Q.  Now, Mr. Conrad didn't have access to either of

15  those accounts, did he?

16     A.  He did not.

17     Q.  Okay.  These accounts -- these accounts were

18  owned by Mr. Bedford and Mr. Bertrand, correct?

19     A.  Yes.

20     Q.  All right.

21          MR. SIMMS:  If we could go to Government

22  Exhibit 604.

23  BY MR. SIMMS:

24     Q.  And this is, once again, a summary chart that you

25  prepared based upon records, and it details Bedford

1   Images revenue and costs, correct?

2       A.   Correct.

3       Q.   Okay.  And you would agree with me that the

4   defendant had no access to this account, or didn't have

5   a signatory authority for this account, did he?

6       A.   That's correct.

7       Q.   It was Mr. Bedford that did, right?

8       A.   Yes.

9       Q.   Now, on the chart that is shown in Government

10  Exhibit 601, you detailed incremental checks that were

11  made out to CPE, right?

12      A.   Yes.

13      Q.   Okay.  Do any of those checks equal out to

14  $180,000?

15      A.   Any one check?

16      Q.   Yes.

17      A.   No.

18      Q.   Okay.  They're all smaller checks than that,

19  correct?

20      A.   Yes, yes.

21      Q.   Okay.  Did you review Mr. Bedford's tax return

22  information?

23      A.   No.

24      Q.   So, you don't know if he listed a loan to

25  Mr. Conrad on his tax return or not, do you?

1            MR. BURKE:  Objection, calls for
2  speculation.
3            MR. SIMMS:  I'm asking --
4            THE COURT:  Sustained.
5  BY MR. SIMMS:
6     Q.  Did you review Mr. Conrad's personal tax returns?
7     A.  I want to say one.
8     Q.  Okay.  And which year was that?
9     A.  2010.
10    Q.  Okay.  And you would agree with me ---so you
11 didn't review 2011?
12    A.  I don't think I did.
13           MR. SIMMS:  Let's go back to Government
14 Exhibit 601.
15 BY MR. SIMMS:
16    Q.  How many checks, written out, were made out in
17 2011?
18    A.  From Team America to CPE?
19    Q.  Yes.
20    A.  Eight.
21    Q.  And how many were in 2010?
22    A.  Oh, I'm sorry.  You said 2011?
23    Q.  Yes.  How many were made out in 2011?
24    A.  Six.
25    Q.  Okay.  And how many were made out in 2010?

1    A.  Two.

2    Q.  The payment that you noted from Mr. Conrad to

3  Mr. Bedford for "the hut truck" --

4    A.  Yes.

5    Q.  -- did your investigation reveal that that was a

6  food truck?

7              MR. BURKE:  Objection, calls for

8  speculation.

9              MR. SIMMS:  It's based upon her

10  investigation.

11              THE COURT:  Overruled.

12              You can answer.

13              THE WITNESS:  I just looked at the check.

14  BY MR. SIMMS:

15    Q.  Okay.  You didn't -- okay.  You didn't do any

16  further research?

17    A.  No.

18    Q.  Okay.  Did you review any loan documents or

19  leases that Mr. Bedford would have taken out for a

20  restaurant?

21    A.  Leases for space that he rented.

22    Q.  A space that he rented?

23    A.  I'm sorry.  Mr. Conrad, not Bedford.

24    Q.  Okay.

25    A.  You said Mr. Bedford, right?

1    Q.   Yes.

2    A.   Yeah.  I didn't review any loan documents for

3    Mr. Bedford.

4    Q.   Okay.

5         THE COURT:  If you can get a little closer

6    to the microphone.  I'm having a little trouble hearing

7    you.

8         THE WITNESS:  Oh, I'm sorry.

9         THE COURT:  Thank you.

10   BY MR. SIMMS:

11   Q.   You said you didn't review any leases for --

12   A.   Repeat the question, please.

13   Q.   Did you review any leases that Mr. Bedford would

14   have signed for restaurants?

15   A.   No.

16   Q.   You didn't look -- you didn't look for them?

17   A.   No.

18   Q.   Okay.  How about Mr. Bertrand; did you look for

19   them?

20   A.   No.

21   Q.   Okay.  Did you review Mr. Bertrand's tax records?

22   A.   No.

23   Q.   How were you able to find the checks made out to

24   CPE?

25   A.   Using the bank statements and supporting

1    documents that came with the bank statements, the

2    canceled checks.

3        Q.   Okay.  And Mr. Conrad was a signatory on those

4    accounts, right?

5        A.   The accounts that deposited --

6        Q.   Yes.

7        A.   Yes.

8        Q.   Okay.  And were all of the checks deposited into

9    the same account?

10       A.   I don't think so.

11       Q.   Okay.

12       A.   A few -- do you want to put the exhibit back up?

13       Q.   Yes.

14            MR. SIMMS:  You can put up Government

15   Exhibit 601 again.  Thank you.

16            THE WITNESS:  No.  They went into three

17   different accounts.

18   BY MR. SIMMS:

19       Q.   Three different accounts.

20            But, once again, he had signatory authority over

21   all of those accounts?

22       A.   Yes.  And in one account, he was the only signer

23   on the account.

24       Q.   Okay.

25            MR. SIMMS:  Thank you.

1                     REDIRECT EXAMINATION

2     BY MR. BURKE:

3        Q.   Ms. Johnson, you mentioned during

4     cross-examination some leases or a lease that you may

5     have looked at.  Do you recall that answer?

6        A.   Yes.

7        Q.   And the lease you're talking about is a lease for

8     the defendant, correct?

9        A.   Yes.

10       Q.   And was that a lease associated with The Chicken

11    Place Express?

12       A.   Yes.

13       Q.   Not some other business?

14       A.   No.

15                 MR. BURKE:  Nothing further, Your Honor.

16                 May the witness be excused?

17                 THE COURT:  Yes.

18                 You're free to leave.  Thank you for coming.

19                 (Thereupon, the witness withdrew from the

20    stand.)

21                 MR. BURKE:  Your Honor, may we approach?

22                 THE COURT:  Yes.

23                 (Thereupon, the following sidebar conference

24    was had:)

25                 MR. BURKE:  Your Honor, the government is

1  prepared to rest, but before we do, we would like to

2  make sure that we're in agreement as to what exhibits

3  have been admitted or not, so we can clear that up

4  before we rest.

5  So, my request would be that we excuse the

6  jury for a few minutes to get -- so we can work it out,

7  and make sure that we're in agreement and, if we're not

8  in agreement, resolve any differences that we may have.

9  THE COURT:  Okay.  Well, I have another

10  suggestion.  If there's nothing that you think you've

11  left out, you could rest conditionally, with the

12  understanding that you all will review the exhibits.

13  And if there's something that has not been admitted that

14  you both think should be admitted, or there's some issue

15  about something that is not admitted, I can take that up

16  outside the hearing of the jury.  So we can keep going.

17  MR. BURKE:  Very well.  We will rest -- we

18  will rest conditionally upon agreement about exhibits.

19  THE COURT:  All right.

20  MR. SIMMS:  At that time, I would have a

21  motion.

22  THE COURT:  Okay.  All right.  My preference

23  would be to take up the motion outside the hearing of

24  the jury.

25  Do you have any witnesses you want to call?

1          MR. SIMMS:  No, not before the motion, no.

2          THE COURT:  Well, what I'm saying to you is,

3     what I'm trying to do is, to use the time we have in the

4     court efficiently, take your motion outside the hearing

5     of the jury.  So my question to you is:  Do you have any

6     witnesses that you want to call today?

7          MR. SIMMS:  Yes, I do, Your Honor.

8          THE COURT:  All right.

9          MR. SIMMS:  I have one witness.

10         THE COURT:  All right.  Let's call that

11    witness now.  Start.  Okay?

12         And your motion is preserved for the record

13    as being made at the end of the government's case.

14         MR. SIMMS:  Okay.

15         THE COURT:  Thank you.

16         (Thereupon, the sidebar conference was

17    concluded.)

18         MR. BURKE:  Your Honor, the government is

19    prepared to rest conditioned upon agreement about

20    exhibits.

21         THE COURT:  All right.  Government rests.

22         MR. SIMMS:  Your Honor, at this time the

23    defense would call John Wu -- Jun Mao.  I apologize.

24         MR. HENDRICK:  Face the clerk.  Please raise

25    your right hand.

1                    (Witness sworn.)

2                    THE WITNESS:  I do.

3                    THE CLERK:  Thank you.

4                    Have a seat, please.

5                    THE COURT:  You may proceed.

6                    THEREUPON, JUN WU, having been duly sworn,

7    testified as follows:

8                         DIRECT EXAMINATION

9    BY MR. SIMMS:

10      Q.   Good afternoon, sir.

11           Can you please state your name for the record.

12      A.   My name is Jun Wu, J-u-n, W-u.

13      Q.   J-u-n, W-u?

14      A.   Yes.

15      Q.   Okay.  Mr. Jun, what do you do for a living?

16      A.   I work for the IT consulting firm Notion

17   Consulting.

18      Q.   Okay.  I'm going to need you to scoot up to the

19   microphone a little and speak a little louder.  Okay?

20      A.   I work for a company called Notion Consulting.

21   My profession is in IT consulting work.

22      Q.   Okay.  And what is your title with Notion

23   Consulting?

24      A.   I'm the vice-president responsible for IT

25   operations.

1     Q.   Okay.  And is Jian Mao your partner?

2     A.   He's the president of the -- an owner of the

3     company.  I work for him.

4     Q.   Okay.  And how long have you worked for Notion?

5     A.   Since September of 2004.

6     Q.   Okay.  And in your duties as vice-president, what

7     do you do?

8     A.   So, we do primarily IT consulting for government

9     contracts.  I -- I manage the group that does IT support

10    that includes server storage, network security, things

11    like this.  I'm personally, myself, is also a, kind of a

12    subject matter expert, engineering and security.

13    Q.   Okay.  And do you know Raushi Conrad?

14    A.   Yes, I know Raushi Conrad.

15    Q.   Okay.  How long have you known him for?

16    A.   Since I started getting involved in projects at

17    the Bureau of Industry and Security.  So, that's

18    probably somewhere around 2006, maybe late 2005, maybe,

19    early 2006.  Something like that.

20    Q.   Now, Mr. Wu, are you aware of a data migration

21    project that occurred with the Department of Commerce,

22    BIS --

23    A.   Yes.

24    Q.   -- in 2010 and 2011?

25    A.   Yes.  My understanding was that the project

1   involved moving a large --
2              MR. BURKE:  Objection, foundation.
3              THE COURT:  All right.
4              Your next question.  I think he's going
5   beyond your original question, Mr. Simms.  Next
6   question.
7              MR. SIMMS:  Okay.
8   BY MR. SIMMS:
9      Q.  So, you were aware of the -- the data migration
10  project?
11     A.  I was aware there was data migration project,
12  yes.
13     Q.  Okay.  And how did you become aware of the
14  project?
15     A.  So, our company was responsible for, in general,
16  IT operations at BIS.  So, any such project would
17  involved some sort of participation from our company.
18  For example, if you want to move files from one location
19  of the network to a different location of the network,
20  our company supports the whole IT infrastructure for
21  BIS.
22             So -- and I'm pretty sure that such project would
23  also be discussed at BIS.  So, I personally wasn't at
24  BIS all the time.  I was more of a part-timer.  I was
25  only there when needed.  But other people would have

1  discussed with me about such project.

2      Q.  Okay.  Based on your knowledge of the data

3  migration project, had your company ever performed that

4  type of work before?

5              MR. BURKE:  Objection, hearsay.  He

6  testified that he was not personally involved in any of

7  this.

8              MR. SIMMS:  He testified that he became

9  aware of what the data migration project was.

10             THE COURT:  Well --

11             MR. SIMMS:  I'm not asking --

12             THE COURT:  -- being aware of and having

13  personal knowledge are two different things.

14             If you have a question that can lay

15  foundation of personal knowledge, I'll allow it.

16  Otherwise, I'll sustain the objection.

17             MR. SIMMS:  Okay.

18  BY MR. SIMMS:

19     Q.  Although you weren't there, did you obtain

20  personal knowledge, other than what somebody told you,

21  of what the data migration project entailed?

22             MR. BURKE:  Objection, hearsay.  Calls for

23  speculation.

24             MR. SIMMS:  I clearly said, other than what

25  somebody else told him.

1              THE COURT:  I sustain the objection to the

2    form of that question.

3    BY MR. SIMMS:

4        Q.  How did you become aware of the data migration

5    project?

6        A.  My recollection was that the people who work

7    there discussed the project with me.  Um --

8              THE COURT:  That's enough.  That's hearsay.

9              Go ahead.  Next question.

10   BY MR. SIMMS:

11       Q.  Are you familiar with data -- has your company

12   done data migration project work before?

13       A.  Well, my understanding of the project was to

14   moving large amount --

15             THE COURT:  Well, his question -- please

16   listen to his question.

17             Recite your question again.

18             THE WITNESS:  Okay.  I just want to make

19   sure that --

20             THE COURT:  Hold on.

21             THE WITNESS:  -- I understand the data

22   migration project.

23             THE COURT:  Hold on.

24             THE WITNESS:  Okay.

25             THE COURT:  The way this works is the lawyer

1  has to ask you a specific question.

2              THE WITNESS:  Okay.

3              THE COURT:  Listen to his question and just

4  answer that question.

5              THE WITNESS:  Okay.

6              THE COURT:  He will get a chance to ask you

7  additional questions.

8              THE WITNESS:  Okay.

9              THE COURT:  Now, ask your question again,

10  Mr. Simms.

11  BY MR. SIMMS:

12     Q.  Had your company ever done data migration work

13  before?

14     A.  No, not that I'm aware of.

15     Q.  Okay.

16              MR. SIMMS:  Thank you.

17              No further questions.

18              MR. BURKE:  No cross, Your Honor.

19              THE COURT:  May the witness be excused?

20              MR. BURKE:  Yes.

21              MR. SIMMS:  Yes.

22              THE COURT:  You're free to leave, sir.

23  Thank you.

24              THE WITNESS:  Thank you.

25              (Thereupon, the witness withdrew from the

1 stand.)

2          MR. SIMMS:  Your Honor, may we briefly
3 approach?

4          THE COURT:  Sure.

5          (Thereupon, the following sidebar conference
6 was had:)

7          MR. SIMMS:  Judge, I'm sorry.  I should have
8 told you when we were up here before, that that's my
9 only witness, other than, potentially, Mr. Conrad
10 testifying.  In candor with the Court, Mr. Conrad is
11 trying to make his mind up as to whether he wants to
12 testify.

13          THE COURT:  Well, he should be told that
14 this is the time.  The trial is underway now.  So, if
15 he's going to testify, I've got a half an hour here.  He
16 can get on the stand right now and we can get going.  If
17 he is going to waive the right to testify, he needs to
18 tell us that.

19          MR. SIMMS:  Okay.  If I could have just
20 30 seconds with him, to let him know.

21          THE COURT:  You can have the whole
22 60 seconds.  I'll give you the whole 60 seconds.

23          MR. SIMMS:  Okay.  I appreciate it.

24          THE COURT:  Go talk to your client.  I'll
25 wait right here.

1           MR. SIMMS:  Your Honor, if he chooses not to
2   testify --
3           THE COURT:  I'll have him come to sidebar
4   and put it on the record.
5           MR. SIMMS:  Okay.  Then we'll proceed with,
6   I guess, the motion?
7           THE COURT:  Yes.  And I'll let the jury know
8   we're doing instructions.
9           MR. SIMMS:  Okay.
10          MR. BURKE:  Judge, do you want us to wait
11  here or --
12          THE COURT:  You can go back to your table
13  until he comes back.
14          (Counsel conferring with defendant.)
15          MR. SIMMS:  Your Honor, he will not be
16  exercising his right to testify.
17          THE COURT:  Bring him up here.
18          Mr. Conrad.
19          MR. CONRAD:  Yes, sir.
20          THE COURT:  Have you discussed with your
21  lawyer whether or not you should testify?
22          MR. CONRAD:  Yes.
23          THE COURT:  And have you made a decision
24  about whether or not you're going to testify?
25          MR. CONRAD:  Yes.

1    THE COURT:  And have you decided that you
2   will or will not testify?

3    You're not required to testify.  I've said
4   that many times.  It's up to you.

5    MR. CONRAD:  Just so I'm clear, so if I
6   don't testify, I cannot refuse any of the --

7    MR. SIMMS:  Mr. --

8    THE COURT:  The jury can only consider what
9   comes from the witness stand.  And whatever questions
10  your lawyer has brought out, whatever documents were
11  brought out, whatever testimony was brought out with
12  Mr. Bedford and others, all that's going to be
13  considered by the jury.

14    But he won't be able to stand up and say,
15  "Mr. Conrad said" so and so, because you didn't testify.
16  Except for whatever the government admitted into
17  evidence against you.

18    MR. CONRAD:  So, if the government said I
19  said something, that could be admitted against me.

20    THE COURT:  It's already in evidence.  All
21  those statements that you gave to the investigator, all
22  that is in evidence.

23    MR. CONRAD:  All of the interviews and
24  everything else would be --

25    THE COURT:  Only the parts you heard in

court.

MR. CONRAD:  Just so I'm clear, so even though the government played whatever portion of the tape, the rest of that interview would be in evidence, from Two Thousand --

THE COURT:  No, just what you heard in the courtroom.

MR. BURKE:  Your Honor, we did -- we admitted the entirety of the recording.

THE COURT:  Okay.  The whole recording is going in.

MR. CONRAD:  But nothing from any of the other interviews; just the 2011 ones?

MR. SIMMS:  Yes.

MR. WALKER:  That was the one --

MR. BURKE:  That recording, plus the testimony about the other -- the other interviews that have been here in the court.

THE COURT:  Right.

MR. CONRAD:  (No response.)

THE COURT:  It's up to you.  I just have to make a record that you were given -- understood that you have the right to remain silent, and that you are making a knowing and intelligent waiver of your right to remain silent, by admitting that you're not going to testify

1  and you're doing this of your own free will.

2        You're not being forced to testify, not

3  forced to not testify.  It's up to you.  It is your

4  trial.

5        MR. CONRAD:  But when the decision is made,

6  there's no --

7        THE COURT:  Once the decision is made, I'm

8  going to start working on the jury instructions and the

9  case will be over, as far as witnesses are concerned.

10        MR. SIMMS:  It's your choice.

11        MR. CONRAD:  I would follow the instructions

12  of my attorney.

13        THE COURT:  No, it's not -- your lawyer

14  doesn't have any instructions.

15        MR. CONRAD:  His recommendation.

16        THE COURT:  His recommendation.

17        MR. CONRAD:  Is that right?  Is that more

18  acceptable?

19        THE COURT:  That's more acceptable.  His

20  recommendation to you is private.  You tell me what you

21  want to do.

22        MR. CONRAD:  I think what I want and what

23  might be the right thing are two different things, I

24  guess.

25        THE COURT:  No.  What happens in the trial

1    is ultimately up to you.  So, your lawyer has given you

2    advice.  You do well to listen to your lawyer's advice.

3          But, ultimately, you have to decide for

4    yourself what you're going to do.  Just like you decided

5    to go to trial, that was your decision.  You could have

6    done something else, and you decided to go to trial.

7    That's your decision.

8          Whether you get on the witness stand or not

9    is entirely up to you.  This is your case.  This is your

10   day in court.  There will not be another one.

11         MR. SIMMS:  I mean -- it's up to you.

12         THE COURT:  And you hired a very experienced

13   lawyer.  Mr. Simms is well-known to this Court.  He's

14   tried many cases here, and he used to be a prosecutor

15   for a long, long time, if I have my recollection right.

16   So he knows how to do it outside the courtroom, too.

17         (Pause.)

18         MR. CONRAD:  I -- can I have 30 seconds just

19   to --

20         THE COURT:  Yes.

21         (Simultaneous speaking.)

22         MR. CONRAD:  -- in its entirety.

23         THE COURT:  Sure.  Sure.

24         (Proceedings in open court as follows:)

25         THE COURT:  Ladies and gentlemen, I want to

talk with counsel just a moment.  I will have you go out for a moment.  Okay.

Take them out, please.

(Jury not present.)

THE COURT:  Do you wear a watch, Mr. Simms?

MR. SIMMS:  Yes.

THE COURT:  Why don't you all go outside, have five minutes, do whatever you do, come back and we'll do it.

You go outside the courtroom.  Take a brief recess.

(Thereupon, the sidebar conference was concluded.)

(Court recessed at 4:38 p.m. and reconvened at 4:46 p.m.)

(Jury not present.)

THE COURT:  Mr. Conrad, you can come to the podium.

MR. CONRAD:  (Complies.)

THE COURT:  What is your decision?

(Pause.)

MR. CONRAD:  I will choose to remain silent, Your Honor.

THE COURT:  All right.  Is that your own decision, not to testify?

1          MR. CONRAD:  Yes, Your Honor.

2          THE COURT:  All right.  Thank you.

3          (Defendant seated.)

4          THE COURT:  We can bring the jury back.

5          And I think what I'll do is let them go and

6   work on jury instructions tonight.  And we need to have

7   Mr. Simms's motion.  But we'll do it outside the

8   presence of the jury, after I send the jury out.

9          Thank you.

10          You can bring our jury out, Mr. Hendrick.

11   Thank you.

12          MR. HENDRICK:  Yes, sir.

13          (Jury present.)

14          THE COURT:  You may be seated.

15          All right.  Ladies and gentlemen --

16          MR. SIMMS:  Your Honor, at this time the

17   defense rests.

18          THE COURT:  The defense rests.

19          Ladies and gentlemen, you've heard all the

20   evidence you're going to hear in connection with this

21   case.

22          It's now my job to meet with the lawyers to

23   prepare the jury instructions.  And then once we have

24   them all ready, when you come back tomorrow, my plan

25   will be to instruct you, allow the lawyers to argue the

case and submit to you their closing arguments.  Then
the case will be submitted to you for deliberation.

In the interim, several instructions.

First, we'll start tomorrow at 10:30 instead
of 10:00.  10:30.  Hopefully, that will give me
sufficient time to have everything ready to go at 10:30.

And if you get here at 10:30 and I'm not
ready at 10:30, it's because I'm still working on the
instructions.

But when you come into court, we'll be ready
to give you instructions and the lawyers' arguments, and
the case will be submitted to you.

Please do not discuss the case.  Don't
permit the case to be discussed in your presence.  Don't
do any research on the case.  Don't visit any place
mentioned in the case.

And leave your notes in the jury
deliberation room.  We will resume tomorrow at 10:30.

Thank you.

(Jury excused at 4:49 p.m.)

THE COURT:  You may be seated.

Mr. Simms, I'll hear from you when you're
ready.

MR. SIMMS:  Thank you.

RULE 29 MOTION BY THE DEFENDANT

MR. SIMMS:  Your Honor, this is a Rule 29 motion by defense, Your Honor, and I'll start with the bribery offense as an initial matter.

THE COURT:  It helps me focus if you tell me what the legal issues are.

MR. SIMMS:  Okay.

Your Honor, I'll start with the fact that -- the position that there was no official act that the government's testimony evidence presented.

Despite what Mr. Bedford testified that he thought the payment was for, he agreed that there was no -- there was never any confirmation, conversation or communication between he and Mr. Conrad about an exchange of money for government contracts.

Mr. Bedford testified that he had a conversation with Mr. Conrad and his business partner, Mr. Bertrand in the Summer of -- early Summer of 2010 about a loan to Mr. Conrad for business purposes.

He denied that loan -- or said that at that time they didn't give Mr. Conrad the loan because they didn't have $180,000 to give him at one time.  There was never any other conversation about that loan.

Mr. Bedford testified that they received a contract from Tridea as a -- as a subcontractor.  Now --

THE COURT:  This contract came after the

meeting or before?

          MR. SIMMS:  The contract came after the meeting.

          THE COURT:  All right.

          MR. SIMMS:  According to Mr. Bedford's testimony.

          THE COURT:  All right.

          MR. SIMMS:  Now, Mr. Bedford didn't testify to any personal knowledge of what Mr. Conrad did for him.  He discussed that he had told Mr. Conrad that he had experience.  His company had 20 years of experience in data migration.  And he did this after hearing Mr. Conrad talk about a data migration project.

          So, Kim Bryant testified during the government's case-in-chief and stated that the name "Bedford Images" was given to him by Mr. Conrad.  He never testified to any undue pressure that Mr. Conrad put him under.  He didn't even talk about the conversation that him and Mr. Conrad had about Bedford Images and what was said.

          A lot of the information that was in the indictment was not -- did not come out through Mr. Bryant's testimony.

          On the contrary, Mr. Bryant's testimony exposed the fact that he didn't even have the power to

award the contract to Bedford Images.  He said that that
would have been Tridea's authority, and he would have
had no say in who they gave that -- who they chose for
that subcontract position.

So, based upon the case law and the
testimony as presented, there has been no testimony
whatsoever that Mr. Conrad made an official act, nor
could Kim Bryant make it an official act for that point.

The individual with Tridea, Mr. Hodor, said
he's never spoken to Mr. Conrad at all, let alone spoken
to him about Bedford Images.

Your Honor, the case law is clear that
communication about a company or individual, an
introduction, arranging meetings, is not an official
act.

The contract, once again, was also awarded
after the discussion of the loan, and there was never
any mention whatsoever about that contract being awarded
in exchange for the loan.

Your Honor, that's the first issue.  I can
go on to the second issue, or do you want --

THE COURT:  If you would, that would be
fine.

MR. SIMMS:  Okay.

Your Honor, the second issue deals with the

conspiracy charge.  Your Honor, in order for a
conspiracy charge to be sustained, even at this level,
there needs to be an agreement, a meeting of the minds.

And here, clearly, based upon the testimony
and the evidence submitted by the government, there was
no meeting of the minds here.

So, we have a discussion of a loan in the
Summer of 2010.  Once again, Mr. Bedford testified that
Mr. Conrad was told they can't do it because of -- they
don't have that much at one time.  There was never any
further discussion about it.

The contract is awarded.  He is invoicing
the government.  He is not sending these invoices to
Mr. Conrad.  There's no discussions about the loan from
the time that the contract -- from the time that the
initial discussion happens until this invoice is
submitted by CPE.

Now, once the invoice is submitted, as
Mr. Bedford testifies, based upon his prior dealings
with the government and his feelings about how things
happen within the contracting world, he sees this
invoice as a -- a request for payment in exchange for
the contract.

He says, "I felt compelled to give
Mr. Conrad this money because, for one, he said he was

family to Mr. Bertrand, and two, he had gotten us the contract."

Well, despite what Mr. Bedford thought, Mr. Conrad didn't have the ability to give them the contract.

Kim Sins testified to that. She stated that Raushi didn't have the power to choose the vendor.

Kim Bryant testified about that. He said neither Mr. Conrad nor he had the power.

And Tridea was the one that selected the vendor.

Your Honor, what could have caused a meeting of the minds would have been if Mr. Bedford or Mr. Bertrand had picked up the phone and -- or e-mailed Mr. Conrad and said, "What's this invoice for?" And there could have been a discussion about why Mr. Conrad was submitting an invoice for services he didn't provide.

Now, what they chose to do was to just pay it without any question.

Furthermore, did they not just pay that one, but they continued to pay other ones that came even after the data migration project had ended.

So, once again, clearly, there is not a meeting of the minds here, because if it was a payment

for contracts, then it would have stopped when the data migration project ended.

If it was a payment for contracts and there was a meeting of the minds, then there would have been payment after Bedford Images received that first hundred -- over a hundred thousand dollar check.  But they didn't get any request until November.

Once again, Your Honor, I would submit that that shows that there was no agreement, no meeting of the minds, no discussion.  But as Mr. Bedford put in his own statement to the Probation Office, he interpreted what that meant.

Now, his interpretation of what that invoice meant included a corrupt intent, and that's why he pled guilty and that's why this Court found him guilty and accepted that plea.  Because, despite what the invoice might have been for, in his mind, Mr. Bedford's mind, he thought it was a bribe, and he paid it.

So, if that's the corrupt intent, yes, he was guilty.  But he can't impute that same intent, that same corrupt mind, that same corrupt motive, upon Mr. Conrad, because he never made any attempt to confirm it.  He didn't ask him or make any other efforts to understand why he would be paying Mr. Conrad.

Lastly, Your Honor, Mr. Bedford admitted on

1  the stand that there was never any discussion of

2  Mr. Conrad receiving payments in exchange for giving

3  Bedford Images contracts.

4          And, lastly, in terms of the basement, the

5  government asked Mr. Bedford on the stand whether or not

6  Mr. Conrad ever repaid him for the work done in the

7  basement.

8          What they didn't ask him is:  Why didn't

9  Mr. Conrad pay?

10          And I think that they missed a -- a large --

11  or a key element in the case when they didn't ask him

12  that question.

13          Your Honor, based upon that evidence or lack

14  thereof, I would submit to this Court that the

15  government has failed to prove both the conspiracy count

16  and the substantive count.

17          THE COURT:  All right.  Thank you.

18          MR. BURKE:  Your Honor, the government's

19  evidence of guilt is overwhelming, especially as judged

20  by Rule 29 standards.

21          And as Your Honor is well aware, at this

22  stage we resolve all factual disputes in favor of the

23  government, and we draw all reasonable inferences in

24  favor of the government, and then ask whether any

25  reasonable jury could find the defendant guilty.

1           And as judged by that standard, the

2 government's evidence is overwhelming.

3           We have falsified invoices.  We have

4 attempts to conceal the conduct.  We have $208,000 in

5 payments going to the defendant for -- for nothing, for

6 work he never did, based on fake invoices that he

7 prepared, that he knew.

8           It is undisputed that those invoices were

9 prepared by the defendant, that they were fake, that

10 they represented no actual work, and that they were

11 submitted to -- to Team America at the same time that

12 Team America and Bedford's Images were profiting

13 enormously under this data migration contract.

14           Now, I think what puts this most starkly in

15 focus is the definition of "official act," which is set

16 forth in the parties' joint instruction number 52, which

17 is taken directly from O'Malley, as well as from the

18 Supreme Court's recent opinion in McDonnell versus the

19 United States.

20           And what it says is -- and I'm reading from

21 parties' joint instruction number 52, which we have

22 agreed is a correct statement of the law:

23           "A decision or action on a qualifying step

24 for a question, matter, cause, suit, proceeding or

25 controversy, would qualify as an official act.

1    "An official act also includes a public
2    official exerting on another official to perform an
3    official act, or providing advice to another official,
4    knowing or intending that such advice will form the
5    basis for an official act by another official."

6    So, what is abundantly clear from McDonnell
7    and from the case law is that the public official need
8    not be the final decision-maker.  They need not be the
9    sole decision-maker.  As long as they either provide
10    advice to or pressure on another official, hoping or
11    intending that that would cause that other official to
12    do something, that's an official act, squarely within
13    the meaning of the case law.

14    And while -- while it is clear that the
15    defendant should not have been able to influence the
16    award of contracts, that if the system had worked as
17    intended, he shouldn't have been able to influence.  The
18    testimony at trial showed, certainly on Rule 29 --
19    frankly, we think the only reasonable construction is
20    that even if he didn't have de jure control, he had
21    de facto control.

22    He was able to influence -- Kim Bryant
23    testified they got -- Bedford's Images got hired because
24    Raushi Conrad told me to.  I viewed him as my customer.
25    He was a GS-15.  He was in control.

And keep in mind, Your Honor, also, again, reading from the definition of "official act" as set forth in the parties' joint proposed instruction number 52:

"The public official need not actually perform an official act or even intend to do so. When the defendant is a public official charged with receiving a bribe, it is sufficient if the public official agrees to perform an official act in exchange for a thing of value. This agreement need not be explicit, and the public official need not specify the means he will use to perform his end of the bargain.

"You may, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value, knowing that it was given with the expectation that the official would perform an official act in return."

Again, from parties' joint instruction number 53:

"The government need not know that the defendant intended for payments to be tied to specific official acts. Bribery requires the intent to effect an exchange of money or other thing of value for a specific official action, but each payment need not be correlated with the specific official act.

1    "Rather, it is sufficient to show that the

2    defendant intended for each payment to induce him to

3    take a specific course of action.

4           "In other words, the intended exchange in

5    bribery can be this for these, or these for these, not

6    just this for that.

7           "Further, it is not necessary for the

8    government to prove that the defendant intended to

9    perform a set number of official acts in return for the

10   payments.

11          "The requirement that there be payment of a

12   thing of value in return for the performance of an

13   official act is satisfied so long as the evidence shows

14   a course of conduct of things of value flowing to a

15   public official in exchange for a pattern of official

16   actions favorable to the donor."

17          That's -- that's precisely what this case

18   presents, Your Honor.

19          Moreover, the defendant's arguments --

20   defense counsel's arguments about the absence of an

21   explicit discussion really is completely irrelevant.

22          The case law is very clear that bribery

23   agreements need not be expressed.  They need not be

24   explicit.  Conspiracies need not be expressed, need not

25   be explicit.

In fact, it would be shocking to actually
find a written bribery contract.  And the fact that this
was all a wink and a nod in no way undermines the
government's having carried its burden.

To the contrary, the fact that they have
this, what is clearly a pretextual conversation about a
loan that everyone knows is not, in fact, a loan, that
are then followed up by fake invoices that just appeared
out of thin air, I mean, that is offer, acceptance and
consideration.

He shows up -- the defendant shows up with a
fake invoice, and, sure enough, they pay it.  He knows
the invoice is fake.  They know the invoice is fake.
And so when he gets paid that money, they know they are
paying for the data migration contract, and so does he.

It could not be clearer that there was a
meeting of the minds here or that there was a corrupt
quit pro quo.

We have certainly carried our burden at the
Rule 29 stage.

THE COURT:  All right.

Anything further?

MR. SIMMS:  Your Honor, I'll just submit
that counsel's reading of the instruction actually goes
further to prove the point made by defense counsel.

1      And we're not stating that the conspiracy
2   always needs to be written or expressly had.  But
3   clearly, when you have a discussion about a loan, which
4   is not criminal within itself or not corrupt within
5   itself, in June of 2010, and not another mention of it
6   beforehand, and then an invoice that the government puts
7   into evidence five months later, clearly that shows a
8   lack of a meeting of the minds.
9      It goes well, well short of a wink and a nod
10  or an informal agreement.  It's five months later, and
11  there has been no discussion about it whatsoever.  When
12  they got that invoice, I wonder if Mr. Bedford had even
13  remembered the discussion he had with Mr. Conrad about
14  the loan.
15     I think, based upon his testimony, him and
16  Mr. Bertrand decided to call it what they wanted to, but
17  never inquired about the purpose of that invoice from
18  Mr. Conrad.
19          THE COURT:  All right.
20              RULING BY THE COURT
21          THE COURT:  Let the record reflect this
22  matter is before the Court on the defendant's motion for
23  judgment of acquittal under Rule 29.
24     And at this stage of the proceeding, I'm
25  required to view the evidence in the light most

favorable to the government and nonmoving party.  And
I'm able to determine whether or not the government has
come forward with sufficient evidence for the matter to
go to the jury where there's a question of fact.  That
is to say, are they missing some element of the offense
for the jury to consider?

The defense's motion has basically two
points.

The first is whether there was any official
act by the defendant that preceded action that led to a
bribe of some kind.

And defendant summarizes the evidence from
Mr. Bedford, that there was no specific conversation
where the defendant demanded a bribe, and there was no
discussion between he and the defendant about payments
in connection with what I will call fake invoices that
were submitted by the defendant's company, CPE, to
Mr. Bedford and Mr. Bertrand at Team America.

As I see this, the issue here reduces itself
to whether the evidence that, out of the clear blue sky,
an invoice was submitted by the defendant to
Mr. Bertrand and Mr. Bedford, is just an act that should
be viewed in isolation, and the judgment they made to
pay, whether or not that is an issue that would be
sufficient to go to the jury.

It seems to me that circumstantial evidence can be considered in determining whether or not there's an issue of fact about an official act by the defendant.

There's no doubt from the evidence that I heard that the individual who identified Team America is the defendant.  There was no indication that any other official at BIS suggested the name Team America, except Mr. Conrad.

Now, maybe Mr. Conrad suggested BIS because -- suggested to BIS Team America because his relative worked at Team America, and he had been talking to Mr. Bedford about the experience they had in data migration.  That may be well how it all started.

But thereafter, when Mr. Conrad submitted a bill that there has been no evidence whatsoever to suggest that the invoice was valid, that demonstrates that there was some issue of fact for the jury on bribery, because there were several false invoices submitted to the company.

And I note that, as I recall the testimony, the testimony is that -- is that Mr. Conrad actually went to the office and presented the bill and waited for a check.

That, I think, alone is enough for a jury to look at whether or not there was some agreement between

the parties, that he was being bribed for work that was not done.

I do note that there has been no indication that, after the discussion about the loan, that any loan was made. There's no evidence a loan was made.

But the amount of the loan requested was $180,000, but the evidence produced at this trial is that more than $200,000 was paid to Mr. Conrad.

Now, again, maybe the jury can conclude that $200,000 was paid out of the clear blue sky. But as it relates to "official act," I think that the "official act" definition set forth in the jury instruction, that we're going to talk about later, does suggest that official action being taken, and official action here would be Mr. Conrad putting forward Team America, continuing to put forward Team America, and thereafter submitting an additional request for additional funds for Team America, and thereafter he receives these payments for fake invoices, is sufficient from the standpoint of showing a question of fact as to whether or not he was demanding or receiving a bribe.

I don't think that Mr. Bedford or Mr. Bertrand had to specifically ask Mr. Conrad, "Are you asking for a bribe by submitting a false bill?" I think the jury will be able to get through that very

1 quickly and ascertain: Well, maybe out of the clear
2 blue sky you just paid somebody $200,000 on a million
3 dollar contract for nothing at all.

4          And maybe the jury can conclude that, but it
5 seems to me for the purposes of a Rule 29 motion, that
6 there is sufficient circumstantial evidence here to
7 demonstrate an official action was taken in response to
8 a demand. Whether it was a meeting of the minds or not,
9 there is certainly enough here for the jury to infer,
10 and for the Court to submit to the jury, the issue of
11 bribery.

12          As it relates to conspiracy, a conspiracy
13 does not necessarily require a written agreement, and we
14 all agree with that. That is all very well-known.

15          And it seems to me that, again,
16 circumstantial evidence can be shown to demonstrate a
17 conspiracy. And here, going back to the invoices, the
18 false invoices, the payments, and the no explanation for
19 why these payments were made -- and I'm not saying the
20 defendant has to make the explanation, but it seems to
21 me that Mr. Bedford's explanation that it was a bribe, a
22 nod and a wink, is certainly enough for the jury to
23 consider whether or not there was a conspiracy here.

24          Because you have concerted action. That is
25 to say, Mr. Conrad presenting the company's name to

SPAWAR, Mr. Bryant did not identify Team America, only Mr. Conrad did. Tridea Works did not identify Bedford's Images. Only Mr. Conrad did.

And from what I heard from Ms. Woodberry, the only name given to BIS was the name Team America, which came from Mr. Conrad.

And now the evidence shows that, not only that he had -- he may not have had direct control, but he certainly had sufficient control over the names submitted to SPAWAR, and to even request additional funds that he had de facto control over the -- the work being carried out for data migration.

And it seems to me that, given that the invoices do not come out of the clear blue sky, and the indication that Mr. Conrad presented a bill at the office and he got paid at the office, while the contract was ongoing, when he did absolutely no work, is more than sufficient to demonstrate a conspiracy.

So the motion under Rule 29 will be denied.

INSTRUCTIONS CONFERENCE

THE COURT: Are you all ready to take up jury instructions?

I see we only have eight to take up, so I would like to do that. I have a -- now.

Do you have the instructions handy?

1          Can we do that?

2          MR. SIMMS:  Your Honor, for whatever reason

3    I just have the joint instructions.

4          THE COURT:  I have it right here.

5          MR. BURKE:  Your Honor, I have the joint and

6    the disputed.

7          THE COURT:  Okay.  Well, it looks like the

8    joint, there's really not a big -- the joint ones, I

9    think I will be likely to consider.

10         My preference would be to take up the

11   disputed instructions.  And my list says the first

12   disputed one is defendant's five, which is interest in

13   the outcome.  Is that right?

14         (Court and law clerk conferring.)

15         THE COURT:  My law clerk has prepared

16   binders for you all.  Isn't that nice?

17         (Pause.)

18         THE COURT:  So, the way the chart is set up,

19   it looks like the disputed instruction for -- (pause).

20         You can ask a question.

21         MR. SIMMS:  All right.

22         (Off the record discussion).

23         THE COURT:  Just a second.

24         Well, can we take up government's A?

25         Do you have any objection to government's A,

1  Mr. Simms, unindicted, unnamed, separately tried
2  coconspirators?
3            MR. SIMMS:  No, I don't have any issue.
4            THE COURT:  All right.  Government's A will
5  be given.
6            Any objection to B, "corruptly" defined?
7            MR. SIMMS:  Your Honor?
8            THE COURT:  Yes.
9            MR. SIMMS:  Your Honor, the defense's
10 request was that language be added to the instruction.
11 The language comes from case law, *United States versus*
12 *Harvey*, *U.S. v. Quinn*, *U.S. v. Jennings*; the language
13 being:  In other words, the quid pro quo requirement is
14 satisfied so long as evidence shows a course of conduct
15 of favors and gifts flowing to a public official in
16 exchange for a pattern of official actions favorable to
17 the donor.
18           THE COURT:  Is a pattern of official actions
19 required, Mr. Simms?
20           MR. SIMMS:  Under -- Your Honor, I got these
21 instructions from -- they're based upon these cases.
22           THE COURT:  No.  Is this an instruction or
23 is this a case that you cited to me?
24           MR. SIMMS:  This -- it's a quote -- it's not
25 a model instruction, but it's an instruction based upon

1  case law.

2  THE COURT:  Okay.

3  MR. SIMMS:  It's not -- it's not language

4  coming directly from a case.  It's not -- this language

5  isn't cited in a case or anything of that nature.  It's

6  just --

7  THE COURT:  Mr. Burke is standing.

8  What do you have, Mr. Burke?

9  MR. BURKE:  Your Honor, I believe the

10  precise language that Mr. Simms is recommending that we

11  add to the bottom of government's instruction B --

12  THE COURT:  Yes.

13  MR. BURKE:  -- is already encompassed within

14  the parties' joint instruction number 53.  That language

15  is already in there.  It --

16  THE COURT:  Joint instruction 53?

17  MR. BURKE:  Joint instruction 53 says -- and

18  I'm reading -- this is page 70 of the parties' joint

19  instruction number 53:  It is not necessary for the

20  government to prove that the defendant intended to

21  perform a set number of official acts in return for the

22  payments.  The requirement that there be payment of a

23  thing of value in return for the performance of the

24  official act is satisfied so long as the evidence shows

25  a course of conduct of things flowing to a public

1   official in exchange for a pattern of official actions

2   favorable to the donor.

3           So, I believe it would be redundant to put

4   it in two places.

5           MR. SIMMS:  If it's in -- if it's in

6   government instruction 53, then it's fine.  I don't have

7   an objection.  It wasn't mentioned to me before.

8           THE COURT:  Okay.

9           MR. SIMMS:  I didn't see it.

10          THE COURT:  All right.

11          MR. SIMMS:  That's fine.

12          THE COURT:  Then we will give B.

13          Mr. Hines.

14          (Court conferring with law clerk.)

15          THE COURT:  All right.  The next instruction

16  I have -- we're still doing the government's

17  instructions -- is G-1.  Is that right?

18          MR. SIMMS:  Agent of the --

19          THE COURT:  Say again.

20          MR. SIMMS:  Agent of the defendant?

21          THE COURT:  Let me see.  It looks like it

22  says, "Agent of the defendant."  Government's C.

23          MR. SIMMS:  Your Honor, my objection to that

24  was that the defense does not believe the instruction is

25  applicable to the evidence as presented in court.

1          I'm assuming the government is going to

2     argue that Mr. Bryant was an agent of Mr. Conrad.

3          I don't believe that the evidence supports

4     that.  I think that the two -- the two agencies were

5     independent of one another in this case.  And certainly

6     Tridea was independent of Mr. Conrad.

7          THE COURT:  Well, I -- is agency an issue in

8     the case, Mr. Burke?

9          MR. BURKE:  It is, Your Honor.  It is -- the

10     defendant -- the defendant directed Rob Moffett to do

11     it.  He directed Kim Bryant to do things.  He directed

12     Patricia Woodberry to do things.

13          This is a model instruction from O'Malley,

14     and taken directly from 18 USC Section 2, which is taken

15     from the general proposition that's been true for at

16     least 200 years in this country, that you are

17     responsible for others' actions if you direct, counsel,

18     command other people to do them.  You cannot escape

19     criminal liability by having someone else do your dirty

20     work for you.

21          And so we believe that section two in this

22     instruction is squarely applicable to the facts of this

23     case.

24          THE COURT:  So, this is aiding and abetting;

25     is that right?

1     MR. BURKE:  Yes, Your Honor.

2     THE COURT:  All right.  Okay.

3     MR. SIMMS:  I think that that's a stretch.

4  Clearly if the government -- if the jury finds that he

5  went to Patricia Woodberry to ask for something, he is

6  the one that asked for it.  She didn't...

7     The fact of getting someone to be an agent

8  to do something then try to hide behind it, his name is

9  on the e-mail.  He's the one that requested it.  That

10  came out through the evidence.

11     If Rob Moffett was asked to do something, he

12  stated clearly that, "Raushi asked me to do this."

13     It's not a situation where -- even the

14  question on cross-examination implied that he's going to

15  seek to hide behind any type of employee or colleague --

16  colleague's actions.

17     THE COURT:  All right.

18     MR. SIMMS:  It's not the defense here.

19     THE COURT:  The objection is overruled.  I'm

20  going to give C, government's C.

21     The next one is defendant's instruction -- I

22  believe it's one, "Evaluate the credibility of the

23  witnesses."  Is that yours?

24     MR. SIMMS:  Yes, it is.

25     THE COURT:  All right.

1          MR. BURKE:  Your Honor, the government's

2     objection to defendant's proposed instruction number one

3     is that these same concepts are already covered in a

4     more balanced and comprehensive way by what is already

5     in joint instructions 28 and 29, which give a very

6     balanced and thorough description of how to evaluate

7     people's credibility, all of the factors to take into

8     consideration.

9          This instruction would be, first of all,

10     duplicative of those.

11          Second of all, it's unbalanced, because it

12     focuses specifically upon interest in the outcome and

13     motive to testify falsely.

14          All of those concepts certainly are fair to

15     consider.  And the parties' joint instruction 28 and 29

16     already talk about them.

17          But there are a whole host of things that

18     juries should and -- may and should consider, and jury

19     instructions 28 and 29 talk about them, and talk about

20     the --

21          THE COURT:  Is there an instruction on the

22     plea agreement that Mr. Bedford had?

23          MR. BURKE:  We have proposed a specific

24     instruction regarding testimony by accomplices that

25     talks about --

1    THE COURT:  I'm talking about specifically
2  when it talks about the fact -- it does say "plea
3  agreement" in paragraph -- in 29, it does mention a plea
4  agreement --
5    MR. BURKE:  I believe --
6    THE COURT:  -- and that he may have an
7  interest in the outcome of the case.  It does say that.
8  And affected by self-interest.
9    MR. BURKE:  That's right.  That's right.
10    So -- and 28 and 29 in conjunction cover all
11  of these concepts, including directing the jury to
12  consider the -- an accomplice that -- Mr. Bedford's
13  testimony with greater care than the testimony of other
14  witnesses.
15    The fact that an accomplice has entered a
16  plea of guilty to an offense is not evidence.  The jury
17  must determine whether the testimony of the accomplice
18  has been affected by self-interest.
19    These concepts are clearly and
20  comprehensively covered by 28 and 29.
21    THE COURT:  All right.
22    Mr. Simms.
23    MR. SIMMS:  Your Honor, it's defense's
24  position that this instruction and its consent is
25  important enough to separate from the normal instruction

1  that may be given in terms of how to weigh the

2  credibility of a witness.

3         This focuses squarely on interest of --

4  interest in outcome, which clearly Mr. Bedford has

5  motivations, not only based upon his plea agreement,

6  based upon other reasons as well, including additional

7  charges that could have been filed against him.

8         I think that it is worth bearing and

9  emphasizing separately from the all-inclusive

10 instruction on credibility.

11        THE COURT:  All right.

12        I'll overrule the government's objection and

13 I'll give defendant's one.  I will give that.

14        (Pause.)

15        MR. BURKE:  Your Honor, our --

16        THE COURT:  Do you object to defendant's

17 two, impeachment?

18        MR. BURKE:  We do, Your Honor.  Because we

19 think, again, now with -- between jury instructions --

20 joint instructions 28 and 29 and defendant's one, which

21 Your Honor is going to give, we have covered the

22 waterfront and then some, and we've done so in a fair

23 and balanced way.

24        This would be -- that this would be

25 duplicative and -- and unbalanced.  And so that's our

1   objection.

2              THE COURT:  All right.

3              Mr. Simms, don't we already have that in 28

4   and 29?  And now we're giving your defendant's

5   instruction?

6              MR. SIMMS:  Your Honor, with the Court

7   giving defense instruction one, I will concede that this

8   could be removed.

9              THE COURT:  All right.  So you're going to

10  withdraw D-3.  Withdrawn.

11             MR. SIMMS:  Yes.

12             THE COURT:  Witness credibility, D-3, law

13  enforcement.

14             MR. BURKE:  Yes, Your Honor.  The government

15  objects to instruction -- defense instruction number

16  three because we feel that it unfairly singles out law

17  enforcement.

18             We are certainly not asking for law

19  enforcement officials to be given any special treatment.

20  They should --

21             THE COURT:  But you've heard me, even in

22  voir dire, talk about the importance of weighing a law

23  enforcement officer's testimony the same as anyone else.

24             MR. BURKE:  True --

25             THE COURT:  But it's not uncommon for me to

1    give an instruction like this, if this has not been
2    modified in Sand and Siffert, in cases where -- I think
3    in this case we had two agents testify about statements
4    made by the defendant and search warrants and all those
5    things.
6             It also talks about it's legitimate for the
7    defense attorney to try to attack the credibility of the
8    officers.
9             I don't know if that happened, but that's an
10   instruction that I frequently give.
11            Is there a reason I shouldn't give it here.
12            MR. BURKE:  Your Honor, only the reasons
13   that we've already stated, which Your Honor has
14   understood and I understand that you'll be overruling.
15            THE COURT:  All right.
16            Just because there's a difference, I'll give
17   D-3.
18            D-4.  Isn't that in paragraph 40, Mr. --
19   jury instruction number 40?
20            Isn't that in the last paragraph of number
21   40, about merely being present?
22            (Pause.)
23            THE COURT:  Don't we have that?
24            (Pause.)
25            THE COURT:  It looks like the exact same

words, almost.  Take a look at the last paragraph of
instruction 40, joint instruction 40.

MR. SIMMS:  Agreed, Your Honor.  I'll
withdraw it.

THE COURT:  Well, you don't have to withdraw
it.  I just want to make sure you knew --

MR. SIMMS:  Yes.  I understand.  I see it.
I see it.

THE COURT:  We'll withdraw D-4.

Defendant's five, good faith defense.  What
in the world is good-faith defense, Mr. Simms?

He can deny that he did it.  He can say
reasonable doubt.  But --

MR. SIMMS:  Yeah.  This instruction is not
appropriate --

THE COURT:  All right.

MR. SIMMS:  -- based upon the case as
presented.

THE COURT:  All right.  So, we withdraw
defendant's five.

I just want to go through -- I think -- have
I covered all the disputed instructions now?

MR. BURKE:  You have, Your Honor.

But I do think it would be wise for us to
review the joint proposed, because some of them are no

1  longer applicable.

2          THE COURT:  Right.  Well, let's do that.

3  And let me just see where we are.  I think there are

4  several that Mr. Hines identified for us that we may no

5  longer need.

6          Joint number eight.  Federal judge comment

7  on the evidence -- to the jury on the evidence in the

8  case.

9          As a young lawyer in one of my first cases

10  in this Court, I had a judge who summarized the evidence

11  from his point of view from the bench, and it looked

12  like a closing argument from the judge in his robes, and

13  I lost the case, and I always thought it was unfair.

14          So I don't comment on the evidence.  So I'll

15  withdraw eight.

16          What about joint nine?  Do we still need

17  that?

18          Was any limited purpose evidence offered?

19          MR. BURKE:  No, Your Honor.  We think it's

20  no longer applicable.

21          MR. SIMMS:  I agree.

22          THE COURT:  All right.  We'll take out nine.

23          Transcripts were offered, so ten is

24  necessary.

25          I'm just trying to go through the ones that

1 I see, as to whether we need them or not.  And then you
2 all can tell me if you think of any others.  Let me see.
3              Joint instruction 18 does not give a
4 definition of "reasonable doubt."  And I always do.
5              It saves time because the jury is going to
6 come back, "What is reasonable doubt?"
7              That's the most important part of the case.
8 And the Fourth Circuit has said we should not do it, or
9 recommends that we don't do it, but I have had a very
10 positive experience with juries knowing what reasonable
11 doubt means.  It makes them focus and they can make up
12 their mind whether or not it's present.
13              And you all can make your record if you
14 object to it.
15              MR. SIMMS:  Your Honor, just to follow, you
16 are going to instruct on what is reasonable doubt?
17              THE COURT:  Yes.  I don't see it here, but
18 I'll give it to you all and let you see my reasonable
19 doubt instruction.
20              MR. BURKE:  Your Honor, we do object to
21 that, but we understand your ruling.
22              THE COURT:  All right.  Okay.
23              The charts were admitted in evidence, the
24 605, 603, 604, those were admitted into evidence under
25 1006, so I should give joint 23, just the section on

admitted -- the admitted portion of that instruction.

MR. BURKE:  That is correct, Your Honor.

THE COURT:  All right.

Mr. Simms, what about joint 25?

MR. SIMMS:  I don't believe -- I don't believe the instruction applies to the evidence presented.  I don't recall any statements, any accusatory statements being made, or there was silence.

MR. BURKE:  We agree, Your Honor.

THE COURT:  All right.  We'll take out 25.

And on instruction 28, about the credibility of the witnesses, we'll take out, "the testimony of the defendant should be judged in the same manner as any other witness," since Mr. Conrad did not testify.

And we need to have an instruction about -- instruction number 34 is defendant's decision not to testify.  So we'll leave that in.

What about 32, credibility of the witnesses, bad reputation?

I don't think there's any reputation evidence offered in the trial, do you?

Or conviction of a felony.

MR. BURKE:  No, Your Honor.

THE COURT:  All right.  So, conviction of a felony, joint 31, we'll take that out.

1          And 32, bad reputation for truth and
2    veracity, we'll take that out.
3          MR. BURKE:  Your Honor, I apologize if I'm
4    missing something.  We're going to delete 33, joint 33?
5          It speaks about the testimony of the
6    defendant.
7          THE COURT:  Yes, that's what I meant.
8    That's what I'm talking about; 33, we will not give.
9          Thank you for mentioning that, yes.
10          (Pause.)
11          THE COURT:  As I go through this -- I'm down
12    to 50.  If you see something else, let me know.
13          MR. BURKE:  Your Honor, joint 35 does not
14    appear to be applicable.
15          THE COURT:  That's right.  Joint 35,
16    reputation of the defendant, we don't need that.  That
17    will not be given.
18          (Pause.)
19          THE COURT:  I believe I've covered
20    everything.  Is there something more?
21          MR. BURKE:  One other, Your Honor, joint 12,
22    the third paragraph of joint 12 talks about the Court
23    taking judicial notice.  I don't think Your Honor took
24    judicial notice of any facts during the trial, and so
25    perhaps we should strike that paragraph.

```
 1              THE COURT:  All right.  I think that's
 2    right.
 3              MR. SIMMS:  No objection.
 4              THE COURT:  Okay.
 5              Anything else that you all, going through
 6    the instruction, see now that we have missed, or
 7    typographical errors, anything you see?
 8              MR. SIMMS:  Your Honor, is it -- and there
 9    may be -- I may be missing it.  Is there an instruction
10    relating to the fact that a codefendant has pled guilty
11    or been found guilty should have no bearing on the
12    judge's -- on the jury's judging of Mr. Conrad?
13              MR. BURKE:  Yes, Your Honor.  It's in 29.
14              THE COURT:  Yes, it's in 29.  The fact that
15    an alleged accomplish has entered a plea of guilty of
16    the offense charged is not evidence of guilt of any
17    other person, including the defendant.
18              MR. SIMMS:  Okay.
19              THE COURT:  And 30, what about 30?
20              Were there any inconsistent statements, any
21    impeachment here.
22              MR. SIMMS:  By -- yes, by -- by Mr. Bedford.
23              THE COURT:  All right.  Is there anything
24    else?
25              Are we done?
```

1          MR. SIMMS:  No.

2          THE COURT:  I mean, are we done with the

3  objections to the instructions?

4          MR. SIMMS:  Yes, yes.

5          MR. BURKE:  I believe that's correct, Your

6  Honor.

7          THE COURT:  All right.

8          So, Counsel, my plan is this:  We're going

9  to work tonight and tomorrow on the instructions.  They

10  will be e-mailed to you.  And my hope will be to get

11  them in the order in which I intend to give them.

12          They'll be given to you probably in rough

13  form, meaning you'll see the instruction as it's being

14  presented to me.

15          The instructions themselves that go to the

16  jury will not have captions, just have numbers.  And

17  they won't have "defendant" or "government"

18  instructions.  Okay.

19          And the verdict form, to me, is just pretty

20  much straightforward, just plain vanilla.

21          There is no objection to the verdict form,

22  right?

23          MR. BURKE:  None from the government.

24          MR. SIMMS:  No, Your Honor.

25          THE COURT:  Okay.

1          We're starting at 10:30.  My goal is to have
2     everything ready by then.
3          And if something comes up before then, let
4     me know.  I have a plea at 9:30, So there will be a bit
5     of time in between.
6          How much time does the government want for
7     closing argument?
8          MR. BURKE:  Your Honor, between myself and
9     Mr. Walker, a total of approximately one hour, if we
10    could have that.
11         THE COURT:  So, is that 30 and 30 rebuttal,
12    or what is it?
13         MR. BURKE:  No.  I imagine Mr. Walker will
14    want the lion's share of time, so I think it will be 40
15    to maybe 45 minutes for opening close, and 15 minutes
16    for rebuttal.
17         THE COURT:  Well -- well, is it 45 or 40?
18    Because my clerk will keep time and let you know what
19    the time is.
20         MR. BURKE:  Let me consult with my
21    cocounsel.
22         THE COURT:  Sure.
23         (Counsel conferring.)
24         MR. BURKE:  Forty-five for Mr. Walker in
25    opening close, and fifteen for myself in rebuttal,

1  please.

2          THE COURT:  And Mr. Simms?

3          MR. SIMMS:  Your Honor, I'm not going to

4  talk for an hour, but I would like to have at least the

5  opportunity to have the equal amount of time.  But I'm

6  sure I will be shorter than an hour.

7          THE COURT:  Okay.  Less than 60 minutes;

8  59 minutes.

9          All right.  Is there anything else before we

10 leave tonight?

11         MR. SIMMS:  No, Your Honor.

12         MR. BURKE:  No, Your Honor.

13         THE COURT:  We're in recess.  Thank you.

14         (Proceedings concluded at 5:43 p.m.)

15

16                      ---

17

18

19

20

21

22

23

24

25

1

2                      CERTIFICATE OF REPORTER

3

4              I, Renecia Wilson, an official court

5     reporter for the United States District Court of

6     Virginia, Alexandria Division, do hereby certify that I

7     reported by machine shorthand, in my official capacity,

8     the proceedings had upon the jury trial in the case of

9     UNITED STATES OF AMERICA v. RAUSHI J. CONRAD.

10             I further certify that I was authorized and

11    did report by stenotype the proceedings in said jury

12    trial, and that the foregoing pages, numbered 1 to 242,

13    inclusive, constitute the official transcript of said

14    proceedings as taken from my shorthand notes.

15

16             IN WITNESS WHEREOF, I have hereto

17    subscribed my name this  12th  day of  January , 2018.

18

19                         /s/
                           _____
20                         Renecia Wilson, RMR, CRR
                           Official Court Reporter

21

22

23

24

25