IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) Crim. No. 1:16cr169 |
| vs. | ) |
| | ) June 15, 2017 |
| RAUSHI J. CONRAD, | ) |
| Defendant. | ) |

JURY TRIAL

BEFORE:     THE HONORABLE GERALD BRUCE LEE
            UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                  BY:   MATTHEW BURKE, AUSA
                        JAMAR WALKER, AUSA

FOR DEFENDANT:    JONATHAN SIMMS, ESQ.

---

OFFICIAL COURT REPORTER:

                  RENECIA A. SMITH-WILSON, RMR, CRR
                  U.S. District Court
                  401 Courthouse Square, 5th Floor
                  Alexandria, VA 22314
                  (703)501-1580

1                          <u>INDEX</u>

2

3   JURY INSTRUCTIONS BY THE COURT              5

4   CLOSING ARGUMENT BY THE GOVERNMENT         47

5   CLOSING ARGUMENT BY THE DEFENDANT          74

6   REBUTTAL ARGUMENT BY THE GOVERNMENT        93

7   JURY VERDICT                              108

8   FURTHER PROCEEDINGS                       109

9
        (Court recessed)
10

11                          ---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

(Thereupon, the following was heard in open court at 10:32 a.m.:)

(Jury not present.)

THE CLERK:  Criminal Case Number 1:16-cr-169, United States of America versus Raushi J. Conrad.

Will counsel please identify themselves for the record.

MR. BURKE:  Good morning, Your Honor. Matthew Burke and Jamal Walker on behalf of the United States.  And with us at counsel's table, Kevin Luebke of the FBI, and Keeley Sandvig, our paralegal, from the United States Attorney's Office.

THE COURT:  Good morning.

MR. SIMMS:  Good morning, Your Honor. Jonathan Simms on behalf of Mr. Conrad, who is present in court.

THE COURT:  Good morning, Mr. Conrad.

Good morning, Mr. Simms.

Are you all ready to proceed?

MR. BURKE:  Yes, Your Honor.

MR. SIMMS:  Yes.

THE COURT:  Mr. Hendrick, you'll need to

bring the podium over here for them.

MR. HENDRICK:  Yes, sir.

THE COURT:  And Ms. Allen will keep time for you all, Counsel.  And she'll give you cues of how much time you have remaining.

All right.  You can bring our jury out, Mr. Hendrick.

MR. HENDRICK:  Yes, sir.

THE COURT:  Are we ready to proceed with the jury?

MR. BURKE:  Yes, sir.

MR. SIMMS:  Yes.

THE COURT:  All right.

Okay.  You can bring the jury out.  Thank you.

(Jury present.)

THE COURT:  You may be seated.

Good morning, ladies and gentlemen.

THE JURORS:  Good morning.

THE COURT:  Good morning, Mr. Conrad.

Good morning, Counsel.

MR. BURKE:  Good morning.

MR. SIMMS:  Good morning.

THE COURT:  All right.

JURY INSTRUCTIONS BY THE COURT

THE COURT:  Ladies and gentlemen, as I told you at the outset of the trial, Mr. Conrad is facing two charges, conspiracy to commit bribery and acceptance of bribery by a public official.  I'm now going to give you the instructions of law which will govern your deliberations.

I'm going to read the instructions to you, and you will be provided with a written copy of the instructions along with all the exhibits that have been admitted into evidence for your consideration.

Members of the jury, now that you've heard all the evidence that is to be received in this trial, and soon you will hear the arguments of counsel, it becomes my duty to give you the final instructions of the Court as to the law that's applicable to this case.

You should use these instructions to guide you in your decisions.

All the instructions of law given to you by the judge -- those given to you at the beginning of the trial, those given to you during the trial, and these final instructions -- must guide and govern your deliberations.

It is your duty as jurors to follow the law as stated in all of the instructions of the Court, And

to apply these rules of law to the facts as you find
them to be from the evidence received during the trial.

The lawyers may refer to some of the
applicable rules of law in their closing arguments to
you.  If, however, any difference appears to you between
the law as stated by the lawyers and that as stated by
the judge in these instructions, you, of course, are to
be governed by the instructions given to you by the
judge.

You are not to single out any one
instruction alone as stating the law, but must consider
the instructions as a whole in reaching your decisions.

Neither are you to be concerned with the
wisdom of any rule of law stated by the judge.
Regardless of any opinion you may have as to what the
law ought to be, it would be a violation of your sworn
duty to base any part of your verdict upon any other
view or opinion of the law than that given in these
instructions of the judge, just as it would be a
violation of your sworn duty as the judges of the facts
to base your verdict upon anything but the evidence
received in this case.

You were chosen as jurors -- you were chosen
as jurors for this trial in order to evaluate all the
evidence received and to decide each of the factual

questions presented by the allegations brought by the government in the indictment and the plea of not guilty by the defendant.

In resolving the issues presented for you for decision in this trial, you must not be persuaded by bias, prejudice or sympathy for or against any of the parties to the case, or by any public opinion.

Justice through trial by jury depends upon the willingness of each individual juror to seek the truth from the same evidence presented to all the jurors here in the courtroom, and to arrive at a verdict by applying the same rules of law as are now being given to each of you in these instructions of the Court.

I instruct you that you must presume the defendant, Mr. Raushi Conrad, to be innocent of the crimes charged. Thus, Mr. Conrad, although accused of the crimes in the indictment, begins the trial with a clean slate, with no evidence against him.

The indictment, as you know already, is not evidence of any kind.

The law permits nothing but legal evidence presented before the jury in court to be considered in support of any charge against the defendant. The presumption of innocence alone is therefore sufficient to acquit the defendant.

The burden is always upon the prosecution, the government, to prove beyond a reasonable doubt. This burden never shifts to a defendant, for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

The defendant, Mr. Conrad, is not even obligated to produce any evidence by cross-examining the witnesses for the government.

It is not required that the government prove guilt beyond all possible doubt. The test is one of reasonable doubt. The question, then, is: What is a reasonable doubt?

The words almost define themselves. It is a doubt based upon reason and common sense. It is a doubt that a reasonable person has after carefully weighing all of the evidence. It is a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her own personal life.

Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in making an important decision.

A reasonable doubt is not a caprice or a whim. It is not speculation or suspicion. It is not

excuse to avoid the performance of an unpleasant duty.

The jury will remember that the defendant is never to be convicted on mere suspicion or conjecture. Unless the government proves beyond a reasonable doubt that the defendant has committed each and every element of the offenses charged in the indictment, you must find the defendant not guilty of the offenses.

An indictment is but a formal method used by the government to accuse a defendant of crimes. It is not evidence of any kind against the defendant. The defendant is presumed to be innocent of the crimes charged.

Even though this indictment has been returned against the defendant, the defendant begins this trial with absolutely no evidence against him.

The defendant, Mr. Raushi Conrad, has pleaded not guilty to this indictment, and therefore denies that he is guilty of the charges.

The indictment charges that the offenses were committed on or about certain dates. Although it is necessary for the government to prove beyond a reasonable doubt that the offenses were committed on a date reasonably near the dates alleged in the indictment, it is not necessary for the government to prove that the offenses were committed precisely on the

dates charged.

The defendant, Mr. Conrad, is not on trial for any act or any conduct not specifically charged in the indictment.

A separate crime is charged in each count of the indictment.  Each charge and the evidence pertaining to it should be considered separately by the jury.  The fact that you may find the defendant guilty or not guilty as to one of the counts should not control your verdict as to any other count.

Count I of the indictment charges the defendant, Mr. Raushi Conrad, with conspiracy to pay and receive bribes.  That is, Count I of the indictment charges that:  Beginning no later than May 2010 and continuing through October 2011, in the Eastern District of Virginia and elsewhere, that the defendant, Mr. Raushi J. Conrad, along with James Bedford and Individual A, did knowingly conspire and agree with each other, and others known and unknown, to commit certain offenses against the United States, namely, to directly and indirectly corruptly give things of value to, and corruptly receive things of value by, a public official in return for being influenced in the performance of any official act.

The defendant has entered a plea of not

guilty and has denied that he is guilty of the offense
charged in Count I of the indictment.

Section 371 of Title 18 United States Code
provides, it is a crime, quote:  "If two or more persons
conspire to commit any offense against the United
States, and one or more such persons do any act to
effect the object of the conspiracy," close quote.

In order to sustain its burden of proof for
the crime of conspiracy to pay and receive bribes as
charged in Count I of the indictment, the government
must prove the following four essential elements beyond
a reasonable doubt.

One:  The conspiracy, agreement, or
understanding to pay and receive bribes as described in
the indictment was formed, reached, and entered -- or
entered into by two or more persons.

Element two:  At some time during the
existence or life of the conspiracy, agreement or
understanding, the defendant knew the purpose of the
agreement.

And element three:  With knowledge of the
purpose of the conspiracy, agreement or understanding,
the defendant then deliberately joined the conspiracy,
agreement or understanding.

And element four:  At some time during the

existence or life of the conspiracy, agreement or understanding, one of its alleged members knowingly performed one of the overt acts charged in the indictment, and did so in order to further or advance the purpose of the agreement.

A criminal conspiracy is an agreement or mutual understanding, knowingly made or knowingly entered into by at least two people, to violate the law by some joint or common plan or course of action. A conspiracy is, in a very true sense, a partnership in crime.

A conspiracy or agreement to violate the law, like any other kind of agreement or understanding, need not be formal, written, or even expressed directly in every detail.

The government must prove that the defendant and at least one other person knowingly and deliberately arrived at an agreement or understanding that they, and perhaps others, would violate some law by means of some common plan or course of action as alleged in Count I of the indictment.

It is proof of this conscious understanding and deliberate agreement by the alleged members that should be central to your consideration of the charge of conspiracy.

To prove the existence of a conspiracy or illegal agreement, the government is not required to produce a written contract between the parties, or even produce evidence of an express oral agreement spelling out all the details of the understanding.

To prove that a conspiracy existed, moreover, the government is not required to show that all the people named in the indictment as members of the conspiracy were, in fact, parties to the agreement, or that all of the members of the conspiracy -- alleged conspiracy were named or charged, or that all the people whom the evidence shows were actually members of a conspiracy agreed to all of the means or methods set out in the indictment.

Unless the government proves beyond a reasonable doubt that a conspiracy, as just explained, actually existed, then you must acquit the defendant of the charge contained in Count I of the indictment.

Before the jury may find that the defendant or any other person became a member of a conspiracy as charged in Count I of the indictment, the evidence in the case must show beyond a reasonable doubt that the defendant knew the purpose or goal of the agreement or understanding, and then deliberately entered into the agreement, intending in some way to accomplish the goal

or purpose by this common plan or joint action.

If the evidence establishes beyond a reasonable doubt that the defendant knowingly and deliberately entered into an agreement to pay and receive bribes, the fact that the defendant did not join the agreement at the beginning, or did not know all the details of the agreement, or did not participate in each act of the agreement, or did not play a major role in accomplishing the unlawful goal, is not important to your decision regarding membership in a conspiracy.

Merely associating with others and discussing common plans, mere similarity of conduct between or among such persons, merely being present at the place where a crime takes place or is discussed, or even knowing about the criminal conduct, does not, of itself, make someone a member of a conspiracy or a conspirator.

Count I of the indictment charges the defendant with a violation of federal law concerning conspiracy to pay and receive bribes.  The indictment alleges a number of separate means or methods by which the defendant is accused of violating this law.

The government is not required to prove all the means or methods alleged in Count I of the indictment.  Each juror must agree with each of the

other jurors, however, that the same means or methods alleged in Count I of the indictment were, in fact, engaged in or employed by the defendant in committing the crimes charged in Count I of the indictment.

The jury need not unanimously agree on each means or method, but in order to convict, the jury must unanimously agree upon at least one such means or method as one engaged in by the defendant.

Unless the government has proven the same means or method of each of you -- to each of you beyond a reasonable doubt, you must acquit the defendant of the crime charged in Count I of the indictment.

Count I of the indictment charges that the defendant knowingly entered into a conspiracy to pay and receive bribes. In order to sustain its burden of proof for this charge, the government must prove -- must show that the single overall conspiracy alleged in Count I of the indictment existed. Proof of separate or independent conspiracies is not sufficient.

In determining whether or not any single conspiracy has been shown by the evidence in this case, you must decide whether common, master, overall goals or objectives existed, which served as the focal point for the efforts and actions of any members of the agreement.

In arriving at this decision, you may

consider the length of time the alleged conspiracy existed, the mutual dependence or assistance between the various persons alleged to have been its members, and the complexity of the goals and objectives shown.

A single conspiracy may involve various people at different levels, may involve numerous transactions which are conducted over some period of time at various places.

In order to establish a single conspiracy, however, the government need not prove that the alleged coconspirators knew each other alleged members of the conspiracy, nor need to establish that the alleged conspirator was aware of each of the transactions alleged in the indictment.

Even if the evidence in the case shows the defendant was a member of some conspiracy, but that this conspiracy is not the single conspiracy charged in the indictment, you must acquit the defendant of this charge.

Unless the government proves the existence of the single overall conspiracy described in the indictment beyond a reasonable doubt, you must acquit the defendant of this charge.

In order to sustain its burden of proof in Count I of the indictment, the government must prove

beyond a reasonable doubt that one of the members of the alleged conspiracy or agreement knowingly performed at least one overt act, and that this overt act was performed during the existence or life of the conspiracy, and was done to somehow further the goals of the conspiracy or agreement.

The term "overt act" means some type of outward objective action, performed by one of the parties, to or one of the members of the agreement or conspiracy which evidences that agreement.

Although you must unanimously agree that the same overt act was committed, the government is not required to prove more than one of the overt acts charged. The overt act may, but for the alleged illegal agreement, appear totally innocent and legal.

Evidence received in this case that certain persons who are alleged in Count I of the indictment to be coconspirators of the defendant have done or said things during the existence or life of the alleged conspiracy in order to further or advance its goal.

Such acts and statements of these and other individuals may be considered by you in determining whether or not the government has proven the charges in Count I of the indictment against the defendant.

Since these acts may have been performed and

these statements may have been made outside the presence of the defendant, and even done or said without the defendant's knowledge, these acts or statements should be examined with particular care by you before considering them against the defendant who did not do the particular act or make the particular statement.

The term "knowingly" as used in these instructions to describe the alleged state of mind of the defendant means that he was conscious and aware of his act or omission, realized what he was doing or what was happening around him, and did not act because of ignorance, mistake or accident.

The intent of a person, or the knowledge that a person possesses any given time, may not ordinarily be proven by -- directly, because there is no way of directly scrutinizing the workings of the human mind.

In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made or acts done by that person, and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

You may infer, but you are certainly not required to infer, that a person intends the natural and

probable consequences of acts knowingly done or knowingly omitted.  It is entirely up to you, however, to decide what facts to find from the evidence received during this trial.

The government is not required to prove that the parties to or members of the alleged agreement were successful in achieving any or all of the objects of the agreement or conspiracy.

Now some of the people who may have been involved in these events are not on trial.  This does not matter.  There is no requirement that all the members of a conspiracy be charged and prosecuted or tried together in one proceeding.

Nor is there any requirement that the names of the other conspirators be known.  An indictment can charge a defendant with a conspiracy involving people whose names are not known, as long as the government can prove that the defendant conspired with one or more of them.  Whether they are named or not does not matter.

Count II of the indictment charges the defendant with acceptance of bribes by a public official.  That is, Count II of the indictment charges that:  Beginning in or about May 2010 and continuing through in or about October 2011, in the Eastern District of Virginia and elsewhere, that the defendant,

Mr. Raushi J. Conrad, being a public official, did directly and indirectly, knowingly and corruptly, demand, seek, receive, accept and agree to receive and accept things of value in return for promising to perform, and performing of official acts.

The defendant, Mr. Raushi J. Conrad, has entered a plea of not guilty and has denied that he is guilty of the crime charged in Count II of the indictment.

Section 201(b)(2)(A) of Title 18 of the United States Code provides, in part, quote:  "Whoever, being a public official, directly or indirectly corruptly demands, seeks, receives, accepts, or agrees to receive or accept, anything of value, personally or for any other person or entity, in return for being influenced in the performance of an official act," close quote, shall be guilty of an offense against the United States.

In order to sustain its burden of proof for the crime of receiving a bribe by a public official, as charged in Count II of the indictment, the government must prove the following three essential elements beyond a reasonable doubt.

Element one, that the defendant demanded, sought, received, accepted, or agreed to receive and

accept, something of value as described in the
indictment.

Two, the defendant was at that time a public
official of the United States, or was acting on behalf
of the United States.

And element three, the defendant demanded,
sought, received, accepted, or agree to receive and
accept, the item of value corruptly in return for being
influenced in the performance of any official act.

The term "public official" means member of
Congress, or an officer or employee or person acting for
or on behalf of the United States, or any department,
agency or branch of government thereof, in any official
function under or by authority of any such department,
agency or branch of government.

The term "public official" includes any
employee of the United States Government, as well as any
person who is performing work for or acting on behalf of
the United States Government.

The term of "official act" means any
decision or action on any question, matter, cause, suit,
proceeding or controversy which may at any time be
pending, or which may by law be brought before any
public official, in such official's official capacity or
in such official's place of trust or profit.

The term "official act" includes decisions or actions generally expected of a public official. These decisions or actions do not need to be specifically described in any law, rule or job description to be considered an official act.

The definition of "official act" has two parts to it.  First, the question, matter, cause, suit, proceeding or controversy must be specific and focused, and involve a formal exercise of governmental power.

Second, the public official must make or agree to make a decision or take or agree to take an action on that question, matter, cause, suit, proceeding or controversy.  A decision or action or any qualifying step for a question, matter, cause, suit, proceeding or controversy would qualify as an official act.

An official act also includes a public official exerting pressure on another official to perform an official act, or providing advice to another official, knowing or intending that such advice will form the basis for an official act by another official.

Setting up a meeting, hosting event, talking to another official, without more, does not qualify as a decision or action on the question, matter, cause, suit, proceeding or controversy.

Simply expressing support at a meeting,

event, or call, or sending a subordinate to such a
meeting, event or call, similarly does not qualify as a
decision or action on a question, matter, suit, cause,
proceeding or controversy, as long as the official does
not intend to exert pressure on another official or
provide advice, knowing or intending such advice to form
the basis for an official act.

You may, however, consider evidence that a
public official set up a meeting, hosted an event,
talked to another official, expressed support, or sent a
subordinate, as evidence of an agreement to take an
official act.

You may consider all of the evidence in the
case, including the nature of the transaction, in
determining whether the conduct involved an official
act.

In order to satisfy the elements of bribery,
however, the public official need not actually perform
an official act, or even intend to do so.  When the
defendant is a public official charged with receiving a
bribe, it is sufficient if the public official agrees to
perform an official act in exchange for a thing of
value.

This agreement need not be explicit, and the
public official need not specify the means that he will

use to inform his end of the bargain.

You may, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value, knowing that it was given with the expectation that the official would perform an official act in return.

The government need not show the defendant intended for payments to be tied to specific official acts. Bribery requires the intent to effect an exchange of money or other thing of value for a specific official action.

But each payment need not be correlated with a specific official act. Rather, it is sufficient to show that the accident intended for each payment to induce him to take a specific course of action. In other words, the intended exchange in bribery can be this for these, or these for these, not just this for that.

Further, it is not necessary for the government to prove that the defendant intended to perform a set of official acts in return for payments. The requirement that there be a payment of a thing of value in return for the performance of an official act is satisfied so long as the evidence shows a course of conduct of things of value flowing to a public official

in exchange for a pattern of official actions favorable to the donor.

Thus, all that must be shown is that payments were accepted by the public official with the understanding that they were intended to secure a specific type of official action in return.

For example, payments may be accepted with the understanding that they were intended to retain the official's services on an as-needed basis, so that whenever the opportunity presents itself, the public official would take official actions on behalf of the payor's behalf.

An act is done corruptly under this bribery statute if it is performed voluntarily and deliberately, and performed with the purpose of either accomplishing an unlawful end or an unlawful result of accomplishing some otherwise lawful end or lawful result by any means -- by any unlawful means or methods.

The motive to act corruptly is ordinarily a hope or expectation of either financial gain or other benefit to one's self, or some aid or profit to another.

The phrase "anything of value" means any item, whether tangible or intangible, that the person giving or offering the person demanding or receiving considers to be worth something.

The phrase "anything of value" includes a sum of money, favorable treatment, a job or special consideration.

It is not a defense to the crime of bribery, as charged in Count II of the indictment, that the receipt of anything of value was made to the public official to influence an official act which is actually lawful, desirable or even beneficial to the public.

It is not an defense to the crime of bribery, as charged in Count II of the indictment, that the public official did not have the authority, power or ability to perform the act for which the thing of value was demanded or sought.

Count II of the indictment charges the defendant with a violation of federal law concerning the acceptance of bribes by a public official. The indictment alleges a number of specific -- of separate means or methods by which the defendant is accused of violating the law. The government is not required to prove all the means or methods alleged in Count II of the indictment.

Each juror must agree with each of the other jurors, however, that the same means or methods alleged in Count II of the indictment were, in fact, engaged in or employed by the defendant in committing the crimes

charged in Count II of the indictment.

The jury need not unanimously agree on each means or method, but in order to convict must unanimously agree upon at least one of such means or method as engaged in by the defendant.

Unless the government has proven the same means or method to each of you beyond a reasonable doubt, you must acquit the defendant of the crime charged in Count II of the indictment.

In order to sustain its burden of proof on Counts I and II of the indictment, it is not necessary for the government to prove that the defendant personally did every act constituting the offense charged.

As a general rule, whatever a person is legally capable of doing himself, he can do through another acting as his agent.  So if the acts or conduct of another is deliberately ordered or directed by the defendant, or deliberately authorized or consented to by the defendant, then the law holds the defendant responsible for such acts or conduct, just the same as if personally done by him.

The evidence in this case consists of the sworn testimony of the witnesses, regardless of who may have called them, all the exhibits received in evidence,

regardless of who may have produced them, all the facts that may have been agreed to or stipulated.

When the attorneys on both sides stipulate or agree as to the existence of a fact, you may accept the stipulation as evidence and regard that fact as proved.  You are not required to do so, however, since you are the sole judges of the facts.

Any proposed testimony or proposed exhibit to which an objection was sustained by the judge, and any testimony or statement ordered stricken by the judge, must be entirely disregarded by you.

Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded.

Questions, objections, statements and arguments of counsel are not evidence in the case, unless made as an admission or stipulation of fact.

You are to base your verdict only on the evidence received in the case.

In your consideration of the evidence received, however, you are not limited to the bald statements of the witnesses or the bald assertions in the exhibits.

In other words, you're not limited solely to what you see and hear as the witnesses testify or as the exhibits are admitted.  You are permitted to draw from

1    the facts which you find have been proved such

2    reasonable inferences as you feel are justified in light

3    of your experience and common sense.

4              There are two types of evidence which are

5    generally presented during a trial:  direct evidence and

6    circumstantial evidence.

7              Direct evidence is the testimony of a person

8    who asserts or claims to have actual knowledge of a

9    fact, such as an eyewitness.

10             Circumstantial evidence is proof of a chain

11   of facts and circumstances indicating the existence of a

12   fact.

13             The law makes no distinction between the

14   weight or value to be given to either direct or

15   circumstantial evidence; nor is a greater degree of

16   certainty required of circumstantial evidence than

17   direct evidence.  You should weigh all the evidence in

18   the case.

19             Inferences are simply deductions or

20   conclusions which reason and common sense lead the jury

21   to draw from the evidence received in the case.

22             Testimony and exhibits can be admitted into

23   evidence during the trial only if it meets certain

24   criteria or standards.

25             It is the sworn duty of the attorney on each

side of the case to object when the other side offers testimony or an exhibit which that attorney believes is not properly admissible under the rules of law.

Only by raising an objection can a lawyer request and obtain a ruling from the judge on the admissibility of evidence being offered by the other side.

You should not be influenced against an attorney or their client because the attorneys made objections. Do not attempt, moreover, to interpret my rulings on objections as somehow indicating to you how I think you should decide this case. I am simply making a ruling on a legal question regarding that particular piece of testimony or exhibit.

The questions asked by a lawyer for either party to this case are not evidence. If a lawyer asks a question of a witness which contains an assertion of fact, therefore, you may not consider the assertion by the lawyer as any evidence of that fact, unless the witness agrees with the lawyer's assertion of fact. Only the answers are evidence.

Charts or summaries have been prepared by the government and have been admitted into evidence, and have been shown to you during the trial for the purpose of explaining facts that are allegedly contained in

books, records or other documents, which are also in evidence in this case.

You may consider the charts and summaries as you would any other evidence admitted during the trial, and give them such weight or importance, if any, as you feel they deserve.

You, as jurors, are the sole and exclusive judges of the credibility of the witnesses called to testify in the case, and only you can determine the importance or weight, if any, their testimony deserves.

After making your assessment concerning the credibility of a witness, you may decide to believe all of that witness's testimony, only a portion of it, or none of it.

In making your assessment of that witness, you should carefully scrutinize all the testimony given by the witness, the circumstances under which each witness has testified, and all the other evidence which tends to show whether a witness, in your opinion, is worthy of belief.

Consider each witness's intelligence, motive to falsify, state of mind, and appearance and manner while on the witness stand.

Consider the witness's ability to observe the matters to which he or she has testified, and

consider whether he or she impresses you as having an accurate memory or recollection of these matters.

Consider, also, any relation the witness may have to either side of the case, the manner in which the witness might be affected by your verdict, and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to disbelieve or discredit such testimony.

Two or more persons witnessing an incident or a transaction may simply see or hear it different.

Innocent misrecollection, like a failure of recollection, is not an uncommon human experience. In weighing the effect of a discrepancy, however, always consider whether it pertains to a matter of importance or an insignificant detail, and consider whether the discrepancy results from innocent error or from intentional falsehood.

After making your own judgment and assessment concerning the believability of a witness, you can then attach such importance or weight to that testimony, if any, you feel it deserves. You will then be in a position to decide whether the government has

proven the charge beyond a reasonable doubt.

The testimony of an alleged accomplice, someone who said he participated in the commission of the crime, must be examined and weighed by the jury with greater care than the testimony of a witness who did not participate in the commission of that crime.

The fact that an alleged accomplice has entered a plea of guilty to the offense charged is not evidence of the guilt of any other person, including the defendant.

The jury must determine whether the testimony of the accomplice has been affected by self-interest, or by an agreement that he may have with the government, or by his own interest in the outcome of the case, or by prejudice against the defendant.

The testimony of a witness may be discredited or, as we sometimes say, impeached by showing that he or she previously made some statements which are different than or inconsistent with his or her testimony here in court.

The earlier inconsistent or contradictory statements are admissible only to discredit or impeach the credibility of the witness and not to establish the truth of these earlier statements made somewhere other than here during this trial.

It is the province of the jury to determine the credibility of the witness who has made prior inconsistent or contradictory statements.

In evaluating the credibility of witnesses, you should take into account any evidence that the witness has testified -- who has testified may benefit in some way from the outcome of the case.

Such an interest in the outcome of the case creates a motive to testify falsely and may sway the witness to testify in a way that advances his own interests.

Therefore, if you find any witnesses -- any witness whose testimony you are considering may have an interest in the outcome of this trial, then you should bear that factor in mind when evaluating the credibility of his or her testimony and accept it with great care.

This is not to suggest that every witness who has an interest in the outcome of the case will testify falsely.  It is for you to decide what extent, if at all, the witness's interest has affected or colored his or her testimony.

You have heard the testimony of law enforcement officials.  The fact that a witness may be employed by the government as a law enforcement official does not mean that his testimony is necessarily

deserving of more or less consideration, or greater or lesser weight, than that of an ordinary witness.

At the same time, it is quite legitimate for defense counsel to try to attack the credibility of a law enforcement witness on the grounds that his testimony may be colored by personal or professional interest in the outcome of the case.

It is your decision, after reviewing all of the evidence in the case, whether to accept the testimony of the law enforcement witness and to give that testimony whatever weight, if any, you find it deserves.

Evidence relating to any statement, any alleged statement, confession, admission, or act or omission alleged to have been made by the defendant outside of court and after a crime has been committed, should always be considered by the jury with caution and weighed with great care.

All such alleged statements, confessions or admissions should be disregarded entirely, unless the other evidence in the case convinces the jury beyond a reasonable doubt that the statement, confession, admission, or act or omission was made or done knowingly and voluntarily.

In determining whether any alleged

statement, confession, admission, or act or omission alleged to have been made by the defendant outside of court and after a crime has been committed was knowingly and voluntarily made, the jury should consider the age, training, education, occupation, and physical and mental condition of the defendant, and his treatment while in custody or under interrogation, as shown by all the evidence in the case.

Also consider all the other circumstances in evidence surrounding the making of the alleged statement, confession or admission.

If, after considering the evidence, you determine that the statement, confession, admission, or act or omission was made knowingly and voluntarily, you may give it such weight as you feel it deserves under the circumstances.

Statements knowingly and voluntarily made by the defendant upon being informed that a crime has been committed, or upon being accused of a crime -- criminal charge, may be considered by the jury.

When a defendant voluntarily offers an explanation or voluntarily makes some statement tending to show his innocence and is later shown that the defendant knew that his statement or explanation was false, the jury may consider this as a showing of

consciousness of guilt on the part of the defendant, since it is reasonable to infer that an innocent person does not usually find it necessary to invent or fabricate an explanation or statement tending to establish his innocence.

Whether or not the -- evidence as to the defendant's explanation or statement points to a consciousness of guilt on his part, and the significance, if any, to attach to any such evidence are matters exclusively within the province of the jury, since you are the sole judges of the facts of this case.

In your evaluation of the evidence of an exculpatory statement shown to have been false, you may consider that there may be reasons fully consistent with innocence that could cause a person to give a false statement showing that he did not commit a crime.

Fear of law enforcement, reluctance to become involved, and simple mistake may cause a person who ha committed no crime to give such a statement or explanation.

Your decision on the facts of this case should not be determined by the number of witnesses testifying for or against a party. You should consider all the facts and circumstances in evidence to determine which of the witnesses you choose to believe or not to

believe.

You may find the testimony of a smaller number of witnesses on one side is more credible than the testimony of a greater number of witnesses on the other side.

If any reference by the judge or by the lawyers to matters of testimony or exhibits does not coincide with your own recollection of that evidence, it is your recollection which should control during the deliberations and not the statements of the judge or lawyers.  You are the sole judges of the evidence received in this case.

During the course of this trial, I may occasionally ask questions of a witness.  Do not assume I hold any opinion on the matters to which my questions may relate.  The judge may ask a question simply to clarify a matter, not to help one side of the case or hurt another side.

Remember at all times that you, as jurors, are the sole judges of the facts of this case.

Tape recordings of conversations have been received in evidence and have been played for you. Typewritten transcripts of these tape recorded conversations have been furnished to you.  These typewritten transcripts of the conversations are being

given to you solely for your convenience in assisting you in following the conversation or in identifying the speakers.

The tapes themselves are the evidence in the case, and the typewritten transcripts are not evidence. What you hear on the tapes is evidence. What you read on the transcript is not.

If you perceive any variation between the two, you will be guided solely by the tapes and not by the transcripts.

If you cannot, for example, determine from the tape recording that particular words were spoken, or if you cannot determine from the tape recording who said a particular word or words, you must disregard the transcripts insofar as those words or that speaker is concerned.

It is the duty of the judge to admonish an attorney who, out of zeal for his or her cause, does something which I feel is not in keeping with the rules of evidence or procedure.

You are to draw absolutely no inference against a side to whom an admonition of the judge may have been addressed during the trial of this case.

The defendant, Mr. Raushi J. Conrad, in a criminal case, has an absolute right under our

Constitution not to testify.  The fact that Mr. Conrad did not testify must not be discussed or considered in any way when deliberating and arriving at your verdict. No inference of any kind may be drawn from the fact that Mr. Conrad decided not to exercise his privilege under the Constitution and did not testify.

As stated before, the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

You are here to determine whether the government has proven the guilt of the defendant for the charge -- charges in the indictment beyond a reasonable doubt.  You're not called upon to return a verdict as to the guilt or innocence of any other person or persons.

So, if the evidence in the case convinces you beyond a reasonable doubt of the guilt of the defendant for the crimes charged in the indictment, you should so find, even though you may believe one or more other indicted -- unindicted persons are also guilty.

But if any reasonable doubt remains in your mind after impartial consideration of all the evidence in the case, it is your duty to find the defendant not guilty.

There's nothing particularly different in the way that a juror should consider in the evidence in

1 the trial from that in which any reasonable and careful

2 person would deal with any very important question that

3 must be resolved by examining facts, opinions and

4 evidence.

5 You are expected to use your good sense in

6 considering and evaluating the evidence in the case.

7 Use the evidence only for the purposes for which it has

8 been received, and give the evidence a reasonable and

9 fair construction in light of your common knowledge of

10 the natural tendencies and inclinations of human beings.

11 If the defendant be proved guilty beyond a

12 reasonable doubt, say so; if not proved guilty beyond a

13 reasonable doubt, say so.

14 Keep constantly in mind it would be a

15 violation of your sworn duty to base a verdict upon

16 anything other than evidence received in this case and

17 the instructions of the judge.

18 Remember as well that the law never imposes

19 upon a defendant in a criminal case the burden or duty

20 of calling any witnesses or producing any evidence,

21 since the burden of proving guilt beyond a reasonable

22 doubt is always with the government.

23 Upon retiring to the jury room to begin your

24 deliberation, you must elect one of your members to act

25 as your foreperson.  The foreperson will preside over

your deliberations and will be your spokesperson here in court.

Your verdict must represent the collective judgment of the jury.

In order to return a verdict, each -- it is necessary that each juror agree to it.  Your verdict, in other words, must be unanimous.

It is your duty as jurors to consult with one another and deliberate with one another with a view towards reaching agreement, if you can do so without violence to individual judgment.

Each of you must decide the case for himself and herself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors.

In the course of your deliberations, do not hesitate to reexamine your own views and to change your opinion if convinced it is erroneous.  Do not surrender your honest conviction, however, solely because of the opinion of your fellow jurors or the mere purpose of thereby being able to return a unanimous verdict.

Remember at all times that you are not partisans, you are judges, judges of the facts of this case.  Your sole interest is to seek the truth from the evidence received during the trial.

Your verdict must be based solely upon the evidence received in this case.  Nothing you have seen or read outside of court may be considered.

Nothing I have said or done during the course of this trial is intended in any way to somehow suggest to you what I think your verdict should be.

Nothing said in these instructions and nothing in any form of verdict which has been prepared for your convenience is to suggest or convey to you in any way or manner any intimation as to what verdict I think you should return.

What the verdict shall be is the exclusive duty and responsibility of the jury.  As I've told you many times, you are the sole judges of the facts.

The punishment provided by law for the offense charged in the indictment is a matter exclusively within the province of the judge and should never be considered by the jury in any way in arriving at an impartial verdict as the offenses charge.

The verdict form has been prepared and is fairly straightforward.  It lists Count I and Count II, guilty or not guilty.  It's that simple.

You will take this form to the jury room, and when you have reached a unanimous agreement as to your verdict, you will have your foreperson write your

verdict, date and sign the form, and then return with the verdict to the courtroom.

If it becomes necessary during your deliberations to communicate with the judge, you may send a note, signed by your foreperson or by one or more members of the jury, through the court security officer.

No member of the jury should ever attempt to communicate with the judge by any means other than a signed writing.  And the judge will never communicate with any member of the jury concerning the evidence, your opinions, or deliberations other than in writing or orally here in open court.

During your deliberations, you should not discuss or provide any information about the case with anyone.  This includes discussing the case in person, in writing, by phone, by any electronic means, via text messaging, social media, e-mail, Facebook, LinkedIn, Twitter, blogging, or Internet chat room, or any other feature.

In other words, do not talk to anyone on the phone or in person, correspond with anyone, or communicate by electronic means about this case with anyone except your fellow jurors, and then only while you are all in the jury room.

If you are asked or approached in any way

about your jury service or anything about this case, you should respond you've been ordered by the judge not to discuss the matter, and you should report the contact to the judge as soon as possible.

Along the same lines, you should not try to access any information about the case or do any research on any issue that arose during the trial from any outside source, including dictionaries, reference books, or anything on the Internet.  Information that you may find on the Internet or in a printed reference might be incorrect or incomplete.

In our court system, it is important that you not be influenced by anyone or anything outside of the courtroom.  Your sworn duty is to base this case solely and wholly on the evidence you received here in the courtroom.

You will note from the oath about to be taken by the court security officer that he, as well as all other persons, are forbidden to communicate in any way or manner with any member of the jury concerning the evidence, your opinions or deliberations.

Bear in mind, also, that you are never to reveal to any person, not even the judge, how the jury stands, numerically or otherwise, on the question of whether or not the government has sustained its burden

1    of proof until after you have reached a unanimous

2    verdict.

3              We'll have Mr. Hendrick come forward and

4    take the oath.

5              (Thereupon, Mr. Kim Hendrick, the court

6    security officer was duly sworn.)

7              MR. HENDRICK:  I shall.

8              THE CLERK:  Thank you.

9              THE COURT:  Ladies and gentlemen, for your

10   convenience, I've given each side about an hour.  I

11   don't know if they will each use a full hour.

12             I'm prepared to take a brief recess now, if

13   you would like, if anybody would like to do that for

14   purposes of convenience.  But the first argument is

15   30 minutes.

16             Should we go forward now, or would you like

17   a short break?

18             (Jurors indicating.)

19             THE COURT:  Short break?  Let's take about a

20   15-minute break.  Thank you.

21             (Jury not present.)

22             THE COURT:  Take a 15-minute recess.  Thank

23   you.

24             (Court recessed at 11:26 a.m. and reconvened

25             at 11:41 a.m.)

1          (Jury not present.)

2          THE COURT:  Ready to proceed, Counsel?

3          MR. BURKE:  Yes.

4          MR. WALKER:  Yes, Your Honor.

5          THE COURT:  Mr. Hendrick, you can bring out

6    our jury.

7          MR. HENDRICK:  Yes, Your Honor.

8          (Jury present.)

9          THE COURT:  You may be seated.

10          All right, Counsel, you may proceed.

11          MR. WALKER:  Thank you, Your Honor.

12          CLOSING ARGUMENT BY THE GOVERNMENT

13          MR. WALKER:  In December of 2010, the

14   defendant, Raushi Conrad, walked into the offices of

15   Team America in Manassas, Virginia, with this invoice,

16   an invoice he knew was fake, an invoice James Bedford

17   knew was fake, an invoice Glen Bertrand knew was fake,

18   an invoice you, members of the jury, now know is fake;

19   this invoice, for $55,000 worth of support services from

20   The Chicken Place Express to Team America, that simply

21   never happened.

22          So, why?

23          Why did the defendant walk into the offices

24   of Team America with this fake invoice?

25          Because now it was time for Team America to

hold up its end of the bargain.  The defendant had secured them a lucrative data migration contract, a contract that enabled Mr. Bedford and Mr. Bertrand to line their pockets with over a million dollars of government funds.

And so in December of 2010, it was the defendant's turn to get paid.  Over time, the defendant created fake invoice after fake invoice after fake invoice after fake invoice, to cover up the true nature of these payments, payments that he called by many names.  But you, members of the jury, know there's only one real name for what these payments were:  bribes.

The evidence has shown that the defendant, Mr. Bedford and Mr. Bertrand joined together to commit bribery.  And these fake invoices are the symbol of that agreement.

As the government in this case, we bear the burden of proof.  We have to prove to you beyond a reasonable doubt that the defendant is guilty of the crime he's been charged with.  And that is exactly what we have done.

Judge Lee has already instructed you on the law in this case and on the elements of each offense we have to prove.  But I want to walk through those elements with you briefly so we can really focus on what

is truly at issue here.

The defendant has been charged with two crimes, conspiracy to pay and receive bribes, and acceptance of bribes by a public official.

In order to prove that the defendant is guilt of conspiracy to pay and receive bribes, we had to prove four things:

First, that a conspiracy was entered into by two or more people.

Second, at some time during the conspiracy's existence, the defendant knew the purpose of the agreement.

Third, with knowledge of the purpose of the agreement, the defendant deliberately joined it.

And, fourth, during the conspiracy a member knowingly performed one of the overt acts charged in the indictment and did so to further and advance the purpose of the agreement.

We've also charged the defendant with acceptance of bribes by a public official.  In order to prove that the defendant is guilty of that offense, we had to prove essentially that the defendant received or agreed to receive something of value and that at the time of the office, the defendant was a public official of the United States and that the defendant agreed to

receive and accept something of value corruptly in
return for being influenced in the performance of any
official act.

So, essentially, members of the jury,
Count I, the conspiracy charge, is the illegal
agreement; and Count II, the substantive count, is
actually committing bribery.

Now, most of these issues aren't seriously
contested.  For example, the defendant has stipulated
that at the time of the offenses he was a public
official of the United States.

And it's clear that he received something of
value in the form of checks and free work done on his
basement.

So the real question before you is this:
Were the things the defendant received, the items of
value in return or exchange for the performance of
official act?

You know the answer to that question is yes.

To understand how that corrupt agreement
began, let's go back to the meeting that took place at
Team America's offices in the late spring of 2010.
After briefly discussing the data migration project with
Mr. Bedford, the defendant showed up out of the blue at
the offices of Team America and asked Mr. Bedford and

Mr. Bertrand for a $180,000 loan.

After Mr. Bedford and Mr. Bertrand told the defendant they couldn't afford to pay him a loan, the defendant then changed his story to an investment, an investment in the defendant's struggling chicken business.

Now it's clear that no one, not Mr. Bedford, not Mr. Bertrand, not the defendant, ever used the word "bribe." But in that moment everyone in that room knew exactly what was going on. They knew that the defendant's request for a loan or an investment was nothing more than a veiled solicitation request for a bribe.

Mr. Bedford and Mr. Bertrand agreed to that request, and shortly thereafter they obtained the data migration contract.

And just how did they obtain that contract?

Because the defendant made it so that they would. It was the defendant's idea to hire Bedford's Images.

The defendant admitted to law enforcement on multiple occasions that it was his idea. The defendant cut everyone else out of the process almost entirely.

Think about Mr. Moffett and Mr. Bryant. It was supposed to be Mr. Moffett's job to interface with

Mr. Bryant to come up with recommendations and
suggestions to meet BIS's needs.

But it was the defendant who first mentioned
Bedford's Images to Mr. Moffett.

And Mr. Bryant told you that the defendant
was emphatic when he said Bedford's Images should be
hired.

Now, members of the jury, it's not just that
Bedford's Images was hired, but it's also how they were
hired that shows the corrupt nature of this agreement.

Take a look at some of the things that
didn't happen before Bedford's Images was hired.

There was no market research conducted to
determine what type of work -- what type of cost work
like this would incur.

There was no comparison shopping to see if
another vendor could perform the work more affordably.

No formal competitive bids were ever
submitted.

And no one, including the prime contractor
involved in the project, knew anything about Bedford's
Images aside from what the defendant told them.

And if you needed any more evidence of the
corrupt agreement between the defendant and his
coconspirators, then look no further than the option he

ignored that was sitting right down the hall.

Dr. Jian Mao testified that his company, Notion Consulting, had performed a host of services technologically for BIS in the past. They actually designed the very network that the files were being migrated onto.

They could have provided advice about the best way to go about tackling the project. They could have provided insight when problems were occurring. They could have done the work themselves.

Yet, Dr. Mao was never asked a single question, never approached by the defendant, never given a meaningful opportunity to compete for the work.

The defendant instead chose Bedford's Images. The defendant instead chose to do not what was best for BIS, but what was best for him.

If the defendant truly cared about the government getting bang for its buck, then it would have explored other options.

You heard from multiple witnesses on the stand about how intelligent the defendant was and about how good he was at his job.

But someone who is good at what they do, who is truly trying to do what is right, doesn't refuse to take very simple steps that could have saved the

government hundreds of thousands of dollars.

Those steps weren't taken, because in order for the defendant's corrupt agreement to even get off the ground, Bedford's Images needed to be hired.  And the defendant saw to it.

And once Bedford's Images was hired, Bedford's Images was awarded the contract, and the defendant did everything in his power to protect his corrupt bargain.

In his opening statement, Mr. Simms said the defendant, quote:  "Was not good at crossing his t's and doting his i's."

But when it came to protecting his corrupt agreement, the defendant tried to do just that.  He ensured that no one had any real substantive contact with Bedford's Images from the outset.

The defendant exercised what multiple witnesses called complete control over the project.  It was the defendant who determined the process for how the files would be transferred.  It was the defendant who determined whose files will be transferred.  It was the defendant who came up with the method for converting files.  It was the defendant who took the files offsite, to BIS.  It was the defendant who brought the files back from BIS.

1    And when others tried to learn more about
2  the process, to wrap their arms around the data
3  migration project, the defendant simply shut them out.
4    You heard from Ms. Sins, who said she wanted
5  to know more.  She wanted to stop the data migration
6  work.  And so she approached the defendant, and the
7  defendant didn't even give her the name of the vendor.
8    And what do we know about the product the
9  vendor used for this work?
10    You heard from Mr. Bedford on
11  cross-examination that he told the defendant about that
12  product while the data migration work was ongoing.
13    Members of the jury, this is that product.
14  Instead of choosing Dr. Mao with his Ph.D. in physics,
15  or some other qualified company, the defendant wanted
16  Bedford's Images, a company who used an off-the-shelf
17  PDF converter that cost $209.97 from Office Depot.
18    The defendant had decades of IT experience.
19  He knew what was being used to perform this work.  He
20  chose to look the other way.
21    If the defendant was truly trying to do what
22  was right, he would have stopped Bedford's Images.
23    And what do we know about how much money
24  Bedford's Images spent on this project?
25    Because aside from this off-the-shelf PDF

converter, the only other expense Bedford's Images incurred were from the contractors who were hired to perform the work, contractors who had no specialized computer knowledge or training. And even if they did, they told you they weren't using it in this case; contractors who described the work as tedious and repetitive, contractors who said they weren't using any specialized knowledge or training.

So why is that important?

Let's look at just how much money Team America profited from this contract. $1.1 million in revenue, just $60,000 in cost; north of a million dollars in profits.

Members of the jury, Team America's costs were 18 times less than its profits. And those exorbitant profits matter.

First, they make it clear that there should have been a competitive bid process so that the government wasn't losing its shirt over this work.

Second, they provide incentive for Mr. Bedford and Mr. Bertrand to enter into this corrupt agreement, because they would still be able to pay the defendant $208,000 in checks to perform thousands of dollars of renovation work on his basement and still profit handsomely.

And it provided the defendant leverage to solicit the bribes in the first place.

The defendant's official acts didn't stop at just ensuring that Bedford's Images received the data migration contract, because the defendant knew that the work being performed was shoddy.  Yet he still continued to siphon money and work to Bedford's Images.

It doesn't matter if the defendant didn't know about the process, because as the man in charge of the project, he knew the results:  Files that were completely missing, PDFs with unidentifiable characters, spreadsheets with missing formulas, files that were totally unusable.  The problems were rampant.

The defense has made much of the defendant's relationship with his former coworkers, namely Ms. Sins, Mr. Donnell, Mr. Moffett, in an effort to suggest that they were setting the defendant up to fail.

Despite the fact that there is no evidence that those individuals were setting the defendant up to fail, think about what you heard from Mr. Horner and Mr. Rolfe, two individuals who don't have a dog in this fight, who just wanted their files and the files of other BIS employees to be working properly.  They, too, complained to the defendant about the work.

On February 23rd, 2011, Mr. Horner e-mailed

the defendant.  And you can see right here that he told him, "I don't know who you got to move these files, but most of them are not formatted correctly.  They're missing spreadsheet labels.  It would have been impossible for us to clean them up."

And just six days later, he e-mails the defendant again, says, "I don't think OCIO got a full return on its investment.  You paid for services that were not of quality.  Several files were worthless. Money thrown away."

But the complaints didn't stop there, because Mr. Rolfe e-mailed the defendant on March 14th, 2011, and he told the defendant that the promised magic transfer of these files didn't seem to happen to anyone he had spoken to.

He described this as a colossal IT snafu. Files were corrupted.  Data was missing.  Formats were distorted; not exactly what the defendant indicated.

The defendant was aware of multiple complaints regarding the work.  He was well aware that there was a problem with the work being done on the project.

Yet, despite all these complaints he was receiving, despite the complaints that Ms. Sins and others relayed to him almost daily, the work never

improved and the work never stopped.

If the defendant was doing his job to the best of his ability and not engaged in a corrupt agreement, he wouldn't have continued to funnel work to Bedford's Images so that they could get more money.

And so, after all of that, the defendant didn't stop Bedford's Images. No, he doubled down and committed another official act by requesting an additional $55,000 for the work.

And why?

Why, in the face of all of these complaints, would he request more money for Bedford's Images to do more work?

Well, because now, in addition to the checks he was receiving, he was also getting free renovation work done on his basement.

Four witnesses testified about the work they did on the defendant's basement.

May 2011, Charles Boyd performs $2,700 worth of plumbing and heating work.

Also in May 2011, Quentin Powell performs a host of electrical services for the defendant, $2,895 worth.

Again, in June 2011, Quentin Powell performs another $1,865 worth of electrical work.

And in August of 2011, Delaney Harris performs $300 worth of work installing a thermostat and a control board in the defendant's basement.

These men were independent contractors. They were not employees of Team America. They were not sitting on their hands with nothing to do, as the defense suggested in their opening statement. No.

Mr. Bertrand sought them out and he told them to go to the defendant's basement and do exactly what the defendant asked them to do.

And then there was Charly Orellana-Nogales. Mr. Nogales testified that in the Summer of 2011, he worked at the defendant's basement for six weeks, installing drywall, sandblasting walls, raising walls, connecting a bath and shower, installing a door; six weeks, eight hours a day, forty hours a week; not to mention the work that Mr. Orellana's father and his brother and his friend did at the defendant's basement.

Mr. Orellana paid for all of those -- those supplies with a Team America credit card, not with a card from the defendant.

All of these men -- Mr. Boyd, Mr. Powell, Mr. Harris, Mr. Nogales -- they all performed work at the defendant's basement. They were all paid by Team America, and the defendant never repaid Team America one

cent.

And so the defendant repays Team America in a different way, not by writing a check for the money for the work that was being done in his basement, but by requesting an additional $55,000 in funding just a month after the summer work renovating his basement had ended.

That, members of the jury, is the very definition of quid pro quo, this for that.

That quid pro quo becomes even clearer when we compare the timing of when Bedford's Images got paid to the timing of when the defendant got paid by Team America.  So, let's look at that timing.

November 5th, 2010, Tridea Works makes a payment to Bedford's Images for $125,000.  Just one week later, Team America pays the defendant's business, the Chicken Place Express, $18,000.

December 7th, 2010, Bedford's Images gets paid, and just eight days later the defendant gets paid, a check for $55,000 of support services that never happened.

March 7th, 2011, Bedford's Images gets paid $400,000.  Three days later, Team America pays the defendant $50,000, again for support services that never happened.

And finally, May, May of 2011, Bedford's

Images gets paid, and just one day later, May 3rd, 2011, Team America pays the defendant $20,000, again for support services that never happened.

All of these payments were made while the defendant was in control and minding the data migration project.

Members of the jury, that evidence of a quid pro quo is not just a coincidence.  Time and time again, this was the script:  James Bedford gets paid, the defendant gets paid; this for that.

And if you had any doubt about whether everyone involved in this corrupt agreement knew exactly what was going on, then take a look at the memo line of this check.  That memo line says this check was for data migration.

We know The Chicken Place Express wasn't performing data migration work for Team America.

But who was performing data migration work, and who got them that work?

When the defendant went and picked up this check that had a memo line that read "data migration," do you think that he had any doubt what this check was for?

That memo line is not just a Freudian slip. It reveals that everyone knew what this was.

So what did those checks and that free work the defendant receive all amount to?

$208,000 in checks, $7,800 in renovation work done on his basement.  And keep in mind that that figure doesn't even factor in -- take into account the six weeks of work and 240 hours of work done by Mr. Nogales, because he was a Team America employee not an independent contractor.  So, of course, there are no records of that.

But you know it happened, because Mr. Nogales, again a man with no stake in this case, told you it did.  He told you that his boss, Mr. Bertrand, told him to go to the defendant's basement and do whatever the defendant told him.  And that's exactly what he did.

Those checks, that free work, that's why the defendant entered into this corrupt bargain.  That's why he kept feeding work to Bedford's Images.

Now, as I explained to you earlier, the government bears the burden of proof.  That means that the defendant has no burden.

But think about the claims the defense made in their opening statement, claims that are simply just not supported by the evidence.  Let's walk through a couple of those claims so we can talk about why they

1  just don't add up.

2          First, the claim that this was -- this

3  agreement was a loan or an investment.

4          Members of the jury, you get to use your

5  common sense when evaluating the defendant's guilt.  And

6  common sense suggests that when something is a loan,

7  it's supposed to be paid back; maybe not all at once,

8  but over time some efforts are made to repay the debt.

9          The defendant never repaid a loan in this

10  case.  Mr. Bedford told you that there was no loan, and

11  the defendant never repaid him back; no evidence of a

12  repayment plan, no evidence of a promissory note, no

13  discussion of an interest rate, no evidence of repayment

14  whatsoever.

15          And the notion that this was an investment

16  carries little weight as well.  No business plans

17  detailing profit sharing.  There were no discussions as

18  to ownership structures, no agreement, not even so much

19  as signatures on a napkin.

20          This was, again, an attempt by the defendant

21  to cover up his tracks.  If this was truly an

22  investment, then he wouldn't have needed to create fake

23  invoices.

24          If this was truly an investment, the

25  defendant wouldn't have needed to cover his tracks.

There would be something, some evidence of an agreement between the defendant and his coconspirators.  This supposed investment was nothing of the sort.

You heard that this supposed loan or investment was only discussed one time in that initial meeting.  And why is that?  Because it was pretext.  There was no more discussion because there was no loan.  There was no investment.

Think about what you heard from law enforcement about the thoroughness of the investigation in this case.

The case agent reviewed over three terabytes of electronic data and box after box of hard-copy records from the defendant and Team America.

FBI Forensic Accountant Showlatha Johnson scoured almost 30 bank accounts, trying to find evidence of a repayment on this supposed loan from the defendant to Mr. Bedford, or from the defendant's businesses to Team America.  She found no evidence of repayment of a supposed loan.

Members of the jury, law enforcement didn't find those -- that evidence because they didn't look hard enough; clearly they did.  They didn't find it because it doesn't exist.

The evidence shows that these payments were

not loans.  But let's assume for a moment that they were.

If the defendant received a loan from Team America that had no repayment plan, that he never paid back, that was no -- that had no interest rate, well, then, he still received a thing of value because he would never be able to get a loan on those terms in the real world.  And the only reason he was able to get a loan on those terms is because of the position he held.

Similarly, if the defendant received an investment on those terms, he also received a thing of value.  And that's because no businessperson in his or her right mind would ever agree to an investment structure that had no formalized agreement, no discussion of when this supposed investment was going to pay dividends.

So even if you believe these payments were loans or an investment, they are still something of value the defendant received in exchange for his official acts.

Now let's talk about the BIS witnesses. Because the defense spent much of his cross-examination of those witnesses attempting to show that the defendant didn't have as much control as we said he did, and that other BIS employees, namely Ms. Sins, Mr. Donnell,

1  Mr. Bryant and -- of SPAWAR, were asleep at the
2  controls.
3          But remember, the defendant himself admitted
4  to law enforcement that he was in control of the
5  project.  He admitted that it was his decision to hire
6  Bedford's Images.  It doesn't matter if other employees
7  needed to take steps to actually formalize that hiring.
8          And to make that clear, let's take a look at
9  a portion of the jury instruction on "official act" you
10 received.  A decision or action or a qualifying step
11 would qualify as an official act.  An official act also
12 includes a public official exerting pressure or
13 advice -- pressure on another official to perform an
14 official act, or providing advice to another official,
15 knowing or intending that such advice will form the
16 basis for an official act by another official.
17         Members of the jury, I know that seems like
18 a mouthful, but what matters is that the defendant did
19 just that.
20         When he told Mr. Moffett that Bedford's
21 Images was the company he wanted hired, when he told
22 Mr. Bryant, and that he was emphatic in doing so, that's
23 what mattered.
24         So when his pressure or advice ultimately
25 resulted in steps taken by Mr. Bryant and Mr. Moffett to

make that hiring happen, well, then the defendant
performed an official act.  He exercised the control
that mattered most.

And regarding BIS employees being asleep at
the controls, members of the jury, we don't disagree.
Other BIS employees should have done a better job of
policing the defendant's behavior.

But you know what all that really means?

It means the defendant had the opportunity
to commit this crime.  Their lack of control doesn't
excuse his behavior.  It explains it.  Their lack of
control allowed an intelligent man to seize upon an
opening to commit this crime.

I want to close, members of the jury, by
talking to you a bit more about the admissions the
defendant made to law enforcement and his attempts at
concealment that further prove the evidence of his
guilt.

The defendant was interviewed three times by
law enforcement.  And over the course of those
interviews he made several important admissions.

He admitted that it was his idea to hire
Bedford's Images.  He admitted that "CPE" stood for
Chicken Place Express.  And that's important because the
checks written from Team America were written to CPE,

the defendant's business.

He admitted that he received payments from Team America.  He admitted that he deposit the checks from Team America.

He admitted he did no work for the checks from Team America.  He admitted that he did not perform the work in the check memo lines.  He admitted the invoices were fake.

Those admissions are important.  But there is another part of this story that's just as important, too.  Because the defendant -- his attempts at concealment prove his guilt as well.

Think about how the defendant's story kept shifting over time.  In 2011, when the defendant was first interviewed, the investigation was just beginning. And the reality of the fact is the agents didn't know about those secret bribe payments then.

You'll have the trans- -- the recording of that interview in the deliberation room, and you can listen to it as many times as you would like.  Listen carefully to the nervousness, the hesitation in the defendant's voice.  It's clear that he is trying to suss out just how much the agents knew.

And so, at the end of that interview, when he realized they had not asked him about the secret

payments, you know, having listened to a clip of that interview, the defendant lied. When asked, "What's your relationship" -- "outside relationship with Team America," the defendant said, "I don't really have one with Team America."

"I don't really have one with Team America." Think about that, members of the jury. Two months before this interview took place, the defendant was still receiving checks. The defendant was still having work done on his basement.

By October 19th, 2011, when this interview took place, the defendant had $215,000 worth of outside relationship with Team America. Those checks, that free work, they are the very definition of an outside relationship.

The defendant's attempts at concealment didn't stop there. Over time he was interviewed twice more. In that second interview, he admitted that he received the payments, but provided no explanation whatsoever as to why he did.

In the third interview, he initially said these payments were a loan. Then he changed his story and said these payments were an investment.

You heard from Supervisory Special Agent Luebke that over the course of that same interview, the

defendant's story kept changing.  Whether it was saying there was no outside relationship, or providing no explanation for the payments, or saying these payments were a loan, or saying that it was an investment, the defendant's story kept shifting.

But, members of the jury, you don't have to tell four different stories if you're telling the truth from the beginning.

The defendant didn't resign because he wanted to take accountability for his actions.  He resigned because he wanted this all to go away.  And accountability surely isn't lying to law enforcement in a recorded interview.  These shifting stories, this changing narrative:  the defendant's attempts to cover up his crime.  Just as Mr. Burke said in our opening statement, the coverup proves the crime.

You heard from Mr. Bedford himself, a man who has pled guilty and who has admitted to conspiring with the defendant and to paying him bribes.

The defense has tried to insinuate that because Mr. Bedford didn't tell the truth initially about the existence of those bribes, well, that means his testimony must be bought and sold.

But members of the jury, no one wants to admit they've committed a crime.  The defendant,

Mr. Bedford and Mr. Bertrand, didn't tell anyone about their arrangement.

And so it wasn't until after Mr. Bedford was confronted with the evidence against him that he told the truth.  And now he must suffer the consequences of his agreement with the defendant.

But think about what he told you on the stand.  He told you that he paid the defendant in exchange for the data migration contract.  He told you this situation was a classic wink and a nod.  He told you this situation was pay for play.

No matter how much the defendant tries to insinuate that Mr. Bedford was untruthful on the stand, no matter what they say, no matter what we say, you, members of the jury, get to judge Mr. Bedford's credibility, his remorse, his contriteness for yourselves.

Pretend for a moment that Mr. Bedford never even took the stand.  All of the other evidence still proves the defendant is guilty.  The defendant's decision to hire Bedford's Images, the defendant's control over the project, the defendant requesting additional funding despite numerous complaints, the defendant creating fake invoices, the defendant receiving free work on his basement, the defendant's

shifting stories, all of it proves he is guilty beyond a reasonable doubt, no matter how much time they spend trying to discredit Mr. Bedford.

Everything you've heard from the defense over the course of this trial are just more attempts to cover up the crime.

This case isn't a case about blurred lines, as the defense would have you believe.  It's a case about a corrupt public official who took bribes in exchange for official acts.

At every turn, the defendant tried to conceal what he and his coconspirators knew all along. These were bribes.

Members of the jury, public officials who control how government money is spent have a lot of power.  And the higher up that chain you go, the power becomes greater.  But with that power comes the responsibility not to use the position of trust for your own personal gain.

That's exactly what the defendant did here. He steered a government contract towards two men he conspired with to commit bribery.  He abused his power. But now the tables have turned, and the power is in your hands.

The defendant has claimed that he's taken

accountability for his actions.  But members of the
jury, accountability lies with you.  When you go back
into that deliberation room, you're going to see, just
like you've seen throughout this entire trial, when you
review the evidence, that the defendant is guilty of
conspiracy to commit bribery and bribery.

Hold him accountable.  That is why we ask
that you find him guilty.

Thank you.

THE COURT:  Why don't you stand and stretch
for a moment.

(Pause.)

THE COURT:  Mr. Simms, you're ready?

MR. SIMMS:  Yes.

THE COURT:  All right.

CLOSING ARGUMENT BY THE DEFENDANT

MR. SIMMS:  Ladies and gentlemen, the
government had a burden to meet.  That burden is proof
beyond a reasonable doubt.  Mr. Conrad is presumed
innocent until and unless the government meets that
burden.

In this case, the government has failed to
meet that burden.  And let's talk about that.

So amongst all the papers and documents,
e-mails, charts, checks, tax records and government

forms that the government has put into evidence, they've only called one witness, one witness, who is interpreting what happened as a bribe, and that was James Bedford.

You didn't hear from Mr. Bertrand.  It's the government's burden.  They didn't call him.  I guess we can put him on a milk carton because he was not called to testify to anything about his relationship with Mr. Conrad or even his relationship with Mr. Bedford.

So, let's talk about Mr. Bedford, the only witness that they did call to discuss this.

What do we know about Mr. Bedford?

Well, as Mr. Walker just stated, if you tell me the truth, then you don't need four different versions of a story.

Well, we know that Mr. Bedford had several different versions of events, several different stories that he told agents several different versions when he testified before you.

So we know that Mr. Bedford was a disgruntled contractor.  He said he had been contracting for over 20 years.

In his own personal statement to the Court that he typed out, he stated that he had a frustration because he was missing out on contracts.

Now he didn't take accountability that maybe he was missing on contracts because he was bidding too high, or maybe his company just wasn't qualified. He says that he was missing out on contracts because he wasn't paying for them.

And he was tired of seeing other people get contracts that he thought his company should get, and he thought that it was a good old boy network and a pay for play type of system.

So, in his mind, he came to the conclusion that, "I've got to pay money in order to get contracts."

Mr. Conrad never told him that. Mr. Conrad never told him, "Hey, this is how the game works. You've got to pay money or give things of value and then you get what you want." Never had that type of conversation with Mr. Conrad.

Now, what else do we know about Mr. Bedford?

We know that he lied to the government. We know he cheated the government and he stole from the government. He inflated every single invoice he submitted for payment.

He didn't even ease into it. His first invoice that he submitted for the migration project had lies in it, and he got paid over a hundred thousand dollars based on those lies.

Mr. Bedford, ladies and gentlemen, was a brazen liar and a brazen thief, with no remorse.

He was good at deceiving individuals. You heard from his family friend who said she had known Mr. Bedford for over 20 years, known him for over 20 years, and had no idea that he was lying to the government and stealing this money. So he's good at deceiving people as well.

We know he had various different versions of why he gave money to Mr. Conrad. First he says it was a loan. Then he says it was a restaurant venture.

And then, when he's confronted with these invoices, he realized that he's in hot water. He realizes that the government has caught him on his lies, his thievery, and the story changes.

At this time he says, "Well, you know what? Although Mr. Conrad told us that it would be a loan or an investment, I took it to be a bribe."

Now that doesn't make any sense. And we'll get to that later on.

Let's look at Mr. Bedford's plea agreement and his motivation to lie in this case. So, the plea agreement that Mr. Bedford signed is kind of like a contract. There's agreements on the part of what the government will do, and Mr. Bedford is supposed to be

agreeing to things that he will do.

Now, a part of that contract that Mr. Bedford signed, a part of that plea agreement, is a clause that states that upon the motion of the government, they could -- they have the discretion to file for a reduction of a sentence.

And, Mr. Bedford told you on the stand that, by testifying, he hoped to get a reduction in his sentence.

Now, ladies and gentlemen, we didn't get into specifics, but we all have eyes and ears and we can see that Mr. Bedford is not a physically healthy individual. He could barely make it through half a day of testimony. Do you think he can make it through one day in jail?

So think about that incentive that he would have to lie, that self-preservation.

The government will have you believe that because Mr. Bedford signed this plea agreement, which is like a contract, and he has promised not to lie, that you should believe him.

But hasn't he signed other government contracts before and lied on them over and over and over again?

Mr. Bedford is not a credible individual.

He is not someone who is trustworthy. He is someone who is looking out for himself, especially now.

Now, we know that he lied in order to get money. His company profited over a million dollars at the government's expense. And that was just for money.

Now, what's more important to an individual than money, ladies and gentlemen?

What's more important than money?

Your freedom. Your liberty. Mr. Bedford is in the position where he's facing a significant amount of jail time. We know he lied to get money. No doubt that he would lie to maintain his freedom, to maintain his liberty and not to go to jail.

Let's look at his testimony. He states that he -- he overheard Mr. Conrad complaining about the data migration project, just walked by and overheard him complaining about it.

He says he approached Mr. Conrad, unsolicited, and said, "Hey, I have over 20 years of doing data migration projects. I used to -- I've worked for Department of -- the Department of Navy and other contractors. I even have a website. You should go take a look at it and see what you think."

So that was his testimony to you all. Then he says that shortly after that, Mr. Conrad approached

Mr. Bedford and Mr. Bertrand and asked for a loan or an investment of $180,000.

And he said that he and his business partner said, "No, we can't do it, because we can't give you all of that money at the same time."

There was no further discussion of the loan, no further discussion of an investment at all.

Mr. Bedford and Mr. Bertrand said no.  But they still get the contract.  They get the contract, and they get their first payment in August.  That first payment is over a hundred thousand dollars.

Now, in November -- or, sorry, in December, it's about five or six months, or five months after the conversation, he says that Conrad shows up to the office with an invoice and gives it to Ms. Alice (sic) for payment.

He says that he gets the invoice, shows it to Mr. Bertrand.  They take a look at it.  They don't call Mr. Conrad -- and keep in mind, Mr. Bertrand and Mr. Conrad are family.  Mr. Bedford also knows Mr. Conrad quite well.

They don't call him.  They don't e-mail him. They don't do anything.  And they say, "We got it, and we just decided to pay it."

And he said they paid it because, "In our

mind, we thought it was a wink and a nod, a request for a bribe."  No confirmation from Mr. Conrad.  He never used the word "bribe."  He never talked to them about that, but that's what they took it to mean.

So, they paid it, and they continued to pay it -- pay invoices even after the data migration project was done.

And in his personal statement he said, "I felt compelled to pay those invoices because Mr. Conrad was like family."  And he says, Mr. Conrad recommended him for the contract.

Well, who told him that?  Who told him that? He's assuming that information.  Because, as I stated before, after the request for a loan, there was never any other conversation between the two of them about that contract.

There was never any conversation, when Mr. Conrad ask for the loan, about a contract.  The only time there was a discussion about the data migration contract was when Mr. Bedford told Mr. Conrad that, "Hey, I have the experience.  My company can do it."

Now, why doesn't Mr. Bedford's story make any sense?

Well, he said that they didn't agree to the investment of the loan because they didn't have $180,000

1   to give at one time.

2           Well, ladies and gentlemen, they never gave
3   the defendant $180,000 at one time.

4           Another reason why his story doesn't make
5   sense:  If this was actually a bribe scheme, then why
6   wouldn't Mr. Conrad approach them right after they got
7   awarded that contract?

8           He asked for the investment of the loan in
9   early June.  Bedford's Images got paid over a hundred
10  thousand dollars in August.

11          How come Mr. Conrad, if it was a bribe,
12  didn't go and get his piece of pie at that time?

13          Instead, Mr. Bedford's story states that
14  there was no communication about anything for five
15  months, and then magically an invoice comes, and then
16  once again the payments continued, even after the data
17  migration contract ends.

18          Now, let's talk about the invoices and
19  payments.  So, the government has entered into several
20  invoices that were given from Raushi Conrad to Team of
21  America contractors, Bedford Images.

22          He didn't deny those invoices.  He also
23  didn't deny getting payment from Team of America,
24  Bedford Images.

25          Now neither of those, standing alone, are

violations of law.  And let's talk about and look at
those things using common sense, everyday common sense.

So, if this was a bribe payment, why in the
world is Mr. Conrad creating a paper trail?

Why would he do that?  What's the purpose of
going there, presenting the invoice, holding it up like
a ticket, like -- "I'm ready for my bribe payment.
Here, take this and keep it in your records just in case
investigators ever want to -- ever want to come, they
can confirm that I got paid for a bribe"?

Makes no sense whatsoever.

And look at the invoices and the subject
line and what they say.

Now, "CPE" is Chicken Place Express.  It's a
restaurant.  Food services.  If Mr. Conrad was trying to
use the invoices to hide a bribe, wouldn't he put
"vendor services" or something to do with food on those
invoices?

Why in the world would he put "engineering
services," "support services," things of that nature?

It doesn't make any sense.

Ladies and gentlemen, you're allowed to make
inferences.  And the inference in this case is that
those invoices were just documentations of the loan
payments that Bedford Images were giving to Mr. Conrad.

They weren't an attempt to cover up anything.

Now, let's look at the checks.  And you heard me ask witness after witness for the government that testified about the checks:  So those checks were written out to CPE, also known as Chicken Place Express. They were deposited into two separate accounts.  Both accounts are tied back to Raushi Conrad.

Let's talk about common sense again.  Why is Mr. Conrad creating a paper trail if this is a bribe?

He's depositing checks into banking accounts that go directly back to him.  And as I stated in opening, the government stated, and also his former colleagues stated, Mr. Conrad is an intelligent individual, too smart, if this was a bribe payment, to deposit checks into his own account for bribery payments.

Ladies and gentlemen, common sense calls us to know that when people get paid for bribes, they get cash.  They don't want a paper trail coming back to them.  They don't want individuals who can investigate to be able to track down their checks.

In this case, the investigators were able to go right to Mr. Conrad's banking account and look at the checks.  They were right there.  He never denied receiving them.

The things that Mr. Conrad did make no sense for someone that was committing criminal activity. It's like robbing a bank, getting the money, and then leaving your business card with the teller you just took the money from and leaving. It makes no sense.

Now let's talk about the work on the basement.

Once again, Mr. Bertrand and Mr. Conrad are family. Mr. Bertrand handles the construction side of the company. That's what Mr. Bedford stated. He handles the construction side. Mr. Bedford handles the digital technology side.

Individuals came to -- they worked for Team of America. Mr. Bertrand's side of the business came to Mr. Conrad's house and did work.

Now, in terms of what was actually done, I tend to question because, as Mr. Harris stated, when he went to the basement it was in pristine condition.

But Quentin Powell said when he went there, it looked as though the place was under construction.

But, any event, their testimony was that they went there and they performed work at the direction of Mr. Bertrand.

Now, Mr. Bedford testified about the work and the work being done, but never stated why they paid

1   the contractors.  He didn't say, "Oh, we paid them
2   because we wanted to continue getting contract work."
3   He simply stated that they didn't pay it.
4              Now, there could be various reasons why
5   Mr. Bertrand didn't require Mr. Conrad to repay him for
6   the basement work.  It could have been because he was
7   family.  It could have been because he owed him for
8   something -- not government contract work -- for
9   something that Mr. Conrad had done for him.  But we
10  don't know that because the government didn't call
11  Mr. Bertrand.
12             Now, the government has made a great deal
13  about the repayment of the loan.
14             Now, first off, not repaying a loan or
15  investment is not a crime.  Now, it can be -- cause a
16  civil judgment against you, but it's not a crime.
17             And let's be real.  Mr. Conrad was in debt
18  to a lot of people.  He wasn't good at repaying people
19  after he borrowed money.
20             Now, there's been discussion from three
21  witnesses about a restaurant venture, and one witness
22  had talked about the truck hut.
23             Now, when you think about it, Mr. Bedford
24  wanted to go into the restaurant business.
25             Who's the expert or who has been involved in

the restaurant business for years?

Who has a restaurant that, as Mr. Bedford testified to, has this chicken sauce that -- that has value to it?  That's Mr. Conrad.

So, three witnesses testified that they were seeking out a restaurant location, even as late as 2012, to open.

I would submit to you that, once again, you're allowed to make inferences.  And acting as a consultant, possibly giving Mr. Bedford the sauce to the recipe to that chicken, is a thing of value.

I'm going to draw your attention to some of the instructions that the Court gave you previously.

I'm going to draw -- I want you to look at, when you go back to the jury room, instruction 20.  It talks about Count II of the indictment, and it states that the public official would have to have done something, directly or indirectly, knowingly, corruptly, demand, seek, receive, accept, and agree to receive and accept, things of value -- and this is what I'm going to emphasize on here -- in return for promising to perform and performing official acts.

So, look at the evidence in this case. There has been no witnesses called that testified that Mr. Conrad said that he promised to perform an official

act for them.

When did he ever promise Bedford Images that he was going to perform official acts for them?

It wasn't during the time that Mr. Bedford came and said, "We have experience doing data migration projects."  It wasn't when Mr. Conrad asked for a loan or an investment.  And it certainly wasn't when Mr. Bedford got this invoice for Ms. Alice (sic).  There was never any promise to do anything in return. Mr. Bedford took it for what he wanted to.

Now, you heard from Kim Sins, one of Mr. Conrad's former colleagues.  And she was adamant -- I believe she said it three times -- that Mr. Conrad did not select the vendor in this case.

Now, you also heard from Kim Bryant from SPAWAR.  Kim Bryant said that he did receive a call from Mr. Conrad about Bedford Images, but there was no testimony about any pressure.

Mr. Walker stated that Mr. Bryant testified that Mr. Conrad was emphatic.

I don't recall that testimony.  Your recollection controls.  If you heard that word, I did not.  I heard testimony about Mr. Conrad making a phone call to Mr. Bryant and mentioning Bedford Images.

Mr. Bryant never said that Mr. Conrad

threatened him.  Mr. Bryant never said that Mr. Conrad pressured him or put any undue influence on him to choose Bedford Images.

Now let's talk about that, for Mr. Bryant to choose Bedford Images.

Mr. Bryant testified on the stand that he doesn't have the authority or the power to choose the subcontractor.  That's Tridea.  Tridea selects who the subcontractor would be.  So they would be the individuals to select Bedford Images.

Now, when Henry Hodor took the stand and talked about his role in the data migration project, he said he never had any conversation with Mr. Conrad at all.  He said he never had any communication with Mr. Conrad at all.

So, where is the official act?

Where is the pressure?

Where is the promising to perform?

Ladies and gentlemen, the evidence does not show that there was any promise to perform.  The evidence is lacking an official act.

Now, let's focus on the aspect or the element where the public official must receive and accept things in exchange for the official act.

So we've just discussed that, about

Mr. Conrad not having authority.  And when you go back
to Mr. Bedford's testimony, you won't hear anything
about any promises to act.

So those gaping holes caused by the
government creates a situation where their case has
fell (sic) well short of proving bribery under the law.
There's been a lot of testimony, a lot of documents,
submitted in this case.

And like I stated, there's no contesting
that Mr. Conrad received payment.  There's no contesting
that there were invoices that were submitted.

And once again, getting a loan from a
company that had a contract, it was a conflict of
interest.  And when Mr. Conrad was interviewed by
federal agents, he did attempt to hide that.  He told
them that he didn't have a relationship with Team of
America.

And the reason that he did that is because
he knew that he shouldn't have had a relationship with
Team of America, when they were also doing work for his
department.  And it created a conflict of interest.

But that is completely different than him
getting payment in exchange for getting a contract
awarded to Team of America or Bedford Images.

Now, we've also heard from government

1  officials in this case who came in here -- and I will

2  submit to you that their testimony and their actions in

3  this case were completely ridiculous.

4         They came in here trying to cover themselves

5  because, on their watch, over a million dollars was

6  taken from the United States Government.

7         And that wasn't on Mr. Conrad.

8         Mr. Walker testified (sic) that their lack

9  of action, their lack of performing their duties,

10 allowed Mr. Conrad or gave him opportunity.

11        He wasn't the one receiving invoices.  He

12 wasn't tasked with the duty of making sure that the

13 hours matched what was being paid out.

14        That was Tridea's job.  That was Kim

15 Bryant's job.  And then, later, Kim Sins should have

16 looked into it.

17        And they came in here and they want you to

18 believe that, "We asked him so hard who the vendor was,

19 and we wanted to know, and he wouldn't tell us."

20        "Did you ask a name?"

21        Mr. Donnell, said, "Well, no, I never -- I

22 never asked a name."

23        "Did you ask for an e-mail address?"

24        "Well, no."

25        Well, then, were you really trying to find

out?

If things were really that bad, as you're coming in now and saying, did you really try to find out what was going on?

Or was everybody sleeping behind the wheel?

Now, Mr. Bedford stated that Mr. Conrad did approach him and he said, "What software are you using?"

Mr. Bedford revealed the software, but then he said he would not tell Mr. Conrad how he was performing the data migration.

So Mr. Conrad, being in the same position as Kim Sins, being in the same position as Eddie Donnell, didn't follow up and go through with how the work was being done.

And there were errors and there were mistakes. But that, ladies and gentlemen, falls on Mr. Conrad's job and his oversight, not his integrity.

He fell asleep. Kim Sins fell asleep. Eddie Donnell fell asleep. And the fox that got away with the hen was James Bedford.

Now, we've heard his story. And like I said, he was the only witness called. And I would submit to you: Don't be another audience that takes his word for it. Don't be fooled by his lies. Don't be fooled by -- or even feel sympathy for an individual by

1   the ilk of James Bedford. Because he has lied. He's

2   stolen from the government time and time again, and I

3   submit to you he's lied during this trial.

4           There are key missing pieces from this case.

5   And once again, the government has the burden. And I

6   request, and the law demands, that you hold them to that

7   burden.

8           Rely on the legal standards as the judge has

9   stated them to you, and if you do, there will be no

10   other result but to find Mr. Conrad not guilty.

11           Thank you.

12           THE COURT: It's about 15 minutes; is that

13   right?

14           MR. BURKE: Yes, sir.

15           THE COURT: All right.

16           REBUTTAL ARGUMENT BY THE GOVERNMENT

17           MR. BURKE: Ladies and gentlemen, I am not

18   sure what trial Mr. Simms has been watching, but it

19   isn't the one that happened in this courtroom.

20           The evidence that the government has

21   presented to you is overwhelming and leaves no doubt

22   about the defendant's guilt.

23           You've seen the secret payments. You've

24   seen the fake invoices. You've seen the timing. You've

25   heard the recorded interview where the defendant lies.

You've seen the memo lines for work that didn't exist.
You've heard about all of the actions that the defendant
took to control the process, to cut other people out;
the fact that he controlled this project from top to
bottom, and that he lined the pockets of James Bedford
and, in exchange, got kickbacks in the forms of bribes,
secret payments and free work done at his house.

And so when Mr. Simms stands up and talks to
you about the case, I'm not sure what case he is talking
about, but it is not this one.

So, there are many things that Mr. Simms
just said that make utterly no sense, but I will try to
respond to them in turn.

First of all, let's consider the argument
that defense counsel has made to you about how there's
no explicit agreement, that there's no express
agreement, that no one ever came out and said the word
"bribe."

Ladies and gentlemen, of course they didn't.
What in the world is Mr. Simms expecting?

That the FBI, or that the Department of
Commerce's Office of Inspector General is going to find
a signed bribery contract?

"Dear Mr. Conrad, I hereby agree that I will
pay you bribes in exchange for you illegally steering me

government contracts"?

Does he expect it to be notarized?

Ladies and gentlemen, if -- if James Bedford came into this courtroom and brought a document like that, that would be how you would know he was lying.

Who in their right mind would ever talk about there being an explicit bribery agreement?

And so when the defendant -- I'm sorry -- when defense counsel talks to you about how that evidence is missing, of course it's missing.  It would be shocking if we found it.  And if we did present it to you, ladies and gentlemen, that would be exactly the type of evidence that you should reject.

Because who in the world would actually have a signed bribery contract?

Who in the world would ever come and say it out loud?

The fact that this was all subtext, the fact that it was all unspoken, is the surest evidence that it was a bribe agreement, that it was a conspiracy.

And, just picture the scene in your mind, ladies and gentlemen.  It's December of 2010.  The Bedford's Images has received this contract for which they are wholly unqualified.  They are performing the work and it's awful.  They are hiring people who have

zero -- zero experience.

They're profiting hand over fist because they're using a PDF converter they bought at Office Depot for $209, and they're getting paid hundreds of thousands of dollars under a contract that the defendant controls, by virtue of his position at the Department of Commerce.

And in December, he shows up, unannounced, at their offices.  He shows up with a fake invoice.

By the way, ladies and gentlemen, the evidence in this case, undisputed, that invoice is fake; undisputed that the defendant created that invoice, and that it refers to stuff he never did.

And the invoice, ladies and gentlemen, demands payment of $55,000.

So he shows up with this fake invoice in his hand.  He knows it's fake.  He knows he hasn't done any of the work.  They know it's fake.  They know he hasn't done any of the work.  They know his company hasn't done any of the work.  He presents it to them, and sure enough, they pay it.

What more evidence of an agreement do you need?

What more evidence of an agreement is defense counsel referring to?

And, ladies and gentlemen, defense counsel's arguments on this point are completely schizophrenic. On the one hand, Mr. Simms blames us because we haven't presented any evidence of anyone coming out and saying, "Dear Mr. Conrad, I am going to give you a bribe."

"Dear Mr. Bedford, I agree to your offer of a bribe, and in exchange I will make sure that you get government contracts."

And then on the other hand, he says:  We can't possibly have proven the case against his client because our evidence is just too strong.  Our evidence, the paper trail that we have discovered is just too powerful.  No one would ever be foolish enough to do that.

Well, no, ladies and gentlemen.  A clumsy bribe scheme is still a bribe scheme.  Powerful evidence of a corrupt agreement is still powerful evidence of a corrupt agreement.

And the fact that the FBI and the Department of Commerce's Office of Inspector General found that evidence is the reason we are here today, ladies and gentlemen.  It's not a reason to acquit.

And, ladies and gentlemen, on this point, not only does your common sense tell you that, of course, we do not have to show an explicit agreement,

1   the law does not require that we show an explicit

2   agreement.

3            Just as you have been instructed by Judge

4   Lee and as you will have copies of the instructions back

5   in the jury deliberation room, I'll point out for your

6   consideration instruction number ten:  A conspiracy or

7   agreement to violate the law, like any other kind of

8   agreement or understanding, need not be formal, written

9   or even expressed directly in every detail.

10           Of course not, ladies and gentlemen.  What

11  criminals engaged in an unlawful venture would

12  explicitly write down what they did?

13           To prove -- again, from instruction number

14  ten:  To prove the existence of the conspiracy or an

15  illegal agreement, the government is not required to

16  produce a written contract between the parties or even

17  produce evidence of an express oral agreement spelling

18  out all the details of the understanding.

19           Similarly, you'll see similar instructions

20  regarding the definition of "official act," ladies and

21  gentlemen and regarding the definition of "bribery."

22           Now, when faced with these fake invoices

23  that everyone agrees are fake, and that everyone agrees

24  the defendant presented to Team America and for which he

25  got paid, the defense has offered you this theory that

1  is both absurd on its face, contrary to common sense,

2  and totally unsupported by the evidence.

3         And that's the theory that these fake

4  invoices are somehow related to this supposed loan

5  agreement.

6         Just consider that for a second, ladies and

7  gentlemen.  Consider the testimony and the evidence

8  you've heard about this supposed loan agreement.

9         Right before the contract is corruptly

10 awarded to -- to James Bedford's company, the defendant

11 shows up, and they have this garbled discussion -- he

12 shows up, again unannounced -- garbled discussion about

13 a loan or investment.  And he leaves, and there's never

14 again another discussion about this loan or investment,

15 where he is requesting nearly $200,000; never once

16 another word spoken about it.

17        Now, what legitimate loan agreement or

18 actual investment would ever occur that way, one

19 conversation and then silence for eternity about that

20 agreement?

21        And then, a few months later, he shows up

22 with invoices.  These invoices don't say anything about,

23 "I will be indebted to your company," or, "You will be

24 investing in my chicken restaurant," or, "Here is the

25 repayment schedule."

1    These invoices demand payment.  That's what
2  an invoice is.  It's a bill.  I deliver a bill.  You pay
3  me.
4    So how in the world does this have anything
5  to do with a legitimate loan?
6    The theory that defense counsel has put
7  forward is absurd, ladies and gentlemen, and it need not
8  detain you for any more than an instance before you
9  realize that it's ridiculous.
10    Defense counsel has talked about how the
11  government haven't proven its case, because, well,
12  Mr. Conrad really wasn't the one who controlled any of
13  this stuff, that he couldn't make the final decisions.
14    Ladies and gentlemen, that is -- that is
15  incorrect as a matter of fact, and also as a matter of
16  law.
17    It may be the case that in some formal,
18  abstract sense, that -- that the defendant should --
19  shouldn't have been able to control this process.  It
20  may be that other people should have acted as more of a
21  check or a balance against the defendant's corrupt
22  actions.
23    But what the evidence in this case showed
24  overwhelmingly is that, in fact, he did control the
25  process.  He was the one that directed Robert Moffett,

his subordinate, as to what to do.  He was the one who had that conversation with Kim Bryant of SPAWAR.

And you heard his testimony, ladies and gentlemen.  Kim Bryant said the defendant was emphatic.

"Why did you make sure that Bedford's Images was hired?"

"Because the defendant told me to."

You heard the testimony of Henry Hodor.  He hired them because that was the deal.  He was told to do so.

The defendant set in course a chain of events to make sure that Bedford's Images was hired. And again, it wasn't just the initial hiring, ladies and gentlemen.  He continued to feed them work after he knew full well that -- that the work was terrible and that they weren't qualified, that it was a complete disaster.

He is the one that went to Patricia Woodberry in September of 2011, after he had received all the free checks and free work at his house, and sought yet more funding.

He's the one that said, "I'm going to go and get the signatures."  He's the one that went to BIS's chief financial officer to get that additional money funded.

And again, the fact that other people were

involved, not a defense.  The fact that somebody else
may have, in some formal sense, been the last guy to
sign off on it, not an offense, ladies and gentlemen, as
you'll see from the jury instructions.

The definition of "official act,"
instruction number 24.  A decision on an -- or action on
a qualifying step, for a question, matter, cause, suit,
proceeding or controversy, would qualify as an official
act.

An official act also includes a public
official exerting pressure on another official to
perform an official act, or providing advice to another
official, knowing or intending that such advice will
form the basis for an official act by another official.

That is exactly what he did here.

You'll also be instructed in instruction
number 31:  It is not necessary for the government to
prove that the defendant personally did every act
constituting the offense charged.  If the acts or
conduct of another is deliberately ordered or directed
by the defendant or deliberately authorized or consented
to by the defendant, then the law holds the defendant
responsible for such acts or conduct just the same as if
personally done by him.

You cannot escape criminal liability by

having somebody else do your dirty work.

The theories that the defense has put before you are not defenses.  The description of the facts that Mr. Simms has put before you is simply not consistent with the evidence that you've seen in this case.

And, finally, ladies and gentlemen, defense counsel suggested that there has not been evidence of an official act.

That's just ridiculous.  The defendant was the one who told Rob Moffett that he wanted Bedford's Images hired.  The defendant is the one who was emphatic and directed Kim Bryant to hire Bedford's Images.

The defendant admitted to Special Agent Luebke that the defendant negotiated the price with Bedford's Images for the data migration project.

The defendant took the files to James Bedford.  And every time he delivers files to James Bedford, he is putting money in James Bedford's pocket, because every batch of files is another batch of files that James Bedford can bill the government for, for obscene rates.

He is the one that continued to pick up the files and saw just how terrible the work was.  He is the one that went to Patricia Woodberry and sought yet more funding.

Ladies and gentlemen, the evidence that the defendant took official acts in the course of his job in the Department of Commerce is abundantly clear.

So, as we said in opening, as Mr. Walker said to you in his closing statement, as the evidence has shown, ladies and gentlemen, the evidence overwhelmingly proves the defendant guilty of both of the counts charged in the indictment.

And we ask that you now finally hold the defendant accountable for the crimes that he committed, and that you return the only verdict consistent with the evidence in this case, a verdict of guilty on both counts.

THE COURT:  Mr. John Brown and Mr. Patrick Steffen, we selected you as jurors, as alternate jurors in the case, during the course of the trial.

You are Mr. Brown.  This is your jury certificate.  And I want to excuse you with the thanks of the Court.  If you have things in the jury deliberation room, you can go and get them.

Mr. Steffen.

THE JUROR:  Yes, sir.

THE COURT:  Thank you both for your service, and we appreciate your time.

Leave your notes.  Mr. Hendrick will take

care of them, make sure they are destroyed.  Again,
thank you for your participation.

Go to the Clerk's Office and tell them
you've been relieved as an alternate.

Thank you very much.

THE JUROR:  Thank you, Your Honor.

THE JUROR:  Thank you, Your Honor.

(Alternate jurors excused.)

(Pause.)

THE COURT:  Are the alternates gone from the
jury room now?

MR. HENDRICK:  Yes, sir.

THE COURT:  All right.

Ladies and gentlemen, you've heard all the
evidence in the case, the instructions of the Court, and
now you've heard the arguments of counsel.

It is your duty to deliberate and arrive at
a unanimous verdict.

I suggest your first order of business ought
to be the election of a foreperson.  And then you should
break for lunch, because we're going to break for lunch
now from 1:00 to 2:05.

Again, during the luncheon recess, don't
discuss the case.  Don't permit the case to be discussed
in your presence.  Don't do any research on the case.

1  And leave your notes in the jury deliberation room.

2         When you return to begin your deliberations,
3  make sure that all of the jurors are present.

4         If someone wants to step out to use the
5  facilities during the deliberations, stop until that
6  person comes back, to make sure each person has a chance
7  to deliberate.

8         And again, as I said to you at the beginning
9  of trial, the fact that something is in somebody's notes
10 does not mean they are entitled to greater consideration
11 than someone who did not take notes.

12        So we ask you to retire now, return a
13 unanimous verdict.

14        And after you pick your foreperson and go to
15 lunch, when you come back, all the exhibits and the
16 jury instructions and your notebooks will be available
17 to you in your jury room.

18        We ask you to return and return a unanimous
19 verdict.  Thank you.

20        (Jury out for lunch and deliberation.)

21        THE COURT:  All right, Counsel, what I want
22 you to do is to meet with the clerk and make sure all
23 the exhibits that have been admitted into evidence are
24 what's going back.

25        In other words, if there's anything that was

excluded that should not be in evidence, it should not
go back.  You should review every single exhibit to make
sure that what goes back is what we've all agreed is
evidence.

And I want you each to sign a certification
that you reviewed the exhibits to make sure that it's
right.

Some of you have been around long enough to
know that I had a case where I excluded evidence and it
went back to the jury and we had to start all over in a
multi-day trial.  So I'm not going to do that.

So you have a requirement, as officers of
the Court, to review each document to make sure what
goes back is the evidence in the case.

If you have any problems with what evidence
has admitted or not admitted, let the clerk know, and
I'll come back on the bench if necessary.

We're now in recess until the jury returns a
verdict.

Thank you.

(Court recessed at 1:09 p.m. and reconvened
4:46 p.m.)

THE COURT:  You can bring our jury out,
Mr. Hendrick.

MR. HENDRICK:  Yes, sir.

```
1                    (Jury present.)
2                    THE COURT:  You may be seated.
3                              JURY VERDICT
4                    THE COURT:  Mr. Foreperson or
5    Ms. Foreperson, have you all reached a verdict?
6                    THE FOREPERSON:  We have, Your Honor.
7                    THE COURT:  If you would hand it to the
8    court security officer.
9                    Thank you.
10                   (Document tendered.)
11                   THE COURT:  All right.
12                   Here you go.
13                   THE CLERK:  Will the defendant, Raushi
14   Conrad, please stand and face the jury.
15                   "Criminal Case Number 1:16-cr-169, United
16   States of America versus Raushi J. Conrad.
17                   "Count I.  With respect to Count I,
18   conspiracy to pay and receive bribes, we, the jury, find
19   the defendant, Raushi J. Conrad, guilty.
20                   "Count II.  With respect to Count II,
21   acceptance of bribes by a public official, we, the jury,
22   find the defendant, Raushi J. Conrad, guilty."
23                   Signed by the foreperson.
24                   THE COURT:  And dated with today's date?
25                   THE CLERK:  Today's date, June 15th.  Sorry.
```

1          THE COURT:  All right.

2          Any objection to the form of the verdict?

3          MR. SIMMS:  No, Your Honor.

4          THE COURT:  Is there a request to poll the

5    jury?

6          MR. SIMMS:  No, Your Honor.

7          THE COURT:  All right.

8          Ladies and gentlemen, the Court and the

9    parties appreciate all the time and effort that you've

10   devoted to the case.

11         Give me just a few minutes to speak to

12   counsel, and I'll come back and I will dismiss you for

13   the day.

14         Thank you very much.

15         (Jury excused at 4:49 p.m.)

16              FURTHER PROCEEDINGS

17         THE COURT:  Let's select a date for

18   sentencing.

19         How about September 8th, which is a Friday?

20         MR. SIMMS:  That's fine.

21         THE COURT:  All right.  We'll set the matter

22   for sentencing on Friday, September 8th, at

23   9:00 o'clock.

24         Bond will be continued.

25         You all are excused.  Thank you.

1           We're in recess.

2           (Proceedings concluded at 4:51 p.m.)

3

4                        ---

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

I, Renecia Wilson, an official court reporter for the United States District Court of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the jury trial in the case of UNITED STATES OF AMERICA v. RAUSHI J. CONRAD.

I further certify that I was authorized and did report by stenotype the proceedings in said jury trial, and that the foregoing pages, numbered 1 to 111, inclusive, constitute the official transcript of said proceedings as taken from my shorthand notes.

IN WITNESS WHEREOF, I have hereto subscribed my name this __12th__ day of __January__ , 2018.

_____/s/_____
Renecia Wilson, RMR, CRR
Official Court Reporter