IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:16-CR-169 |
| | ) | Civil No. 1:19-CV-953 |
| RAUSHI J. CONRAD, | ) | |
| | ) | Honorable Claude M. Hilton |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE HIS CONVICTION UNDER 28 U.S.C. § 2255 AND FOR NEW TRIAL UNDER FED.R.CRIM.P. 33(b)**

COMES NOW the Defendant, by and through his undersigned counsel, and respectfully files his reply to the Government's Response in Opposition to Defendant's Motion to Vacate his Conviction under 28 U.S.C. § 2255 and for New Trial Under Fed.R.Crim.P. 33(b).

The thrust of defendant's petition is, as the government states, that "witness after witness lied at trial, that counsel was constitutionally ineffective in failing to expose those lies, and that the prosecutors violated his right to due process by sponsoring testimony that they know or should have known to be false." Gov't. Resp., Dkt. 151 at 1. Notably, in its Response, the government does not once dispute Conrad's claims that defense counsel was ineffective in failing to conduct appropriate factual inquiries or develop exculpatory and impeachment evidence. Nor does the government argue that the underutilized discovery was cumulative, or that it did not contradict, in part, the testimony of every crucial government witness. As importantly, the government does not dispute the veracity of Mr. Conrad's evidence, or claim that it would not have changed the outcome *had Mr. Conrad testified*.

Rather, the government argues that the evidence was either not meaningful, or would not have made a difference in the face *of the evidence presented at trial – at which Mr. Conrad did*

1

*not testify*. Indeed, the government concedes that competing affidavits on Mr. Conrad's claim that counsel failed to prepare him to testify would likely require a hearing to resolve. The government appropriately requested the Court set an evidentiary hearing as to that issue. Gov't Resp., Dkt. 151 at 1-2. Had Mr. Conrad exercised his right to testify, the jury would almost certainly have weighed the testimony of the government's witnesses through a different prism. Mr. Conrad, therefore, respectfully requests that this Court defer ruling on his motions and set the entire matter for an evidentiary hearing.

In its defense of the verdict, the government substitutes its judgment of the witnesses' credibility for that of the jury, a role that it properly declined with respect to the advice and preparation Mr. Conrad was given regarding his right to testify. However, "[t]he question of the credibility of witnesses is one for the jury alone." *Chesapeake & O. Ry. Co. v. Martin*, 283 U.S. 209, 216 (1931). As the Supreme Court stated:

> A fundamental premise of our criminal trial system is that "the jury is the lie detector." Determining the weight and credibility of witness testimony, therefore, has long been held to be the "part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men."

*United States v. Scheffer,* 523 U.S. 303, 313 (1998); see also *United States v. Buczkowski*, 458 Fed.Appx. 311, 315 (4th Cir. 2011) (quoting *Scheffer*; it is the unique province of the jury to assess the credibility of the witnesses and find the facts).

Because Mr. Conrad did not testify, the witnesses' credibility was the most important issue at trial. The Supreme Court has emphasized the importance of supplying the jury with enough evidence to evaluate a witness's credibility in a criminal case. *Id*. at 972. Because crucial impeachment evidence was not exposed on cross-examination, the jury did not have "enough evidence" when making its credibility determinations. "A conviction must be set aside

even if the false testimony goes only to a witness's credibility rather than the defendant's guilt." *Napue*, 360 U.S. 264, 270 (1959); *Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 146 (3d Cir. 2017).

### Conrad Presented Convincing Evidence Contradicting The Testimony Of The Government's Key Witnesses. Had The Evidence Been Introduced, There Is A Reasonable Probability That The Outcome Of The Trial Would Have Been Different

While mere inconsistencies between the testimony of different witnesses may not be enough to establish that a prosecutor knowingly used false or perjured testimony, the record in this case contains countless statements that were not merely impeaching, but that flatly contradicted important aspects of the government's key witnesses, or at the very least, created false impressions of material facts.

The government writes off materially inconsistent statements by Eddie Donnell that prove he knew the identity of the vendor with a single email in which he refers to Bedford as "the vendor." The government also argues that the fact that Donnell was copied on an email addressed to JBedford@Tacc2.com did not mean that he knew the identity of the vendor, or recognize that it was associated with Bedford's Images. According to the government, that alone would have made further cross-examination of Donnell futile. Gov't Resp. Dkt. 151, at 13-14. The significance of this evidence was a question for the jury to decide after hearing all of the evidence – and one it might well have decided differently.

Similarly, the government credits an isolated statement in Robert Moffett's November 2013 interview as a basis for crediting Moffett's and Donnell's trial testimony that Mr. Conrad was in complete control of the data migration project. As previously argued, there was more than enough evidence in the investigative record to prove that other BIS and SPAWAR employees were (1) involved in the decision to award and extend the initial contract; (2) kept

3

informed about the progress of the data migration project; (3) responsible for authorizing and approving funding of Bedford's invoices; and (4) were responsible for monitoring the quality of the work.

The government also argues that attacks on Kim Sins' testimony regarding the poor quality of the work and frequency of complaints would have been futile. This argument fairs no better. A diligent lawyer would have discovered evidence in the investigative record that discredited the witnesses who the government claimed corroborated her testimony. See Gov't Resp., Dkt. 151 at 21-25.

Effective cross-examination of Ron Rolfe would have undermined his testimony and free-flowing hyperbole about "[t]his colossal IT conversion snafu" and "the promised magic" that didn't seem to have happened. See Gov't Resp., Dkt. 151 at 23. Rolfe's complaint that "the transfer mechanism did not seem to function," did not relate to work within Bedford's purview and was not a data conversion problem. Effective cross-examination would have also proven that the other complaints Rolfe conveyed to Conrad involved the operation of the scanners used by BIS employees. Reasonably diligent counsel would have known that the BI system Rolfe referred to was the old Bureau Infrastructure system that was infected with a virus that had been disabled when BIS switched over to the new network in mid-February 2011. Reasonably diligent counsel would have also confronted Rolfe with his own email listing the files he asked Conrad to convert and transfer to the new system, with Conrad's reply, telling him that his files would be ready by Wednesday of that week, and with Rolfe' response that he would be looking for those documents on Wednesday. JA 2840. Reasonably diligent counsel would also have confronted the government's reliance on Rolfe's testimony in its closing argument with this evidence. JA 1067.

Reasonably diligent counsel could also have refuted much of Sins' damaging testimony by calling the BIS employee who prepared a Power Point presentation to describe the data project's planned deployment and the fact that 100,000 files had been successfully converted by January 2011. Assuming an average of ten pages per file, a representative sampling of 100,000 files, including excel files with tables, formulas, and executable references, would total approximately one million pages. An error rate of 1% would produce errors on 10,000 pages. Reasonably diligent counsel would have elicited this type of testimony which would have put Rolfe's and Horner's complaints about formatting and corrupted files into perspective. This evidence would also have had a similar effect on other complaints government witnesses could have presented. See Gov't Resp., Dkt. 151 at 23-24 and GX 2, 5, 7.

Notably, none of the government's additional emails from Mila Thomas, Lee Ann Carpenter, or Latonya Jackson involved the quality of Bedford's conversion work. Contrary to the government's claims, the emails contained complaints about files that simply had not been transferred. See Gov't Resp., Dkt. 151 at 24-25, and GX 3, 4, 6. Had the government called these additional witnesses, reasonably diligent counsel could have introduced follow-up emails from Lee Ann Carpenter telling Mr. Conrad that "[i]f it's easier to transfer the entire contents of the U: drive folder on the re-try, there's plenty of room in my H: drive," (see Gov't. Resp., Dkt. 151-4 at 2). This email also confirmed that out of the 54 files that were successfully transferred, only one contained a Power Point presentation that she said did not transfer well. (See Gov't. Resp., Dkt. 151-5 at 2). Carpenter's email exchange with Conrad also disproved Sins' testimony regarding the rate of errors and could have been used to the defendant's advantage to change the minds of one or more jurors.

There was additional evidence in the investigative record refuting Sins' testimony that Conrad allowed Bedford run up a $350,000 "without approval of his co-workers or so much as an invoice." That evidence would have also undermined the government's theory that Conrad increased Bedford's profit by controlling the number of files each person could convert. See Gov't. Resp., Dkt. 151 at 29. Sins' February 2011 email proved that Eddie Donnell approved the assignment of funds for Bedford's +/- $350K, invoice and that he, and not Conrad, made the decision to approve an additional $150K in funding for what Sins described as "the remaining native file conversions for the 250 files per person task." *Id*. The defense could have effectively argued that by February 2011, Sins would have been expected to raise serious objections to the expenditure of $450K, including $150K in new money, if her testimony about the state of the data migration project was truthful. This email would have been particularly helpful because Sins testified that the problems with data migration began immediately. The initial data migration contract was signed in the Fall of 2010.

Sins' email would have also been helpful to prove that there was a project-wide, 250 file per person limit on the number of files that could be converted. Dkt. 151-8 at 2-3. In closing, the government effectively argued that "[t]he defendant took the files to James Bedford. And every time he deliver[ed] files to James Bedford, he is putting money in James Bedford's pocket, because every batch of files is another batch of files that James Bedford can bill the government for, for obscene rates." JA 1112. The email established that there was a group-wide limit on the number of files that could be converted.

The same set of emails would have proven that the only reason Sins or Bryant ever told Bedford not to do any more data migration work was because no funding or contract ceiling had been established specifically for the data migration work. Bryant warned Bedford: "[i]f you do

any work that SPAWAR does not concur on you are working at risk and the invoices shall not be paid." Sins, Moffett, and Hodor (Tridea), but not Conrad, were all copied on Bryant's email because it was a funding issue. Gov't Resp., Dkt. 151-8 at 3.

Strangely, the government also argues that the fact Conrad was not copied on the email threads proves nothing about the decision to allocate the additional funding or about his control over the decision-making process. This argument has no basis in common logic. Conrad's lawyer failed to present evidence that he was not copied on numerous emails that authorized payment of Bedford's invoices and approved Bedford's estimates for new work. Nor was he copied on key email exchanges regarding the decision to provide an additional $54,000 in data migration funding that was made in September 2011. The fact that he was not a participant in these policy discussions is strong evidence that he did not control the decision-making process. The emails are also convincing proof that Conrad did not engage in an "official act" to provide Bedford with additional work, or get approval for $54,000 in new data migration funding.

More generally, rather than highlighting Conrad's "extensive" role in the data migration process, the emails are direct evidence of a decision-making process by senior BIS officials from which Mr. Conrad was purposefully excluded. See Gov't Resp., Dkt 151 at 34-35. The meaning of the emails and the inferences to be drawn from them were matters for the jury to decide. The government also presented evidence that Conrad violated normal acquisition protocols.

Patricia Woodberry testified that Conrad "worked to ensure that BIS awarded additional data migration work to Bedford's company by violating BIS' normal acquisition protocols." Defense counsel's lack of familiarity with the official Department of Commerce Acquisition Manual ("CAM") left the jury with the false impression that Woodberry's description of BIS's

normal acquisition procedures was accurate.[1] Given the significance of Woodberry's testimony, the effect of counsel's deficient preparation should be obvious.

While legitimate fodder for closing argument, the government's arguments ignore the fundamental precept that it is "[t]he jury's estimate of the truthfulness and reliability of a given witness [that] may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois*, 360 U.S. 264, 260 (1959). The Court in *Napue* (also a post-conviction case) took this warning one step further, stating:

> *[w]e do not believe that the fact that the jury was apprised of other grounds* for believing that the witness [] may have had an interest in testifying against petitioner *turned what was otherwise a tainted trial into a fair one*. (emphasis added).

*Id.*, at 270. Similarly, the fact that Conrad's counsel exposed some inconsistencies in the government witnesses' testimony did not turn "what was otherwise a tainted trial into a fair one." *Id*. A reasonable attorney would have been alerted to potential testimony regarding the volume of complaints and the poor quality of Bedford's work, and would have been in a position to refute that evidence. Considering the record as a whole, there is a reasonable probability that, absent these errors, the jury would have found reasonable doubt with respect to Mr. Conrad's guilt.

### Counsel Did Not Adequately Cross-Examine Bedford and Failed to Call Glen Bertrand Sr. as a Witness

The effect on the jury of counsel's shortcomings was exacerbated by his failure to adequately cross-examine James Bedford or to call Glen Bertrand Sr. as a witness.

---

[1] Emails between defense counsel and one of his associates identified the Department of Commerce Vendor Communication Plan as a document Conrad's lawyer wanted his associate to review. Duran-00000034. Counsel made no use of the Vendor Communication Plan at trial.

On March 13, 2013, Bedford gave the first of several lengthy FBI interviews.[2] During that interview, Bedford described in detail the discussions he and Bertrand had with Mr. Conrad about Conrad's request for a loan. As reported by the agents:

> "BEDFORD advised that at some time he and BERTRAND were approached by CONRAD when they were downtown providing support to DOC. CONRAD told them he was in financial trouble with his restaurant. CONRAD offered them an opportunity to invest in his restaurant. BEDFORD and BERTRAND both told CONRAD that it was not a good idea but they wanted to help him out. They offered to write him a check for what he owed. It would be considered a loan to CONRAD. CONRAD was opposed to that as he said his investors would question the check and start asking too many questions. CONRAD made it appear he would get in trouble with his investors. CONRAD advised he would pay the money back but did not want a paper trail.
>
> "BERTRAND agreed to the loan. Because CONRAD did not want a paper trail, BEDFORD advised there was no documentation regarding the loan. BEDFORD was asked about the loan and repayment terms. BEDFORD did not know the repayment or loan terms. However as part of the loan, CONRAD agreed to provide assistance to them in starting their own chicken restaurant. BEDFORD advised they were looking to diversify their business and thought it would be a good idea. CONRAD advised he would help with providing the chicken recipes and his knowledge of the restaurant business.
>
> "BEDFORD advised CONRAD said he needed the loan because the store he just opened was not doing well. CONRAD blamed it on the store not opening on time. BEDFORD was asked why they wanted to open their own chicken restaurant when CONRAD was struggling financially with his restaurant. BEDFORD explained CONRAD showed them financial reports of one of the chicken restaurants. The restaurant was showing a good profit. BEDFORD advised they were serious about the chicken restaurant and actually found a location in Manassas to lease. However the owner of the location would not lease them the property because neither BEDFORD nor BERTRAND had any restaurant experience. CONRAD agreed to provide assistance to them. CONRAD told them he was going to be leaving the government and he would able to help out.
>
> BEDFORD believes they loaned CONRAD approximately $180,000. They did not loan the money all at once as they told CONRAD they did not have that kind of money. But, over time, they loaned him approximately $180,000. There is no loan documentation regarding the $180,000 paid to CONRAD. CONRAD has yet to make any payments on the loan."

---

[2] A copy of the 3/14/2013 FBI 302 is attached as Exhibit 1.

Duran-00001817.

> Bedford was further questioned about the loan to Mr. Conrad. As reported in the 302:
>
> "CONRAD told BEDFORD and BERTRAND that he was in trouble with his investors and he was looking for $200,000 to get caught up. BERTRAND and BEDFORD were willing to give CONRAD a loan but they wanted documentation. CONRAD advised he did not want any documentation as he wanted to conceal the loan from his investors. CONRAD said a loan would be a problem. CONRAD advised he asked KNOWCEAN CONSULTING for a loan and they had turned him down.
>
> "BEDFORD advised they were okay with lending the money to CONRAD without documentation because CONRAD and BERTRAND had a past relationship as they were family friends. BEDFORD believed CONRAD would be true to his word and pay the money back. BEDFORD advised CONRAD was to make payments starting in January 2013 but they have yet to receive a payment. BEDFORD advised there was no interest rate on the loan.
>
> "BEDFORD advised there was no connection between the loan to CONRAD and the data migration contract. While CONRAD provided the files to convert, BEDFORD did not consider CONRAD his boss on the data migration contract. BEDFORD thought he was working for BRYANT."

Duran-00001818.

Bedford was also asked about the invoices from CPE to Team America. Bedford advised the agents that "the invoices were provided by Conrad and was Conrad's idea." Bedford also stated that the invoices were made up and CPE did not perform any work which was claimed on the invoices." Duran-00001817-18. Bedford further stated that it was Robert Moffett who originally asked him about his ability to provide document management services. Bedford told agents that he "had previously told Moffett about the document management services he provided to the Military Sea Lift Command," and stated that "[s]hortly thereafter, Bryant asked Bedford if he was interested in providing data migration work for the DOC." Duran-00001819. Bedford said that no one else, including Team America's accountant, was aware of the loan. Duran-00001820.

10

Bedford was interviewed again on May 20, 2013. During this interview, Bedford told investigators that "[he] was at the Capital Court office suite completing punch-out work, when he overheard Conrad and Moffett talking about problems they were having with a data conversion project." Bedford said he "interrupted and told Moffett that he previously operated BI, which conducted document conversion work." A week or two later, while Bedford was doing construction work at the DOC's downtown office, Bedford said "Conrad asked [him] if he was serious about doing document conversion work." Bedford said he was serious and was interested in the work. Shortly after his discussion with Conrad, Bedford said "[he] was contacted by Bryant for his credentials to do the conversion work." Bedford said that "Bryant also asked [him] for a proposal to complete the work." Duran-00001828-29.[3]

Bedford was also asked during the same interview about payments to the Chicken Place Express during the interview. As reported,

> "BEDFORD was asked about the payments to CPE. BEDFORD advised that prior to being awarded the document conversion project, CONRAD approached BEDFORD and BERTRAND for a loan. CONRAD advised he was having financial problems with his restaurant and needed to borrow approximately $180,000. Both BEDFORD and BERTRAND laughed at CONRAD as they did not have money to loan him. CONRAD said he would really appreciate the loan and asked them if they were interested in a CHICKEN PLACE franchise. Both BEDFORD and BERTRAND advised they were not interested. CONRAD then asked them if they would be willing to loan him the money and in return CONRAD would provide services to assist them in opening their own restaurant. CONRAD offered to find a commercial restaurant site set up the restaurant to include developing the menu and providing recipes. BEDFORD and BERTRAND would still provide the capital for the restaurant but CONRAD would provide his restaurant expertise to help them get off the ground. The caveat was if CONRAD did not find a suitable restaurant location, CONRAD would then start paying back the loan.
>
> "BEDFORD, BERTRAND and CONRAD agreed to the loan agreement wherein they loaned CONRAD $180,000 in return for his services. They loaned the money to CONRAD in installments as they did not have the cash available to pay

---

[3] A copy of the 5/21/2013 FBI 302 is attached as Exhibit 2.

>out in one lump sum.  BEDFORD advised that no one knew of the loan agreement besides the three of them.  It was an oral agreement.  There was no documentation regarding their agreement.  BEDFORD advised they did not share the loan agreement with TA's attorneys or accountants.  BEDFORD admitted it was bad judgement on his part.  BEDFORD advised the loan to CONRAD was not tied to any contracts they were receiving from the DOC.
>
>"BEDFORD was asked about the invoices that were submitted by CPE to TA.  BEDFORD advised CONRAD submitted the invoices to TA.  BEDFORD received them in his in-box at work.  They were probably put in his in-box by either ALICE or VALETTA.  BEDFORD questioned the first invoice as it did not contain an address or tax identification number.  Once BEDFORD received the information, BEDFORD approved the payment.  BEDFORD was asked why CONRAD submitted invoices when they were considered loan payments.  BEDFORD did not know why CONRAD provided invoices but was aware CONRAD did not want his investors to know about the loan.  BEDFORD was asked why he processed the invoices when they contained false information regarding the services provided.  BEDFORD could not provide an explanation."

Duran-00001830.  Copies of both 302s were produced in discovery in the habeas proceeding as part of defense counsel's file.  Bedford's detailed statements mirrored much of what Mr. Conrad told FBI agents and, if believed, would have made it impossible for the government to prove a *quid pro quo*.

>At trial, Bedford reversed course and testified,
>
>"Conrad *recommended* us to SPAWAR and we got the contract.  Conrad then approached my partner, Glen Bertrand and me about investing money in his chicken restaurant …. So I rationalized this investment as a means to help a friend and diversify our business …. But in reality, Bertrand and I paid Conrad because he helped us get the SPAWAR contract for Team America …. We knew his requests for payments were disguised payments for him delivering us the SPAWAR contract …. "I signed off on the invoices to get funds to Conrad in exchange for him making continued *recommendations* for the work."  (emphasis added). JA 844-45.

Bedford claimed that he and Bertrand knew "it was a wink and a nod," and knew it was "pay for play," but they pretended that it was not.  JA 845.  Bedford said Mr. Conrad showed up unexpectedly with the first invoice that he didn't know ahead of time he would be receiving.  JA 539.

12

Defense counsel was able to elicit several helpful admissions from Bedford on cross-examination. Specifically, Bedford testified that Conrad's initial request was for a loan and later "it was requested to be an investment in his chicken business restaurant." JA 808-09. Bedford also admitted that in 2010, he and Mr. Conrad had conversations about opening a restaurant, but did not recall discussing Mr. Conrad assisting with opening a restaurant as a way of making repayment. JA 808, 810. Bedford later acknowledged telling federal agents he and Mr. Conrad were thinking about opening two restaurants and that was why he paid him $180,000. JA 823-24. He claimed he did not remember explaining why or the conditions, and said he told the agents he didn't have an explanation for the loan. JA 824-825. After reviewing the 302 of a 2013 interview, Bedford did recall telling them that the loan to Conrad was not tied to any contracts. JA 826.

Conrad's lawyer also questioned Bedford about the "Defendant's Version of Events" he submitted to the Probation Office. Bedford acknowledged saying that Conrad never told him the $180,000 payment was in exchange for directing work to Team America or Bedford's Imaging." JA 833. He also agreed that Conrad never promised to take any action to get Bedford's company a government contract if he gave him money. JA 833-34. However, on redirect, the government had Bedford read from highly damaging portions of the Probation document that the jury would not otherwise have heard – beginning with the statement, "[w]hile Conrad never said, 'this payment is in exchange for my directing work to Team America and Bedford's Images.' *Both Bertrand and I knew it was*." JA 843. Under the rule of completeness, the government was also permitted to elicit other damaging statements, such as "[w]e knew his requests for payments were disguised payments for him delivering us the SPAWAR contract," and "I signed off on the

invoices to get funds to Conrad in exchange for making continued recommendations for the work." JA 844-45.

Despite their knowledge of Bedford's earlier statements, the prosecutors fully exploited Bedford's trial testimony in its closing argument. Specifically, the prosecutors argued:

> "Consider the testimony and the evidence you've heard about this supposed loan agreement.
>
> "Right before the contract is corruptly awarded to -- to James Bedford's company, the defendant shows up, and they have this garbled discussion – he shows up, again unannounced – garbled discussion about a loan or investment. And he leaves, and there's never again another discussion about this loan or investment, where he is requesting nearly $200,000; never once another word is spoken about it.
>
> "Now, what legitimate loan agreement or actual investment would ever occur that way, one conversation and then silence for eternity about that agreement?
>
> "And then, a few months later, he shows up with invoices. These invoices don't say anything about, 'I will be indebted to your company,' or, 'You will be investing in my chicken restaurant.' Or 'Here is the repayment schedule.' "

JA 1108.

Defense counsel's cross-examination of Bedford was both deficient and prejudicial. *First*, counsel failed to exploit Bedford's detailed statements about the loan agreement that both corroborated Conrad's voluntary statements to the FBI and the defense theory of the case, and *second*, his cross-examination opened the door to highly damaging testimony the jury would not otherwise have heard that provided compelling evidence that Conrad harbored a corrupt intent. The impact on the jury could not be more obvious.

The effect of Bedford's testimony was also amplified by counsel's failure to unmask the other witnesses' false testimony, and by Conrad's own decision not to testify. Counsel's shortcomings with respect to Bedford's testimony are sufficient grounds upon which to grant Mr. Conrad's motion.

Glen Bertrand was also questioned about the loan on June 10, 2013, pursuant to a proffer agreement at which he was accompanied by his lawyer. According to an FBI 302 located in Conrad's lawyers' files,

> "BERTRAND advised CONRAD approached BERTRAND and BEDFORD after the construction was completed at the CHICKEN PLACE restaurant at the Fair Oaks Mall. **CONRAD asked for a loan as his restaurant was doing poorly. CONRAD feared he would lose everything. CONRAD had this discussion with BERTRAND and BEDFORD at the offices of TA. They told CONRAD they would think about it. BERTRAND and BEDFORD then had a private discussion about the pros and cons of providing a loan to CONRAD. The pros were that TA wanted to be in the restaurant business and could use CONRAD's restaurant expertise to assist them in their restaurant venture. They also thought CONRAD was responsible and would pay them back.** On the negative side, they were worried CONRAD would not pay them back. However they believed even if CONRAD did not pay them back, his value to them would be his ability to help them form a restaurant. **BERTRAND thought even if he didn't pay any money back they were still getting a good deal. BERTRAND and BEDFORD agreed to give CONRAD the loan**.
>
> "BEDFORD told CONRAD they agreed to give him the loan. BERTRAND was not part of those conversations but **it was decided to give CONRAD a loan of approximately $180,000 and CONRAD would pay the money back when his business became profitable. In addition, CONRAD would be obligated to assist and help manage TA's restaurant business**.
>
> "**BERTRAND admitted the loan to CONRAD did not have an interest rate nor a payment schedule. The loan was not put in writing as it was just a verbal agreement between BERTRAND BEDFORD and CONRAD**. BERTRAND advised they did not tell anyone to include his wife ALICE BERTRAND, TA's bookkeeper, or TA's accountant. BERTRAND was asked why they didn't document the loan agreement or tell anyone else about the loan, BERTRAND stated TA was his business and he did things the way he wanted to do them. When asked if CONRAD wanted to keep the loan quiet, BERTRAND stated CONRAD did not ask for loan documents nor did he say he didn't want loan documents. BERTRAND was asked if CONRAD ever expressed an apprehension over the loan documents because of CONRAD's business partners at the CHICKEN PLACE. **BERTRAND said CONRAD never said he did not want loan documents because of his business partners**.
>
> "BERTRAND was asked about the loan disbursements to CONRAD. BERTRAND did not know how the monies were disbursed to CONRAD as BEDFORD handled the loan disbursements. BERTRAND was aware that the monies came from TA. BERTRAND was asked if the monies paid to CONRAD

15

> originated from monies TA received from contract work with the federal government. BERTRAND advised the monies originated from an accumulation of contracts to include work TA was doing for the federal government.
>
> "BERTRAND was asked if he was aware CONRAD was involved in the DOC contracts TA received. BERTRAND advised be was not aware of that. BERTRAND thought all the contracts came through KIM BRYANT.
>
> "BERTRAND was asked about invoices submitted by CPE to TA BERTRAND was unfamiliar with the invoices as it was handled by BEDFORD. The bookkeeper for TA has been his wife ALICE since the inception of TA until the present day. BERTRAND was asked how ALICE was to record the loan in TA's books if she was unaware of the loan. BERTRAND was uncertain how the loan was booked in TA's financial records. BERTRAND advised he did not pay attention to TA's books and records and left that to BEDFORD. BERTRAND believes ALICE must have asked BEDFORD about the payments to CPE but BERTRAND was not aware of any conversations. BERTRAND was asked if TA had $180,000 to loan to CONRAD BERTRAND said he didn't know how much money TA had available. BERTRAND didn't pay attention to the financial condition of TA." (emphasis added).

Duran-00001342-43.[4]

Conrad's lawyer's performance was plainly deficient in failing to call Bertrand as a defense witness, or to elicit this testimony from one of the law enforcement agents conducting the interviews. Bertrand's detailed statements about the loan refuted Bedford's unsupported trial testimony and corroborated Conrad's exculpatory statements to the FBI.[5] Bertrand's testimony would have also provided the only direct evidence that Conrad did not harbor a corrupt intent.

**Bertrand's Statements Were Additional Proof That Bedford's Trial Testimony Was False**

The statements Bertrand made during his proffer session taken together with Bedford's prior law enforcement statements are concrete evidence that prosecutors knew or should have known Bedford's trial testimony was false. The fact that Bertrand was not charged for his involvement in the conspiracy or required to forfeit his half of the fraudulent profits is further

---

[4] A copy of the 6/15/2013 FBI 302 is attached as Exhibit 4.

[5] See Conrad's 9/17/2013 statement attached as Exhibit 3. Duran 00001677-78.

16

evidence that prosecutors were on notice. "The reasoned exercise of prosecutorial discretion is essential to the fair, effective, and even-handed administration of the federal criminal laws." DOJ Memorandum to All Prosecutors, Department Policy on Charging and Sentencing, May 19, 2010, available at *https://www.ussc.gov › pdf › annual-national-training-seminar › DOJ_memo.* The reasoned exercise of prosecutorial discretion does explain how these prosecutors could have credited Bedford's trial testimony and not charged Bertrand with bribery, obstruction of justice, or a false statement offense. Hence, this is not a case of "[m]ere inconsistencies in testimony by government witnesses," as the government would claim – particularly because no other witness supported Bedford's testimony. Bedford's post-trial recantations are further evidence that his trial testimony was false.

Nor has the government ever removed the threat of prosecution, leaving Bertrand in legal limbo. If subpoenaed to testify by the defense, Bertrand could still make a valid assertion of his Fifth Amendment rights.

To convict the defendant of bribery under 18 U.S.C. § 201(b)(2)(A), the government was required to prove that the defendant demanded, sought, received, accepted, or agreed to receive or accept "anything of value," and that he did so corruptly "in return for . . . being influenced in the performance of any official act." Without Bedford's testimony, Mr. Conrad could not have been convicted.

For all of the foregoing reasons, this Court should schedule a hearing on Mr. Conrad's Motions.

Respectfully submitted,

RAUSHI CONRAD
By Counsel

_____/s/_____
Nina J. Ginsberg, Esquire
*Counsel for Defendant*
Virginia Bar No. 19472
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
Tel: (703) 684-4333
Facsimile: (703) 548-3181
nginsberg@dimuro.com

## **CERTIFICATE OF SERVICE**

I certify that on November 6, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to the attorney of record.

_____/s/_____
Nina J. Ginsberg, Esquire
*Counsel for Defendant*