IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 1:16cr169 |
| | ) | |
| RAUSHI J. CONRAD, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

This case is before the Court on Defendant's Motion to Vacate and Set Aside Judgment of Convictions and Sentence, pursuant to 28 U.S.C. § 2255, and Defendant's Motion for a New Trial, pursuant to Fed. R. Crim. Pro. 33(b). Following an evidentiary hearing and two rounds of briefings on these Motions, the Court finds that Defendant's trial counsel acted in a reasonably competent manner and there are no grounds for a new trial in this case.

In June 2017, Defendant was tried by a jury on two criminal charges: (1) conspiracy to commit bribery, in violation of 18 U.S.C. § 371, and (2) acceptance of bribes by a public official, in violation of § 201(b)(2)(A). The Government presented evidence that Defendant, the Director of Operations and System Security at the Department of Commerce Bureau of Industry and Security ("BIS"), used his official position to solicit and accept bribes from James Bedford, owner of Bedford's Images, Inc. and Team America Corp.

The Government alleged Defendant "accepted hundreds of thousands of dollars in payments and renovation work at his home from James Bedford, in return for taking official acts to steer government contracts to companies owned by Bedford." United States v. Conrad, 760 F. App'x 199, 200 (4th Cir. 2019).

Jonathan Simms and Stephanie Duran represented Defendant during his four-day trial, which concluded June 15, 2017 when the jury convicted Defendant on both counts in the indictment. The Court sentenced Defendant to pay restitution in the amount of $213,000 and to serve a prison term of fourty-eight months (which commenced October 17, 2017) and two years of supervised release. Defendant appealed the Court's judgment on three grounds, including that "the evidence at trial was insufficient to support his convictions." Id. The U.S. Court of Appeals for the Fourth Circuit affirmed the Court's judgment on January 24, 2019, finding the "jury's verdict was based on substantial evidence." Id. at 209. The Fourth Circuit further found, "Appellant performed subsequent official acts—most significantly, seeking and obtaining authorization to award additional funds to Bedford's Images—while receiving Bedford's payments. These actions alone are sufficient to support the jury's verdict." Id.

Defendant filed the present motions with the Court on July 22, 2019, claiming his trial counsel was ineffective on five grounds and requesting a new trial on the basis of newly discovered

2

evidence of perjury by key government witnesses. The Government submitted a response in opposition to these motions, which included a request for an evidentiary hearing on the narrow issue of whether Simms and Duran adequately advised Defendant of his right to testify at trial and the consequences resulting from the exercise of this right. Both Defendant and Simms testified at the evidentiary hearing on January 29, 2020. At the conclusion of the hearing, the Court requested supplemental briefs on this specific issue. Defendant and the Government filed their respective briefs April 28, 2020.

The Sixth Amendment of the U.S. Constitution affords a criminal defendant the right to effective and competent counsel at each critical stage of his defense. See United States v. Cronic (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771, n. 14 (1970)) ("[T]he right to counsel is the right to the effective assistance of counsel."). A defendant seeking to challenge the effectiveness of his counsel may bring a claim under 28 U.S.C. § 2255.

A successful claim for ineffective assistance has two necessary components: (1) Counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. The defendant bears the burden of proving both elements. See Strickland v. Washington, 466 U.S. 668, 687 (1984) (setting forth the two-prong test for claims of ineffective assistance). If the

defendant can satisfy this burden, he is entitled to have the court vacate and set aside his sentence. See § 2255.

A court's review of an ineffective assistance of counsel claim is "highly deferential" to counsel's performance. Strickland, 466 U.S. at 689. Effective assistance does not mean perfect performance with the benefit of hindsight. See id. ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Each attorney has liberty to make certain strategic decisions that may vary from attorney to attorney, and client to client, so long as they are "within the range of competence demanded of attorneys in criminal cases." McMann v. Richardson, 397 U.S. 759, 770-71 (1970).

But the Sixth Amendment right to counsel does entitle defendants to a certain standard of care: "simple reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. Performance falling below the objective standard of reasonableness is considered deficient under the first prong of the Strickland test.

To satisfy the second prong of the Strickland test, a defendant must show "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. This probability must be

4

"sufficient to undermine confidence in the outcome" of the proceeding after considering the totality of the evidence presented to the jury. Id. at 694-95.

In this case, Defendant challenges the effectiveness of his trial counsel on three main grounds. First, he asserts that his trial counsel did not adequately cross-examine the Government's witnesses to impeach their allegedly false statements. Next, he challenges his trial counsel's decision not to request a jury instruction on the lesser included offense of illegal gratuities. Finally, he asserts that his trial counsel was deficient in preparing him for the possibility to testify at trial. The Court considers each of these grounds in turn.

I.

To convict a defendant of bribery, the Government must prove existence of a quid pro quo, that the defendant corruptly "in return for . . . being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2)(A) (emphases added). At trial, the Government called several witnesses involved in the contracting process with Bedford's companies (e.g., Eddie Donnell, Robert Moffett, Kim Bryant, Kim Sins, Patricia Woodberry) to testify that Defendant undertook "official acts" to commit bribery. Defendant asserts that his trial counsel was constitutionally defective because they permitted these witnesses—without adequate confrontation—to mislead the jury to falsely

believe he performed "official acts" pursuant to the bribery statute. Though Defendant's trial counsel did not, in hindsight, identify or introduce every piece of *arguably* inconsistent evidence, cross-examinations of these witnesses never fell below the standard of reasonably effective counsel.

First, Defendant argues that Eddie Donnell testified falsely at trial that (i) Donnell did not know the name of the data migration contractor (Bedford's Images); (ii) he did not know anything about the contract; (iii) he made no efforts to learn about the contractor after hearing complaints about their quality of work; and (iv) only the Defendant was responsible for selecting the vendor. As he does throughout the Memorandum in support of his present motion, Defendant isolates and contorts the witnesses' testimony in a light he then characterizes as "perjury." The Court instead considers the purportedly false statements as the jury heard them, in the context of the witness' entire trial testimony.

Donnell was the Acting Chief Information Officer at BIS during the time of the offenses in question. At trial, Donnell testified that he did not (at the time of the ongoing data migration project) know the name of the contractor tasked with the project. Defendant points to emails Donnell either sent or was copied on that trial counsel supposedly should have used to impeach Donnell's testimony. Defendant's argument fails because these emails do not contradict Donnell's testimony. In fact, Donnell's February 10,

2011 email, which was sent more than eight months after the original data migration award, refers only to "the vendor" and shows how uninformed he was about the contract ("Raushi, I need to understand this process. . . . Can you set up a meeting for me to talk to the vendor?").

The February 18, 2011 email, on which both Donnell and Bedford were copied, also does little to discredit Donnell's testimony that he was ignorant of the vendor's identity. Being copied on an email alongside another email address does not suggest that one knows the identity of the other account holder. This is especially true when it is not readily apparent that the email address (jbedford@tacc2.com) might represent the company performing the migration work.

Referencing the same email, Defendant also asserts that Donnell lied when he testified that he knew nothing about the data migration contract. But Donnell never testified that he "knew nothing" about the contract. Instead, he testified that Defendant helped him understand the contracting process and "identified a vendor" familiar with data migration. This testimony is wholly consistent with Donnell's February 10, 2011 email.

Defendant's allegation that Donnell falsely testified about making no attempt to identify the vendor is without merit. Donnell testified at trial that he asked Defendant for information about the vendor.

7

Defendant cites other documents and emails that allegedly contradict Donnell's testimony that only Defendant was in control of the data migration project. But this alleged evidence either (1) references a separate project that resulted from the BIS network infection or (2) is wholly consistent with Donnell's trial testimony. Defendant specifically alleges that Moffett's May 2013 interview with the Office of Inspector General ("OIG") is inconsistent with the notion that Defendant was in control of the data migration project. But in fact, Moffett stated during the interview, "[W]hile Mr. Moffett was at BIS, [Defendant] was the only person involved with the project." Defendant's trial counsel acted reasonably in its cross-examination of Donnell because the evidence Defendant cites would not have impeached Donnell's testimony.

Robert Moffett was the operations manager in the BIS Office of the Chief Information Officer and the primary point of contact for the Space and Naval Warfare Systems Command ("SPAWAR"), a branch of the Navy that "provides access to contractors and existing contracting vehicles" to BIS. Moffett oversaw IT contractors working at BIS. His testimony at trial showed that Defendant circumvented the normal contracting process at SPAWAR to select Bedford's Images for the data migration project.

Defendant claims his trial counsel "failed to elicit testimony that Moffett believed Bedford['s] Images was credible

8

based on his own review." During a September 2015 interview conducted by the OIG, Moffett told investigators he conducted some research on Bedford's Images and prepared the general requirements document provided to SPAWAR. Moffett also explained that Defendant was ordinarily responsible for soliciting a competitive bidding process.

Defendant argues incorrectly that these interview statements were inconsistent with his trial testimony and "would have been helpful in proving his involvement in the selection process." But the Government's trial narrative was not that Defendant was the *sole* employee involved in the contracting process. To the contrary, the Government's witness list was filled with BIS and SPAWAR employees who were at some time involved in the contracts with Bedford's companies.

The trial record is also replete with evidence that Defendant performed no competitive bidding process and failed to justify doing so. In his interview with OIG, Moffett stated he did not know whether Defendant performed the usual market research and seems to speculate about why Defendant provided no the sole source justification. There is no reason to believe Moffett's OIG interview would have impeached his trial testimony, let alone a reasonable probability it would have led to a different trial outcome.

Defendant next claims that his trial counsel acted

deficiently when it failed to mention and introduce evidence that BIS conducted a trial period, during which Bedford's Images performed some data migration work so that BIS could test the quality of Bedford's work. Defendant claims this evidence shows he was responsible only for "recommending" this trial period, not the "second contract" that followed the trial period. He claims this distinction rebuts the Government's narrative "that [Defendant] pressured BIS to award Bedford a single data migration contract worth over one million dollars without testing."

Evidence at trial showed that Defendant pressured BIS officials to select Bedford's companies for the data migration contract. Defendant fails in his attempt to distance himself from his "recommendation" by insisting his recommendation was only for a trial period. There is no evidence Defendant intended for a trial period to occur, much less that his recommendation was conditioned upon the successful completion of a trial period. The emails Defendant references between Moffett, Bedford, and Henry Hodor (owner of the prime contract with SPAWAR) is relevant only to show other BIS officials requested a trial period with Bedford's Images. Trial counsel acted reasonably by omitting this evidence at trial because it is irrelevant to Defendant's intent, which was to ensure Bedford was selected as the contractor for the data migration project.

To the extent Defendant argues this trial period was evidence

that Bedford's companies were performing well, trial counsel was justified in not drawing focus to this issue. Though Bedford's Images may have performed satisfactorily during the trial period, the Government at trial introduced testimony and evidence from Kim Sins, Ronald Rolfe, Gerald Horner, Patricia Woodberry, and others that quality of Bedford's migration work under the contract was wanting. As the Government points out, "Any attempt to elicit evidence showing that Bedford['s] Images did quality work . . . was destined to fail." Defendant's own Memorandum accompanying the present Motion refers to Bedford's "shoddy work that in many instances was of little value to the government." Defendant's trial counsel acted reasonably when it decided not to draw the jury's attention to an issue with such overwhelming evidence against Defendant.

Kim Bryant was a SPAWAR program manager and the point of contact between BIS and SPAWAR. He testified that Defendant broke with standard BIS acquisition protocols to hire Bedford's Images. Specifically, Bryant testified that he ensured Bedford's Images received the award "because the defendant told me to." Defendant argues his trial counsel should have impeached this testimony with statements Bryant made during a prior OIG interview. In this interview, Bryant stated that Defendant never "told" him which contractor to hire, but "recommended" certain contractors. But any literal inconsistency between these statements would not have had

11

the exculpatory value Defendant ascribes because Defendant admitted on two separate occasions that he selected Bedford's Images to complete the data migration project. Bryant's inconsistent word choice would not have changed the outcome of the trial, given the totality of the evidence on this point.

Defendant also seeks to show that Bryant was more involved in the contracting process with Bedford's Images than he suggested at trial. Again, the Government did not assert that Defendant was the sole employee involved in the contracting process. Control over a project like this is not finite, nor is it static. While evidence of Bryant's communication with Bedford and the emails of Tridea owner Henry Hodor might have been persuasive of Bryant's involvement, it does not exculpate Defendant.

Kim Sins, a help desk manager at BIS, testified at trial about the poor quality of work completed by Bedford's Images. The Government used this evidence to show Defendant's motive for granting Bedford additional work was not merit, but bribery. Defendant asserts that his trial counsel was ineffective in discrediting Sins' testimony on that matter. He first points to Sins' May 2012 OIG interview, which Defendant claims was inconsistent with Sins' trial testimony because she "said little about complaints concerning the quality of work." Sins' testimony is not, as Defendant describes, "flatly" contradictory. It is perfectly consistent for Sins to mention the quality of work during

an OIG interview then expand on that topic at trial.

Next, Defendant states that Sins' email to "review [the attached] power point presentation in preparation for a project implementation meeting" supported Bedford's work on the document migration, when at trial Sins testified she tried to stop Bedford's work on the migration. Defendant suggests that his trial counsel "failed to call witnesses from the front office . . . who could have refuted arguments by the prosecution that [Defendant] knew the conversion work was shoddy." Neither Sins' email nor the attached presentation provides evidence that members of the front office would have testified in this manner. The mere fact that that Sins did not use this email as an opportunity to discuss the complaints she received is not evidence she did not receive them, nor does it suggest Defendant was unaware of the complaints. As discussed *supra*, trial counsel acted reasonably by not drawing attention to the overwhelming evidence that Bedford's companies were performing "shoddy" work.

Defendant suggests the mere fact that Sins was included  on some email chains are evidence that "she exerted a significant measure of control" over the project. Thus, as Defendant suggests, diminishing his own role in selecting Bedford's Images and administering the project to the level it would no longer qualify as an "official act" as contemplated by the bribery statute. The Court is not persuaded.

Sins' involvement in the approval process does not necessarily diminish Defendant's involvement, nor does it discredit the evidence that Defendant was exerting pressure on other BIS officials at various times during the contracting process. There is no reason to believe a jury—even one that heard evidence of Sins' involvement—would have changed its decision that Defendant committed an official act when he pressured BIS officials to select and maintain a business relationship with Bedford's companies.

To the extent Defendant argues that this evidence disputes the Government's closing statement that "no one had any real substantive contact with Bedford['s] Images from the outset," this statement is too ambiguous for this Court to assume each juror's interpretation. Further, no interpretation contests the issue at hand: Whether Defendant committed an official act within the meaning of the bribery statute. It is reasonably probable that the jurors would have found Defendant committed one or more official acts even if others had "real and substantive contact with Bedford['s] Images."

Defendant next argues his trial counsel was constitutionally defective in its failure to cross-examine Patricia Woodberry, the Contracting Officer's Representative in the BIS Office of Chief Information Officer. Defendant claims the Government "relied exclusively" on Woodberry to provide testimony that Defendant

14

engaged in official acts to provide Team America (another company owned by Bedford) additional data migration work in September 2011. Woodberry explained "normal" acquisition protocols at BIS, in which at least three competitive quotes or a sole source justification was required for any contract request above a certain cost threshold. Although the Team America contract was above this threshold, she testified that Defendant did not include additional competitive quotes or a sole source justification. The Government used this testimony as evidence that Defendant circumvented normal BIS acquisition protocols to provide Bedford more work, thus committing an "official act."

Defendant disputes Woodberry's testimony, noting first that the Government omitted a key email in an email chain between Defendant and Woodberry. In this omitted email, Defendant justified providing only the Team America cost estimate because Vivian McPherson, the BIS Contracting Officer, told him he "only need[ed] the one quote." Defendant argues his trial counsel's failure to introduce this email gave the jury the false impression that he had no reason to forgo BIS protocols. But trial counsel confronted Woodberry on this issue during cross-examination. Woodberry admitted that Defendant gave her this explanation, and the jury was fully aware of this during its deliberations.

Defendant also suggests Woodberry's signature on the contract suggests she (and not Defendant) committed the official act of

assigning Bedford additional work. But Woodberry's signature on the acquisition form does not exonerate Defendant of wrongdoing. An official act may include "using his official position to provide advice to another official, knowing or intending that such advice will form the basis of an 'official act' by another official." McDonnell v. United States, 136 S.Ct. 2355, 2359 (2016). The Defendant providing Woodberry the necessary information to draft and sign the document could constitute evidence of his own official act. Trial counsel did not act ineffectively when they decided not to bring this into focus.

Defendant also argues his trial counsel should have introduced evidence disputing the Government's characterization of Defendant's role regarding the sole source justification. According to the Commerce Acquisition Manual—which Defendant alleges his trial counsel did not research—sole source justifications are to be provided by the Program Manager. Defendant argues that since he was not the Program Manager, he was not responsible for the breached BIS protocols relating to the sole source justification. While failure to introduce this evidence might have been poor performance on trial counsel's part, there is still no reasonable probability that such evidence would have been sufficient to undermine the jury's conviction. The lack of sole source justification was but one example of Defendant's efforts to ensure BIS funneled more work to Bedford's companies. That another

16

individual was responsible for drafting this document does little to shift the weight of the evidence that Defendant instructed Woodberry to select Team America as contractor for the additional data migration. The Manual does not provide reasonable probability that a jury would not have convicted Defendant.

Defendant's argument that other BIS employees requested additional migration work is irrelevant, as are the communications between upper level officials at BIS regarding the budget for the additional migration. Such evidence is not "convincing proof" of Defendant's detachment from the additional migration work, but rather only shows Defendant was not involved in authorizing the money allocated for additional work. It does not dispute that Defendant exerted pressure on other BIS officials to select Team America for this additional authorized work, considering the overwhelming evidence of the poor quality of Bedford's previous work.

Any failure to impeach the testimony of the Government's trial witnesses did not prejudice the Defendant. He has not demonstrated with reasonable probability that this evidence would have changed the outcome of his conviction. Even considering the collective evidence Defendant has cited in his Memorandum, the trial record shows overwhelming evidence from which a jury could have found beyond a reasonable doubt that Defendant committed an official act within the meaning of the bribery statute. Grounds One through

17

Three of Defendant's Motion fail.

## II.

Illegal gratuities are recognized distinctly from bribery under federal law. Unlike bribery, which must include a quid pro quo, an illegal gratuity "may constitute merely a reward for some future act that a public official will take . . . or a past act that he has already taken." United States v. Sun-Diamond Growers of Cal., 526 U.S. 398, 405 (1999). An illegal gratuity requires no specific intent to exchange something of value for an official act.

Defendant argues a reasonable jury could have found Bedford's payments were illegal gratuities, rather than bribery. But Defendant's trial counsel did not ask the Court to issue a lesser included illegal gratuities jury instruction. This failure, Defendant claims, prejudiced the outcome of his trial because a finding of guilt on an illegal gratuities charge would have limited his prison sentence to only two years.

At trial, the defense team proceeded on the theory that the payments from Bedford to Defendant were completely unrelated to Defendant's work at BIS. Defendant insisted that the payments were "a loan to assist with his failing business" and not in return or in response to any official act. A jury instruction on the offense of illegal gratuities would have been inconsistent with that

theory.

Simms, Defendant's trial counsel, asserts that Defendant was clear and unwavering in his instructions for trial. Simms stated in his September 5, 2019 affidavit that Defendant insisted on the theory that "the payment from Team America was not a bribe. It was not a gratuity. . . . There would be no evidence offered or argued to present an alternative theory." Counsel has an ethical obligation to comply with his client's demands. See Model Code of Pro. Resp. EC 7-8 (Am. Bar Ass'n 1980) ("[T]he authority to make decisions is exclusively that of the client and, if made within the framework of the law, such decisions are binding on his lawyer."). Defendant cannot second guess his own decision making by shifting blame to his trial counsel for the restraints Defendant himself placed on them.

Further, trial counsel asserts that they decided not to pursue the lesser included gratuities offense because (they believed) the jury would be better positioned to find Defendant guilty on that charge. The Government (again, as the defense believed) was facing a tall obstacle to prove existence of a quid pro quo, and as Defendant points out, the Government had only one witness, Bedford—whose credibility was in question—to prove it. Trial counsel's all-or-nothing strategy was not unreasonable given the heavy burden on the Government. "Ordinarily, courts considering a claim of ineffective assistance should not second-guess strategic

decisions of counsel." Hoots v. Allsbrook, 785 F.2d 1214, 1219 (4th Cir. 1986). A reasonable strategy like Defendant's trial counsel pursued here cannot be the basis of an ineffective assistance claim.

### III.

Next, Defendant asserts that his trial counsel failed to effectively prepare him for the possibility to testify in his own defense. Ultimately, Defendant chose not to testify at trial because "counsel hadn't prepared him." Defendant asserts that trial counsel "(i) never advised [Defendant] of the pros and cons of testifying or not testifying in advance of trial, (ii) never prepared him to testify, (iii) never went through the types of questions he would ask him and or the types of themes and issues that he could bring out with his testimony, and (iv) never prepared him for cross-examination in any respect."

Effective assistance includes counsel's "responsibility for advising the defendant of his right to testify and for explaining the tactical implications of doing so or not." Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998). Counsel's failure to advise on these matters consitutes deficient performance that falls "below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88. Any defendant who can show such failure would satisfy the first prong of a Strickland analysis.

It appears to the Court that Defendant's trial counsel adequately advised Defendant of his right to testify and the consequences of doing so. At the January 29 evidentiary hearing, Defendant admitted that trial counsel advised him of his "right" and "option" to testify at trial and that "it was [his] choice and [his] choice alone." He admitted that his trial counsel discussed Defendant's version of events, "the potential pitfalls of testifying," and "what would happen" if he testified, including cross-examination on his inconsistent statements, which "was a factor" in his decision not to testify. Counsel even prepared a presentation on this matter. Counsel also discussed with Defendant the risks of taking the stand, including "concerns about [his] demeanor," his "likeability," and his tendency to be "combative." Possibly most compelling, his trial counsel explained that Defendant could be exposing himself to additional legal liability for employing illegal immigrants at his restaurant and avoiding taxes. And if this advice was not sufficient, trial counsel conducted multiple mock testimony sessions (including, Defendant admits, hypothetical questions). Defendant is unfounded in his suggestion that Simms perjured himself because he did not have a written examination prepared for these sessions or transcribe Defendant's answers.

Counsel more than adequately advised Defendant of his right to testify and "the tactical implications of doing so or not."

21

Sexton, 163 F.3d at 882. Defendant fails to show his trial counsel was constitutionally deficient in preparing him to testify.

IV.

Finally, Defendant requests the Court grant him a new trial pursuant to Federal Rule of Criminal Procedure 33(b) because "the Government presented false or perjured testimony." This allegedly false or perjured testimony refers to (1) Woodberry's testimony that Defendant subverted the normal BIS acquisition process to favor Bedford's companies, (2) Sins' and Bryant's testimonies that Defendant had complete control of the migration project and continued to give Bedford's companies work in spite of their poor performance, and (3) "newly discovered recantation" testimony from Bedford about the nature of the payments.

As an aside, Defendant's Memorandum misrepresents the law by suggesting a due process violation occurs if the government obtains a conviction on false evidence "even when the prosecutor is unaware of the falsity." This is plainly *not* what the Fourth Circuit nor the U.S. Supreme Court has held. See Napue v. Illinois, 360 U.S. 264, 269 (1959) ("The district attorney has the responsibility and duty to correct *what he knows to be false* and elicit the truth.") (emphasis added); Giglio v. United States, 405 U.S. 150, 154 ("*[D]eliberate* deception of a court and jurors by the presentation of *known* false evidence is incompatible with 'rudimentary demands of justice.'") (emphases added); United States v. Basham, 789 F.3d

358, 376 (4th Cir. 2015) (requiring "the prosecution knew or should have known of the falsity").

The Due Process Clause of the Fifth Amendment bars the government from "knowingly us[ing] false evidence, including false testimony, to obtain a tainted conviction." Napue, 360 U.S. at 269. This bar applies to evidence meant to impeach the credibility of a witness to the same extent as evidence of guilt or innocence. Evidence may be false even if it simply "creates a false impression of facts." Hamric v. Bailey, 386 F.2d 390, 394 (4th Cir. 1967). To succeed on his motion, Defendant "must demonstrate (1) that the testimony at issue was false, (2) that the prosecution knew or should have known of the falsity, and (3) that a reasonable probability exists that the false testimony may have affected the verdict." Basham, 789 F.3d at 376 (internal citations omitted).

For the reasons provided in Part I of this Opinion, Defendant has not shown that Woodberry's, Sins', nor Bryant's testimony was false. But even if the Court were to accept that the testimony was inconsistent with the evidence Defendant now presents, Defendant has not shown reasonable probability that these inconsistencies would have undermined the jury's verdict, given the weight of the other evidence against him at trial. See United States v. Griley, 814 F.2d 967, 971 (4th Cir. 1987) ("Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony.").

Likewise, Bedford's newly recanted testimony fails as a basis for this Court to grant Defendant a new trial. On October 4, 2017, Defendant secretly recorded a meeting between him and Bedford, in which Bedford supposedly recants his testimony and admits the payments to Defendant were a loan. Defendant provided the Court excerpts of this conversation that he found relevant.

It is critical to note that the Court looks upon post-trial recantations of testimony "with the utmost suspicion." United States v. Lighty, 616 F.3d 321, 375 (4th Cir. 2010) (internal quotations omitted). A court may grant a new trial based on a witness's recanted testimony only if a defendant shows "(1) a material witness [gave] false testimony, (2) the false testimony might have affected the jury's verdict, and (3) the moving party was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial." United States v. Bynum, 227 F. App'x. 260, 263-64 (4th Cir. 2007) (internal quotations omitted).

Defendant fails to show Bedford gave false testimony at trial. Defendant argues that Bedford used the term "loan" to describe the payments during their October 2017 conversation. But upon examining the context of Bedford's terminology, the Court finds no evidence that Bedford actually believed it was a loan. His statements are consistent with his trial testimony describing the payments as a "loan" with a "wink and a nod." Despite what appears

to be a number of efforts by Defendant to get Bedford to admit to perjury, Bedford never succumbs. He consistently admits to his crimes. The excerpts of their conversation show no real recantation of Bedford's testimony, largely because (from the broken pieces of this conversation the Court can reconstruct) the parties appear to be theorizing scenarios that could reverse Defendant's conviction. The Court does not question the truth of Bedford's trial testimony based on this conversation.

Even if the Court were to accept that Bedford recanted his testimony during this conversation, Defendant fails to prove that he was "taken by surprise" by Bedford's characterization of the payments at trial. Since Bedford "gave conflicting statements in connection with his guilty plea" in December 2016, Defendant was or reasonably should have been aware at trial of Bedford's conflicting statements about the payments and the invoices. Defendant fails to show he was surprised by this information at trial, and thus his motion for a new trial fails.

For the foregoing reasons, Defendant's motions are denied. An accompanying order shall issue.

_Claude M. Hilton_
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
March _3_ , 2021